IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**PUEBLO OF JEMEZ, a federally recognized Indian tribe,**

      **Plaintiff,**

vs.                                          No. CIV 12-0800 RB/RHS

**UNITED STATES OF AMERICA,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

Plaintiff brought this action pursuant to the Quiet Title Act, 28 U.S.C. §2409A, seeking a judgment that it has the exclusive right to use, occupy, and possess the lands of the Valles Caldera National Preserve pursuant to its continuing aboriginal title to such lands. (Doc. 1). Defendant moves to dismiss for lack of jurisdiction and failure to state a claim. (Doc. 14). Plaintiff opposes the motion and requests oral argument. (Doc. 18). The Court finds that oral argument is unnecessary as the Indian Claims Commission Act (ICCA), formerly codified at 25 U.S.C. §§ 70 to 70n-2, divests this Court of jurisdiction over Plaintiff's claim.

**I.    Background**

The ancestral Jemez people used and occupied the lands of the Valles Caldera National Preserve and surrounding areas in the Jemez Mountains of New Mexico. (Doc. 1; Report of Henry J. Walt, Ph.D., Doc. 18-5). The Valles Caldera is the dormant crater of a super volcano in the center of the Jemez Mountains. (Doc. 1). The crater rim is approximately twenty miles in diameter, and contains four high mountain valleys and eleven resurgent volcanic domes. (*Id.*)

The Valles Caldera is located within the exterior boundaries of the Valles Caldera National Preserve, established pursuant to the Valles Caldera Preservation Act, 16 U.S.C. §§ 698v-609v-10. (*Id*.)

The ancestral Jemez people were the primary Native American occupants and land users of the Jemez Mountains, including the Valles Caldera National Preserve and the Rio Jemez watershed, for a period of 800 years. (Doc. 1; Doc 18-5). Plaintiff, the modern Jemez Pueblo, is a consolidation of the ancestral Jemez populations of Towa-speaking pueblos, including Pecos Pueblo and the modern Jemez Pueblo village of Walatowa. (Doc. 1). Plaintiff describes the ancestral Jemez aboriginal title area surrounding the Rio Jemez drainage and the Valles Caldera as the western Jemez homeland. (*Id*.) Plaintiff contends that the aboriginal title to this land is vested in Plaintiff, whose members are the descendants of the ancestral Jemez people. (*Id*.)

Plaintiff states that the western Jemez homeland extends over an area of more than 1,100 square miles in and around the Jemez Mountains, including the Valles Caldera National Preserve, the entire Rio Jemez drainage system above Walatowa, and the sections of the Rio Puerco drainage west of the Jemez Mountains. (Doc. 1; *see also* Declaration of Paul Tosa, Doc. 18-3). The ancestral Jemez have occupied the western Jemez homeland since migrating from the mesa and canyon country to the northwest prior to 1200 A.D. (Doc. 1). Archaeological investigations within the western Jemez homeland have identified at least sixty pueblo villages, all linked with an extensive network of trails, and many thousands of home sites, agricultural fields, ceremonial sites, sacred areas, mineral procurement areas, hunt traps and blinds, and camp sites associated with the ancestral Jemez people. (*Id*.) The ancestral Jemez population in the western Jemez

homeland ranged from approximately 10,000 to 15,000 people.  (*Id*.)

Plaintiff greatly values the Valles Caldera as a spiritual sanctuary as it contains many important religious sites vital to traditional ancestral Jemez religion and culture.  (Doc. 1).  The ceremonial sites and gathering areas are actively used by Jemez Pueblo members and are crucial to the continuing survival of the traditional Jemez Pueblo culture and religion.  (*Id*.)  Ancient religious pilgrimage trails link Walatowa to sites within the Valles Caldera, including Redondo Peak and sacred springs.  (Doc. 18-3).

Plaintiff's members continue to rely on the Valles Caldera for many critical resources.  (Doc. 1).  For instance, Plaintiff's members make religious pilgrimage visits to these sites to leave prayer offerings and conduct rituals.  Additionally, Plaintiff's hunt societies make lengthy visits to the Valles Caldera for the purpose of hunting, religious ceremonies, and initiations.  (*Id*.)  The mineral and hot springs within the Valles Caldera are used by Plaintiff's medical societies for healing.  (*Id*.)

