**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **PUEBLO OF JEMEZ**, a federally recognized Indian tribe, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:12-cv-800 (JB)(JHR) |
| **UNITED STATES OF AMERICA**, | ) ) ) | |
| Defendant, and | ) ) ) | |
| **NEW MEXICO GAS COMPANY**, | ) ) ) | |
| Defendant-in Intervention. | ) ) | |
| _____ | ) | |

**PLAINTIFF PUEBLO OF JEMEZ'S
MOTION AND MEMORANDUM IN SUPPORT OF MOTION
FOR COURT VIEW OF VALLES CALDERA**

**MOTION**

The Pueblo of Jemez asks the Court to conduct a one-day site visit to the Valles Caldera for a first-hand "view" of the land at issue in this action. Because weather conditions limit access within the Valles Caldera in late October and November, and due to hunting that takes place in the Valles Caldera in late October and early November, Plaintiff requests that the view occur before trial.[1] Plaintiff suggests that the view include the trial judge and appropriate court staff, legal counsel for each party, and one witness for each party to identify relevant physical features, geographic and geologic locations. If the motion is granted, Plaintiff suggests that the parties work cooperatively to provide a view of the Valles Caldera that will allow the Court to

---

[1] Hunts are scheduled for the following dates: October 6-10, 13-17, 20-24 and 27-31, November 3-7and 17-21. The October hunts are all scheduled to occur Saturday-Wednesday, leaving Thursdays and Fridays available for a view.

observe for itself the significant physical, geographic and geologic features that will be the subject of witness testimony and documentary evidence in the courtroom, and will give the Court the necessary context for understanding that testimonial and documentary evidence. If the Court grants this motion, Plaintiff asks that the Court set a deadline by which the parties are to submit a joint proposal for conduct of the view, including those aspects of the view on which the parties agree and each party's alternative suggestion regarding any issue on which the parties cannot reach agreement. The United States agrees that a site visit would be useful to the Court's understanding of the issues in this case, but objects to Plaintiff's motion in part to preserve its right to have input on logistical, attendance, and format issues, which the United States intends to outline in its response to this motion. Defendant-in-Intervention New Mexico Gas Company does not oppose this motion.

**MEMORANDUM IN SUPPORT**

## I.      Legal Standard.

A trial judge has "inherent power . . . to order a view by the jury, or, in a judge-tried case, to take a view personally." § 219.Views, 2 McCormick On Evid. § 219 (7th ed.) (footnote omitted). Whether to conduct a view "is a matter that is subject to the discretion of the trial court." *Arkansas Game & Fish Comm'n v. United States*, 736 F.3d 1364, (Fed. Cir. 2013) (confirming propriety of a view during bench trial of 23,000 acre wildlife management area); *accord United States v. Gray*, 199 F.3d 547, 550 (1st Cir. 1999) ("Determining if a view is appropriate in a particular situation remains a matter committed to the trial court's informed discretion"). In the Tenth Circuit, "a view should always be considered evidence." *Lillie v. United States*, 953 F.2d 1188, 1192 (10th Cir. 1992) (reversing lower court due to improper view

by trial judge).  To properly conduct a view in a bench trial, the judge should provide notice and give counsel for the parties the opportunity to accompany the judge, and make a record.  *Id.*

## II.   Argument.

### A.   A View Is an Important Evidentiary Tool.

"Courts have sensibly recognized that if a thing cannot be brought to the observer, the observer must go to the thing.  Venturing forth to observe places or objects that are material to litigation but which cannot feasibly be brought, or satisfactorily reproduced, within the courtroom, is termed a 'view.'"  § 219.Views, 2 McCormick On Evid. § 219 (7th ed.) (footnote omitted).  As the Ninth Circuit Court of Appeals has noted, "[i]f a picture is worth a thousand words, then the real thing is worth a thousand pictures."  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1266–67 (9th Cir. 2001) (holding that "the district judge should have given the parties and their counsel the opportunity to accompany him" during a site-visit, but noting that there is nothing wrong "with official excursions by a judge or jury to view evidence that simply cannot, because of physical limitations, be brought into a courtroom.").

