# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **PUEBLO OF JEMEZ**, a federally recognized Indian tribe, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:12-cv-800 (JB)(JHR) |
| v. | ) ) | |
| **UNITED STATES OF AMERICA**, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| **NEW MEXICO GAS COMPANY**, | ) ) | |
| Defendant-in Intervention. | ) ) | |

## UNITED STATES' MEMORANDUM IN SUPPORT OF ITS
## MOTION ON THE PLEADINGS AND FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF UNCONTESTED MATERIAL FACTS ........................................... 2

   I.   The United States' Grant of the Preserve and subsequent transfers ........................ 2

   II.  Pueblo use of the Preserve ...................................................................................... 2

   III. Indian Claims Commission Docket 137 ................................................................. 2

   IV. Pueblo Opposition to Geothermal Development in the Valles Caldera .................. 4

   V.  The United States' Acquisition of the Preserve in 2000 and Related Investments .. 6

   VI. The Pueblo of Santa Clara ...................................................................................... 7

   VII. The Pueblo of Zia .................................................................................................... 9

   VII. Restrictions on Jemez Use of Valles Caldera prior to 2000 .................................. 10

PROCEDURAL BACKGROUND .................................................................................. 14

STANDARD OF REVIEW ............................................................................................. 14

ARGUMENT ................................................................................................................... 15

   I.   Plaintiff's repeated admissions that other tribes used the lands that are now the Preserve defeat its position that it held exclusive aboriginal title. ........................ 15

   II.  Plaintiff did not continuously use the Preserve lands through 2000. ..................... 22

   III. Plaintiff's title claim is barred by the statute of limitations because its alleged aboriginal use of the Preserve lands was terminated or circumscribed well before the United States purchased the lands in 2000. ....................................................... 27

     A. Plaintiff's claim is barred by the Indian Claims Commission Act ....................... 28

     B. Plaintiff's claim is barred by the Indian Tucker Act ............................................ 31

     C. Plaintiff's claim is barred by the Quiet Title Act ................................................. 32

   IV. Federal Rule of Civil Procedure 19 requires dismissal of this case because Santa Clara is: (1) a necessary and indispensable party to a case that would impact its real property, cultural, and religious interests; and (2) is immune from suit ........ 33

     A. Santa Clara is a necessary party to this case ........................................................ 34

     B. It is not feasible to join Santa Clara to this case ................................................... 35

     C. Equity and Good Conscience require dismissal under Rule 19(b) ........................ 36

        i.    Santa Clara would be prejudiced by its absence ............................... 36

        ii.   The prejudice to Santa Clara cannot be lessened or avoided ........... 37

i

iii.     Judgment in Santa Clara's absence would be inadequate ................ 39

iv.     Santa Clara's sovereign immunity leaves no room for balancing whether Plaintiff will have an adequate remedy if this case is dismissed ......................................................................................... 39

V.   Plaintiff's claims are barred by laches because Plaintiff actually requested the United States to purchase the Preserve .................................................................. 40

**CONCLUSION** ........................................................................................................... 43

# TABLE OF AUTHORITIES

## Federal Cases

*Alabama-Coushatta Tribe v. United States*, 2000 U.S. Claims LEXIS 287 (Fed. Cl. June 19, 2000) .................................................................................................................... 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 15

*Apache Survival Coal. v. United States*, 21 F.3d 895, 907 (9th Cir. 1994) ..................... 41

*Armijo v. Hayes*, No. CIV 14-0362 JB/CG, 2016 U.S. Dist. LEXIS 38297 (D.N.M. Mar. 15, 2016) ............................................................................................................................ 15

*Battise v. United States*, 12 Cl. Ct. 426 (Ct. Cl. 1987) ..................................................... 19

*Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036 (10th Cir. 2014) ................. 40, 41

*Caddo Tribe of Okla. v. United States*, 35 Ind. Cl. Comm. 321 (1975) ........................... 16

*Citizen Band Potawatomi Indian Tribe v. Collier*, 17 F.3d 1292 (10th Cir. 1994) ......... 14

*City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005) ....................................... 42

*Davis v. United States*, 343 F.3d 1282 (10ᵗʰ Cir. 2003) ................................. 34, 36, 39, 40

*E.E.O.C. v. W.H. Braum, Inc.*, 347 F.3d 1192 (10th Cir. 2003) ....................................... 14

*Enter. Mgmt. Consultants, Inc. v. Hodel*, 883 F.2d 890 (10ᵗʰ Cit. 1989) ........................ 40

*Hugoton Energy Corp. v. Plains Res., Inc.*, 141 F.R.D. 320 (D. Kan. 1992) ................. 37

*John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008) ........................... 28, 31

*Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324 (10th Cir. 1982) ................................. 41

*Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419 (1982) ........................... 30

*Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............. 15

*Menominee Tribe v. United States*, 726 F.2d 718 (Fed. Cir. 1984) ................................. 28

*Mesa Grande Band of Mission Indians v. Salazar*, 657 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................................................................................................................ 35

*N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272 (10th Cir. 2012) ........................ passim

*N. New Mexicans Protecting Land Water & Rights v. United States*, 161 F. Supp. 3d 1020 (D.N.M. 2016) ............................................................................................................ 32

*N. Nat. Gas Co. v. Approximately 9117 Acres*, No. 10-1232-DWB, 2013 U.S. Dist. LEXIS 93787 (D. Kan. July 2, 2013) ............................................................................ 21

*Native Village of Eyak v. Blank*, 688 F.3d 619 (9th Cir. 2012) ....................................... 16

*Navajo Tribe v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987) ................................... 28, 29

*Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. United States Army Corps of Eng'rs*, 570 F.3d 327 (D.C. Cir. 2009) ........................................................................ 29

*Proschold v. United States*, 90 F. App'x 516 (9th Cir. 2004) ........................................... 35

*Pueblo of Jemez v. United States,* 790 F.3d 1143 (10th Cir. 2015) .......................... passim

*Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995) ................................... 38

*Pueblo of Zia v. United States*, Dkt. 137, 33 Ind. Cl. Comm. 1 (Jan. 10, 1974) ........... 2, 16

*Rio Grande Silvery Minnow v. Bur. of Reclamation*, 599 F.3d 1165 (10th Cir. 2010) .... 32

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) .................................................. 36, 39

*Shoshone Indian Tribe v. United States*, 672 F.3d 1021 (Fed. Cir. 2012) ...................... 28

*Sioux Tribe v. United States*, 500 F.2d 458 (Ct. Cl. 1974) ............................................ 29

*Spirit Lake Tribe v. North Dakota*, 262 F.3d 732 (8th Cir. 2001) ............................ 28, 32

*Strong v. United States*, 518 F.2d 556 (Ct. Cl. 1975) ................................................... 21

*Tlingit & Haida Indians v. United States*, 177 F. Supp. 452 (Ct. Cl. 1959) ................... 23

*United States v. Craft*, 535 U.S. 274 (2002) ............................................................... 20

*United States v. Dann*, 470 U.S. 39 (1985) ................................................................ 28

*United States v. Harrell*, 642 F.3d 907 (10th Cir. 2011)................................................. 6

*United States v. Mottaz*, 476 U.S. 834 (1986) ............................................................. 28

*United States v. Pueblo of San Ildefonso*, 513 F.2d 1383 (Ct. Cl. 1975) ................. 20, 22

*United States v. Pueblo of Zia*, 474 F.2d 639 (Ct. Cl. 1973) ........................................ 29

*Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765 (D.C. Cir. 1986) .............. 40

*Wichita Indian Tribe v. United States*, 696 F.2d 1378 (Fed. Cir. 1983) ........................ 16

*Wright v. Incline Vill. Gen. Improvement Dist.*, 597 F. Supp. 2d 1191 (D. Nev. 2009) .. 39

## State Cases

*Woodstone Lakes Dev., LLC v. Iroquois Hunting & Fishing Club, Inc.*, 24 Misc. 3d
1217(A), 1217A (Sup. Ct. N.Y. 2009) ............................................................................ 35

## Federal Statutes

Indian Claims Commission Act, 79 P.L. 726, 60 Stat. 1049 (Aug. 13, 1946)...... 28, 29, 31

National Defense Authorization Act for Fiscal Year 2015, 113 P.L. 291, 128 Stat. 3292
    (Dec. 19, 2014)............................................................................................... 7, 36

Quiet Title Act, 28 U.S.C. § 2409a (2018)............................................................... 28, 35

Valles Caldera Preservation Act of 2005, 109 P.L. 132, 119 Stat. 2570 (Dec. 20, 2005) .. 6

## INTRODUCTION

Plaintiff seeks title to the Valles Caldera National Preserve ("Preserve"),[1] which the United States purchased in 2000 from a private third party.  Plaintiff's theory – that it is the exclusive aboriginal occupant of the Preserve and maintained its aboriginal use of the Preserve lands through 2000 – is undone by Plaintiff's repeated admissions to the contrary.

Plaintiff's multiple admissions that other tribes used the Preserve lands defeat its claim that it was the exclusive aboriginal user of the lands.  And Plaintiff's admissions that the third party owners eliminated or restricted Plaintiff's use of the Preserve lands for farming, grazing, hunting, timber gathering, and religious purposes means that Plaintiff did not maintain any aboriginal title through continuous use.  Plaintiff's admissions also bar Plaintiff's claims because they conclusively establish that the statute of limitations accrued and expired decades ago. Federal Rule of Civil Procedure 19 also bars Plaintiff's claim because the Pueblo of Santa Clara – who holds an easement over a portion of the Preserve and continues its traditional use of the Preserve lands – is indispensable, cannot be joined, and resolving this case in its absence would be inequitable.  Finally, Plaintiff's claim is barred by laches because, rather than pursue its asserted claim in 2000, Plaintiff actually testified before Congress that it strongly supported the United States' purchase of the Preserve and offered to pay for title to some of the Preserve lands. Plaintiff's failure to timely pursue this claim would, if successful, prejudice the United States by negating its expenditure of over $130,000,000 to acquire, rehabilitate, and maintain the Preserve.

---

[1]     This brief typically uses "Preserve lands" to refer to the subset of the Baca Location No. 1 grant at issue in this case.  As set forth below, portions of the Baca Location No. 1 grant were sold to different parties, including the Pueblo of Santa Clara.

## STATEMENT OF UNCONTESTED MATERIAL FACTS

**I.      The United States' Grant of the Preserve and subsequent transfers**

1.      The United States granted the lands that are now the Valles Caldera National Preserve, as well as other lands that are not at issue in this case, to the heirs of Luis Maria Cabeza de Baca in 1860.  *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147 (10th Cir. 2015).

███ ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██ ██████████████████████████████████████████████████

████████████████████████████████████████████

**II.      Pueblo use of the Preserve**

4.      In 1912, Federal surveyor William Douglas identified Redondo Peak as a place visited by "the pueblos of Jemez, [Zia], [Kewa], Sandia, Cochiti, San Ildefonso, Santa Clara and [Ohkay Owingeh]."  W. Douglass, "Notes on the Shrines of the Tewa and Other Pueblo Indians of New Mexico," at 357-358. (Ex. 2).

