# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **PUEBLO OF JEMEZ**, a federally recognized Indian tribe, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:12-cv-800 (JB)(JHR) ) |
| **UNITED STATES OF AMERICA**, | ) ) |
| Defendant, | ) |
| and | ) ) |
| **NEW MEXICO GAS COMPANY**, | ) ) |
| Defendant-in Intervention. | ) ) |

_____)

### PLAINTIFF PUEBLO OF JEMEZ'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT
### CONFIRMING ITS INDIAN (ABORIGINAL) TITLE TO THE
### BANCO BONITO AND REDONDO MOUNTAIN

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

MOTION FOR PARTIAL SUMMARY JUDGMENT ............................................1

MEMORANDUM IN SUPPORT ..............................................................................1

Introduction ..............................................................................................................1

Legal Argument ........................................................................................................2

   I.   BACKGROUND .............................................................................................2

   II.  THE LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT ....................4

   III. THE UNDISPUTED MATERIAL FACTS CONFIRM THAT THE JEMEZ
       PUEBLO HAS INDIAN TITLE TO AT LEAST THE BANCO BONITO AND
       REDONDO MOUNTAIN ..............................................................................6

      B. The Undisputed Facts Confirming The Pueblo of Jemez's Indian Title to Redondo
         Mountain……………………………………………………………………………12

   IV. APPLYING THE LAW REGARDING INDIAN TITLE TO THE UNDISPUTED
       FACTS CONFIRMING THAT PLAINTIFF HAS TITLE TO BANCO BONITO
       AND REDONDO MOUNTAIN…………………………………………………..17

      A. The 10th Circuit Court of Appeals Confirmed the Law Regarding Establishment
        of Aboriginal Title…………………………………………………………………17
      B.  Applying the Undisputed Facts to the Applicable Law Confirms that Plaintiff
        has Aboriginal Title to Banco Bonito…………………………………………….20
      C.  Applying the Undisputed Facts to the Applicable Law Confirms that Plaintiff
        has Aboriginal Title to Redondo Mountain…………………………………….....23

CONCLUSION………………………………………………………………………30

CERTIFICATE OF SERVICE………………………………………………………..30

# TABLE OF AUTHORITIES

## CASES

*Alabama-Coushatta Tribe of Texas v. United States.*,
No. 3-83, 2000 WL 1013532, at \*12 (Fed. Cl. June 19, 2000) ...................................... *passim*

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*,
939 F.2d 887 (10th Cir. 1991) ...................................................................................4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)......................................................................................................4

*Colony Nat'l Ins. Co. v. Omer*,
No. CIV 07-2123, 2008 WL 2309005 (D. Kan. June 2, 2008)...................................................5

*Confederated Tribes of the Warm Springs Reservation of Or. v. United States*,
177 Ct.Cl. 184, (1966) ...........................................................................................21

*Harjo v. City of Albuquerque*,
No. CV 16-1113 JB/JHR, 2018 WL 3621025, at \*24 (D.N.M. July 28, 2018).......................5

*Herrera v. Santa Fe Pub. Sch.*,
956 F.Supp.2d 1191 (D.N.M. 2013) ............................................................................4

*Johnson v. Lindon City Corp.*,
405 F.3d 1065 (10th Cir. 2005) ..................................................................................19

*Mitchel v. United States*,
34 U.S. 711 (1835)..............................................................................................17, 18

*Native Village of Eyak v. Blank*,
688 F.3d 619 (2012)..................................................................................................21

*Oneida Indian Nation of N. Y. v. City of Sherill, N. Y.*,
145 F. Supp. 2d 226, (N.D. N.Y. 2001) .....................................................................19

*Pueblo of Jemez v. United States*,
790 F.3d 1143 (10th Cir. 2015) ......................................................................... *passim*

*Sac & Fox Tribe of Indians of Okla. v. U.S.*,
179 Ct.Cl. 8 (1967) ........................................................................................17, 21, 24

*Spokane Tribe of Indians v. United States*,
No. 5-62, 1963 WL 8583, (Ct.Cl. 1963).......................................................................26

*Strong v. United States*,
518 F.2d 556 (Ct.Cl. 1975) ....................................................................................25, 27

*United States on behalf of Pueblo of Jemez v. Abousleman*,
No. CV 83-1041 MV/WPL, 2016 WL 9776586 (D.N.M. Oct. 4, 2016)..............................1, 4

*United States on behalf of Pueblo of Jemez v. Abousleman*,
    No. CV 83-1041 MV/WPL, 2017 WL 4364145 (D.N.M. Sept. 30, 2017) .............................1

*United States on behalf of Pueblo of Jemez v. Abousleman*,
    No. CV 83-1041 MV/WPL Pueblos and United States Opening Brief................................1, 4

*United States v. Pueblo of San Ildefonso*,
    513 F.2d 1383, 1394 (Ct.Cl. 1975) ..................................................................................24

*United States v. Santa Fe Pac. R. Co.*,
    314 U.S. 339 (1941)........................................................................... *passim*

*United States v. Seminole Indians of the State of Florida*,
    180 Ct.Cl. 375, (1967) ..................................................................................25

*Wilson v. Omaha Indian Tribe*,
    442 U.S. 653, (1979)......................................................................................19

*Wichita Indian Tribe v. United States*,
    696 F.2d 1378, 1385 (Fed. Cir. 1983)..............................................................26

**RULES**

Fed. R. Civ. P.56............................................................................... *passim*

Fed. R. Civ. P.56(c) ............................................................................4

**OTHER AUTHORITY**

Stratigraphic Nomenclature of Volcanic Rocks in the Jemez Mountains, New Mexico, United
States Department of the Interior Geological Survey Bulletin 1274-P, 1969..................................6

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Pueblo of Jemez moves for Partial Summary Judgment against the Defendant United States of America and Defendant-in-Intervention New Mexico Gas Company[1] pursuant to Federal Rules of Civil Procedure Rule 56, confirming that the Jemez Pueblo has Indian (aboriginal) title to the Banco Bonito and Redondo Mountain.

## MEMORANDUM IN SUPPORT

### Introduction

Litigation in which the United States participated as a party has confirmed that as a matter of law the Pueblo of Jemez established Indian (aboriginal) title to certain lands in what is now northern New Mexico at the time the Spanish first entered this area.  *United States on behalf of Pueblo of Jemez v. Abousleman*, No. CV 83-1041 MV/WPL, 2016 WL 9776586, at *5 (D.N.M. Oct. 4, 2016), *report and recommendation adopted,* No. CV 83-1041 MV/WPL, 2017 WL 4364145 (D.N.M. Sept. 30, 2017).  Thereafter: "The Pueblos came under American jurisdiction in 1848 with their aboriginal rights as recognized by American law fully intact, including their aboriginal rights to water, and nothing had occurred during the previous 250 years of Spanish and Mexican rule in New Mexico that had any effect on those rights whatever." *Abousleman*, Pueblos and United States' Opening Brief, No. 83-1041, Doc. No. 4362 at 7.  After 1848: "The Pueblos never entered into any treaty with the United States, for the cession of any of their lands or for any other purpose, nor did they engage in any other act after 1848 that effectuated a relinquishment of the Aboriginal Lands or their associated water rights." *Id*.  The question to be decided in this action is the extent of that Indian (aboriginal) title in the Valles Caldera.  Because there is no genuine issue of material fact as to the Pueblo of Jemez's title to

---

[1] Plaintiff requests judgment against Defendant New Mexico Gas Company to the extent that it is consistent with stipulations approved by the Court on December 19, 2016 [Doc. 103].

the area known as the Banco Bonito and Redondo Mountain, those areas should be awarded to the Pueblo as a matter of law prior to trial.