Plaintiff acknowledges that, in 1860, Congress granted the heirs of Luis Maria Cabeza de Baca (Baca heirs) 99,289 acres including and surrounding the Valles Caldera, which was subsequently known as the Baca Ranch.  (Doc. 1).  Plaintiff maintains that the Baca heirs received this land grant subject to its aboriginal title.  (*Id*.)  The Jemez people continued to use the land with the permission of the Baca heirs and their successors-in-interest.  (Doc. 18-3). On July 25, 2000, Defendant purchased the property interests of the Baca heirs' successors-in-interest to establish the Valles Caldera National Preserve.  (Doc. 1).  Plaintiff argues that the property interest held by Defendant remains subject to Plaintiff's aboriginal title.  (*Id*.)

Plaintiff seeks a judgment that it has the exclusive right to use, occupy and possess the lands of the Valles Caldera National Preserve pursuant to its continuing aboriginal title to such lands, quieting its alleged aboriginal title to the Valles Caldera National Preserve, and for attorneys' fees and costs. (Doc. 1). Defendant moves to dismiss on the grounds that the Indian Claims Commission Act (ICCA) divests this Court of jurisdiction over Plaintiff's claim and the Complaint fails to state a claim. (Doc. 14).

## II.   Legal Standard

"Federal courts are courts of limited jurisdiction, and the presumption is that they lack jurisdiction unless and until a plaintiff pleads sufficient facts to establish it." *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) (citations omitted). If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence. *Id.* at 327 (citation omitted). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013).

Federal Rule of Civil Procedure 12(b)(1) allows a court to dismiss a complaint for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). A Rule 12(b)(1) motion can take one of two forms. First, a moving party may lodge a facial attack against the complaint's allegations as to the existence of subject matter jurisdiction. *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013). In reviewing a facial attack, the Court must accept the well-pled factual allegations in the complaint as true. *Id.* at 1205-06. Second, a party may go beyond the allegations contained in the complaint and challenge "the facts upon which subject matter jurisdiction depends." *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292

(10th Cir. 2005) (citation omitted). In reviewing a factual attack, the Court may look beyond the complaint and has wide discretion to consider evidence in the form of documents, affidavits, and even testimony. *Id.* (citations omitted). Only if resolution of the jurisdictional question requires review of the merits of the substantive claims is a court required to convert a Rule 12(b)(1) motion into a Rule 56 summary judgment motion. *Id.* (citations omitted). Defendant's motion does not relate to the merits of Plaintiff's claims, so the Court may consider evidence outside the four corners of the complaint in determining whether it has jurisdiction.

### III.  Discussion

Sovereign immunity bars Plaintiff's claim. Defendant, as the sovereign, is immune from suit unless it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). "The concept of sovereign immunity means that the United States cannot be sued without its consent." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks*, 960 F.2d 911, 913 (10th Cir. 1992). A federal court lacks subject matter jurisdiction over a claim against the United States for which sovereign immunity has not been waived. *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 1290, 1295 (10th Cir. 2009). There is a presumption against jurisdiction and "the burden of establishing the contrary rests with the party asserting jurisdiction." *Kokkonen*, 511 U.S. 375, 377 (1994). As a result, Plaintiff may not proceed unless it can establish that Defendant has waived its sovereign immunity with respect to its claim. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Sydnes v. United States*, 523 F.3d 1179, 1182-83 (10th Cir. 2008).

The Court's ruling is determined by binding Tenth Circuit precedent. In *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987), the Navajo Tribe asserted that the

5

United States improperly transferred tribal lands to the State of New Mexico and several individuals. *Id*. at 1462. The United States, the State of New Mexico, and the individual grantees were named as defendants. *Id*. The Tenth Circuit held that the Navajo Tribe's claim against the United States was barred because it fell within the exclusive jurisdiction of the Indian Claims Commission (ICC) and was barred by the applicable statute of limitations contained within the Indian Claims Commission Act (ICCA). *Id*. at 1471.

The Tenth Circuit explained that "[u]ntil 1946, Indian tribes could not litigate claims against the United States unless they obtained specific permission from Congress." *Navajo Tribe*, 809 F.2d at 1460. In 1946, Congress enacted the ICCA, which created a quasi-judicial body, the ICC, to hear and determine all tribal claims against the United States that accrued before August 13, 1946. *Id.*; *see also* 28 U.S.C. § 1505. Congress's intention was to "draw [ ] in all claims of ancient wrongs, respecting Indians, and to have them adjudicated once and for all." *Temoak Band of W. Shoshone Indians, Nev. v. United States*, 219 Ct. Cl. 346, 350, 593 F.2d 994, 998 (Ct. Cl. 1979). The primary purpose of the ICCA was "to dispose of the Indian claims problem with finality." *United States v. Dann*, 470 U.S. 39, 45 (1985).