Courts will conduct a site-visit when the physical features of the property provide context for determining the facts.  *Moore v. United States*, 54 Fed. Cl. 747, 748 (2002).  In *Moore*, 300 landowners filed a takings claim when a trail corridor was established across their lands.  The Court held trial on thirteen of the parcels "in hopes that the parties could apply this ruling to the remaining [287] parcels."  *Id.*  During the view the Court observed how the trail physically hindered those wishing to cross the trail by vehicle and was located in places where the Plaintiffs' property was seen and accessed.  *Id.* at 749.

A view during a bench trial also was appropriate in an action where the Plaintiff Indian tribe's traditional religious practices were "an intensely private spiritual experience that

is inextricably intertwined with the natural environment." *Comanche Nation v. United States*, No. CIV-08-849-D, 2008 WL 4426621, at *7 (W.D. Okla. Sept. 23, 2008). *Comanche Nation* involved the proposed construction of a 43,000 square foot building directly south of the Medicine Bluffs – an area sacred to the Plaintiff tribe in that case. 2008 WL 4426621 at *1. The tribe provided testimony from its members on the tribe's use of the bluffs, including how the view of the bluffs was central to the tribe's religious practices. *Id*. at *7. The court, relying on "extensive exhibits," hearing testimony, and "the Court's observations during the site-viewing" held that Defendant's proposed construction would significantly burden the tribe's traditional practices. *Id*. at **1, 17.

It is common for courts to take in all relevant evidence while on a site-visit, including hearing relevant evidence. *See Nw. Nat. Cas. Co. v. Global Moving & Storage Co.*, 533 F.2d at 323 (court toured building and asked counsel and owner of building questions); *Moore,* 54 Fed. Cl. at 748-750 (court conducted trial on thirteen representative parcels for eleven days and heard testimony from fact witnesses who were familiar with particular parcels); *Arkansas Game & Fish Comm'n*, 736 F.3d at 1380 (court conducted view on 23,000 acre wildlife management area, stating: "[w]hat I see and hear by way of facts are going to be insofar as humanly possible spread on the record.").

### B.     A View is Critical to the Presentation of Evidence in This Action.

The Pueblo of Jemez brought this lawsuit to quiet its unextinguished aboriginal title to approximately 94,761 acres of land inside the Valles Caldera. *Pueblo of Jemez v. U.S.*, 790 F.3d 1143, 1147, 1150 (2015). The district court dismissed the case holding that "the Jemez Pueblo had a claim against the United States that accrued as a matter of law before 1946, and therefore its sole remedy was to have brought an action before the [Indian Claims Commission]." *Id.* at

1150.  The Tenth Circuit Court of Appeals reversed, holding that the 1860 Baca grant did not

extinguish the Jemez Pueblo's aboriginal title to the Valles Caldera.  *E.g., Pueblo of Jemez,* 790

F.3d at 1170.  The Court remanded the case to this Court to allow the Jemez Pueblo to present

facts showing it has unextinguished aboriginal title to the lands at issue.[2]  A three-week trial is

now set to begin on October 29, 2018 in Albuquerque.  ECF No. 223.

At trial the Court will hear evidence regarding the use of the Valles Caldera by the Pueblo

of Jemez stretching over hundreds of years.  Much of that evidence has been developed during

discovery, which has included the depositions of forty-five fact witnesses and eleven expert

witnesses.  The Defendant has produced over a hundred thousand documents containing millions

of pages.  Jemez fact witnesses have identified innumerable specific locations in the Valles

Caldera used by Jemez members, which often relate to or are influenced by the physical

geography.  The Defendant also has focused its fact development on specific locations in the

Valles Caldera, including deposition questioning on physical locations and physical structures

built in the last century by the successors to the Baca's land grant.

At trial, fact and expert witnesses are expected to testify in detail regarding specific

geographic and geologic features that are in, on or close to the Valles Caldera.  Oral history and

records of interviews and testimony in other proceedings will be referred to by experts including

references to geologic and geographic locations throughout the approximately 94,761 acres at

issue.  To place the anticipated three weeks of testimony and hundreds of exhibits to be presented

in context, and to allow the Court to view for itself the scope and breadth of the land at issue, the

Court needs to conduct a one-day view of the Valles Caldera and areas adjacent to the Caldera.  A

---

[2] "On remand, the Jemez Pueblo will have the burden to establish, as a matter of fact, that it has
aboriginal title."  *Pueblo of Jemez,* 790 F.3d at 1147.

view will allow the Court to obtain information in a form unavailable through other types of trial evidence, and will provide context to live witness testimony and documents on the matters at issue in this case.