**III.      Indian Claims Commission Docket 137**

5.      The Pueblos of Zia, Santa Ana, and Jemez brought a successful petition before the Indian Claims Commission ("ICC").  Findings of Fact on Compromise Settlement, *Pueblo of Zia v. United States*, Dkt. 137, 33 Ind. Cl. Comm. 1 (Jan. 10, 1974).

6.      ICC Docket 137 alleged that the United States "allowed and permitted" third parties to obtain possession of Plaintiffs' lands, specifically by patenting some of those lands, causing Plaintiffs to lose their aboriginal title to the land without just compensation.  Amended Petition, *Pueblo de Zia v. United States,* ICC Dkt. 137 at 2 (Mar. 17, 1951) (ECF 14-1).

7.      Plaintiff's Petition in ICC Docket 137 alleged that the "three Pueblos . . . have a common interest" in 520,000 acres of land in northern New Mexico.  *Id.* at 2, 24-25.

8.      The Pueblos presented evidence of using three areas, including "Area No. 3," which encompassed a portion of the Baca Location No. 1, "for the purpose of showing total land used by claimants."  Pet'rs Proposed Findings of Fact and Br., ICC Dkt. 137 (June 3, 1957) (Ex. 3); Map, Pet'rs Ex. 14, ICC Dkt. 137 (Ex. 4).

9.      Former Jemez Governor Pat Toya testified before the ICC on behalf of Jemez that Redondo Peak was "[s]acred to" and was used ████████████ by all three tribes.  Tr., *Pueblo de Zia v. United States*, ICC Dkt. 137 at 50-51 (Dec. 5, 1956) (Ex. 5) ("ICC Tr.").[2]

10.     Governor Toya testified that Jemez, Zia and Santa Ana had ████████████████ ████████████████████ northeast of Redondo Peak.  *Id.* at 59-60.

11.     Governor Toya testified that Santa Clara and San Ildefonso prayed at Redondo Peak.  *Id.* at 84-85.

12.     Governor Toya testified that Santa Clara, San Ildefonso, Zia, Santa Ana, and Jemez used ████████, which was within the Baca Location No. 1.  *Id.*; Map, Pet'rs Ex. 14 (Ex. 4).

13.     Dr. Florence Hawley Ellis served as an expert witness for Jemez before the ICC.  ICC Tr. at 333 (Ex. 5); Deposition ("Dep") of Dr. T. J. Ferguson at 61-63 (June 27, 2018) (Ex. 6).

14.     The three Pueblos submitted a map that Dr. Ellis helped to prepare.  The map identified Redondo Peak as the location of a ████████.  ICC Tr. at 310-11 (Ex. 5); Map, Claimant's Ex. No. 18, ICC Dkt. 137 (Ex. 7).

---

[2]      The United States is redacting portions of past public disclosures by Jemez and Zia witnesses based, in part, upon Zia's representation that disclosing information beyond the fact that Redondo Peak is sacred is forbidden by Zia's leaders.  Lt. Gov. Lucero Dep. at 7-8.

**IV.    Pueblo Opposition to Geothermal Development in the Valles Caldera**

15.     On January 16, 1981, 18 Pueblos sued the Department of Energy to halt a geothermal project located within the Preserve.  The Pueblos alleged that they "regularly and continuously practiced their respective religions on and near Redondo Peak" until the project interrupted them. Compl., *Pueblo of Jemez, et al. v. Sec'y of Energy*, No. 81-0113, at 6-12 (Jan. 16, 1981) (Ex. 8); Statement of Material Facts, *Pueblo of Jemez, et al. v. Sec'y of Energy* (Oct. 26, 1981) (Ex. 9).

16.     Dr. Ellis submitted an affidavit on behalf of the 18 Pueblos who sued the Department of Energy to halt construction of a geothermal project on the Preserve lands.  Aff. of F. Ellis, *Pueblo of Jemez, et al. v. Sec'y of Energy*, No. 81-0113 (Oct. 6, 1981) (Ex. 10).

17.     Dr. Ellis stated that the ancestors of Zia, Santa Clara, Jemez, and other tribes, "regularly and consistently practiced their religions on and near Redondo Peak. . . . ██████████

██████████████████████████████████████████

18.     Dr. Ellis stated that ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

19.     Dr. Ellis stated that her "most recent studies of" Jemez and Zia "establish the central importance of the Valles Caldera and Redondo Peak to" the Pueblos' religious beliefs.  *Id*. at 12.

20.     Dr. Ellis created a map identifying ████████████████████████████

███████████████████████████

21.     ████████████████████████████████████

██████████████████████████████████████

████████████████

22.     In 1981, Dr. Ellis wrote that, while many pueblos were "concerned with . . . religious use of the Redondo Peak – Valles Caldera area today . . . [t]he three which have continued that use to the greatest extent in the modern period are Jemez, Zia, and Santa Clara."  F. Ellis, Redondo Peak, the Valles Caldera, and Pueblo Religions at 5 (Ex. 12) ("Ellis, Redondo Peak").

23.     Dr. Ellis wrote that Jemez, Zia, and Santa Ana might have included the Baca Location No. 1 within their ICC claim "but with some knowledge of the other Rio Grande pueblos similarly considering the Valles caldera area sacred and of ritual use, it was impossible to put it into a claim depending on sole and exclusive use of lands."  F. Ellis, Religious Freedom of Zia and Jemez Pueblos at 21 (Ex. 13) ("Ellis, Religious Freedom").

24.     Members of other Pueblos provided sworn testimony in opposition to the proposed geothermal development between 1979 and 1982. Tr. of Public Hr'g on Envtl. Impact Statement at 3-4 (Aug. 16, 1979) (Ex. 14) ("Aug. 16, 1979 Tr.").

25.     Santa Clara member Paul Tafoya testified against the geothermal development.  While he refused to disclose all of Santa Clara's sacred places within the Preserve, he stated that Santa Clara used Redondo Peak.  *Id*. at 49-50.

26.     Zia Administrator Peter Pino testified in opposition that Zia ███████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████

27.     In 1980, Santa Clara geothermal research director Jose Lucero testified against the geothermal plant.  He testified that Santa Clara's religious societies carry out ceremonies at Redondo Peak and the surrounding areas.  Tr. of New Mexico Public Serv. Comm'n Hr'g 10-1, 10-2, 35-38, 41-45, 48-49 (Nov. 7, 1980) (Ex. 16) ("1980 PSC Tr.").

28.     In 1982, Jemez Council Member Tony Sandoval testified that Redondo Peak "is a big cathedral for all Indian religions from the Indian tribes of New Mexico and others." Tr. of New Mexico Public Serv. Comm'n Hr'g at 56-57 (May 27, 1982) (Ex. 17) ("1982 PSC Tr.").

**V.     The United States' Acquisition of the Preserve in 2000 and Related Investments**

29.     At a Senate hearing held to consider the United States' proposed acquisition of the Preserve, Plaintiff "strongly support[ed] the proposed acquisition of the Valles Caldera." *Verbal Test. of the Pueblo of Jemez re: S. 1892* at 13-14 (Mar. 10, 2000) (ECF No. 194-4).

30.     Plaintiff asked Congress "to consider granting us a right to acquire a mere 200 acre tract of land located on top of Redondo peak that encompasses the 'primary' sacred shrine of the Jemez People. . . . [T]his tract is less than 0.02% of the 90,000 acre Baca Location." *Id.*

31.     The Valles Caldera Preservation Act authorized the United States to purchase the Baca Location No. 1 and assign a portion of the land in the northeast corner of the Baca Location to the Pueblo of Santa Clara. § 104(g), 114 Stat. 598 (July 25, 2000).

32.     The United States acquired 89,716.31 acres of Baca Location No. 1 in 2000 for $96,523,042.00. Warranty Deed and Assignment of Rights and Reciprocal Conservation and Access Easement at 1 (Ex. 1 to Compl., ECF No. 1) ("Warranty Deed").

33.     Congress amended the Valles Caldera Preservation Act to direct the United States to acquire the outstanding mineral interest in the Preserve lands. Valles Caldera Pres. Act of 2005, 119 Stat. 2570 (Dec. 20, 2005).

34.     In 2006, the United States condemned the outstanding mineral interest in the Preserve for approximately $3,800,000. *United States v. Harrell*, 642 F.3d 907, 910-11 (10th Cir. 2011). Plaintiff did not seek to intervene in that case.

35.     The United States spent "about $31 million" between 2000 and 2009 to manage and restore the Preserve.  Gov't Accountability Office, Valles Caldera: The Trust Has Made Progress but Faces Significant Challenges to Achieve Goals of the Pres. Act (Oct. 2009) (Ex. 18).

36.     Plaintiff filed this case on July 20, 2012.  Compl. ECF No. 1.

37.     Plaintiff's plan is for the United States to: (1) take title to the Preserve in trust for Plaintiff, and (2) pay Plaintiff to manage and operate the Preserve and for the right to continue the United States' research.  Gov. Loretto Dep. at 186-189 (Ex. 19); Valles Caldera Tribal Cultural Nat'l Pres. Mgmt. Plan Prelim. Draft at 7-8 (Aug. 25, 2014) ("Mgmt. Plan") (Ex. 20).

**VI.     The Pueblo of Santa Clara**

38.     On July 25, 2000, the Dunigan family transferred 5,045.5298 acres of Baca Location No. 1 to the Pueblo of Santa Clara for $4,476,958.00.  Warranty Deed and Reciprocal Conservation and Access Easement at 1 ("Santa Clara Deed") (Ex. 21).

39.     Santa Clara's trust lands are adjacent to the Preserve.  *Id*. at 4.

40.     Santa Clara purchased a "Conservation and Access Easement," which imposes restrictions on a portion of the land that is now the Valles Caldera National Preserve "for the benefit of the adjoining lands of the Pueblo of Santa Clara."  *Id*. at 2.

41.     Santa Clara's easement provides for, among other things, a procedure under which Santa Clara can obtain temporary "exclusive use" of areas within the easement, and imposes land use restrictions upon the portion of the Preserve subject to Santa Clara's easement.  *Id.* at 15-17.

42.     Congress identified Santa Clara as having an interest in the Preserve's management. Nat'l Def. Auth. Act for Fiscal Year 2015 § 3043(b)(3)(C)(iii), 113 P.L. 291, 128 Stat. 3292 (Dec. 19, 2014) ("The management plan shall be prepared in consultation with . . . (III) Indian tribes and

pueblos, including the Pueblos of Jemez, Santa Clara, and San Ildefonso."); Preserve Mgmt. Act Tribal Consultation with Santa Clara at 2 (Apr. 23, 2015) (Ex. 22).

43.     On December 1, 2015, Santa Clara participated in a session to develop the Preserve's foundation document.  Santa Clara stated that it used the Caldera for "traditional gathering of medicinal and ceremonial plants and other cultural resources."  It listed mineral paint, game animals, obsidian, ceremonial uses of water and trees, and hunting as traditional ways in which it used the Caldera.  It stated that its use of the Caldera included "pilgrimages to certain mountains, springs, and shrines."  It could not divulge details of its use because its activities are "of a sensitive and religious nature."  Santa Clara Talking Points at 1 (Dec. 1, 2015) (Ex. 23).

44.     Santa Clara has used and continues to use the Preserve to gather "plants and minerals for traditional purposes, traditional ceremonial activities, and" for other purposes.  Gov. Chavarria Dep. at 9:12-13:2 (ECF No. 162-4); Santa Clara Talking Points at 1 (Dec. 1, 2015) (Ex. 23).