## Legal Argument.

### I.      BACKGROUND.

The Pueblo of Jemez brought this action to confirm its Indian title to land within the geologic formation known as the Valles Caldera, and specifically those portions of the land in which the Defendant United States acquired an interest in the year 2000 from the successors to the Baca heirs.  *See Pueblo of Jemez v. United States*, 790 F.3d 1143 (10th Cir. 2015) (reversing district court dismissal and remanding for trial).  Discovery has been completed, and trial is scheduled to begin October 29, 2018.  At trial the parties will present facts regarding use and occupancy of the approximately 94,000 acres at issue in this action also known as the Valles Caldera National Preserve ("VCNP").  But discovery has confirmed that there is no genuine issue of material fact as to the Pueblo's Indian title to two portions of the disputed area lying in the southwest corner of the VCNP.  These areas are commonly referred to as the Banco Bonito and Redondo Mountain and are depicted below in Figure 1.



Figure 1

2

The Valles Caldera is a dormant crater of a super volcano located at the center of the Jemez Mountains.  See the undisputed material facts contained herein ("UMF") No. 2.  The crater rim itself is twenty miles in diameter and is surrounded by four high-mountain valleys and eleven resurgent volcanic domes.  *Pueblo of Jemez*, 790 F.3d at 1148.  The term "Valles Caldera" includes the interior of the crater, and the geologic formation making up the crater itself – the rim and cliffs on the interior, and the sloping exterior.  UMF No. 2 and Robert Parmenter 10/27/2017 Dep. 11: 22-25, 12: 1-3 attached hereto as Exhibit A.

The Banco Bonito is a geologic formation created thousands of years ago by a volcanic eruption within the Valles Caldera.  *See generally* Stratigraphic Nomenclature of Volcanic Rocks in the Jemez Mountains, New Mexico, United States Department of the Interior Geological Survey Bulletin 1274-P, 1969, at 18-19.  The Banco Bonito is an upland area on the northern edge of the Jemez Plateau, and extends from the rim above San Diego Canyon near Battleship Rock (7,100 ft) to the lower slopes of Redondo Mountain (*Wâavēmâ P'êtabū* in the Jemez Pueblo tradition often shortened to *Wâavēmâ* aka *Wavema*) (8,820 ft).  UMF Nos. 2 and 30.  A high-altitude Jemez farming complex is located in the Banco Bonito.  UMF Nos. 5-6.  The Jemez farming complex is associated with a constellation of major Jemez mountain villages located on the high mesas and canyon floors directly south and southwest of the Valles Caldera.  UMF Nos. 24-26.  The Banco Bonito extends between these Jemez Pueblos and Redondo Peak.  UMF No. 4 The high-altitude Jemez Pueblo villages and associated agricultural land use on the Banco Bonito is only associated with ancestral Jemez populations.  UMF Nos. 13 and 24.  Jemez people travelled on the mesa tops, in the mountains, and within the Jemez River basin from their mountain Pueblos and Banco Bonito fieldhouses to Redondo Peak and throughout the Valles Caldera to hunt, gather, and conduct religious ceremonies, among other activities.  UMF No. 24.

Redondo Mountain is also found in the southwest corner of the VCNP as depicted in Figure 1. It is undisputed that the Jemez people believe this mountain is of primary spiritual importance and that those religious underpinnings are inextricably woven into Jemez society. UMF Nos. 27-33. It is also undisputed that Plaintiff has continuously used Redondo Mountain for centuries. UMF Nos. 33- 32 and 34-39. Although the parties dispute whether other tribes historically used Redondo Mountain and the extent and nature of any such uses, it is undisputed that other tribes no longer use Redondo Mountain or that Jemez's uses of Redondo are dominant. UMF Nos. 33 and 40-42.

The Defendant United States believes it has evidence to challenge whether the Jemez people established Indian title to much of the lands at issue. But as to the Jemez people's "exclusive use and occupancy" of the Banco Bonito and Redondo Mountain, there is no genuine issue of material fact, and the Jemez Pueblo's Indian title has never been extinguished. *Abousleman*, No. CV 83-1041, 2016 WL 9776586, *Abousleman*, Opening Brief, MV/WPL, Doc. No. 4362, 7 (D.N.M. Oct. 4, 2016). That is particularly true as to the Banco Bonito and Redondo Mountain. The Pueblo of Jemez therefore is entitled to judgment in its favor as a matter of law, confirming its continuing Indian title to the Banco Bonito and Redondo Mountain.

## II.   THE LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT.

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Herrera v. Santa Fe Pub. Sch.*, 956 F. Supp.2d 1191, 1221 (D.N.M. 2013) (Browning, J.) (*quoting Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)). As this Court has noted:

4

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u>

*Harjo v. City of Albuquerque*, No. CV 16-1113 JB/JHR, 2018 WL 3621025, at *24 (D.N.M. July 28, 2018) (Browning, J.) (quotation marks and citations omitted, emphasis by the court).

Once the movant meets this burden, Rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  Harjo, 2018 WL 3621025 at *24 (citations omitted).  "Rule 56(c)(1) provides: 'A party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record ...'" *Id.* at *25.  The non-moving party may not avoid summary judgment "by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  *Id.* (*citing Colony Nat'l Ins. Co. v. Omer*, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  *Id.*  Moreover:

> A mere "scintilla" of evidence will not avoid summary judgment. Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, there is no genuine issue for trial.

*Harjo*, 2018 WL 3621025 at *25 (internal quotations, alterations and citations omitted).

III.   **THE UNDISPUTED MATERIAL FACTS CONFIRM THAT THE JEMEZ PUEBLO HAS INDIAN TITLE TO AT LEAST THE BANCO BONITO AND REDONDO MOUNTAIN.**

A.   **The Undisputed Facts Confirm the Pueblo of Jemez's Indian Title to Banco Bonito.**

Pursuant to Rule 56, the Pueblo of Jemez identifies the following undisputed facts that support summary judgment in its favor as to the Banco Bonito:

**A.1 Undisputed Facts as to the Geography/Geology of the Banco Bonito**

1.  Banco Bonito is located on the southwest corner of the VCNP at an elevation between 8000 to 8940 feet and is approximately 8 square miles.  Liebmann Expert Report at 9 attached hereto as Exhibit B.