"Congress deliberately used broad terminology in the [ICCA] in order to permit tribes to bring all potential historical claims and to thereby prevent them from returning to Congress to lobby for further redress." *Oglala Sioux Tribe of Pine Ridge Indian Reservation v. U.S. Army Corps of Eng'rs*, 570 F.3d 327, 332 (D.C. Cir. 2009) (citing *Otoe & Missouria Tribe of Indians v. United States*, 131 Ct. Cl. 593, 600, 131 F. Supp. 265, 272 (Ct. Cl. 1955) and COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 445 (2005 ed.)). "To balance this permissiveness and to ensure finality, the Act established a 5-year limitation on all claims existing before 1946; any claim

not presented within the 5-year period may not be submitted to any court or administrative agency." *Oglala Sioux Tribe*, 570 F.3d at 332. Thus, the ICCA allowed tribes five years within which to file claims with the Commission.[1] *See* 25 U.S.C. § 70k. Any claim not filed by the deadline of August 13, 1951 could not "thereafter be submitted to any court or administrative agency for consideration." *Id*.

It is well-established that the ICCA provided the exclusive remedy for pre-1946 Indian tribal land claims against the United States. *See Navajo Tribe*, 809 F.3d at 1460; *Paiute-Shoshone Indians of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 1000 (9th Cir. 2011); *Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States*, 650 F.2d 140, 141-42 (8th Cir. 1981); *Minn. Chippewa Tribe Red Lake Band v. United States*, 768 F.2d 338, 341-42 (Fed. Cir. 1985); *Snoqualmie Tribe of Indians v. United States*, 178 Ct. Cl. 570, 578, 372 F.2d 951, 959 (Ct. Cl. 1967); *W. Shoshone Nat'l Council v. United States*, 279 Fed.Appx. 980, 988 (Fed. Cir. 2008); *Hannahville Indian Cmty. v. United States*, 4 Cl. Ct. 445, 461 (Ct. Cl. 1983); *Six Nations Confederacy v. Andrus*, 610 F.2d 996, 998 (D.C. Cir. 1979). In other words, if a tribe failed to bring a timely claim under the ICCA, it lost its opportunity to litigate its dispute with the United States. *Navajo Tribe*, 809 F.3d at 1460; *Paiute-Shoshone Indians*, 637 F.3d 993 at 1000; *Oglala Sioux Tribe*, 650 F.2d at 141-42. This bar extends to those claims that were not litigated but could have been litigated. *See W. Shoshone Nat'l Council v. Molini*, 951 F.2d 200, 202 (9th Cir. 1991) (barring claims of aboriginal and treaty reserved hunting and fishing rights); *United States v. Dann*, 873 F.2d 1189, 1200 (9th Cir. 1989) (holding that payment pursuant to an

---

[1] To ensure that Indian tribes would have a venue to bring any future claims, Congress authorized the Court of Claims to adjudicate any claims that accrued after August 13, 1946. *See* 28 U.S.C. § 1505.

ICC award barred the plaintiffs from asserting tribal title to grazing rights and aboriginal title to the lands); *White Mountain Apache Tribe v. Clark*, 604 F. Supp. 185, 187-89 (D. Ariz. 1984), *aff'd sub nom White Mountain Apache Tribe v. Hodel*, 784 F.2d 921 (9th Cir.), *cert. denied*, 479 U.S. 1006 (1986) (concluding that a boundary dispute concerning 14,000 acres of national forests was "exactly the type of claim Congress intended the Commission to hear"). Plaintiff does not distinguish these authorities and relies on inapplicable cases involving claims for aboriginal title against parties other than Defendant.

Plaintiff speculates about what the Tenth Circuit meant when it discussed how broadly the word "claim" under the ICCA should be interpreted in *Navajo Tribe*, 809 F.2d at 1462. (Doc. 18-1 at 20). However, this Court is not free to speculate about what the Tenth Circuit might have meant. Rather this Court is tasked with ascertaining and applying the Tenth Circuit's holding that the Navajo Tribe's claim against the United States was barred because it fell within the exclusive jurisdiction of the ICC and was barred by the applicable statute of limitations contained within the ICCA. *Id*. at 1471. Plaintiff's inconsistent suggestions that *Navajo Tribe* does not control and it was wrongly decided are both unpersuasive and unavailing. *Navajo Tribe* is concordant with the decisions of other courts and it is controlling precedent.

Plaintiff claims aboriginal title to the lands comprising the Valles Caldera National Preserve. In its Complaint, Plaintiff maintains that the Baca heirs received this land grant in 1860 subject to its aboriginal title. (Doc. 1). However, in its brief, Plaintiff claims that it did not have a claim against the United States in 1946. (Doc. 18-1). Plaintiff cannot have it both ways. Either Defendant's grant to the Baca family extinguished aboriginal title or not. If the Baca land grant extinguished Plaintiff's aboriginal title, then aboriginal title was extinguished in 1860 and Plaintiff

8

cannot claim aboriginal title now. On the other hand, if the Baca land grant did not extinguish Plaintiff's aboriginal title, Plaintiff's claim existed prior to 1946 and Plaintiff had the opportunity to avail itself of the remedy afforded by the ICCA and such claim is now barred by the statute of limitations contained in the ICCA.