> Indeed, and as recognized by the Court of Appeals:
>
> > One must remember that much of the land involved here is remote.  As described by the court in *United States v. Redondo,* 254 F. at 657, "[t]he lands in the [Baca No. 1] location and the surrounding country were wild, mountainous, and principally in forest, unsettled in 1860 and ever since."  In these circumstances, it is easy to see how the Surveyor General may have mistakenly believed the lands were vacant even if they were being used by the Jemez for hunting, fishing, and other such activities.  Similarly, it is also easy to see how a peaceful and private Indian pueblo might have used portions of this large area of land for its traditional purposes while one agreeable rancher was using portions of it for grazing livestock.

*Pueblo of Jemez,* 790 F.3d at 1165 (alterations in original, footnote omitted).  Conducting a view will allow the Court to see for itself this remote, "wild, mountainous," and forested land – the very land at issue in this important case.  Moreover, it is important for the Court not just to see these locations, but also to view on its own the characteristics of the features themselves and their physical relationships to one another.

A view will allow the Court to observe for itself features identified by the Court of Appeals in its opinion, and other areas including the "Rio Jemez drainage system above Walatowa, the modern Jemez Pueblo Village,"[3] springs within that system,[4] Redondo Peak and the Eagle on its southern side (which confirmed to the Jemez people centuries ago, and continues to confirm to them today, that this is the land on which they are to live forever), the field houses inside the Caldera where Jemez people lived after working their high altitude fields during the

---

[3] *Pueblo of Jemez,* 790 F.3d at 1148.
[4] *Pueblo of Jemez,* 790 F.3d at 1149.

spring and summers,[5] "ceremonial sites, sacred areas, mineral procurement areas, camp sites and other areas associated with the ancestral and contemporary Jemez," the single obsidian mine that is inside the walls of the Caldera and is the location where Jemez people obtained this valuable stone used to make arrowheads and spear tips,[6] the Gas Company's existing gas line, and the routes and distances into the Caldera from various Pueblos. These are just a few of the important physical, geologic and geographic features the Court needs to see for itself to understand the evidence presented in the courtroom and to appropriately resolve the matters at issue in this action.

Finally, a view will allow the Court to understand the relationship of the geology and geography of the Valles Caldera to human uses of the area over the centuries. A view will best demonstrate how the terrain naturally limits what uses can occur, and during which seasons of the year, both on the outside slopes of the Caldera, and within the Caldera's crater. For example, a view will allow the Court to observe how the sloping exterior and rim of the Caldera serve as a barrier, limiting access to the lands at issue except along a few routes, including the cut in the Caldera's side created by the Rio de Jemez. A view will also allow the Court to see first-hand how use of areas within the Caldera are limited by terrain. For example, the Valle Jaramillo is limited by surrounding mountain peaks (also inside the crater), including Cerro del Medio and Cerro del Abrigo. Certain areas have sparse water which limits use to certain time-frames or for only certain purposes and other areas consist of wide meadows and valleys appropriate for grazing and gathering. These observations, in addition to other relevant evidence, will allow the

---

[5] *Pueblo of Jemez,* 7790 F.3d at 1148-49 ("Archeological investigation in the [Jemez] western homeland have found at least sixty pueblo villages linked with a network of trails and many thousand farmhouse sites [and] agricultural fields . . . .").
[6] *Pueblo of Jemez,* 790 F.3d at 1149 (referencing "mineral procurement area").

Court appropriately to apply this important evidence in making a sound determination of all the claims at issue in this action.

### C.     A View Will Help the Court Apply the Evidence to the Legal Issues.

The Court of Appeals provided a detailed discussion of the "history and legal concepts that govern aboriginal title and Indian land" and did so to clarify "the nature of the claims and to place in proper perspective the contested historical facts advanced by the parties." *Pueblo of Jemez,* 790 F.3d 1152-61.  In doing so, the Court noted:

> The problem of recognizing possessory rights claimed by Indians has engaged the attention of jurists since European settlement of the Americas.  In fact, the decisions concerning Indian law and aboriginal title cannot be understood without recognizing that the "dealings between the Federal Government and the Indian Tribes have regularly been handled as part of our international relations."