45.     Santa Clara's use of the Valles Caldera is "required by [Santa Clara's] religious leaders to be kept confidential." Gov. Chavarria Dep. at 11:6-16 (ECF No. 162-4).

46.     In October 2016, Santa Clara's cultural committee sent a letter to the Tribal Council, asking that it support the committee's position that the Caldera is not owned or controlled by any Pueblo, but is shared by all.  Santa Clara Res. No. 2016-129 and letter (Dec. 16, 2016) (Ex. 24).

47.     Santa Clara's Cultural Resources Committee determined that "allowing one Pueblo or Nation to have exclusive use [of the Preserve] could jeopardize [Santa Clara's] current use of all areas of cultural importance" within the Preserve.  *Id*.

48.     On December 16, 2016, Santa Clara enacted a tribal resolution affirming "the cultural significance of the Valles Caldera to the Pueblo of Santa Clara and other tribes" and that "no tribe has ever had exclusive use of the Valles Caldera.  *Id*.

49.     Santa Clara historically used the Preserve lands without seeking or obtaining permission from Plaintiff.  Gov. Chavarria Dep. at 14:21-16:5 (ECF No. 162-4).

50.     William Whatley was Plaintiff's tribal archaeologist from approximately 1984 to 2001.  Whatley Dep. at 9; 13; 37-39 (Ex. 25).

51.     At his deposition, Mr. Whatley outlined areas of the Preserve that were used by and considered exclusive to the Pueblos of Santa Clara and Cochiti.  *Id*.; Preserve Map (Ex. 26).

52.     Mr. Whatley created a map in 1995 that purportedly mapped the "Ancestral Jemez Domain."  The map identified a portion of the Preserve lands as a "joint use area" shared with "peoples of the Tewa and Keresan Nations."  Plat of the Ancestral Jemez Domain (Ex. 27).

53.     After Mr. Whatley's deposition, Jemez also produced GIS data compiled by Mr. Whatley.  ██████████████████████████████████████████████████

██████████████████████████████████████████████████

54.     Santa Clara does not consent to a waiver of its sovereign immunity so that it can be joined as a party in this case.  Gov. Chavarria Dep. at 31:24-32:2 (ECF No. 162-4).

55.     Santa Clara believes that the United States cannot adequately represent its interests in this case.  *Id.* at 32:3-15.

**VII.   The Pueblo of Zia**

56.     The Pueblo of Zia historically used the Valles Caldera without seeking or obtaining permission from Jemez.  Lt. Gov. Lucero Dep. at 7-12 (Ex. 29).

57.     ██████████████████████████████████████████████████

██████████████████████████████████████████

58. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

59. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

60.     Jemez Governor Joseph A. Toya testified that Jemez would "object to anyone at all who is not Jemez" going to Redondo Peak.  Gov. Toya Dep. at 189:19-191:19 (ECF No. 203-3).

61. ████████████████████████████████████████████████████

62.     Zia is concerned that its "access will be restricted or denied if the Valles Caldera is under the ownership of one tribe, similar to when it was under . . . private ownerships."  Lt. Gov. Lucero Dep. at 14 (Ex. 29).

██ ████████████████████████████████████████████████████████

██████████████████████████████████████████████████.

64.     Plaintiff's plan for the Preserve is to construct a "resort lodge," "campgrounds and RV facilities," "recreational infrastructure such as additional and strategically located parking lots, trailheads and picnic areas . . . including the creation of a mountain bike trail system."  Mgmt. Plan at 7-8 (Ex. 20).

**VIII.   Restrictions on Jemez Use of Valles Caldera prior to 2000**

65. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

66.     "Baca Location No. 1 was surveyed . . . and patented to private owners. . . . In this way, large parts of the aboriginal lands were permanently lost."  Jemez Strategic Plan at 8-9 (Aug. 2001) (Ex. 35).

67.     The 18 Pueblos who sued the Energy Department characterized their land use as "a limited number of Indians using, for secretly conducted religious activities, certain circumscribed areas within the several thousand acres owned by the movants."  Pl.s' Resp. to Intervention Mot. of Dunigan Enters., *Jemez v. Sec'y of Energy*, 81-cv-113 at 4 (D.D.C. Nov. 18, 1981) (Ex. 36).

68.     The 18 Tribes admitted that they "do not contest the ownership of – nor do they seek any interest in – movants' land."  *Id*. at 2.

69.     Jemez historian Joe Sando testified that Jemez "felt the loss of . . . part of the [Preserve] in the first hald [sic] of the Eighteen Hundreds to the" Baca heirs.  Aug. 16, 1979 at 52; *Id*. at 53-54 ("We used the area as our own until 1904. . . . Jemez names carved on the Aspen trees [are] dated 1927, which was the last time [Jemez] had use of the area.") (ECF No. 170-11).

70.     Mr. Sando testified that "[w]hen the various Jemez religious societies go to the shrine [on Redondo] they have to get permission from [the owner, who lives] in Texas."  *Id*. at 54.

71.     Mr. Sando reported that the Valles Caldera "was used ████████████████████ ██████████ until the early 1900s."  History of Jemez Pueblo Aboriginal Land, J. Sando, Jemez Pueblo at 10-11 (May 1983) (Ex. 37) ("Sando, Jemez History").

72.     Lois Weslowski conducted an ethnographic analysis of Jemez Pueblo use of the geothermal project area based on interviews with Jemez elders in 1979.  L. Weslowski, Native Am. Land Use Along Redondo Creek at 105 (June 9, 1981) (Ex. 38) ("Weslowski, Land Use").

73.     Weslowski wrote that Jemez or "Towa oral history describes the boundaries of . . . the aboriginal domain of their ancestors. . . .  This domain is traditionally recognized as a joint use

area for the three pueblos of Zia, Santa Ana, and Jemez which have cooperatively utilized the region since prehistoric times." *Id*. at 108, 125.

74.    Weslowski mapped the "joint use area" as including most of the Preserve lands, but excluded eastern and northern portions of the Preserve. *Id*. at 108-09.

75.    Frank Bond erected fences around the Baca Location No. 1 in 1917.  Letter from F. Bond to E. Wetmore, Redondo Dev. Co. (Aug. 11, 1917) (Ex. 39); Inventory, Quemondo Sheep Co. (Nov. 30, 1917) (Ex. 40).

76.    The Preserve's owners prohibited Jemez from grazing its animals in the Preserve between the 1920s and 2000.  Weslowski, Land Use at 115 (Ex. 38); Ferguson Dep. at 110-111 (Ex. 6).

77.    ███████████████████████████████████████████████

███████████████

78.    Plaintiff acknowledged that prior to 1971 it "came to lose proprietary interest in their ancient shrine" on Redondo Peak and "realize[d] that [the Baca Land and Cattle Company] exercise[d] control of the place under the system of laws now in effect." Letter from D. Gardner, to Baca Land and Cattle Co. (Nov. 23, 1971) (Ex. 41).

79.    According to a report prepared by Dr. Ellis in 1981, it was "utterly impossible [for Jemez] to obtain permits to get in [to the Preserve] since 1976.  The religious societies do not feel that they dare sneak in."  Ellis, Religious Freedom at 58 (Ex. 13).

80.    The Bonds put "restrictions on Jemez hunting."  Ferguson Dep. at 104-105 (Ex. 6).

81.    The Dunigan family, who operated a hunting business within the Preserve, placed "greater restrictions on Jemez hunting."  *Id.*; Gov. Gachupin Dep. at 43; 112 (Ex. 42).

82.    Plaintiff could not collect timber in the Valles Caldera during the time the Dunigan family owned the land.  *Id*. at 112.

83.     Plaintiff obtained permission from the Bond or Dunigan families to worship within the Preserve on certain occasions prior to 2000.  Weslowski, Land Use at 111 (Ex. 38).

84.     On at least one occasion, Patrick Dunigan prohibited Plaintiff from worshipping on Redondo Peak.  P. Dunigan Dep. at 45:6-46:18 (Ex. 43).



85.     ███████████████████████████████████████████████████████████
███████████████████████ I. Sando Dep. at 86:5-89:22 (ECF No. 203-2).

86.     ███████████████████████████████████████████████████████████
██████████████████████████████ *Id.*

87.     ███████████████████████████████████████████████████████████
████████████████████ Todd Loretto Dep. at 34-35 (Ex. 44).

88.     ███████████████████████████████████████████████████████████
████████████████████ Thurman Loretto Dep. at 26-28 (Ex. 45).

89.     ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████. Yepa Dep. at 93-95 (Ex. 46).

90.     New Mexico purchased an easement for a highway that traverses the Preserve for $10,000 in 1960.  Grant of Right of Way (June 8, 1960) (Ex. 47).

91.     The United States acquired "an easement to construct, operate, maintain, repair, patrol, replace and/or remove a natural gas pipe line" through the Preserve lands.  ECF No.  55-2.

92.     The United States' easement for a gas pipeline through the Preserve lands was signed by Franklin Bond on January 11, 1951.  *Id.*

13

93.     The United States' easement for a gas pipeline through the Preserve lands was recorded in Sandoval County, New Mexico on April 11, 1951.  *Id.*

94.     The United States condemned a perpetual and assignable easement through the Preserve lands in 1999 prior to transferring the pipeline easement.  Compl., Case No. 99-774 (July 12, 1999) (ECF No. 55-3); Stipulation and Consent to Entry of Final Judgment (Sept. 1, 1999) (ECF No. 55-4); Final Judgment, Oct. 18, 1999 (ECF No. 55-5); Deed (Aug 4, 1999) (ECF No. 55-6).

## PROCEDURAL BACKGOUND

Plaintiff brings this action under the Quiet Title Act.  It seeks a judgement that Plaintiff "has the exclusive right to use, occupy and possess the lands of the" Preserve. Compl., ECF No. 1, at pp.14-15, ¶¶ 1-2.  This Court granted the United States' Motion to Dismiss.  The Tenth Circuit remanded the case for factual development. *Jemez*, 790 F.3d 1143.

## STANDARD OF REVIEW

A motion for dismissal for failure to join a party may be made pursuant to Rule 12(b)(7). Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." A challenge for failure to join a necessary party, although normally brought as a Rule 12(b)(7) motion before filing an answer, may be made pursuant to Rule 12(c).  Fed. R. Civ. P. 12(h); *See E.E.O.C. v. W.H. Braum, Inc.*, 347 F.3d 1192, 1195 (10th Cir. 2003).  Courts reviewing Rule 12(b)(7) motions must accept factual allegations in the Complaint as true.  *Citizen Band Potawatomi Indian Tribe v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994).  But the proponent of a Rule 12(b)(7) motion may meet its burden by producing evidence, including evidence outside of the pleadings.  *Id.*

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The "movant bears the burden of

making a prima facie demonstration that there is no genuine issue of material fact."  *Armijo v.*

*Hayes*, No. CIV 14-0362 JB/CG, 2016 U.S. Dist. LEXIS 38297, at *18 (D.N.M. Mar. 15, 2016).