2.  The Banco Bonito is a geologic formation created thousands of years ago by a volcanic eruption within the Valles Caldera.  *See generally* Stratigraphic Nomenclature of Volcanic Rocks in the Jemez Mountains, New Mexico, United States Department of the Interior Geological Survey Bulletin 1274-P, 1969, at 18-19.  The Banco is an upland area on the northern edge of the Jemez Plateau, and extends from the rim above San Diego Canyon near Battleship Rock (7,100 ft) to the lower slopes of Redondo Mountain (Wavema) (8,820 ft).  Liebmann Expert Report at 9, 13 (Exhibit B); Anastasia Steffen 06/21/2018 Dep. 220: 9-12 attached hereto as Exhibit C.

3.  The Banco Bonito extends between Jemez villages and Redondo Peak and is depicted below as "Figure 2."  Figure 2 was created by New Mexico Bureau of Geology and Mineral Resources and can also be found at https://geoinfo.nmt.edu/repository/ data/2011/20110002/GM-79_mapsheet.pdf (last visited Aug. 17, 2018).

6



Figure 2

**A.2 Undisputed Facts as to the Jemez Exclusive Use and Occupancy of the Banco Bonito. Undisputed Facts as to Jemez Fieldhouses and Features on the Banco Bonito**

4.  The archaeological record of Banco Bonito consists of architectural features used primarily for agricultural purposes.  Archaeologists have recorded terraces, stone-bordered gardens, and fieldhouses in Banco Bonito.  Gauthier Expert Report at 15 attached hereto as Exhibit D; Madeline Scheintaub 10/25/2017 Dep. 132: 7-11 attached hereto as Exhibit E.

5.  There are at least "100 fieldhouses" in Banco Bonito.  Kurt Anschuetz 05/25/2018 Dep. 237: 4-5 attached hereto as Exhibit F; and Liebmann Expert Report at 9 (Exhibit B). Figure 3 below shows the Jemez fieldhouses found in the Jemez Mountains, including those in Banco Bonito, Figure 3 was developed by Dr. Matthew Liebmann and appears in his Expert Report at p. 6 (Exhibit B).

7



Figure 3

6. The archeological evidence found at Banco Bonito shows aboriginal use of at least a 100-year span, from at least 1500 to 1600 C.E.  Anschuetz Expert Report at 190 attached hereto as Exhibit G; Rory Gauthier 05/26/2018 Dep. 34: 12-14, 219: 3-11 attached hereto as Exhibit H; Steffen Dep. 221: 19-24, 222: 1-11 (Exhibit C); and Liebmann Expert Report at 9 (Exhibit B).

7. A fieldhouse is a stone structure used for housing and shelter during the summer months while agricultural activities take place close by.  Parmenter Dep. 67: 16-25 (Exhibit A).

8. Fieldhouses represent land use and occupation by those who use the fieldhouses.  Steffen Dep. 217: 2-14 (Exhibit C); Anschuetz Expert Report at 42 (Exhibit G); and Liebmann Expert Report at 10 (Exhibit B).

9. VCNP staff would often contact Jemez Pueblo members to gain information held by Jemez members about the interpretation of fieldhouses that would then be used in fieldhouse tours held by the VCNP.  Steffen Dep. 314: 11-22, 315: 6-11 (Exhibit C).

**Undisputed Facts as to Jemez Black-on-White Pottery on the Banco Bonito**

10. Archeologists utilize pottery left by ancestral peoples at ancestral sites to determine cultural affiliation of a site.  Gauthier Expert Report at 1 (Exhibit D); and Liebmann Expert Report at 4, 14 (Exhibit B).

11. Jemez Black-on-White is a form of pottery affiliated with and produced only by ancestral Jemez.  Gauthier Expert Report at 12 (Exhibit D); and Liebmann Expert Report at 6 (Exhibit B).

12. The archeological evidence, including Jemez Black-on-White pottery, shows that the sites at Banco Bonito, including the fieldhouses, are Jemez sites.  Gauthier Dep. 34: 5-11, 137: 3-21 (Exhibit H); Gauthier Expert Report at 15, 17 (Exhibit D); Steffen Depo. 218: 5-17 (Exhibit C); Anschuetz Expert Report at 42, 190 (Exhibit G); Anschuetz Dep. 237: 10, 20-22 (Exhibit F); and Liebmann Expert Report at 11 (Exhibit B).

13. The absence of Tewa ceramic evidence at Banco Bonito and the dominant presence of Jemez Black-on-White ceramics establishes that only Jemez utilized Banco Bonito. Gauthier Expert Report at 16-17 (Exhibit D); and Liebmann Expert Report at 15, 18 (Exhibit B).

**Undisputed Facts as to Jemez Fields and Farming on the Banco Bonito**

14. The Banco Bonito was farmed by ancestral Jemez Pueblo people.  Anschuetz Expert Report at 190 (Exhibit G); Gauthier Expert Report at 15 (Exhibit D); Gauthier Dep. 34: 5-11(Exhibit H); Steffen Dep. 218: 5-17 (Exhibit C); Parmenter Dep. 67: 8-14 (Exhibit A); and Liebmann Expert Report at 13 (Exhibit B).

**Undisputed Facts as to Jemez Uses Beyond Their Farms on the Banco Bonito**

15. Ancestral peoples travelled from the fieldhouses to hunt game, gather native plants and collect obsidian.  Anschuetz Expert Report at 42 (Exhibit G); and William Whatley 01/17/2018 Dep. 75: 10-15, 76: 1-13 attached hereto as Exhibit I.

16.  Steffen Dep. 283: 3-17, 293: 11-17 (Exhibit C); Scheintaub Dep. 134: 6-12 (Exhibit E); and Anschuetz Expert Report at 40 (Exhibit G).

17. ██████████████████████████████████████ ██████████████ Anschuetz Expert Report at 40 (Exhibit G); and Paul Tosa 01/17/2018 Dep. 89: 8-13 attached hereto as Exhibit J.

**Undisputed Facts as to Jemez Religious Use of the Banco Bonito**

18. Jemez spiritual uses of Banco Bonito continue today, ████████████████████ ████████████████████████████████████████████████ Steffen Dep. 281: 1-17, 283: 6-17, 293: 11-17 (Exhibit C); Scheintaub Dep. 83: 7-15, 134: 1-12 (Exhibit E); Christopher Toya 01/26/2018 Dep. 90: 20-25, 222: 2-8 attached hereto as Exhibit K; and Parmenter Dep. 53: 8-15 (Exhibit A).

19. Jemez members historically collected and currently gather plants in and around Banco Bonito while using the ancestral pilgrimage routes for medicinal and religious purposes. Steffen Dep. 283: 24-25, 284: 1-13 (Exhibit C); and C. Toya Dep. 89: 14-19 (Exhibit K).