Indeed, Plaintiff filed a claim with the ICC under the ICCA seeking, in pertinent part, compensation for the extinguishment of aboriginal title to lands that did not include the land that now comprises the Valles Caldera National Preserve. On July 9, 1951, Plaintiff and the Pueblos of Zia and Santa Ana filed a timely claim seeking compensation for Defendant's transfer of approximately 520,000 acres of land in New Mexico to third parties. *See Pueblo of Zia, et al. v. United States*, ICC No. 137, Amended Petition; (Def. Ex. A, Doc. 14-1). Plaintiff sought compensation for the extinguishment of aboriginal title to lands that were privately owned by virtue of Spanish and Mexican land grants, as well as lands that entered the public domain under the Treaty of Guadalupe Hildalgo. (Doc. 14-1). Nonetheless, Plaintiff did not include the subject property in its claim before the ICC. (*Id*.)

After extensive litigation, the ICC found that the Pueblos were deprived of aboriginal title to the lands claimed therein through the actions of the United States. *See Pueblo de Zia v. United States*, 200 Ct. Cl. 601, 603, 474 F.2d 639, 641 (Ct. Cl. 1973). Ultimately, the Pueblos and the United States entered into a stipulation of settlement whereby a final judgment of $749,083.75 was entered in favor of the Pueblos on January 10, 1974. (Def. Ex. C, Doc. 14-3). In 1980, Congress approved the plan for the distribution of funds. *See* Pub. L. No. 96-194, 94 Stat. 61 (Feb. 21, 1980).

Plaintiff could have brought its claim for aboriginal title to the lands comprising the Valles

9

Caldera National Preserve in the ICC, as demonstrated by Plaintiff's petition in the ICC that sought compensation for the taking of aboriginal title to other lands.  (Doc. 14-1).  Despite the fact that the alleged aboriginal title existed prior to 1946, Plaintiff did not include the subject property in its ICCA claim.  (Doc. 14-1).  Because Plaintiff did not comply with the requirements of the ICCA with respect to the subject property, its claim against the United States is barred by sovereign immunity.

The fact that the Defendant acquired the subject property in 2000 does not alter the result.  Courts have uniformly held that a tribe cannot obtain review of a historical land claim otherwise barred by the ICCA by challenging present-day actions involving the land.  *Oglala Sioux Tribe*, 570 F.3d at 332; *Catawba Indian Tribe of S.C. v. United States*, 24 Cl. Ct. 24, 29-30 (Ct. Cl. 1991); *Pueblo of Santo Domingo v. United States*, 16 Cl. Ct. 139, 141-42 (Cl. Ct. 1988); *Sokaogon Chippewa Cmty. v. State of Wis., Oneida Cnty.*, 879 F.2d 300, 302 (7th Cir. 1989) (holding the district court appropriately dismissed the Quiet Title Act claim against the United States, because the ICCA created an "exclusive remedy against the United States for tribal claims" accruing before 1946, and that plaintiff tribe's lawsuit in 1986 was "too late.").  Through the ICCA, Congress waived its sovereign immunity over any claim of aboriginal title to the subject property, but Plaintiff failed to take advantage of that waiver.  In that Plaintiff did not comply with the requirements of the ICCA with respect to its claims to the lands comprising the Valles Caldera National Preserve, its claim is barred by Defendant's sovereign immunity.

Defendant is immune from suit unless it consents to be sued.  *Sherwood*, 312 U.S. at 586.  Plaintiff has the burden of establishing jurisdiction.  *Kokkonen*, 511 U.S. at 377.  This Court lacks subject matter jurisdiction over a claim against Defendant for which sovereign immunity has not

10

been waived. *Normandy Apartments, Ltd.*, 554 F.3d at 1295. Plaintiff has not met its burden to establish a valid waiver of sovereign immunity. As a result, Plaintiff's claim may not proceed. *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 100; *Sydnes*, 523 F.3d at 1182-83. Plaintiff's claim is barred because it fell within the exclusive jurisdiction of the ICC and it is barred by the statute of limitations contained within the ICCA. *Navajo Tribe*, 809 F.3d at 1460.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Dismiss (Doc. 14) is granted.

**IT IS FURTHER ORDERED** that this matter is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**