*Id.* at 1152 (citing Felix S. Cohen, *Original Indian Title,* 32 Minn. L. Rev. 28, 43 (1947)).

To recover its lands through this action, the Pueblo of Jemez "must show actual, exclusive, and continuous use and occupancy 'for a long time' of the claimed area.'" *Pueblo of Jemez,* 790 F.3d at 1165 (internal citation omitted).  As part of that burden, the Pueblo must show it "exercised control over [the claimed area] and over other Indians who may have ventured therein." *Id.* at 1166 (modification in original, citation omitted).  To help meet that burden, the Pueblo needs the Court to see the land at issue for itself.

Although a court might be able to "picture" certain lands from "various reports, petitions, and letters," that limited understanding only suffices when the lands at issue are "mostly arid, little grazing was to be found; water holes and creeks were sparsely scattered and … irrigation was virtually non-existent." *Pueblo De Zia v. United States*, 165 Ct. Cl. 501, 508 (1964).  But the lands of the Valles Caldera are fertile, with wide meadows, high peaks and numerous springs and streams.  The lands at issue are mountainous, with elevations ranging from a low of 6,790

feet to a high of 11,270 feet.  The "picture" that was sufficient in *Pueblo De Zia* will not suffice here – requiring a view of the lands instead.

Finally, "the nature of Indian occupancy [differs] significantly from the occupancy of settlers." *Pueblo of Jemez,* 790 F.3d at 1165.  Evidence of Jemez occupancy of the Valles Caldera simply looks different from the intermittent and varying uses made of the land by the Bacas and their successors.  Jemez occupancy of the Valles Caldera is inextricably intertwined with the natural environment, to the extent that Jemez witnesses often describe their use based upon what they saw while at a location.[7]  A view is particularly important for the Court to understand testimony from Jemez religious society members because of the interrelated way in which the environment, certain timeframes, and the purpose of a use will be discussed.  For example, Jemez witness Todd Loretto is a part of a religious society that uses the northeastern portion of the Valles Caldera.  01/16/2018, Loretto Dep. 29: 9-25.  *See* Exhibit B.  In Loretto's deposition he identified a location on the north side of Cerro del Medio where his great-grandfather was initiated in the early 1900s and another location in Cerro de los Posos where two members of his society were initiated in 1949.  *Id*., Ex. B at 27.  Loretto explained the change in location was because water in Valle Toledo was scarce and they historically had to transport water when conducting the initiations.  *Id*. Ex. B. at 28-29.  A view is necessary to help the Court understand and corroborate this type of witness testimony.

---

[7] Jemez witness Pauline Correro describes hunting with her father in Valle Jaramillo.  She states, "I remember this creek there, so it must have been maybe right in this area … because we could see Redondo Peak from there, because there's three other peaks right there."  08/17/2017 Dep. Pauline Correro 28: 7-10.  *See* Exhibit A.

**III.    Conclusion.**

The Pueblo of Jemez respectfully asks the Court to view for itself the lands at issue in this litigation.  A site-visit to the Valles Caldera will provide the Court with essential information necessary to understand the land at issue and uses of that land, its resources, accessibility and challenges.  A view will provide much needed context and clarity when the parties present the expected plethora of testimonial and documentary evidence in the courtroom. In sum, a site-visit will provide the Court with key information that is critical to resolving the claims at issue in this case.

Dated:  August 7, 2018                              Respectfully Submitted,

                                                    */s/ Randolph H. Barnhouse*_____
                                                    Randolph H. Barnhouse
                                                    Christina S. West
                                                    Barnhouse Keegan Solimon & West LLP
                                                    7424 4th Street NW
                                                    Los Ranchos de Albuquerque, NM 87107
                                                    Tel:     (505) 842-6123
                                                    Fax:     (505) 842-6124
                                                    dbarnhouse@indiancountrylaw.com
                                                    cwest@indiancountrylaw.com
                                                    *Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on August 7, 2018, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

        Peter Dykema, Peter.dykema@usdoj.gov
        Matthew Marinelli, Matthew.marinelli@usdoj.gov
        Jacqueline Leonard, Jacqueline.Leonard@usdoj.gov
        *Attorneys for Defendant United States*

        Kirk R. Allen, kallen@mstlaw.com
        *Attorneys for Defendant-in-Intervention NMGC*

*/s/ Randolph H. Barnhouse*_____
Randolph H. Barnhouse