The nonmovant must go beyond the allegations and denials of his pleadings and provide

admissible evidence, which the Court views in the light most favorable to him.  *Id.* at *18.  But

"[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts. . . . Where the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*,

475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the [trier

of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## ARGUMENT

**I.  Plaintiff's repeated admissions that other tribes used the lands that are now the Preserve defeat its position that it held exclusive aboriginal title.**

Plaintiff's repeated admissions that other Tribes used the Preserve lands are fatal to its

claim that it is the exclusive aboriginal owner of the Preserve lands.  Plaintiff "must show,"

among other things "actual, exclusive, and continuous use and occupancy 'for a long time' of the

claimed area." *Jemez,* 790 F.3d at 1165 (internal quotations and citation omitted).  As part of that

burden, Plaintiff must show that it "exercised control over [the claimed area] and over other

Indians who may have ventured therein." *Id.* at 1166 (modification in original, citation omitted).

At a minimum, Plaintiff must show that "it exercised its right of aboriginal occupancy to these

lands in 1860 and thereafter." *Id*. at 1165.  It cannot reasonably be disputed that other tribes used

the Preserve lands in a manner that defeats Plaintiff's aboriginal title claim.

To meet its burden of establishing exclusive aboriginal use, Plaintiff "'must show that it used and occupied the land to the *exclusion of other Indian groups.*'" *Jemez*, 790 F.3d at 1165-66 (quotation omitted).  Several of the cases the Tenth Circuit relied upon expand upon this exclusivity requirement.  *Id*. (collecting cases).  In *Native Village of Eyak v. Blank*, the Ninth Circuit held that "Exclusivity is established when a tribe or a group shows that it used and occupied the land to the exclusion of other Indian groups". 688 F.3d 619, 623 (9th Cir. 2012). Among other things the Ninth Circuit focused on the evidence that the tribe's population was insufficient to control the large territory claimed.  *Id.* at 624-25. *Wichita Indian Tribe v. United States* held that land where a tribe "hunted cannot have been used exclusively by" a claimant and that "[l]ands continuously wandered over by adverse tribes cannot be claimed by any one of those tribes." 696 F.2d 1378, 1385 (Fed. Cir. 1983).  Only where tribes entered "territory mainly to trade with [a claimant] and considered this land to be that of the [the claimant], these visiting tribes should be considered guests" whose presence did not affect aboriginal title.  *Id*.; *Caddo Tribe of Okla. v. United States*, 35 Ind. Cl. Comm. 321, 343, 351 (1975) (exclusivity established where Tribe "exercised control over [the claimed area] and over other Indians who may have ventured therein").  Plaintiff's admissions that other tribes used the Preserve prior to the United States' 2000 purchase defeats Plaintiff's claim to have been the "exclusive" aboriginal user.

First, Plaintiff brought a claim before the ICC that was predicated on Plaintiff's joint use of land with the Pueblos of Zia and Santa Ana.  Findings of Fact on Compromise Settlement, 33 Ind. Cl. Comm. 1 (Jan. 10, 1974).  Plaintiff, Zia, and Santa Ana specifically alleged that the United States "allowed and permitted" third parties to obtain possession of Plaintiffs' lands, specifically by patenting some of those lands, causing Plaintiffs to lose their aboriginal title to the land without just compensation.  Am. Pet. at 24-25 (ECF No. 14-1).  The three pueblos did

not seek compensation for the Preserve lands, but presented evidence regarding their joint use of a portion of those lands.  Pet'rs Proposed Findings of Fact and Br., ICC Dkt. 137 (Ex. 3); Map, Pet'rs Ex. 14 (Ex. 4).  Plaintiff's expert later explained why the Pueblos presented evidence of their use of the Preserve without seeking compensation.

Plaintiff's own expert, Dr. Ellis, wrote that Jemez, Zia, and Santa Ana might have included Baca Location No. 1 within their ICC claim "but with some knowledge of the other Rio Grande pueblos similarly considering the Valles caldera area sacred and of ritual use, **it was impossible to put it into a claim depending on sole and exclusive use of lands**."  Ellis, Religious Freedom at 21 (emphasis added).  Dr. Ellis's 1981 admission is buttressed by her testimony for Plaintiffs.  She helped prepare a map that the Pueblos submitted to the ICC.  The map identified Redondo Peak as a ▆▆▆▆.  ICC Tr. at 310-11 (Ex. 5); Map, Claimant's Ex. No. 18, ICC Dkt. 137 (Ex. 7).  Jemez Governor Pat Toya's testimony before the ICC similarly establishes that other tribes used the Preserve lands.  First, Governor Toya testified that Redondo Peak was "[s]acred to the Pueblos of Jemez, Zia and Santa Ana" and was used ▆▆▆▆▆ ▆▆ by all three tribes.  ICC Tr. at 50-51 (Ex. 5).  Second, he testified that the Pueblos had ▆ ▆▆▆▆▆▆▆▆ on or near Redondo Peak.  *Id*. at 49-50. Third, he testified that Santa Clara and San Ildefonso worshipped at Redondo Peak.  *Id.* at 84-85. Fourth, Governor Toya testified that Santa Clara, San Ildefonso, Zia, and Santa Ana used ▆▆▆ ▆▆▆ which was within Baca Location No. 1.  *Id*.; Map, Pet'rs Ex. 14 (Ex. 4).  In sum, Plaintiff's own admissions establish that it was not the exclusive user of the Preserve lands because other tribes used the lands.

Plaintiff's admissions in its 1981 lawsuit are independently fatal to its current assertion of exclusivity.  Plaintiff and 17 other Pueblos challenged an Energy Department-funded geothermal

17

project on the Preserve lands.  The 18 Pueblos alleged that they "continuously practiced their

respective religions on and near Redondo Peak" from pre-Colombian times through 1981.

Compl. for Inj. Relief, *Pueblo of Jemez et al. v. Sec'y of Energy*, No. 81-0113, at 6 (Jan. 16,

1981) (Ex. 8).  The Pueblos again relied upon Dr. Ellis's expertise.  Dr. Ellis expanded upon

Plaintiff's prior testimony by swearing that Zia, Santa Clara, and other tribes "consistently

practiced their religions on and near Redondo Peak. . . . ████████████████████████████

████████████████████████████████████."  Ellis Aff. at 3-4 (Ex. 10).[3]  Dr.

Ellis described ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  In connection with her work for the 18

Pueblos, Dr. Ellis wrote in 1981 that, while many Pueblos used the Preserve lands, "[t]he three

which have continued that use to the greatest extent in the modern period are Jemez, Zia, and

Santa Clara."  Ellis, Redondo Peak at 5 (Ex. 12); Ellis, Religious Freedom at 21 (describing other

tribal use of Preserve) (Ex. 13).  And a Jemez leader testified that Redondo Peak "is a big

cathedral for all . . . the Indian tribes of New Mexico and others." 1982 PSC Tr. at 56-57 (Ex.

17).  To be clear, Plaintiff's statements opposing the geothermal project admit that: (1) other

tribes used the Preserve lands; and (2) Zia and Santa Clara continued significant aboriginal use

of the Preserve through 1981.  Plaintiff was never the exclusive user of the Preserve lands.

---

[3]   Dr. Ellis's testimony is supported by William Douglass's survey of the area in the early
1900s.  W. Douglass, "Notes on the Shrines of the Tewa and Other Pueblo Indians of New
Mexico," at 357-358. (Ex. 2)

Plaintiff's admissions regarding other tribal usage are confirmed by the tribes themselves. Santa Clara member Paul Tafoya testified that Santa Clara used Redondo Peak.  Aug. 16, 1979 Tr. at 49-50 (Ex. 14).  Zia Administrator Peter Pino testified that Zia ███████████████████ ███████████████████████████████████████████ Aug. 30, 1979 Tr. at 46-47, 51 (Ex. 15).  Jose Lucero similarly testified that Santa Clara's religious societies carry out ceremonies at Redondo Peak and the surrounding areas.  1980 PSC Tr. at 10-1, 10-2, 36-38, 41-45, 48-49 (Ex. 16).  It cannot reasonably be contested that other tribes, particularly Santa Clara and Zia, used the Preserve lands for hundreds of years prior to 1981.  In other words, Plaintiff's use was never exclusive.

Significantly, other tribes used the Preserve lands without seeking or obtaining Plaintiff's permission.  Use of an area by other tribes typically defeats a claim of exclusive aboriginal use unless the other tribes "sought or obtained permission . . . to move into and use resources of the claim area."  *Battise v. United States*, 12 Cl. Ct. 426, 431 (Ct. Cl. 1987).  Plaintiff's Interrogatories made the unsubstantiated assertion that "[a] majority of visiting tribal groups would have to pass by, or near, the place of Jemez leadership and would typically seek permission for use in the Valles Caldera."  Plaintiff's Response to Interrogatory No. 1.  But Plaintiff's witnesses admitted that other Tribes did *not* seek its permission prior to using the Preserve.  Plaintiff's Governor – the signatory of Plaintiff's interrogatory responses – admitted that Plaintiff's interrogatory response was incorrect.  Specifically, he admitted the basic geographical fact that the majority of tribes [including Santa Clara] would not have to pass through Walatowa, the place of Jemez leadership, in order to use the Preserve.  Toya Dep. at

200:9-203:13 (ECF No. 203-3).[4]  Unsurprisingly, Plaintiff's expert anthropologist could not

identify a single occurrence where any pueblo asked Jemez's permission prior to using the

Preserve lands.  Ferguson Dep. at 123 (Ex. 6).  Plaintiff's effort to establish that other tribes used

the Preserve subject to Jemez's "implicit" permission simply does not meet the legal standard.

*Id*. at 129-131.  Nor does it square with the common sense testimony provided by Zia and Santa

Clara – that they would use the Preserve without seeking Jemez's permission.  Chavarria Dep. at

14:21-16:5 (ECF No. 162-4); Lt. Gov. Lucero Dep. at 7-12 (Ex. 29).  Indeed, Plaintiff's former

archaeologist identified areas of the Preserve that were exclusive to Santa Clara and Cochiti,

rather than Jemez.  Preserve Map (Ex 26).  The widespread use of the Preserve lands by other

tribes without seeking or obtaining Jemez's permission defeats Jemez's claim of aboriginal title.

Plaintiff was not the exclusive owner of the Preserve at any time because it has never

possessed the right to exclude others.  As the Court of Claims held:

> Implicit in the concept of ownership of property is the right to exclude others.
> Generally speaking, a true owner of land exercises full dominion and control over
> it; a true owner possesses the right to expel intruders. In order for an Indian tribe
> to establish ownership of land by so-called Indian title, it must show that it used
> and occupied the land to the exclusion of other Indian groups. True ownership of
> land by a tribe is called in question where the historical record of the region
> indicates that it was inhabited, controlled or wandered over by many tribes or
> groups. Ordinarily, where two or more tribes inhabit an area no tribe will satisfy
> the requirement of showing such 'exclusive' use and occupancy as is necessary to
> establish ownership by Indian title.

*United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975).[5]  While "two or

more tribes or groups might inhabit a region in joint and amicable possession without destroying

---

[4]      Governor Toya's testimony highlights Jemez's confusing approach of simultaneously: 1)
asserting that other tribes would seek Jemez permission prior to using the Preserve lands and 2)
denying that other tribes used the lands.