20. Since the United States has controlled the VCNP, no other tribe has requested to use the Banco Bonito.  There is no indication in the records of the United States that any tribe other than Jemez used the trails in the Banco Bonito, collected plants or utilized religious

sites, such as springs or shrines.  Steffen Dep. 424: 3-24 (Exhibit C); and Jorge Silva-Banuelos 01/23/2018 Dep. 112: 12-17 attached hereto as Exhibit L.

**Undisputed Facts as to the Jemez Pueblos/Villages**

21. Archeological evidence shows that there are at least ten ancestral villages located just outside the southwestern boundaries of the VCNP and Banco Bonito, and those villages belonged to the Jemez ancestral peoples.  Liebmann Expert Report at 6, 12 (Exhibit B); Gauthier Dep. 32: 15-22, 38: 9-15, 64: 23-25, 65: 1-13 (Exhibit H); and Anscheutz Expert Report at 35 (Exhibit G); *see also*, Figure 3 above and Figure 4 below (showing the location of three of the large Jemez villages closest to Banco Bonito).



Figure 4

22. Jemez ancestral villages are closer to Redondo Peak and Banco Bonito than non-Jemez ancestral villages.  Gauthier Dep. 38: 9-15 (Exhibit H); Anschuetz Expert Report at 35,

39 (Exhibit G); and Michael Elliot 01/11/2018 Dep. 32: 12-25, 33: 1-9, 65: 12-14 attached hereto as Exhibit M.

23. Jemez people travelled on the mesa tops, in the mountains, and within the Jemez River basin from their mountain Pueblos and Banco Bonito fieldhouses to Redondo Peak and throughout the Valles Caldera to hunt, gather, and conduct religious ceremonies, among other activities.  Anschuetz Expert Report at 40, 42 (Exhibit G); and Whatley Dep. 75: 10-25, 76: 1-13 (Exhibit I).

**B.**  **The Undisputed Facts Confirm the Pueblo of Jemez's Indian Title to Redondo Mountain.**

24. Redondo Mountain is the primary mountain to Jemez Pueblo. Complaint [Doc 1], ¶ 41. The people of Jemez believe that Redondo Mountain is indispensable to the Jemez people for many reasons.  ███████████████████████████

███████████████████████████████████████

█████████████████████████ Joseph Toya 01/25/2018 Dep. 81: 6-16 attached hereto as Exhibit N; P. Tosa 27: 12-20 (Exhibit J); Anthony Yepa 11/29/2017 Dep. 37: 11-15 attached hereto as Exhibit O; C. Toya Dep. 68: 25, 69: 1-8 (Exhibit K); and David Yepa 01/09/2018 Dep. 34: 24-25, 20: 1-13 attached hereto as Exhibit P.

25. One of the reason Redondo Mountain is paramount to Jemez existence is that all waters from the mountain springs and rivers of the Valles Caldera flow down to sustain Jemez Pueblo and irrigate its fields, and Redondo Peak is the central symbol of that vital water basin.  Complaint [Doc. 1], ¶ 44; Parmenter Dep. 73: 2-9 (Exhibit A); J. Toya Dep. 43: 5-14 (Exhibit N); A. Yepa Dep. 53: 2-12 (Exhibit O); and John Gachupin 12/12/2017 Dep. 40: 16-25, 41: 1-2 attached hereto as Exhibit Q.

26. [redacted] The image of the eagle on Redondo is a part of Jemez identity and remains important to Jemez members. A. Yepa Dep. 28: 6-13, 32: 13-15 (Exhibit O); C. Toya Dep. 192: 2-23 (Exhibit K); David Madalena 12/14/2017 Dep. 221: 1-15 attached hereto as Exhibit R; and D. Yepa Dep. 28: 11-25, 29: 1-7 (Exhibit P).

27. In Jemez's native tongue of Towa that is still widely spoken today, Redondo Mountain is called Wâavēmâ, and Jemez spiritual beliefs maintain that everything the Jemez people need to survive physically exists at Wâavēmâ and the areas surrounding Wâavēmâ. P. Tosa Dep. 27: 12-20 (Exhibit J); and D. Madalena Dep. 48: 8-16 (Exhibit R).

28. [redacted] Parmenter Dep. 89: 16-24, 90: 2-10 (Exhibit A); Steffen Dep. 419: 6-13 (Exhibit C); Eusebio Toya 08/03/2017 Dep. 10: 5-13 attached hereto as Exhibit S; J. Toya Dep. 90: 1-7 (Exhibit N); C. Toya Dep. 39: 24-25, 40: 1-4 (Exhibit K); and D. Yepa 34: 24-25 (Exhibit P).

29. [redacted] Complaint [Doc. 1], ¶ 45. J. Toya Dep. 76: 6-14 (Exhibit N); P. Tosa Dep. 64: 21-25, 89: 8-13 (Exhibit J); A. Yepa Dep. 34: 9-15 (Exhibit O); C. Toya Dep. 56: 1-19, 222: 1-10

(Exhibit K); and Dr. T. J. Ferguson Expert Report at 32-37, 81-82, 86, 90-91, 102, 104, 111-112, 117 and 121-122 attached here to as Exhibit AA.

30. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████ Parmenter Dep. 90: 2-6 (Exhibit A); E. Toya Dep. 10: 5-13, 18: 4-15 (Exhibit S); Steffen Dep. 424: 3-24 (Exhibit C); Jonathan Romero 12/11/2017 Dep. 27: 17-25, 28: 1 attached hereto as Exhibit T;  J. Gachupin Dep. 31: 10-21, 38: 10-17 (Exhibit Q); A. Yepa Dep. 90: 6-9, 21-25, 91: 1-2 (Exhibit O); Gregory Gachupin 01/08/2018 Dep. 34: 4-10 attached hereto as Exhibit U; and D. Madalena Dep. 46: 12-17 (Exhibit R).

31. Since they were children, Jemez people have been using the Redondo Mountain.  For some, their first trips to Redondo Mountain was with their great-grandparents, grandparents, and parents.  Then that use of Redondo continues to be passed down to the next generations.  P. Tosa Dep. 47: 17-19 (Exhibit J); J. Romero Dep. 30: 1-8, 58: 4-20 (Exhibit T); A. Yepa Dep. 37: 25, 38: 1-10 (Exhibit O); J. Toya Dep. 24: 10-18 (Exhibit N); and C. Toya Dep 50: 14-25, 51: 1-11, 59: 3-25, 60: 1-20 (Exhibit K).

32. Andrew Dunigan, a former non-Indian owner of the VCNP prior to US ownership, testified that since he was a child he was aware of the fact that Jemez used Redondo. Additionally, he does not recall any other tribe using Redondo or the VCNP except for Jemez members, who did use Redondo Peak for traditional purposes prior to 2000. Patrick Dunigan 09/21/2017 Dep. 30: 3-8, 11-17, 134: 24-25, 135: 1-2 attached hereto as

Exhibit V; and Baca Land and Cattle Company Inc. Authorization Forms attached hereto as Exhibit W.