[5]      "A common idiom describes property as a 'bundle of sticks' - a collection of individual
rights which, in certain combinations, constitute property.  *United States v. Craft*, 535 U.S. 274,

the 'exclusive' nature of their use and occupancy, and without defeating Indian title," *id.*,

Plaintiff cannot meet this test for two reasons.  First, while tribes might maintain a claim for

compensation under the ICC's liberal standards, Plaintiff can cite no case in which a single tribe

quieted title to land based on a claim that it possessed that land jointly.  Second, to meet the

"joint and amicable" possession standard, "the relationship of the Indian groups must be

extremely close."  *Strong v. United States*, 518 F.2d 556, 561 (Ct. Cl. 1975).  While Plaintiff's

Indian Claims Commission Act ("ICCA") claim was premised on an alleged joint grant of land

to the Pueblos of Jemez, Zia, and Santa Ana, Plaintiff cannot establish that it was so close with

Zia and Santa Ana that the three tribes considered themselves to have merged in a manner that

would satisfy the "joint and amicable" standard.  *See id.* at 561-62.  Santa Clara indisputably

used the Preserve lands without entering into an "extremely close" relationship with Plaintiff.

Indeed, Plaintiff's own expert admitted ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Regardless, Plaintiff could not maintain exclusive ownership while using the Preserve lands

jointly with at least 17 Pueblos.  Plaintiff's argument to the contrary would eviscerate the

meaning of "exclusive."  The undisputed facts establish that Jemez was never the exclusive user

of the Preserve lands.  Its claim fails at this hurdle.

---

278 (2002).  "The right to exclude others is 'one of the most essential sticks in the bundle of
rights that are commonly called property.'"  *N. Nat. Gas Co. v. Approximately 9117 Acres*, No.
10-1232-DWB, 2013 U.S. Dist. LEXIS 93787, at *44 (D. Kan. July 2, 2013) (right to exclude
taken by Government order granting exclusive right to use property).

## II.    Plaintiff did not continuously use the Preserve lands through 2000.

To show "'actual' and 'continuous use,'" Plaintiff "must show, as it alleges in its Complaint, that the Jemez people have continued for hundreds of years to use the Valles Caldera for traditional purposes, including hunting, grazing of livestock, gathering of medicine and of food for subsistence, and the like." *Jemez*, 790 F.3d at 1166.[6]  "[I]f there was actually substantial interference by others with these traditional uses . . . Jemez Pueblo will not be able to establish aboriginal title." *Id.*  The Tenth Circuit remanded this case so that the parties could submit evidence about whether "the Baca grant or use of the land by the Baca heirs or their successors" "actually interfered with the Jemez Pueblo's traditional occupancy and uses of the land in question here, before or after 1946." *Id.* at 1168.  Jemez's alleged aboriginal uses were substantially interfered with long before the United States purchased the Preserve.  Specifically, Jemez's farming, grazing, hunting, and religious practices were either eliminated or curtailed well before 2000 by the Baca heirs' successors.  The Bond and Dunigan families exercised their ownership in a manner that defeats Jemez's claim that it maintained any title to the Preserve.

The Tenth Circuit cited *Pueblo of San Ildefonso* as illustrating how interference defeats a claim of actual and continuous use.  *Jemez*, 790 F.3d at 1166.  In *San Ildefonso*, three pueblos brought a claim for failure to protect aboriginal title.  The Court found that "the impact of authorized white settlement upon the Indian way of life in aboriginal areas may serve as an important indicator of when aboriginal title was lost."  513 F.2d at 1390.  That inquiry focused on the process by which the claimant tribe was gradually "displaced."  *Id.* at 1391 ("United

---

[6]    "[A]boriginal use and occupancy" has been defined "to mean use and occupancy in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers."  *Id.* at 1165.  Jemez bases its claim on uses such a grazing, farming, gathering timber, hunting, and religious ceremonies.  *Id.* at 1149; Compl. at ¶ 59.

States allowed and sanctioned - over a period of several decades beginning around 1870 - the intrusion of white settlers and miners onto appellees' aboriginal lands."). Similarly, a taking occurred when the United States "made it possible for white settlers . . . to legally deprive the Tlingit and Haida Indians of their use of" fishing, hunting, gathering, and timber areas through "failure and refusal to protect the rights of the Indians in such lands and waters." *Tlingit & Haida Indians v. United States*, 177 F. Supp. 452, 467-68 (Ct. Cl. 1959). Just as Alabama Coushatta's request that its alleged aboriginal territory "be set aside for them" in the face of encroachment reflected a loss of aboriginal title, *Alabama-Coushatta Tribe v. United States*, 2000 U.S. Claims LEXIS 287, at *168-71 (Fed. Cl. June 19, 2000), Jemez has repeatedly recognized that it lost its aboriginal title. As the Tenth Circuit suggested, the Baca heirs and their successors used the Preserve lands in a manner that displaced Plaintiff's alleged aboriginal use of the Preserve lands.

Plaintiff was aware that it lost any aboriginal title to the Preserve prior to 1946. Tellingly, Plaintiff's own expert, Dr. Ellis, stated that Baca Location No. 1 might have been included in the joint Jemez, Zia, Santa Ana ICC petition if not for the fact it was used by other tribes. Religious Freedom at 21. Dr. Ellis thereby acknowledged that the three pueblos knew that they lost any ownership of the Preserve lands some time prior to 1951.

To the extent Plaintiff "contends its claim accrued only when the United States acquired an interest in the Valles Caldera in 2000 and began limiting the Jemez Pueblo's access to the land in a manner inconsistent with  its aboriginal title," this assertion highlights the fact that accrual occurred decades earlier. *Jemez*, 790 F.3d at 1151-52. As the law establishes, and as Plaintiff admits, the limitation of access in a manner that is inconsistent with alleged aboriginal title caused Plaintiff's claims to accrue. The uncontested and indisputable record establishes that Plaintiff's access to its alleged aboriginal uses was curtailed or restricted decades earlier.

The Spanish terminated one of Plaintiff's aboriginal uses of a small portion of the
Preserve lands before the United States' acquisition. ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ Plaintiff cannot rely on limited, pre-1650 farming to
establish title because the Spanish substantially interfered with that use over 300 years ago.

Jemez's alleged aboriginal use of the Preserve lands was eliminated or limited in many
ways that are inconsistent with, and therefore fatal to, its current claims of aboriginal use.  Jemez
repeatedly admitted that it lost any aboriginal title to the Preserve lands prior to bringing this
suit.  Plaintiff acknowledged that it "came to lose proprietary interest in their ancient shrine" on
Redondo Peak and "realize[d] that [the Dunigans' Baca Land and Cattle Company] exercise[d]
control of the place under the system of laws now in effect." Letter from D. Gardner, to Baca
Land and Cattle Co. (Nov. 23, 1971) (Ex. 41).  The plaintiffs in the 1981 geothermal lawsuit,
including Jemez, admitted that they did not own, and did not contest the Dunigans' ownership of,
the Preserve lands.  Pl.s' Resp. to Intervention Mot. of Dunigan Enters. at 2 (Ex. 36).  Jemez
historian Joe Sando testified that Jemez "felt the loss of . . . part of the Valles [Caldera] in the
first hald [sic] of the Eighteen Hundreds to the heirs of one Luis Saavedra de Baca."  Aug. 16,
1979 Tr. at 52.  *See also*, *id*. at 53-54 ("We used the area as our own until 1904. . . . Jemez names
carved on the Aspen trees [are] dated 1927, which was the last time [Plaintiff] had use of the
area.") (ECF No. 170-11).  And Plaintiff acknowledged that it "permanently lost" the Preserve
lands when they were "surveyed . . . and patented to private owners" as recently as 2001.  Jemez
Strategic Plan at 8-9 (Aug. 2001) (Ex. 35).

Plaintiff's assertion of continuous use is also defeated by its admission that certain uses were eliminated or circumscribed.  For example, the Bond and Dunigan families used the Preserve lands for ranching.  These large commercial ranching operations monopolized grazing on the Preserve lands, prohibiting Jemez from grazing between the 1920s and 2000.  Weslowski, Land Use at 115 (Ex. 38); Ferguson Dep. at 111 (Ex 6).  The Bonds and Dunigans also restricted or eliminated Jemez's ability to hunt within the Preserve.  *Id*. at 104-105.  Jemez witnesses describe the hunting restrictions during the Dunigans' ownership between 1962 and 2000 as more severe than those during the Bond era.  *e.g.* Gov. Gachupin Dep. at 43 (Ex. 42).  And Plaintiff could not collect timber in the Valles Caldera during the time the Dunigan family owned the land.  *Id*. at 112.  Simply put, Plaintiff's aboriginal use of the Preserve lands for grazing, hunting, and timber, if any, was displaced long before 2000.

Plaintiff's religious practices similarly were generally displaced.  Plaintiff obtained permission from the Bond or Dunigan families to worship within the Preserve on certain occasions prior to 2000.  Weslowski, Land Use at 111 (Ex. 38).  As of 1981, Plaintiff's societies had "to get permission from [the owner, who lives] in Texas" prior to accessing the Redondo Shrine.  Aug. 16, 1979 Tr. at 54 (ECF No. 170-11).  According to Dr. Ellis in 1981, it was "utterly impossible [for Jemez] to obtain permits to get in [to the Preserve] since 1976.  The religious societies do not feel that they dare sneak in."  Ellis, Religious Freedom at 58 (Ex. 13); Ellis Aff. at 13 (Ex. 10).  And on at least one occasion, Patrick Dunigan prohibited Plaintiff from worshipping on Redondo Peak.  Dunigan Dep. at 45-46.  The religious observances permitted by the Dunigan family were limited to certain circumscribed areas.  Pl.s' Resp. to Intervention Mot. of Dunigan Enters., at 2-3 (Ex. 36).  These limitations on religious practices are inconsistent with Jemez's asserted aboriginal use.

Individual Jemez religious societies also had their use of the Preserve eliminated or curtailed in a manner that is inconsistent with Plaintiff's alleged continuous use of the lands.  For example, the ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████  This displacement of Jemez's alleged religious practices defeats its claim of continuous use.

Finally, Plaintiff's pre-lawsuit statements reveal that it never used portions of the Preserve lands.  For example, Lois Weslowski's 1979 interviews with Jemez elders in 1979 established that Jemez did not even claim to use eastern and northern portions of the Preserve. Weslowski, Land Use at 108-09, 125 (Ex. 38).[7]  Similarly, Plaintiff's former archaeologist William Whatley produced three separate maps – all of which indicate that Jemez did not use substantial portions of the Preserve.  Preserve Map (Ex. 26); Plat of the Ancestral Jemez Domain (Ex. 27); Whatley GIS Map (Ex. 28); Whatley Dep. at 37-39 (Ex. 25).

Perhaps most tellingly, Plaintiff requested that Congress allow it to purchase 200 acres of the Preserve in 2000.  The fraction of the Preserve that Plaintiff sought to purchase is the portion of greatest significance to Plaintiff, as it "encompasses the primary sacred shrine of the Jemez

---

[7]     Also undermining Plaintiff's exclusive use claim by identifying the portions of the Preserve that Jemez actually used jointly along with Zia and Santa Ana.

people." *Jemez Test. re: S. 1892* at 13-14 (Mar. 10, 2000) (ECF No. 194-4).  If Plaintiff had

maintained title to the Preserve through 2000, it would not have sought to purchase "less than

two-tenths of one percent of the 90,000 acre Baca location." *Id*.  There is a single explanation for

Plaintiff's offer to purchase a fraction of the Preserve – that Plaintiff lacked any ownership

interest in the land in 2000.  Plaintiff would not need to purchase land that it already owned.