33. No living Jemez members recall ever seeing or hearing through oral history a member of another tribe at Redondo Peak, apart from an incident in 2001 discussed below.  C. Toya Dep. 39: 24-25, 40: 1-19, 41: 2-8 (Exhibit K); E. Toya Dep. 90: 6-10 (Exhibit S); J. Toya Dep. 99: 6-15 (Exhibit N); J. Romero Dep. 41: 25, 42: 1-3 (Exhibit T); D. Madalena Dep. 88: 21-25, 89: 1-18 (Exhibit R); and D. Yepa Dep. 28: 1-3 (Exhibit P).

34. There are dozens of instances in which Jemez members or societies requested access to Redondo Peak since 2000.  Parmenter Dep. 89: 16-24 (Exhibit A); Steffen Dep. 280: 23-25 (Exhibit C); Silva-Banuelos Dep. 156: 1-13 (Exhibit L); and C. Toya Dep. 89: 14-19 (Exhibit K).

35. After purchasing the VCNP, the United States has maintained records of when they have granted access to tribal members to use the VCNP.  Steffen Dep. 325: 4-12, 343: 21-25, 344: 1-10 (Exhibit C).  For the majority of the time during federal management, tribes were required or encouraged to put requests in writing before accessing the VCNP for traditional purposes.  Steffen Dep. 259: 20-12 (Exhibit C); and Valles Caldera Trust Tribal Access Policy attached hereto as Exhibit X.

36. Of these records, there are at least seventeen (17) separate formal requests from the Pueblo of Jemez for their tribal members or religious societies to access the Redondo Mountain, and some of these requests identify multiple, separate dates of requested access to Redondo Mountain.  See Exhibit Y, compiled formal requests for access submitted by the Pueblo of Jemez to the VCNP.

37. There are numerous other instances in which Jemez members or societies requested access to Redondo Mountain directly in person to VCNP staff, without submitting a formal written request.  Parmenter Dep. 89: 16-24 (Exhibit A); Steffen Dep. 300: 2-6 (Exhibit C); Silva-Banuelos Dep. 66: 21-25 (Exhibit L); and C. Toya Dep. 65: 7-15 (Exhibit K).

38. Authorized VCNP staff would also, on occasion, grant verbal requests from Jemez members to access Redondo Mountain.  Parmenter Dep. 89: 16-24 (Exhibit A); Steffen Dep. 300: 2-6 (Exhibit C); and Silva-Banuelos Dep. 66: 21-25 (Exhibit L).

39. According to witnesses for the United States, Jemez's requests for access would occur approximately eight (8) times per year.  Steffen Dep. 299: 17-25 (Exhibit C) and Silva-Banuelos Dep. 156: 1-6 (Exhibit L).



40. ███████████████████████████████████████████ Parmenter Dep. 89: 13-15, 92: 25, 93: 1-5 (Exhibit A); and C. Toya Dep. 43: 12-25 (Exhibit K).

41. ███████████████████████████████████████████ *See* D0020823 and D0021597 through D0021609 attached hereto as Exhibit Z.

42. ███████████████████████████████████████████ Parmenter Dep. 91: 24-25, 92: 1-9 (Exhibit A); J. Toya Dep. 100: 2-8 103: 9-25 (Exhibit N); C. Toya Dep. 44: 16-23 (Exhibit K); and D. Yepa Dep. 34: 2-25 (Exhibit P).

**IV.     APPLYING THE LAW REGARDING INDIAN TITLE TO THE UNDISPUTED FACTS CONFIRMS THAT PLAINTIFF HAS TITLE TO BANCO BONITO AND REDONDO MOUNTAIN.**

**A.     The 10th Circuit Court of Appeals Confirmed the Law Regarding Establishment of Aboriginal Title.**

The Court of Appeals provided a detailed discussion of the "history and legal concepts that govern aboriginal title and Indian land." *Pueblo of Jemez,* 790 F.3d at 1152-61.  As noted in the citations below, the Court of Appeals confirmed most of the following legal concepts that control the determination of the issues in this case:

**Burden of Establishing Indian Title and Rule of Construction in Favor of Indians.**

To establish its Indian title, the Pueblo of Jemez "must show actual, exclusive, and continuous use and occupancy 'for a long time' of the claimed area." *Id.* at 1165 (internal quotations and citation omitted).[2]  As part of that burden, the Pueblo must show it "exercised control over [the claimed area] and over other Indians who may have ventured therein." *Pueblo of Jemez*, 790 F.3d at 1166 (modification in original, citation omitted).  "The merits of this case do not make it necessary to inquire whether the Indians within the United States had any other rights of soil or jurisdiction; it is enough to consider it as a settled principle, that their right of occupancy is considered as sacred as the fee simple of the whites." *Id*. at 1155 (emphasis by the court) (*citing and quoting Mitchel v. United States*, 34 U.S. 711, 745 (1835)).  "We first note that 'the rule of construction recognized without exception for over a century has been' that if there is doubt whether Indian title has been validly extinguished by the United States, any 'doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of'' the Indians.'" *Pueblo of Jemez*, 790 F.3d at 1162.

---

[2] The "for a long time" requirement can be met in as little as twenty-five years. *Sac & Fox Tribe of Indians of Okla. v. U.S.*, 179 Ct.Cl. 8, 23 (1967).

**Types of Use that are Sufficient to Establish Indian Title**

"The nature of Indian occupancy [differs] significantly from the occupancy of settlers." *Id.* at 1165.  The terms Indian use and occupancy "mean use and occupancy in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers."  *Id.* at 1165 (citation omitted).  "'Indian possession or occupation was considered with reference to their habits and modes of life; *their hunting grounds were as much in their actual possession as the cleared fields of the whites; and their rights to its exclusive enjoyment in their own way* and from their own purposes *were as much respected,* until they abandoned them, made a cession to the government, or an authorized sale to individuals.'"  *Id.* at 1155-56 (emphasis by the court) (*citing and quoting Mitchel*, 34 U.S. at 745).  "This describes the very nature of aboriginal title—that it covers lands used by the Indians in their daily lives as hunters and gatherers as well as lands on which they actually resided."  *Pueblo of Jemez,* 790 F.3d at 1156.

**Use by Non-Indians is Irrelevant**

Use by non-Indians is irrelevant **to establishment** of Indian title: "the test meant only that in order to establish aboriginal title, a tribe 'must show that it used and occupied the land to the *exclusion of other Indian groups.*'"  *Id.* at 1165-66 (emphasis added by the Court).  "The government asserts that the Baca's use of the land is inconsistent with the Pueblo's aboriginal title. But simultaneous occupancy and use of land pursuant to fee title and aboriginal title could occur because the nature of Indian occupancy differed significantly from the occupancy of settlers."  *Id.* at 1165.  Jemez Pueblo did not have to allege that the Baca heirs and their successors were not using the land so long as the Pueblo alleged that it was also using the land in traditional Indian ways.  *Id.*

**Extinguishment of Indian Title.**

Once the Pueblo of Jemez establishes its Indian title, any party arguing that subsequent acts extinguished that title must present the Court with facts showing an express action by the United States Congress or the tribe itself that extinguished title.[3]  The decision in *Santa Fe Pacific*, 314 U.S. 339 is the touchstone for any analysis of the actual status of Indian title and whether it has been legally extinguished.  As the Tenth Circuit stated, the Supreme Court in *Santa Fe*:

> made clear that 'the exclusive right of the United States to extinguish Indian title has never been doubted,' and that aboriginal title may be extinguished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise."  The Court explained why several different acts of Congress and the creation of the Colorado River reservation *had not extinguished aboriginal title*—namely, because the Court found no clear or plain indication that Congress intended by those acts to extinguish aboriginal title.