The United States could not take what Plaintiff did not possess.  Plaintiff, by its own

admission, did not maintain its alleged aboriginal use of the Preserve lands through 2000.  Any

farming, ranching, hunting, timber gathering, and religious activities was either terminated or

substantially interfered with by the Baca heirs and their successors.  Plaintiff's alleged aboriginal

occupancy therefore ceased long before 2000.  *Jemez*, 790 F.3d at 1166-68; *Id*. at 1160

("aboriginal title may be extinguished 'by treaty, by the sword, by purchase, by the exercise of

complete dominion adverse to the right of occupancy, or otherwise.'").

### III.    Plaintiff's title claim is barred by the statute of limitations because its alleged aboriginal use of the Preserve lands was terminated or circumscribed well before the United States purchased the lands in 2000.

Plaintiff's claim is barred if the United States permitted "interference with its aboriginal

title." *Jemez*, 790 F.3d at 1147.  The Tenth Circuit remanded this case, in part, for factual

development regarding "whether anyone has actually interfered with the Jemez Pueblo's

traditional occupancy and uses of the land in question here, before or after 1946." *Id*. at 1168.

Because the applicable statutes of limitations bar claims that accrued more than twelve years

before Plaintiff filed suit in 2012, the Tenth Circuit directed this court to focus on whether

Plaintiff's alleged traditional occupancy and use was interefered with prior to 2000.  As set forth

in Section II, above, the facts make clear that Baca heirs' successors precluded traditional Indian

use in a manner that caused Plaintiff's claims to accrue both before and after 1946.

27

When a waiver of sovereign immunity contains a statute of limitations, the provision amounts to a condition on the waiver of sovereign immunity.  *United States v. Mottaz*, 476 U.S. 834, 841 (1986).  This condition on the waiver must be strictly construed.  *Block v. North Dakota*, 461 U.S. 273, 274 (1983).  Statutes of limitations "limiting the scope of a governmental waiver of sovereign immunity," are jurisdictional.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133-134 (2008).  The ICCA, 28 U.S.C. § 2501, and the Quiet Title Act time bars[8] are all jurisdictional.  *Id.*; *Jemez*, 790 F.3d at 1152-53; *Navajo Tribe v. New Mexico*, 809 F.2d 1455, 1469 (10th Cir. 1987).

Statutes of limitations accrue where "Indians were capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim." *Menominee Tribe v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984); *Shoshone Indian Tribe v. United States*, 672 F.3d 1021, 1030-33 (Fed. Cir. 2012) (statute of limitation accrued where tribes not prevented "from being aware of the material facts that gave rise to their claim," even if they were not "aware of the full extent of their injury").  "[W]hen ownership of a disputed property would be resolved based on a single legal theory, notice of the government's claim to one tract constituted notice as to the other tracts." *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 744 (8th Cir. 2001).

**A.  Plaintiff's claim is barred by the Indian Claims Commission Act.**

Congress created the ICC in 1946 to dispose of all Indian claims with finality.  *Navajo*, 809 F.2d at 1464-66; *United States v. Dann*, 470 U.S. 39, 45 (1985).  It therefore made the ICC's

---

[8]     While the Tenth Circuit recently treated Section 12 of the ICCA as a statute of limitations, *Jemez*, 790 F.3d at 1147, Defendant maintains that Section 12 is a statute of repose that bars all claims that existed in 1946.  Plaintiff's actual notice of their claims means that its claim should be dismissed regardless of whether Section 12 is a statute of limitations or repose.

exclusive jurisdiction over pre-1946 Indian claims so broad that it encompassed all legal, equitable, and moral claims.  ICCA § 2, 60 Stat. at 1050.  Congress also provided that "no claim existing" before August 13, 1946 could "be submitted to any court . . . for consideration" after August 13, 1951.  ICCA § 12, 60 Stat. at 1052.  The ICCA required Tribes to bring, among other things, claims challenging the wrongful disposition of land by a date certain – August 13, 1951. *Navajo*, 809 F.2d at 1469; *Sioux Tribe v. United States*, 500 F.2d 458, 489 (Ct. Cl. 1974) ("Act provides in no uncertain terms that any claim existing prior to August 13, 1946, must be filed within five years . . . Congress intended to cut off all claims not filed before August 13, 1951."); *Oglala Sioux*, 570 F.3d at 331-32. ("to ensure finality, the Act established a 5-year limitation on all claims existing before 1946; any claim not presented within the 5-year period may not be submitted to any court or administrative agency. . . . A tribe cannot avoid the [ICCA] through 'artful pleading.'").  Plaintiff's claim that the United States took its aboriginal title to the Preserve accrued and expired before 1946.  Plaintiff's claim is therefore barred by the ICCA.

Plaintiff's use of the Preserve was restricted before 1946.[9]  Jemez historian Joe Sando identified three dates on which Jemez suffered serious infringement of its alleged aboriginal uses of the Preserve lands.  All of those dates occurred prior to 1927.  Aug. 16, 1979 Tr. at 52-54 (ECF No. 170-11).  And it is well-established that Jemez grazing on the Preserve lands was restricted prior to 1946 because the Bond family was using the land for their commercial grazing operation.  Weslowski, Land Use at 115 (Ex. 38); Ferguson Dep. at 110-111 (Ex. 6); Inventory,

---

[9]      Plaintiff conceded before the ICC that the federal transfer of property to private parties extinguished its title. *United States v. Pueblo of Zia*, 474 F.2d 641, 654 n.4 ("The parties agreed . . . that 16,811.74 acres were taken during 1920 by various homestead or preemption entries."). Here too, the transfer of the Preserve lands to the Bacas in 1860, standing alone, caused Plaintiff's claim to accrue.

Quemondo Sheep Co. (Nov. 30, 1917) (describing fencing of Preserve in 1917) (Ex. 40).[10]

███████████████████████████████████████████████████████

███████████████████████████ These restrictions caused Plaintiff to suffer "mental,

physical, spiritual, and psychological consequences" from the 1920s through 2000.  Ferguson

Dep. at 110-111 (Ex. 6).  It is indisputable that Plaintiffs use of the Preserve lands was restricted

in a manner that caused the statute of limitations to accrue prior to 1946.

The clearest indication that Plaintiff knew it lost any aboriginal interest in the Preserve

lands prior to 1946 is the fact that **Plaintiff actually considered including at least some**

**portion of the Preserve lands in its Indian Claims Commission Act claims**.  As Plaintiff's

expert anthropologist stated, Jemez, Zia, and Santa Ana might have included the Baca Location

No. 1 within their ICC land claim "but with some knowledge of the other Rio Grande pueblos

similarly considering the Valles caldera area sacred and of ritual use, **it was impossible to put it**

**into a claim depending on sole and exclusive use of lands**."  Ellis, Religious Freedom at 21

(emphasis added).  Plaintiff excluded the Preserve from its prior lawsuit because it could not

establish exclusive use.  The unavoidable conclusion is that Plaintiff knew that it had lost any

aboriginal title (if it ever had any such title) prior to the ICC's 1946 deadline.

Plaintiff knew or had reason to know the only fact underlying its claim – that its alleged

aboriginal use was interfered with and restricted – prior to 1946.  This caused Plaintiff's claims

regarding its alleged aboriginal title to accrue at that time.  *Jemez*, 790 F.3d at 1167-68

(requirement that Plaintiff obtain grazing licenses and pay grazing fees caused its claims to

accrue) (citing *Zia*, 19 Ind. Cl. Comm. at 74).

---

[10]     Fencing, standing alone, is strong evidence of accrual because it represents the assertion
by non-Jemez of the core right to exclude.  *See Loretto v. Teleprompter Manhattan Catv Corp.*,
458 U.S. 419, 435-36 (1982).

**B.  Plaintiff's claim is barred by the Indian Tucker Act.**

Plaintiff's claims regarding its alleged aboriginal title are also time barred because they accrued and expired between 1946 and 2000.  The Tenth Circuit focused its analysis on the ICCA's barrier to claims that predated 1946.  *Jemez*, 790 F.3d at 1166-71.[11]  But the ICCA provided a framework for resolving post-1946 Indian Claims in addition to resolving all pre-1946 claims.  It subjected claims accruing after 1951 to a six-year statute of limitations.  *See* ICCA § 24, 60 Stat. 1055 (extending Court of Claims' jurisdiction over claims "accruing after" the ICCA's passage).   That Court of Claims' jurisdiction subjected Plaintiff to a six-year statute of limitations.  Plaintiff's claims are therefore also barred because they accrued and expired between 1946 and 2000.

The Court of Claims and its successor court, the Court of Federal Claims, have jurisdiction over "any claim against the United States accruing after August 13, 1946, in favor of any tribe," including claims for the taking of land.  28 U.S.C. § 1505.  28 U.S.C. § 2501 bars Plaintiff from bringing such takings claims against the United States unless the petition "is filed within six years after such claim accrues."  *John R. Sand & Gravel Co.*, 552 U.S. at 135-36.  Plaintiff's admissions that its alleged aboriginal uses were infringed between 1946 and 2000 caused any claim for taking its aboriginal title to accrue after 1946 just as it did prior to 1946.

As established in Section II, above, Plaintiff's alleged aboriginal uses were eliminated or dramatically curtailed before 2000.  Between 1946 and 2000, Plaintiff repeatedly acknowledged that it lost any aboriginal title.  For example, Plaintiff admitted that it "came to lose proprietary interest in their ancient shrine" on Redondo Peak and "realize[d] that [the Dunigans' Company]

---

[11]      It did not directly address the possibility that Plaintiff's claims independently accrued after that date.  *Cf*. *Id*. at 1168 (addressing post-1946 interference with traditional occupancy).

31

exercise[d] control of the place under the system of laws now in effect." Letter from D. Gardner, to Baca Land and Cattle Co. (Nov. 23, 1971) (Ex. 41).  In 1981, Jemez again admitted that it did not own and did not contest the Dunigans' ownership of the Preserve lands.  Pl.s' Resp. to Intervention Mot. of Dunigan Enters. at 2 (Ex. 36).  And in 2000, Plaintiff sought to purchase a fraction of the Preserve rather than assert its alleged title.  *See* pages 26-27, above.

The Bonds alienated parts of the Preserve lands, such as by selling New Mexico an easement for a highway.  Right of Way Grant (June 8, 1960) (Ex. 47).  Restrictions on Jemez use increased during the Dunigan family's ownership of the Preserve lands from 1962 through 2000.  Findings of Fact 67-89, above.  Plaintiff's undisputed loss of the ability to graze, hunt, farm, and conduct religious activities through the owners exercising the right to exclude others from using the Preserve lands, caused the statute of limitations to begin running long before 2000.