*Pueblo of Jemez*, 790 F.3d at 1160 (emphasis supplied by the court) (*citing and quoting Santa Fe Pacific*, 314 U.S. 339).  Other legal concepts that govern extinguishment of Indian title were confirmed by the Court of Appeals as noted in the citations below.  "Once an Indian tribe makes out a prima facie case of prior possession or title to the property in dispute, the burden of proof rests on the non-Indian to demonstrate otherwise."  *Oneida Indian Nation of N. Y. v. City of Sherill, N. Y.*, 145 F. Supp. 2d 226, 242 (N.D. N.Y. 2001) (*citing Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 668-69, S.Ct. 2529, 2538-39, 61 L.Ed.2d 153 (1979)).

---

[3] Because of the position it has taken in *Abousleman* the United States is judicially estopped from arguing that the Pueblo of Jemez did not have aboriginal title to lands in New Mexico, and once the scope of those lands is determined by the Court, is estopped from arguing that the Pueblo's title to those lands has been extinguished.  *See Johnson v. Lindon City Corp*., 405 F.3d 1065 (10th Cir. 2005).  The specific requirements that must be met by a party that claims a tribe's aboriginal title has been extinguished are addressed in detail in the Pueblo of Jemez's Motion in Limine to Exclude Evidence, ECF No. 236, and incorporated into this brief by reference.

**B.**   **Applying the Undisputed Facts to the Applicable Law Confirms that Plaintiff has Aboriginal Title to Banco Bonito.**

The undisputed facts show that Plaintiff continuously used and occupied Banco Bonito for a long time.  UMF Nos. 29-32 and 34-40.  The nature of Indian occupancy differs significantly from the occupancy of settlers as the nature of Indian use conformed with the way of life, habits, customs and usages of the Indians rather than those customs of non-Native settlers.  *Pueblo of Jemez*, 790 F.3d at 1165.  Plaintiff occupied and used Banco Bonito and Redondo Mountain in a manner consistent with ancestral Puebloan peoples, and many of those uses continue today.  UMF Nos. 6-12, 14-19.  The undisputed archeological evidence shows that during the summer months Jemez moved from the nearby, larger villages to live in fieldhouses on the Banco Bonito, primarily to farm.  UMF Nos. 21-23.  Jemez peoples used nearby rocks in the Banco Bonito to build the fieldhouses.  UMF No. 23.  While farming during the summers, Jemez farmers and members of their household travelled beyond the fields and fieldhouses to hunt for food, collect water, gather wood to burn or to build, and to collect plants and other natural materials for food, medicine and religious reasons.  UMF No. 23.  ███████████

████████████████████████████████████

████████████████████████   UMF Nos. 16-18.  Some ████████████

████████████████████████████████████

UMF No. 18.

These undisputed facts of Jemez's possession and use of Banco Bonito are consistent with the habits and modes of traditional ancestral Puebloans and establish that Plaintiff is entitled to quiet title of Banco Bonito as a matter of law.  "'Indian possession or occupation was considered with reference to their habits and modes of life; *their hunting grounds were as much in their actual possession as the cleared fields of the whites; and their rights to its exclusive*

20

*enjoyment in their own way* and from their own purposes *were as much respected,* until they abandoned them, made a cession to the government, or an authorized sale to individuals.'" *Pueblo of Jemez*, 790 F.3d at 1155-56 (emphasis by the court) (*citing and quoting Mitchel,* 34 U.S. at 745).

The undisputed facts also demonstrate that Jemez's use and occupancy of the Banco Bonito happened for a long time.  UMF Nos. 6, 16-18, 23 and 31.  The "for a long time" requirement can be met in as little as twenty-five years.  *Sac & Fox Tribe of Indians of Okla.*, 179 Ct.Cl. at 23.  The undisputed facts show that over the course of at least 100 years, ancestral Jemez used at least 100 fieldhouses in Banco Bonito from at least 1500 through 1600.  UMF No. 6.  Seasonal uses are sufficient to establish aboriginal title.  *Native Village of Eyak v. Blank*, 688 F.3d 619, 623 (2012) ("intermittent or seasonal use is sufficient to support aboriginal title because it's consistent with the seasonal nature of ancestor's way of life …"); and *Confederated Tribes of the Warm Springs Reservation of Or. v. United States*, 177 Ct.Cl. 184, 194 (1966) ("continuous use does not limit recovery to areas where the tribe had permanent villages, but also includes seasonal or hunting areas over which the Indians had control even though those areas where only used intermittently.").

The undisputed facts also demonstrate that Jemez continues to use the Banco Bonito today.  UMF Nos. 9, 18-19 and 29-32.  Although the Spanish colonialist forced Jemez to leave the mountainous areas of Banco Bonito and stop use of fieldhouses to live near missions built by the Spanish, Jemez continued using the Banco Bonito.  *Id.*  "[T]he 'use and occupancy' … essential to recognition of Indian title does not demand actual possession of the land, but may drive through intermittent contacts … which define some general boundary of the occupied land."  *Alabama-Coushatta Tribe of Texas v. U.S.*, No. 3-83, 2000 WL 1013532, at *31 (Fed. Cl.

June 19, 2000) (*quoting Seminole Indians,* 180 Ct. Cl. At 385).  Today in Banco Bonito, Jemez

uses the pilgrimage trail system, gathers plants and visits religious sites.  UMF Nos. 18-19 and

29-32.

Plaintiff's use of Banco Bonito was exclusive.  There is no archeological evidence that

any other tribe used and occupied Banco Bonito.  UMF Nos. 13, 17-18.  There are no ceramic

sherds that demonstrate that other tribes used Banco Bonito.  UMF No. 13.  ███████████

███████████████████████████████ UMF Nos. 9, 17-18 and 21-23.  Since

the United States has controlled the VCNP, no other tribe has requested to use the Banco Bonito.

UMF No. 20.  ███████████████████████████████████

███████████████████████████████████████

████████████ *Id.*  As there is no evidence that any other tribe used Banco Bonito, Jemez

controlled the area as to any other tribes.

The undisputed facts demonstrate that Plaintiff has aboriginal title to the Banco Bonito.