### C.  Plaintiff's claim is barred by the Quiet Title Act.

Finally, Plaintiff's claims are barred by the Quiet Title Act's twelve-year statute of limitations.  The Quiet Title Act's statute of limitations is triggered when the government asserts an adverse interest that clouds alleged aboriginal title, even if that interest is invalid.  *Spirit Lake Tribe*, 262 F.3d at 738 (citation omitted); *Rio Grande Silvery Minnow v. Bur. of Reclamation*, 599 F.3d 1165, 1182 (10th Cir. 2010) (easement interest is real property interest that may cloud title); *N. New Mexicans Protecting Land Water & Rights v. United States*, 161 F. Supp. 3d 1020, 1037-40 (D.N.M. 2016).  Here, the United States asserted an adverse interest in the Preserve lands by, among other things, condemning an easement through the Preserve.

The United States reacquired an interest in the Preserve in 1951.  In 1951, the United States acquired and recorded "an easement to construct, operate, maintain, repair, patrol, replace and/or remove a natural gas pipe line" through the Preserve lands.  Warranty Deed (ECF No. 55-

2).  It then condemned a perpetual and assignable easement through the lands in 1999.  Compl.,

(ECF No. 55-3); Stipulation and Consent to Entry of Final J. (ECF No. 55-4); Final J. (ECF No.

55-5); Deed (ECF No. 55-6).  Either acquisition, standing alone, places a sufficient cloud on

Plaintiff's alleged title to the Preserve to cause the Quiet Title Act's twelve-year statute of

limitations to accrue before 2000 and expire before Plaintiff's 2012 Complaint.[12]

      Discovery has revealed overwhelming evidence that Plaintiff knew it lost any "aboriginal

title" to the Preserve long before 2000.  *See* Sections II and III, above.  The applicable statutes of

limitations therefore require dismissal of Plaintiff's Complaint.

    **IV.**    **Federal Rule of Civil Procedure 19 requires dismissal of this case because Santa Clara is: (1) a necessary and indispensable party to a case that would impact its real property, cultural, and religious interests; and (2) is immune from suit.**

      Santa Clara is the only tribe that possesses a real estate interest in any of the land at issue.

Santa Clara purchased an easement over a portion of the Preserve in 2000.  Santa Clara's

easement protects its cultural sites and lands.  And the fact that Santa Clara obtained an easement

over a portion of the Preserve is evidence of Santa Clara's deep ties to the Preserve lands.

Federal Rule of Civil Procedure 19 must be applied in a manner that respects both Santa Clara's

interests in the Preserve and its sovereign immunity.  Santa Clara is an indispensable party

because the relief Plaintiff seeks cannot be granted without impairing Santa Clara's interests in

the Preserve.  The Court should therefore dismiss this action.[13]

---

[12]    Plaintiff's legal challenge to the Energy Department-funded geothermal project also demonstrates that, as of 1981, Plaintiff: 1) lacked title to the Preserve lands and 2) that its use of the Preserve lands had been restricted to using circumscribed areas for religious purposes.  In other words, Plaintiff's alleged aboriginal uses of grazing, farming, and hunting, among others, were terminated by 1981.  The geothermal project further clouded any aboriginal title.

[13]    Defendant notes that Zia and New Mexico also are indisputably necessary parties to this case.  Zia's concern that its "access will be restricted or denied if the Valles Caldera is under" Jemez ownership is well-founded.  Lt. Gov. Lucero Dep. at 14.  And it is difficult to understand why Jemez did not join other interested parties, such as New Mexico.

A.      **Santa Clara is a necessary party to this case.**

The Court must first determine whether an absent entity is necessary under Federal Rule of Civil Procedure 19(a).  *N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1279-81 (10th Cir. 2012); *Davis v. United States*, 343 F.3d 1282, 1288-89 (10th Cir. 2003).  An entity is necessary if it "claims an interest relating to the subject of the action" and disposing of the action in the entity's absence may "impair or impede the person's ability to protect that interest."  FRCP 19(a).  A tribe has an interest in a case that would have "significant implications for the governance of" the tribe's real estate.  *N. Arapaho*, 697 F.3d at 1279.  Here, Santa Clara's easement over a portion of the Preserve lands, at a minimum, would be impaired by its absence.

Santa Clara, unlike Jemez, possesses a real estate interest in a portion of the Preserve. The easement makes clear that Santa Clara has used and uses areas of the Preserve for religious activities.  And it protects Santa Clara's future use of the easement area.  The easement provides for Santa Clara's "exclusive use" for "customary and traditional activities conducted by Members of the Pueblo in furtherance of religious and cultural practices and beliefs."  Santa Clara Deed at 14-15 (Ex. 21).[14]  And it imposes "land use restrictions on the easement area" for Santa Clara's benefit.  *Id*. at 16.  It prohibits the construction of structures other than "placing of hand-held ceremonial materials in the easement area."  *Id*.  Because the United States owns the Preserve, Santa Clara's rights are protected by a number of statutes, including the National Environmental Policy Act and the National Historic Preservation Act.  To be clear, Santa Clara possesses unique rights and the ability to restrict actions on a portion of the Preserve.

---

[14]      The easement also provides a process whereby Santa Clara can request Interior "to set aside places and times of exclusive use by the Pueblo."  *Id*. at Part II(B).  And the easement provides for "accommodation . . . for reasonable access to the easement area."  *Id.* at III(D).

As this Court recognized in granting New Mexico Natural Gas Company's Motion to Intervene, property interests in easements over the Preserve lands are at issue in this case.  This Court recognized that an easement provides "NMGC [with an] obvious, significant interest relating to this action." ECF No. 85 at 4.  Santa Clara similarly has an obvious, significant interest in its easement over a portion of the Preserve.  *See also Woodstone Lakes Dev., LLC v. Iroquois Hunting & Fishing Club, Inc.*, 24 Misc. 3d 1217(A), 1217A (Sup. Ct. N.Y. 2009) (owner of easement is a necessary party). Plaintiff seeks title to the entire Preserve, including the portion encumbered by Santa Clara's easement.  Compl.[15]  And if Plaintiff were to prevail, it would "have significant implications for the governance" of the Preserve by potentially imposing Jemez's jurisdiction upon Santa Clara.  *N. Arapaho*, 697 F.3d at 1279.  Santa Clara's real estate interest alone makes it a necessary party to this action.[16]

> **B.      It is not feasible to join Santa Clara to this case.**

Santa Clara's sovereign immunity prevents it from being joined without its consent. Indian tribes are typically immune from suit.  *N. Arapaho*, 697 F.3d at 1281.  "A waiver of tribal

---

[15]      While this motion focuses on Santa Clara and Zia's use, other tribes' use of the Preserve is inconsistent with Plaintiff's claims. *See* Findings of Fact 15-28, 42, above.

[16]      The Quiet Title Act's Indian lands exception may also bar Plaintiff's effort to obtain title to land subject to Santa Clara's easement.  The Quiet Title Act "does not apply to trust or restricted Indian lands."  28 U.S.C. § 2409a.  The "Indian lands exception was intended to allow the United States to carry out its commitments to Indian tribes." *Mesa Grande Band of Mission Indians v. Salazar*, 657 F. Supp. 2d 1169, 1175 (S.D. Cal. 2009).  In *Mesa Grande*, the Indian lands exception divested the court of jurisdiction over Mesa Grande's effort to quiet title to land Interior held in trust for the Santa Ysabel Band of Diegueno Mission Indians.  *Id.*  While Santa Clara's easement is not held in trust for Santa Clara, it restricts usage of federal lands for Santa Clara's benefit.  Transferring the Preserve to Plaintiff would interfere with commitments the United States made to Santa Clara, in part, because Jemez may be immune from a lawsuit to enforce the easement terms.  The Indian Lands Exception therefore divests this court of jurisdiction over Plaintiff's effort to obtain title to the area burdened by Santa Clara's easement. *See Proschold v. United States*, 90 F. App'x 516, 518 (9th Cir. 2004) (Indian lands exception applies to easement despite doubt as to trust status of the easement).

sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978).  Santa Clara has not waived its sovereign immunity.  Gov. Chavarria Dep. at 31:24-32:2 (ECF No. 162-4).

### C.      Equity and Good Conscience require dismissal under Rule 19(b).

Santa Clara's indispensability to this case does not end with its easement over the Preserve.  As discussed above, Santa Clara has long used the Preserve lands.  Congress identified Santa Clara as having an interest in the Preserve's management. Nat'l Def. Auth. Act for Fiscal Year 2015 § 3043 (b)(3)(C)(iii), 128 Stat. 3292 (Dec. 19, 2014).  Congress required Interior to consult with Santa Clara, among other tribes, in developing its management plan for the entire preserve.  Santa Clara's statements at recent meetings make clear that its historic uses of the Preserve included "sacred uses, cultural center, food, medicine[,] . . . collection of plants, other materials, ceremonies[,] . . . game" and that it continues to use the Preserve.  Santa Clara Talking Points at 1-3 (Dec. 1, 2015) (Ex.  23); Chavarria Dep. at 9:12-13:2 (ECF No. 162-4).

Rule 19(b) requires the Court to determine "whether the required-but-not-feasibly-joined party is so important to the action that the action cannot 'in equity and good conscience' proceed in that person's absence." *N. Arapaho*, 697 F.3d at 1278-79 (quoting Fed. R. Civ. P. 19(b)).  If so, "then the action 'should be dismissed.'" *Id.*  The Court must consider four factors in evaluating Rule 19(b).  *Id.* at 1281-84; *Davis*, 343 F.3d at 1289.  All four militate in favor of dismissal.  Equity and good conscience demand that Santa Clara not have its real estate, cultural, and religious sites endangered by quieting title of the Preserve to Jemez in Santa Clara's absence.

### i.      Santa Clara would be prejudiced by its absence.

As set forth above, Santa Clara's ability to protect its interests in the Preserve would be prejudiced if this case were to proceed in its absence.  Under Tenth Circuit law, the first Rule

19(b) factor substantially overlaps with Rule 19(a).  *N. Arapaho*, 697 F.3d at 1281.  The United

States will not repeat its arguments above other than to note that Santa Clara's easement,

standing alone, satisfies this factor.  *See Hugoton Energy Corp. v. Plains Res., Inc.*, 141 F.R.D.

320 (D. Kan. 1992) (landowners and leaseholders of gas leases were indispensable parties to

action to quiet title to leases because their interests would be affected if leases declared invalid).

### ii.   The prejudice to Santa Clara cannot be lessened or avoided.

Tribal jurisdiction over land imposes an "all-or-nothing," dramatic change in the nature

of rights.  *Northern Arapaho* 697 F.3d at 1282-83.  The Tenth Circuit's recognition is

particularly pointed here, where Jemez has: (1) displayed hostility toward other Tribes' religious

practices and (2) could reasonably argue that it is immune from legal challenges by those tribes.

Nor can the prejudice to Santa Clara's interests be lessened by the fact that the United

States and Santa Clara agree that the Preserve lands were never controlled by a single pueblo.

Santa Clara believes that the United States cannot adequately represent its interests in this case.

Gov. Chavarria Dep. at 32:3-15 (ECF No. 162-4).  Santa Clara's Cultural Resources Committee

is a repository of the Pueblo's cultural knowledge.  Ferguson Dep. at 222-223 (Ex. 6).  The

Committee determined that "allowing one Pueblo or Nation to have exclusive use [of the

Preserve] could jeopardize [Santa Clara's] current use of all areas of cultural importance" within

the Preserve.  Santa Clara Res. No. 2016-129 and letter (Ex. 24).  And it stated that Santa Clara

uses and has used the "entire area that is now known as the Valles Caldera" for centuries but that

most of "that knowledge is sacred and cannot be divulged to the general public."  *Id*.; Gov.