Defendant cannot demonstrate that either Plaintiff or the United States Congress extinguished

Jemez's aboriginal title to Banco Bonito, as the undisputed facts show that aboriginal title was

expressly reserved.  In *Abousleman*, the Court found that: "The Pueblos never entered into any

treaty with the United States, for the cession of any of their lands or for any other purpose, nor

did they engage in any other act after 1848 that effectuated a relinquishment of the Aboriginal

Lands or their associated water rights."  *Abousleman*, No. CV 83-1041, Pueblos and United

States' Opening Brief Doc. No. 4362 at 7.

**C.** **Applying the Undisputed Facts to the Applicable Law Confirms that Plaintiff has Aboriginal Title to Redondo Mountain.**

**It is undisputed that Redondo Mountain is the centerpiece of Jemez's spiritual beliefs, which serves as the binding thread throughout Jemez society.**

It is undisputed that Redondo Mountain is the most powerful and spiritually significant mountain to Jemez Pueblo.  UMF Nos. 24-30.  The people of Jemez believe that their relationship and use of Redondo is indispensable for the Jemez people's continued existence.  *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████  UMF No. 26.  ███████████

███████████████████████████████████████████████████████

████████████████████████████████  *Id.*  Plaintiff continues to covet that image, which appears in the tribe's seal.  *Id.*

In Jemez's native tongue of Towa, which is still widely spoken today, Redondo Mountain is called *Wâavēmâ P'êtabū*.  UMF No. 27.  *Wâavēmâ* means "place of the eagle" or that you need nothing else.  UMF No. 27.  As illustration of that viewpoint, Redondo Mountain is paramount to Jemez existence because it is a symbol of the watershed upon which Jemez is dependent, and all the waters from the mountain springs and rivers of the Valles Caldera flow down to sustain current and historic crops and villages of Jemez.  UMF No. 25.  Jemez spiritual beliefs affirm that everything the Jemez people need to survive physically exists at Wâavēmâ and the areas surrounding Wâavēmâ.  UMF Nos. 24-30.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████  UMF No. 28.  ████████████████████████████

███████████████████████████████████████████████████████

███████████████  .  UMF Nos. 16-17, 30-32, 34-39.  ███████████████

███████████████████████████████████████████████

████████████████████████████ UMF No. 30. █████████████████████

████████████████████████████████████████ *Id.*  All of these

facts about the supremacy of Redondo Mountain to Jemez society are undisputed by the parties

and demonstrate that Jemez peoples have used Redondo Mountain for centuries and that those

uses continue today.

**Jemez use of Redondo Mountain is exclusive because, even if other tribes historically used Redondo, which is disputed, it is undisputed that other tribes have not used Redondo Mountain in at least the past eighteen years or, to the extent there may be other minimal use by a tribe, Jemez's uses were dominant.**

The parties do dispute the extent and manner which other tribes historically used the

VCNP after Jemez migrated to the Jemez Mountains.  However, evidence of other tribal uses,

established largely through documents maintained by the United States, establish that other tribes

have stopped using Redondo or that Jemez's uses are dominant.

**Law of Exclusivity and Exceptions to Exclusivity**

As previously discussed, to establish aboriginal title, a tribe must show "actual, exclusive,

and continuous use and occupancy for a long time in the claimed area."  *Pueblo of Jemez*, 790

F.3d at 1165 (*quoting Sac & Fox Tribe of Indians of Okla.*, 179 Ct.Cl. at 21).  As part of this

requirement, the tribe must show that it "used and occupied the land to the exclusion of other

Indian Groups."  *Alabama-Coushatta Tribe*, 2000 WL 1013532 at *12 (*quoting United States v.

Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct.Cl. 1975)).  Courts recognize that "true

ownership of land by a tribe is called in question where the historical record of the region

indicates that it was inhabited, controlled or wandered over by many tribes or groups."

*Alabama-Coushatta Tribe*, 2000 WL 1013532 at *12.  Thus, the general rule of "exclusive use

and occupancy is subject to three exceptions: (1) the joint and amicable use exception; (2) the

dominated use exception; and (3) the permissive use exception." *Id.*

## Exception I: Joint and Amicable Use

The first exception, joint and amicable use, applies to "two or more tribes or groups that

might inhabit a region in joint and amicable possession without destroying the 'exclusive' nature

of their use and occupancy, and without defeating Indian title." *Id.* (*citing Strong v. United

States*, 518 F.2d 556 (Ct.Cl. 1975)); *Pueblo of San Ildefonso*, 513 F.2d at 1394; *Sac and Fox

Tribe*, 315 F2.d 896 at 903, n.11 (Ct.Cl.1967). Though the tribes must show that "their

relationship is a 'close and intimate alliance, politically and socially,' it is not necessary for the

Indian groups to show that they are completely merged.'" For example, in *Pueblo of San

Ildefonso*, the two tribes "believed they shared a common ownership of the land 'in joint tenancy

under a 1770 land grant from the Spanish Crown.'" *Alabama-Coushatta Tribe*, 2000 WL

1013532 at *12. This exception does not apply where each tribe "had separate lands, [and] there

was no community of interest in the lands." *Id.*

## Exception II: Dominated Use

The second exception, dominated use, recognizes "where another tribe commonly uses

the land with the claimant tribe, proof of the claimant tribe's dominance over the other tribe

preserves its exclusive use of the land." *Id.* at *13 (*citing United States v. Seminole Indians of

the State of Florida*, 180 Ct.Cl. 375, 383-86 (1967)). In *Seminole*, where the "the Seminole held

a virtual 'monopoly'" on occupation of the land, dominance illustrates the claimant tribe's

"ability to exclude other tribes from the area, even if it never chooses to exercise that ability."

*Alabama-Coushatta Tribe*, 2000 WL 1013532 at *13 (*quoting Seminole Indians*, 180 Ct. Cl. at

383). The Seminole obtained aboriginal title of the Florida peninsula even with the presence of

other tribes, partly because Seminole dominion over the area was never challenged, rather, the smaller tribal groups assimilated with the Seminole, who absorbed "these 'foreign' elements into their own ranks." *Alabama-Coushatta Tribe*, 2000 WL 1013532 at *12.

**Exception III: Permissive Use**

The third exception, permissive use, acknowledges that other tribes could "'range over large portions' of the claimant tribe's land without defeating the exclusive nature of . . . use, as long as the tribe's presence was with the claimant tribe's permission." *Alabama-Coushatta Tribe*, 2000 WL 1013532  at *13 (*quoting Wichita Indian Tribe v. United States*, 696 F.2d 1378, 1385 (Fed. Cir. 1983)).  In *Wichita*, the argument that the Wichitas shared hunting grounds with other tribes was too general to support a lack of exclusive use, especially considering the Wichita's "friendly relations and trading activities." *Alabama-Coushatta Tribe*, 2000 WL 1013532 at *13.  The court explained:

> If the Comanches and Kiowas entered Wichita territory mainly to trade with them and considered the land to be that of the Wichitas, these visiting tribes should be considered guests of the Wichitas, and their presence would not affect the Wichitas' aboriginal title. While the Comanches and Kiowas may have ranged over large portions of the hunting grounds without any regard for the Wichitas, the closer the former two tribes came to the Wichitas' villages, the more likely it would be that they were entering what they viewed as Wichita land. At some near enough line, the Comanche and Kiowa presence would not have impinged on the Wichitas' exclusive use of the land.