Chavarria Dep. at 11:6-16 (ECF No. 162-4).  The United States cannot fully avoid the prejudice

from Santa Clara's absence from this lawsuit because Santa Clara possesses sensitive cultural

information that it cannot divulge to the general public.  Resolving this case without that

sensitive information would prejudice the United States.  And attempting to force Santa Clara to reveal that information would prejudice Santa Clara.  *Pueblo of Sandia v. United States*, 50 F.3d 856, 861 (10th Cir. 1995) ("secrecy . . . is crucial to Pueblo religious and cultural practices").

The risk to Santa Clara is heightened here because of Jemez's opposition to other tribes continuing certain religious practices within the Preserve.  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

Jemez is not just opposed to other tribes constructing shrines on Redondo Peak, it is opposed to other tribes setting foot on Redondo Peak.  Gov. Toya Dep. at 189:19-191:19 (ECF No. 203-3) ("object to anyone at all who is not Jemez" going to Redondo Peak).  And Plaintiff's plan to construct a "resort lodge," "campgrounds and RV facilities," "recreational infrastructure such as additional . . . parking lots, trailheads and picnic areas . . . including the creation of a mountain bike trail system" might undermine other Pueblos' use of the land.  Mgmt. Plan at 7-8 (Ex. 20).  Federal ownership affords tribes, at a minimum, the opportunity for consultation prior to many decisions and the opportunity to challenge many decisions in court.  Jemez ownership would likely not do so.  Santa Clara (as well as Zia and others) would therefore be prejudiced if

Jemez were granted the ability to prevent other tribes from continuing their tradition of worshipping on Redondo Peak.  F. Ellis, Redondo Peak at 1, 5 (Ex. 12).

### iii.    Judgment in Santa Clara's absence would be inadequate.

"Rule 19(b)(3)'s instruction to consider 'whether a judgment rendered in the person's absence would be adequate' is 'not intended to address the adequacy of the judgment from the plaintiff's point of view.'" *N. Arapaho*, 697 F.3d at 1283 (citations and quotations omitted). "Rather, the factor is intended to address the adequacy of the dispute's resolution." *Id.* Resolving this case in Santa Clara's absence would create a possibility of future disputes between Santa Clara and Jemez.  And tribal sovereign immunity makes it likely that any such disputes would reach results inconsistent with this case.  Where a "third-party has an enforceable interest in the subject matter of the dispute, the court cannot grant complete relief in the third party's absence." *Wright v. Incline Vill. Gen. Improvement Dist.*, 597 F. Supp. 2d 1191, 1206 (D. Nev. 2009).  Santa Clara's easement is such an enforceable interest.  Judgment in Santa Clara's absence would be inadequate.

### iv.    Santa Clara's sovereign immunity leaves no room for balancing whether Plaintiff will have an adequate remedy if this case is dismissed.

Rule 19(b)'s final factor is "whether the plaintiff would have an adequate remedy if the action is dismissed for nonjoinder." FRCP 19(b)(4).  This factor turns on the fact that Santa Clara, as a sovereign federally recognized Indian tribe, cannot be joined as a party absent its consent. *See Santa Clara,* 436 U.S. at 58.  The Tenth Circuit has "recognized a 'strong policy . . . favoring dismissal when a court cannot join a tribe because of sovereign immunity.'" *Davis*, 343 F.3d at 1293 (citation omitted).  As applied through Rule 19(b)'s fourth factor, this means that "when . . . a necessary party . . . is immune from suit, there is very little room for balancing of other factors set out in Rule 19(b), because immunity may be viewed as one of those interests

compelling by themselves." *Id.*, 343 F.3d at 1293 (quoting *Enter. Mgmt. Consultants, Inc. v. Hodel,* 883 F.2d 890, 894 (10th Cit. 1989).[17]

### V.     Plaintiff's claims are barred by laches because Plaintiff actually requested the United States to purchase the Preserve.

Laches "bars a party's dilatory claim. . . . when there is: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1090-91 (10th Cir. 2014) (citations omitted). Instead of asserting its current aboriginal title claims, Plaintiff strongly supported the United States' acquisition and requested that Congress grant it the right to purchase 200 of the Preserve's almost 100,000 acres. Plaintiff's support for Defendant's acquisition and failure to disclose, much less diligently assert, its alleged aboriginal title is dramatically prejudicial to the United States. Laches bars Plaintiff from supporting the United States' acquisition and then turning around to claim that the Preserve was Plaintiff's all along.

Plaintiff cannot reasonably contend that it was diligent in bringing its aboriginal title claim. Plaintiff "strongly supported" the United States' acquisition of the Preserve. *Jemez Test. re: S. 1892* at 13 (ECF No. 194-4). Rather than inform the United States of its alleged title, Plaintiff requested Congress "to consider granting us a right to acquire a mere 200 acre tract . . . on top of Redondo Peak . . . [that] is less than 0.02% of the 90,000 acre Baca location." *Id.* at 14. Plaintiff's request for the right to purchase a portion of the Preserve is a clear admission that Plaintiff did not possess title to any of the Preserve. And its failure to notify Congress of its

---

[17]     Tribal sovereign immunity can be determinative even where it leaves a tribal plaintiff without an alternative remedy. *Id.* at 1293 (quoting *Wichita & Affiliated Tribes of Okla. v. Hodel,* 788 F.2d 765, 777 (D.C. Cir. 1986) ("Although we are sensitive to the problem of dismissing an action where there is no alternative forum . . . society has consciously opted to shield Indian tribes from suit without congressional or tribal consent.").

current theory – that Plaintiff had no need to purchase any of the Preserve because it already

owned the land – was, at minimum, a material omission.  Were Plaintiff to prevail, its misleading

request to purchase a portion of the Preserve would be highly prejudicial to the United States.

Plaintiff's other acknowledgments that it lacked any interest in the Preserve lands are

similarly prejudicial.  *e.g.*  Pls.' Resp. to Intervention Mot. of Dunigan Enters. at 2 (Ex. 36).  And

Plaintiff's historian, Joe Sando, testified in that case that Plaintiff lost "use of the area" by the

early 1900 with the exception of limited use of Redondo Peak subject to permission from the

Dunigan family.  Aug. 16, 1979 Tr. at 53-54. (ECF No. 170-11). Plaintiff's admissions prior to

filing this suit cannot be harmonized with Plaintiff's newfound title claim.  They also make clear

that, if Plaintiff ever possessed any aboriginal title, it was not diligent in defending that title.

The United States is prejudiced by Plaintiff's tardy claims because it expended substantial

sums of money to acquire, rehabilitate, and maintain the Preserve between 2000 and 2012, when

Plaintiff filed suit.  Compl.  First, the United States purchased the Preserve for $96,523,042.00 in

2000.  Second, the United States spent "about $31 million in federal funding" between 2000 and

2009 to manage and restore the Preserve.  Third, the United States condemned the outstanding

mineral interest in the Preserve for approximately $3,800,000 in 2009.  Prejudice is established

when the defendant has expended substantial time and effort during the period when Plaintiff

delayed bringing its claims.  *Jiron*, 762 F.3d at 1091.  For example, laches bars NEPA claims

where a tribe's delay in bringing those claims led to lessees investing over $12 million in a

project.  *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1338-39 (10th Cir. 1982) (laches

applies when tribe with "knowledge of the relevant facts, acquiesces for an unreasonable length

of time in the assertion of a right adverse to [its] own").  *See also Apache Survival Coal. v.*

*United States*, 21 F.3d 895, 907, 910 (9th Cir. 1994) (delay unreasonable where "Tribe ignored

41

the *very process* that" it challenged).  Here, rather than ignoring the United States' purchase,

rehabilitation, and maintenance of the Preserve, Plaintiff actively mislead the United States by

offering to purchase a portion of the Preserve.  If Plaintiff were to prevail, the United States

would have been prejudiced by expending over $131,000,000 during the time Plaintiff

unreasonably delayed pursuing its alleged title.

Stunningly, Plaintiff's management plan for the preserve would prejudice the United

States in perpetuity.  Plaintiff's plan for managing the preserve would require the United States:

(1) to take title to the preserve in trust for Plaintiff, and (2) pay Plaintiff annually to manage and

operate the preserve and for the right to continue the United States' research.  Gov. Loretto Dep.

at 186-189 (Ex. 19); Mgmt. Plan at 7 (Ex. 20).  This would compound the prejudice.

Plaintiff's effort to obtain sovereign control over land that the United States granted to

third parties in 1860 and repurchased in 2000 is also barred by *City of Sherrill v. Oneida Indian

Nation*.  "When a party belatedly asserts a right to present and future sovereign control over

territory, longstanding observances and settled expectations are prime considerations." 544 U.S.

197, 218 (2005).  Laches applies with particular force where, as here, tribal action would "uproot

current property owners."  *Id*. at 219.  If Plaintiff were to prevail it would have potentially

serious consequences for both Santa Clara and New Mexico.  Plaintiff's effort to obtain title to

land over which Santa Clara possesses an easement, in particular, raises the likelihood of

complicated overlapping tribal jurisdiction that Santa Clara manifestly opposes.  And Plaintiff's

opposition to other tribes worshipping on Redondo Peak would prejudice the other federally

recognized Indian tribes who hold Redondo sacred, including Santa Clara and Zia.  Ferguson

Dep. at 139-140 (Ex. 6).  Finally, Plaintiff's plan to generate revenue by developing the Preserve

might upset the settled expectations of other tribes who continue to use the Preserve.  *See* pages

38-39, above.  If Plaintiff were correct that it possessed aboriginal title to the entirety of the

Preserve prior to 2000, Plaintiff's statements before Congress amount to a material

misrepresentation rather than a diligent assertion of those claims.  Plaintiff's failure to raise this

claim in a timely manner would prejudice the United States and other parties.

## CONCLUSION

As set forth above, the United States' motion for summary judgment should be granted

because: (1) Plaintiff's admissions that other tribes used the Preserve lands defeat its claim that it

was the exclusive aboriginal user of the lands; (2) Plaintiff's admissions that the third party

owners eliminated or restricted Plaintiff's use of the lands means that Plaintiff did not maintain

any aboriginal title through continuous use; (3) the statute of limitations accrued and expired

decades ago; (4) Federal Rule of Civil Procedure 19 also bars Plaintiff's claim because the

Pueblo of Santa Clara is a necessary and indispensable party; and (5) Plaintiff's claim is barred

by laches because it Plaintiff supported the United States' acquisition rather than timely

notifying the United States of Plaintiff's alleged aboriginal title.

JEFFREY WOOD
Acting Assistant Attorney General

 _/s/ Matthew Marinelli_
PETER KRYN DYKEMA, DC Bar No. 419349
MATTHEW MARINELLI, IL Bar No. 6277967
JACQUELINE LEONARD, NY Bar No.5020474
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0436
Tel: (202) 305-0293
Tel: (202) 305-0493
Fax: (202) 305-0506
Peter.dykema@usdoj.gov
Matthew.marinelli@usdoj.gov

Jacqueline.leonard@usdoj.gov

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

/s/ Matthew Marinelli
Matthew Marinelli

44