*Wichita Indian Tribe*, 696 F.2d at 1385.

Similarly, use by other tribes, if done with the permission of the claimant tribe, does not "diminish . . . Indian title." *Alabama-Coushatta Tribe*, 2000 WL 1013532  at *14 *quoting Spokane Tribe of Indians v. United States*, No. 5-62, 1963 WL 8583, 68-69 (Ct.Cl. 1963).

In *Spokane*, the United States could not explain how the use of other tribes defeated exclusivity, and by failing to "show what lands [other tribes] used or under what condition [the

tribes] happened to be there," there existed "too slim a basis for the affirmative finding that the other natives joined the [claimant tribe] in common, equal use of the [area]." *Spokane*, 1963 WL 8583 at 69. And in *Strong*, the court found that the "claimant tribe's presence was 'overwhelmingly predominant and lasted a long time. Those incidents of use and occupancy by other Indians [the court views] as permissive or as so sporadic as to not be inconsistent with [the claimant tribe's] use and occupancy.'" *Strong*, 518 F.2d 556 at 565.

"To satisfy the permissive use exception, *permission need not be explicit*, but may be inferred from the record as a whole." (emphasis added). *Alabama-Coushatta Tribe*, 2000 WL 1013532 at *14. As in *Strong*, where the court "found that a tribe other than the claimant tribe had two settlements in the claim area[,] the court inferred permissive use." The court found that there was evidence the Wyandot gave:

> permission to other Indian tribes to use their lands in Ohio, and we think the record, taken as a whole, supports the inference that the Ottawa were in the Sandusky area with the consent of the Wyandot. Permissive use by the Wyandot did not diminish the title of the Wyandot, and by the same token, such use gave the Ottawa no interest in the land.

*Id.* at 14 quoting *Strong*, 518 F.2d at 572.

Courts also recognize that within the general rule of exclusive use and the three exceptions, "non-exclusive use of one segment of the claim area is not automatically imputed to the whole claim area. Thus, on the record as a whole, a Hearing Officer may find that a claimant tribe had exclusive use of certain portions of the claim area, but failed to prove exclusive use of other portions." *Alabama-Coushatta Tribe*, 2000 WL 1013532 at *14.

**Assuming there were historic uses by other tribes, the undisputed facts show that other tribes had stopped using Redondo by at least 2000, if not before.**

It is undisputed that no living Jemez members recall ever seeing a member of another tribe at Redondo Peak, apart from a single incident in 2001 discussed below. UMF No. 33.

27

Andrew Dunigan, a former non-Indian owner of the VCNP prior to US ownership, testified that since he was a child he was aware of the fact that Jemez used Redondo.  UMF No. 32. Additionally, he does not recall any other tribe using the VCNP except for Jemez members, who did use Redondo Peak for traditional purposes prior to 2000.  *Id.*  Since the United States purchased the property in 2000 and began managing the property, it is undisputed that the United States maintained records of all tribes that requested and accessed the VCNP.  UMF No. 35. Until the last few years, it was a written policy[4] of the United States that any tribe wanting to access the VCNP had to make a written request for access.  UMF No. 35.  The documents show that there are dozens of instances in which Jemez members or Jemez societies requested and accessed Redondo Mountain since 2000.  UMF Nos. 34-39.

███████████████████████████████████████████████

███████████████████████████████████████ ▪ UMF No. 40. ████

█████████████████████████████████████████████████████

UMF No. 40. ██████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

---

[4] Different VCNP staff members have different understandings about how long the written policy was in effect and/or continued to be followed.  UMF 35.  At the earliest, the written policy ineffective at the time the Park Service took over management on September 30, 2015.  Written tribal requests for access is still encouraged.  UMF 35.

[5] ███████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████

███████████████ UMF No. 42. ████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

     As to Zia, the undisputed facts establish that, for at least the last 18 years, Zia only used Redondo Peak on 1 or maybe 2 occasions. UMF Nos. 40-41. By contrast, Jemez used Redondo on dozens of occasions over the past 18 years, and the undisputed deposition testimony of Jemez witnesses and at least one previous land owner demonstrates that Jemez used Redondo Mountain for centuries through present time. UMF Nos. 24-39. Clearly, Jemez's uses have dominated those of Zia. "Where another tribe commonly uses the land with the claimant tribe, proof of the claimant tribe's dominance over the other tribe preserves its exclusive use of the land." *Alabama-Coushatta Tribe*, 2000 WL 1013532 at *13 citing *United States v. Seminole Indians of the State of Florida*, 180 Ct.Cl. 375, 383-86 (1967). In *Seminole*, where the "the Seminole held a virtual 'monopoly'" on occupation of the land, dominance illustrates the claimant tribe's "ability to exclude other tribes from the area, even if it never chooses to exercise that ability." *Id.* (*quoting Seminole Indians*, 180 Ct.Cl. at 383). The Seminole obtained aboriginal title of the Florida peninsula even with the presence of other tribes, partly because Seminole dominion over the area was never challenged. *Alabama-Coushatta Tribe*, 2000 WL 1013532. As such, Jemez continuously and exclusively used Redondo Mountain and is entitled to quiet title of Redondo Mountain as a matter of law.

**Conclusion**

The Pueblo of Jemez respectfully requests that the Court enter partial judgment in its

favor confirming that no genuine issue of material fact exists regarding the Pueblo's Indian title

to Banco Bonito and Redondo Mountain and that, as a matter of law, the Pueblo has Indian title

to the area within the boundaries of the Banco Bonito and Redondo Mountain as in Figure 1.

August 17, 2018                          Respectfully submitted,

                                         BARNHOUSE KEEGAN SOLIMON & WEST LLP

                                         */s/ Christina S. West*
                                         Christina S. West
                                         Randolph Barnhouse
                                         Justin J. Solimon
                                         7424 4th Street N.W.
                                         Los Ranchos de Albuquerque, NM 87107
                                         (505) 842-6123 (telephone)
                                         (505) 842-6124 (facsimile)
                                         ***Attorneys for Plaintiff Pueblo of Jemez***

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on the day of August 17, 2018, I filed the foregoing
electronically through the CM/ECF system, which caused the following parties or counsel to be
served by electronic means, as more fully reflected on the Notice of Electronic Filing:

    Peter Dykema, Peter.dykema@usdoj.gov
    Matthew Marinelli, Matthew.marinelli@usdoj.gov
    Jacqueline Leonard, Jacqueline.Leonard@usdoj.gov
    *Attorneys for Defendant United States*

    Kirk R. Allen, kallen@mstlaw.com
    *Attorneys for Defendant-in-Intervention NMGC*

*/s/ Christina S. West*
Christina S. West