# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF JEMEZ, a federally recognized
Indian tribe,

     Plaintiff,

vs.                             No. CIV 12-0800 JB\JHR

UNITED STATES OF AMERICA,

     Defendant,

and

NEW MEXICO GAS COMPANY,

     Defendant-in-Intervention.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion in Limine to Exclude

Certain Evidence, filed August 17, 2018 (Doc. 236)("MIL 1"). The Court held a hearing on

September 14, 2018. The primary issue is whether evidence of land use by other than Plaintiff

Pueblo of Jemez after 1848 -- the year when the Pueblo Indians can under United States

jurisdiction -- is relevant to whether Jemez Pueblo holds continuing aboriginal title to the Valles

Caldera.[1] The Court denies MIL 1, because the United States Court of Appeals for the Tenth

---

[1]The Valles Caldera encompasses "a vast and beautiful mountain landscape covering over 139 square miles in northern New Mexico, famous for its scenic beauty and unique geological features." Melinda Harm Benson, <u>Shifting Public Land Paradigms: Lessons from the Valles Caldera National Preserve</u>, 34 Va. Envtl. L.J. 1, 2 (2016). In describing the area, Dr. Peter Gess stated:

Circuit has expressly instructed the Court to consider such evidence. See Pueblo of Jemez v. United States, 790 F.3d 1143, 1165 (10th Cir. 2015)("Whether the Jemez Pueblo can establish that it exercised its right of aboriginal occupancy to these lands in 1860 and thereafter is a fact question to be established on remand, where it will have the opportunity to present evidence to support its claim."). Specifically, the Tenth Circuit has instructed the Court to consider evidence necessary to determine whether Jemez Pueblo's use of the Valles Caldera was exclusive as to other Indian Tribes. See 790 F.3d at 1165 ("[T]he 'exclusive' part of the test mean[s] . . . that in order to establish aboriginal title, a tribe must show that it used and occupied the land to the *exclusion of other Indian groups.*" (internal quotation marks omitted)(emphasis in original)). The Tenth Circuit also has instructed the Court to consider whether Jemez Pueblo's use of the Valles Caldera suffered interference by others after Congress granted the land to the Baca family in 1860. See 790 F.3d at 1166 ("[I]f there was actually substantial interference by others with these traditional uses before 1946, the Jemez Pueblo will not be able to establish aboriginal title."). Furthermore, because the expert report authored by Dr. Terence Kehoe contains relevant evidence of multiple Pueblos' use of the Valles Caldera, the Court will not exclude the substance

---

One could argue that a most important factor leading to the creation of the [Valles Caldera National] Preserve began more than four million years ago; the Jemez Mountain region has seen volcanic activity for at least that long. The renewed volcanic activity 1.22 million years ago spewed 292 cubic kilometers of ash and material, leaving a hollowed-out crater, known as a caldera, surrounded by mountains.

Peter L. Gess, A Grand Experiment in Public Lands Management: Responsiveness in the National Caldera National Preserve 36 (Aug. 2006)(unpublished Ph.D. dissertation, University of Georgia)(on file with the Main Library, University of Georgia).

of Dr. Kehoe's report.  See Expert Report of Dr. Terence Kehoe at 19-20, filed August 31, 2018 (Doc. 249-1)("Kehoe Report").  The Court declines to ignore the Tenth Circuit's express directives, will therefore deny MIL 1, and will consider relevant evidence of land use by other than Jemez Pueblo after 1848.

**FACTUAL BACKGROUND**

The following facts are taken in large part from the Opinion of the Court of Appeals for the Tenth Circuit and supplemented with additional facts from the initial pleadings and subsequent briefs of both parties.  The Court recognizes that some of these facts may be in dispute, and the Court is not making any findings of fact in this Memorandum Opinion and Order.

1.      **The Jemez Pueblo.**

The Tenth Circuit summarized the relevant facts as follows:

> The ancestral Jemez people have used and occupied the lands of the Valles Caldera National Preserve and the surrounding areas in the Jemez Mountains of New Mexico since at least 1200 CE.[2] The ancestral Jemez, whose descendants comprise the modern Jemez Pueblo, a federally recognized tribe, have for more than 800 years been the predominant and primary occupants and land users of the Jemez Mountains, including the Valles Caldera National Preserve and the greater Rio Jemez watershed. The Valles Caldera is a dormant crater of a supervolcano located at the center of the Jemez Mountains. The crater rim itself is twenty miles in diameter and is surrounded by four high-mountain valleys and eleven resurgent volcanic domes. The crater rim, high-mountain

---

[2]The Tenth Circuit notes that "CE stands for 'of the common era' . . . an alternative way of expressing the concept denoted by AD and . . . a 'neutral' chronological term that is 'not specifically anchored in Christianity and therefore sensitive to all and any of the world's religions and belief systems.'" Pueblo of Jemez v. United States, 790 F.3d at 1148 n.5 (citation omitted).

valleys, and volcanic domes are located within the exterior boundaries of the Valles Caldera National Preserve.

The Jemez Pueblo is made up of the ancestral Jemez populations of Towa-speaking pueblos, including the Pecos Pueblo and the Jemez Pueblo village of Walatowa. The ancestral Jemez Pueblo's aboriginal title allegedly included the Rio Jemez drainage and the Valles Caldera, an area known to the Pueblo Jemez as the "western Jemez homeland."[3] . . . The western Jemez homeland includes a portion of the land at issue in this case within the Valles Caldera National Preserve and covers an area of more than 1,100 square miles in and around the Jemez Mountains. It includes the entire Rio Jemez drainage system above Walatowa, the modern Jemez Pueblo village, and sections of the Rio Puerco drainage west of the Jemez Mountains.

The western Jemez homeland contains ancestral Jemez Pueblo villages, sacred areas, and ceremonial shrines where the ancestral Jemez have lived since migrating from the mesa and canyon country to the northwest prior to 1200 CE. The Jemez Pueblo's oral history refers to the area to the northwest and describes the great southern migration to its western Jemez homeland. Archeological investigations in the western homeland have found at least sixty pueblo villages linked with a network of trails and many thousand farmhouse sites, agricultural fields, ceremonial sites, sacred areas, mineral procurement areas, camp sites, and other areas associated with the ancestral Jemez. The ancestral Jemez population in the western homeland has ranged from about 10,000 to 15,000 during the prehistoric period and from 7,000 to 10,000 during the Spanish colonial period.

The ancestral Jemez maintained an extensive network of agriculture and farming practices in the Valles Caldera and Jemez Mountains. The Valles Caldera contains many important sacred areas and religious sites of the traditional ancestral Jemez culture and the area is greatly valued by the Jemez Pueblo as a spiritual sanctuary. The ceremonial sites and gathering areas are still actively used by the Jemez Pueblo today and are crucial to the continuing survival of traditional Jemez Pueblo culture and religion. Ancient religious pilgrimage trails link Walatowa to sites within the Valles Caldera, including Redondo Peak and sacred springs, and the Jemez Pueblo members continue to make religious pilgrimages to these sites to leave prayer offerings and conduct rituals. The Jemez Pueblo hunt societies make lengthy visits to the Valles Caldera to hunt and conduct religious ceremonies and initiations of new members. Moreover, the mineral and hot

---

[3]"In its Complaint, the Jemez Pueblo explains that references to the 'western Jemez homeland' . . . are synonymous with references to the 'Jemez Pueblo aboriginal Indian title area.'" Pueblo of Jemez v. United States, 790 F.3d at 1148 n.6 (citation omitted).

springs within the Valles Caldera are used by the Jemez Pueblo's medical societies for healing.

The Jemez continue to rely on the Valles Caldera for many critical resources, as they have done for more than 800 years, including the land and water for livestock; plants and animals on the land for subsistence living; timber for construction and firewood; mountain and forest shelter from the elements; plants, herbs, and roots for medicine; aspen and willow for drums and ritual objects; oak, cherry, and mahogany for bows and ritual objects; rosewood, plums, and reeds for arrows; obsidian and chert for stone tools; minerals for paint and pigments; spring water and evergreens for ceremonial rites; large and small game for ceremonial use; and feathers for ceremonial use and for arrows. The Jemez Pueblo alleges that by this native occupancy and use it has established aboriginal title to the lands at issue in the Valles Caldera National Preserve.

790 F.3d at 1148-49.

## 2. Treaty of Guadalupe Hidalgo and the Baca Land Grant.

In 1848, the United States signed the Treaty of Guadalupe Hidalgo, thereby ending the Mexican-American war and acquiring the territory of New Mexico.[4] See Treaty of Guadalupe Hidalgo, U.S.-Mex., Feb. 2, 1848, art. VIII, 9 Stat. 922, 928. In the Treaty of Guadalupe Hidalgo, the United States agreed to respect pre-existing property rights within the territory. See 9 Stat. at 929-930. Congress thereafter established the office of Surveyor-General for New Mexico and ordered the Surveyor-General "to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico," and to make a full report on the validity of the various claims. Act of July 22, 1854, 10 Stat. 308 ("1854 Act"). Congress also ordered a report "in regard to all pueblos existing in the Territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos,

_____

[4]The New Mexico Territory at that time included present-day Arizona and parts of southern Colorado. See Pueblo of Jemez v. United States, 790 F.3d at 1156.

respectively, and the nature of their titles to the land." 10 Stat. at 308. The report "shall be laid before Congress for such action thereon as may be deemed just and proper, with a view to confirm bona fide grants, and give full effect to the treaty." 10 Stat. at 308.

Based in part on this report, Congress passed an act confirming land claims that several pueblos, including Jemez Pueblo, made, thereby relinquishing "all title and claim of the United States to any of said lands." Pueblo Lands Act of 1924, 43 Stat. 636 (1924), as amended by Act of May 31, 1933, 48 Stat. 108. See Survey of Conditions of the Indians in the United States: Hearings Before the Subcomm. of the S. Comm. on Indian Affairs, 71st Cong. 11,081-11,317 (1930) (analyzing reasons for Pueblo Lands Act amendments). The Pueblo Lands Act of 1924 established the Pueblo Lands Board, with authority to determine the exterior boundaries of the Pueblo Indians' lands granted or confirmed by the United States' or any prior sovereign's authority, or acquired by the Pueblos by purchase or other method, and to determine the status of all lands within those boundaries. See Pueblo Lands Act, § 2, 43 Stat. 636 (1924). Neither the 1854 Act nor the Pueblo Lands Act of 1924 include the Valles Caldera among the lands confirmed to belong to Jemez Pueblo.

The lands that encompass the Valles Caldera came to the Surveyor-General's attention after his report to Congress that the heirs of Luis Maria Baca ("Baca heirs") and the inhabitants of Las Vegas, New Mexico both had valid but conflicting claims to a large tract of land in the vicinity of Las Vegas. See Lane v. Watts, 234 U.S. 525, 526-27 (1914); Maese v. Hermann, 183 U.S. 572, 578 (1902); Shaw v. Kellogg, 170 U.S. 312, 314 (1898). Congress settled this conflict by allowing the inhabitants of Las Vegas to retain title over the contested land and passing a

statute authorizing the Baca heirs "to select instead of the land claimed by them, an equal quantity of vacant land, not mineral, in the Territory of New Mexico, to be located by them in square bodies, not exceeding five in number." Act of June 21, 1860, 12 Stat. 71, 72 ("1860 Act"). The 1860 Act authorized a selection totaling up to 496,447 acres, see Shaw v. Kellogg, 170 U.S. at 315, and, in December of 1860, the Baca heirs selected the first of their parcels -- known as "Baca location No. 1" -- an area totaling approximately 99,289 acres of land in and adjacent to the Valles Caldera, United States v. Redondo Development Co., 254 F. 656, 657 (8th Cir. 1918). Without notice to Jemez Pueblo, the Surveyor-General reviewed and authorized the Baca heirs' selection, and after the Surveyor-General's approval, the Baca heirs began using the Valles Caldera, primarily for grazing. See United States v. Redondo Dev. Co., 254 F.2d at 657. The Surveyor-General's authorization indicated that, in 1860, the United States viewed the Valles Caldera as "vacant" and unoccupied. Pueblo of Jemez v. United States, 790 F.3d at 1149. Notwithstanding the Surveyor-General's determination that the lands included in Baca Location No. 1 were "vacant,"

> the Jemez Pueblo alleges the lands . . . were "exclusively possessed, used and occupied by Jemez Pueblo pursuant to the Pueblo's aboriginal Indian title," *id.* at 18 ¶ 82, and that the "Baca heirs received these lands subject to the continuing aboriginal Indian title of Jemez Pueblo," *id.* at 18 ¶ 83. Moreover, the Jemez Pueblo alleges that it continued to use and occupy the Valles Caldera for traditional purposes without any opposition or interference from the Baca family.

Pueblo of Jemez v. United States, 790 F.3d at 1149.

### 3. The Pueblo's Claims Before the Indian Claims Commission.

In 1946, Congress enacted the Indian Claims Commission Act, 60 Stat. 1049 ("ICCA"), to "dispose of the Indian claims problem with finality" and to "transfer from Congress to the

Indian Claims Commission the responsibility for determining the merits of native American claims."[5]  United States v. Dann, 470 U.S. 39, 45 (1985).  Congress also included a statute of limitations under which any pre-August 13, 1946, claims against the United States not brought before August 13, 1951, would be forever relinquished.  ICCA §§ 2, 12, 60 Stat. 1049.  Section 12 of the ICCA provides: "[N]o claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress."  ICCA § 12, 60 Stat. 1049.  See also Pueblo of Jemez v. United States, 790 F.3d at 1147 n.13 (quoting ICCA § 12).  Furthermore, under ICCA § 22(a), payment of a claim under the ICCA bars suit against the United States for any claims "touching on any of the matters" presented before the Indian Claims Commission ("ICC").  ICCA § 22(a), 60 Stat. 1049 ("[P]ayment of any claim, after a determination under the Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy.").  See also Pueblo of Jemez v. United States, 790 F.3d at 1170 (quoting ICCA § 22(a)).

On July 9, 1951, within the ICCA's prescribed five-year period for filing claims, the Jemez, Zia, and Santa Ana Pueblos filed a petition with the ICC.  See Pueblo of Zia, et al v. United States, 11 Ind. Cl. Comm. 131 (1962)("Zia I").  Before the ICC, the Pueblos alleged, among other things, that in 1848, they held aboriginal title to approximately 520,000 acres of lands in Sandoval County, New Mexico.  See United States v. Pueblo De Zia, 474 F.2d 639

---

[5]The current United States Code omits the ICCA, because the Indian Claims Commission terminated on September 30, 1978.  See Pueblo of Jemez v. United States, 790 F.3d at 1147 n.3.

(Ct.Cl.1973)("Zia IV"). The Pueblos alleged that the United States had violated their aboriginal title, because other, non-Indian persons were allowed to claim and possess those same lands. See Zia IV, 474 F.2d at 641. Baca Location No. 1, which included the area of the Valles Caldera, was not the subject of this litigation.

The ICC initially concluded that the Pueblos had failed to establish any aboriginal title to any of the lands. See Zia IV, 474 F.2d at 641. The ICC concluded that those lands that the Surveyor-General and the United States had held were subject to Spanish or Mexican grants before the Treaty of Guadalupe Hidalgo were "all held valid and patented by the United States[;] they were private property as of the time of the Treaty of Guadalupe Hidalgo. Therefore, [the Pueblos'] claim of aboriginal title to these areas must be rejected." Pueblo De Zia v. United States, 165 Ct. Cl. 501, 503 (1964)("Zia II"). With respect to those lands that had entered the public domain, the ICC ruled that "the evidence offered is so vague and indefinite that a finding of aboriginal title in the [Pueblos] to any of the claimed area would have to be based on mere conjecture." Zia II, 165 Ct. Cl. at 503. The ICC concluded that the evidence did not establish "the extent of [the Jemez, Zia, and Santa Ana Pueblos'] exclusive use and occupancy of the claimed area as of the critical date." Zia II, 165 Ct. Cl. at 507.

On appeal, the Pueblos "concede[d] the correctness of the Commission's determination that they had no aboriginal claim to the Spanish grants which encroach on the claimed area." Zia II, 165 Ct. Cl. at 503. Nonetheless, the Pueblos contended that they had established that they had, at one time, held aboriginal title to the 298,634 acres that had entered the public domain.

See Zia II, 165 Ct. Cl. at 507-08. The Court of Claims agreed, concluding that the Pueblos had established aboriginal title to those lands. See Zia II, 165 Ct. Cl. at 508-09. The Court of Claims remanded the case to the ICC. See Zia II, 165 Ct. Cl. at 509.

On remand, the Pueblos argued that the United States had extinguished the Pueblos' aboriginal title by including some of the lands within the Jemez National Forest Reserve and by including the remaining lands within the boundaries of a grazing district established pursuant to the Taylor Grazing Act of 1934, 43 U.S.C. §§ 315-315r ("Taylor Grazing Act"). See Pueblo de Zia v. United States, 19 Ind. Cl. Comm. 56, 68 (1968)("Zia III"). The ICC ultimately agreed that the United States had extinguished aboriginal title through those actions. See Zia III, 19 Ind. Cl. Comm.at 74-76. Additionally, the Commission found that the United States had previously extinguished title to many thousands of acres of land when it patented those lands to private parties under the homestead acts. See Zia III, 19 Ind. Cl. Comm. at 77. On appeal, Jemez Pueblo conceded, and the Court of Claims upheld, those conclusions. See Zia IV, 474 F.2d at 641-42 n.4.

The parties entered into a settlement, and on January 10, 1974, the ICC entered a final judgment of $749,083.75 in favor of the Pueblos. See Pueblo of Jemez v. United States, No. CIV 12-0800 RB/RHS, 2013 WL 11325229, at *5 (D.N.M. Sept. 24, 2013)(Brack, J.), rev'd and remanded, 790 F.3d 1143 (10th Cir. 2015)("Pueblo of Jemez I"). The stipulation agreement signed by the Pueblo stated that the "final judgment shall finally dispose of all rights, claims or demands which plaintiffs have asserted or could have asserted with respect to the subject matter of such case." Pueblo of Jemez I, 2013 WL 11325229, at *5. Congress later declared the plan

for the distribution of the award to the Pueblos valid and effective.  See Pueblo of Jemez I, 2013

WL 11325229, at *5.

### 4.  Valles Caldera Preservation Act.

On July 25, 2000, then-President Clinton signed the Valles Caldera Preservation Act of

2000, 16 U.S.C. §§ 698v-698v-10 (repealed 2014)("Preservation Act"),[6] establishing the Valles

Caldera National Preserve.  See Pueblo of Jemez v. United States, 790 F.3d at 1149-50. The

Preservation Act authorized the Secretary of Agriculture to purchase the 94,761-acre ranch on

Baca Location No. 1 from the Baca heirs' successors-in-interest -- the Dunnigan family[7] -- "to

protect and preserve scientific, scenic, geologic, watershed, fish, wildlife, historic, cultural, and

recreational values . . . and to provide for multiple use and sustained yield" of its renewable

resources.  16 U.S.C. §§ 698v-2, -3. Congress also recognized that "certain features on the Baca

ranch have historical and religious significance to Native Americans," and Congress explained

that those features "can be preserved and protected through Federal acquisition of the property."

16 U.S.C. § 698v-10.  Nevertheless, Jemez Pueblo "alleges that the United States purchased this

---

[6]The Preservation Act has been repealed and replaced by the National Defense Authorization Act of 2015, Pub. L. No. 113–291, § 3043, 128 Stat. 3292, 3798.  See also Pueblo of Jemez v. United States, 790 F.3d at 1149 n.7.

[7]The Baca heirs sold Baca Location No. 1 to the Otero family in 1899, and in 1909, the Otero family sold the land to the Redondo Development Company.  See Kristen K. de Graauw et al., Historical dendroarchaeology of two log structures in the Valles Caldera National Preserve, New Mexico, USA, 32 Dendrochronologia 336, 337 (2014).  In 1918, the G.W. Bond and Brothers Company purchased Baca Location No. 1, and used the land for various ranching operations until 1954.  See de Graauw, supra, at 337.  Outside ranchers leased Baca Location No. 1 from 1954 to 1963, when the Dunigan family purchased and held the land until the sale to the United States in 2000, pursuant to the Valles Caldera Preservation Act, which created the Valles Caldera Trust.  See de Graauw, supra, at 337.

property interest subject to its continuing aboriginal Indian title, and that shortly thereafter the government began limiting the Jemez Pueblo's access to the land." Pueblo of Jemez v. United States, 790 F.3d at 1149-50.

## PROCEDURAL BACKGROUND

In 2012, the Jemez Pueblo filed this suit under the federal common law and the Quiet Title Act, 28 U.S.C. § 2409a ("QTA"), seeking a judgment that Jemez Pueblo "has the exclusive right to use, occupy, and possess the lands of the Valles Caldera National Preserve pursuant to its continuing aboriginal title to such lands." Complaint to Quiet Title to Aboriginal Indian Land, Prayer for Relief ¶ 1, at 14-15, filed July 20, 2012 (Doc. 1)("Complaint"). Specifically, Jemez Pueblo alleges aboriginal title to "that certain parcel of land commonly known as Baca Location No. 1 located in Sandoval and Rio Arriba Counties, New Mexico . . . containing 99,289.39 acres, more or less." Doc. 1 at 27.

### 1.    The Motion to Dismiss.

The United States' filed a motion to dismiss pursuant to rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure based on the theories that: (i) the ICC divested the district court of jurisdiction over the Pueblo's claim to the Valles Caldera, and (ii) sovereign immunity and issue preclusion bar Jemez Pueblo from bringing a claim. See United States' Motion to Dismiss Plaintiff's Complaint and Memorandum of Points and Authorities at 2-3, filed February 14, 2013 (Doc. 14)("Motion"). As to rule 12(b)(1), the United States argued that "Congress expressly deprived district courts of jurisdiction over the subject matter of Plaintiff's claims, when it enacted the limited waiver of sovereign immunity in the ICCA, which has since

expired." Motion at 10. Although Jemez Pueblo contends that it possessed unextinguished aboriginal title in 2000, when Congress passed the Preservation Act, the United States argues that Jemez Pueblo was divested of aboriginal title in 1860, when the United States granted the land encompassing the Valles Caldera to the Baca family. See Motion at 10. The United States contends that the ICCA bars Jemez Pueblo's action in this case because of the ICCA's "finality provision," which states that

> (1) payment of any claim after a determination under the Act shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy, and (2) a final determination against a claimant made and reported in accordance with the Act shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy.

Motion at 11 (quoting ICAA § 22(a)). It follows, according to the United States, that the finality provision "fully discharged the United States of *all* liabilities." Motion at 11 (emphasis in Motion).

The United States further argues that, based on the Complaint and the amended petition filed before the ICC in Zia I, Jemez Pueblo's claims concern "the same matters that were litigated nearly 50 years prior." Motion at 13. According to the United States, finality thus occurred when the United States deposited the final monetary award in Jemez Pueblo's bank account. See Motion at 13 (citing United States v. Dann, 470 U.S. 39, 50 (1985)). The United States argued that, even if the ICC finality provision does not bar the claim, Jemez Pueblo expressly waived any right to assert future claims of aboriginal title when it authorized final judgment against the United States in its claim before the ICC. See Motion at 13-14. The United States adds that the ICCA provided the "exclusive forum" for the litigation of Jemez

Pueblo's claim to aboriginal title, and thus the prior litigation precludes the district court from exercising subject-matter jurisdiction. Motion at 14. The United States also argues that the ICC's "wide-ranging and exclusive jurisdiction" over "all possible" historic Indian claims included claims of aboriginal title. Motion at 14 (citing United States v. Pueblo of San Ildefonso, 513 F.2d 1383, 1394 (Ct. Cl. 1975)). The United States adds that, "[a]s a corollary, the ICC's expansive jurisdiction required that tribes present claims of both extinguished and *existing* aboriginal title." Motion at 15 (emphasis in Motion)(citing Navajo Tribe of Indians v. New Mexico, 809 F.2d 1455, 1463 (10th Cir. 1987). The ICCA's "comprehensive nature," the United States contends, expressly deprived the district courts of jurisdiction over claims that fell within the ICCA's jurisdiction. Motion at 15. The United States concedes, however, that Congress provided for monetary damages only and not for equitable relief. See Motion at 15. Nevertheless, the United States contends that the QTA does not evidence Congressional intent to reopen the federal courts to Indian claims that accrued before 1946, as nothing in the QTA or its legislative history suggests such intent. See Motion at 16. Thus, according to the United States, Jemez Pueblo's action to quiet title is a "thinly veiled attempt to seek a remedy . . . that Congress never contemplated in crafting the expansive jurisdiction of the ICC." Motion at 17 (citing Navajo Tribe of Indians v. New Mexico, 809 F.2d at 1467; Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony v. City of Los Angeles, No. 1:06-cv-00736-OWW-LJO, 2007 WL 521403, at *16 (E.D. Cal. Feb. 15, 2007)(Wanger, J.)(concluding that, "even if [a plaintiff] had timely filed its claim under the ICCA, [it] could not have quieted title in these lands or maintained an action in ejectment . . . . The Tribe simply would have had to accept just

monetary compensation if the Commission found their claim to title valid"), aff'd, 637 F.3d 993, 998 (9th Cir. 2011).

The United States also argues that, based on Jemez Pueblo's Complaint, "[t]he United States ostensibly acted in a manner inconsistent with the Pueblo's aboriginal title long before 1946, and [Jemez Pueblo] has offered no explanation why they were unable to pursue this claim in the exclusive forum of the ICC." Motion at 18. The United States further argues that "[i]t is irrelevant that the Pueblo did not claim title to the Valles Caldera in the ICC litigation; the Pueblo could have asserted title to the Valles Caldera in much the same manner that they did with respect to other land claims." Motion at 18. The United States adds that "it is hard to conceive of a claim more stale than Plaintiff's claim of title to the National Preserve," and it "would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." Motion at 19 (citing Block v. North Dakota ex rel. Board of Univ. & Sch. Lands, 461 U.S. 273, 285 (1983)).

The United States also contends that rule 12(b)(6) forms the basis for dismissal of Jemez Pueblo's claims, because Jemez Pueblo already "fully and fairly litigated the scope and extent to which the [Jemez, Zia, and Santa Ana] Pueblos possessed aboriginal title to public lands," and is therefore foreclosed from bringing this claim under the doctrine of issue preclusion. Motion at 19-20. According to the United States, issue preclusion obtains because the ICC: (i) "made specific factual findings . . . defining the outer contours of the Pueblo's aboriginal lands"; (ii) paid an award to Jemez Pueblo that discharged all matters in controversy, which was effectively

the Court of Claims' final judgement; and (iii) permitted Jemez Pueblo to provide "extensive" evidence, which is indicative of a "full and fair" opportunity to litigate. Motion at 22-23.

The United States argues that Jemez Pueblo's claim of aboriginal title fails, because Jemez Pueblo cannot show exclusive use and occupancy given that the Baca family and their successors-in-interest occupied the Valles Caldera for almost 150 years. See Motion at 24. Moreover, according to the United States, the ICC already concluded that the United States' decision "to relinquish ownership and control of land in the public domain . . . extinguished any aboriginal title." Motion at 24. Jemez Pueblo's use was not exclusive, according to the United States, because Jemez Pueblo has already conceded that other individuals occupied the land before federal acquisition in 2000. See Motion at 24. Furthermore, the Preservation Act extinguished Jemez Pueblo's right to exclusive use and occupancy, "if any such right even existed." Motion at 24-25. The United States argues that such reasoning is in accord with the Court of Federal Claims' conclusion that "the Jemez Forest Reserve . . . effectively deprived them of the land and extinguished title." Motion at 25 (citing Zia IV, 474 F.2d at 641. The United States asserts that the sovereign's will dominates, and, thus, "unless otherwise specified by an act of Congress, aboriginal rights prevail only against parties other than the federal government." Motion at 26 (citing Oneida Indian Nation of N.Y. State v. Oneida Cty., 414 U.S. 661, 667 (1974); Vill. of Gambell v. Clark, 746 F.2d 572, 574 (9th Cir. 1984)("[Aboriginal] rights are superior to those of third parties, including the states, but are subject to the paramount powers of Congress.")). According to the United States, the Preservation Act therefore establishes all of the Pueblos' rights in the Valles Caldera's vicinity, and there is no support for

the argument that Congress intended to grant Jemez Pueblo "an exclusive right to occupy and control more than 99,000 acres of federal land." Motion at 27.

      **2.**      **Jemez Pueblo's Response.**

Jemez Pueblo responded to the Motion by arguing that the United States has not provided a factual basis that Jemez Pueblo's "exclusive claim to the Valles Caldera touches on the joint claim in the ICC such that the payment of any award would have triggered the finality provision of the ICCA." Plaintiff's Response in Opposition to United States' Motion to Dismiss Plaintiff's Complaint and Memorandum of Points and Authorities at 4, filed May 13, 2013 (Doc. 22)("Response"). Jemez Pueblo further argues that the United States also fails to provide extrinsic evidence that Jemez Pueblo "had a claim for compensation relating to the Valles Caldera as of 1946." Response at 4. Jemez Pueblo contends that it has alleges facts sufficient to establish a claim that entitles it to relief, specifically that Jemez Pueblo holds aboriginal title to the Valles Caldera "through exclusive use and occupancy from as early as the 13th century." Response at 5-6. Moreover, Jemez Pueblo asserts that the title is still valid, because Congress has not expressly acted to extinguish it. See Response at 6. Moreover, the Congressional statute that grants land to the Baca heirs lacks the requisite, express language necessary to extinguish aboriginal title. See Response at 7. Thus, according to Jemez Pueblo, the Surveyor-General's approval of the land that now encompasses the Valles Caldera "was no more than a ministerial action" incapable of extinguishing title. Response at 8. Furthermore, according to Jemez Pueblo, the Congressional statute authorizes only the selection of "vacant" land and makes no mention of preexisting rights, indicating that the Baca heirs took title subject to the Tribal right

of use and occupancy.  Response at 8.  According to Jemez Pueblo, in the years since the Baca

land grant, Jemez Pueblo has neither ceded nor abandoned its aboriginal title.  Response at 9.

Jemez Pueblo also argues that Congress did not intend that the ICCA be an "exclusive

remedy" which would extinguish otherwise valid aboriginal title.  Response at 10.  The ICCA,

according to Jemez Pueblo, is remedial legislation intended to provide American Indians with "a

measure of justice and a remedy for ancient wrongs."  Response at 10 (citing Blackfeet & Gros

Ventre Tribes of Indians v. United States, 119 F. Supp. 161, 168 (Ct. Cl. 1954)(Madden, J.,

dissenting)("The purpose of the Indian Claims Commission Act was to close out the claims of

Indian tribes for ancient wrongs.")).  Jemez Pueblo notes that "no decision under the ICCA has

ever cited the Act itself as taking or extinguishing Indian title."  Motion at 13.  Moreover, Jemez

Pueblo asserts that the Supreme Court of the United States' opinion in Tee-Hit-Ton Indians v.

United States, 348 U.S. 272 (1955), expressly states that the Congressional purpose behind the

ICCA is "compassion" and that, when Congress acts to extinguish aboriginal title, it does so

through "negotiation rather than force."  Response at 14 (citing Tee-Hit-Ton Indians v. United

States, 348 U.S. at 273-74.  Jemez Pueblo argues that the legislative history of the ICAA, based

on statements from Felix Cohen[8]  to the House Indian Committee Chairman, indicates that the

---

[8]Born in 1907, Felix S. Cohen has been described as "the Blackstone of American Indian
Law."  Cohen's Handbook of Federal Indian Law at xiv (Nell Jessup Newton et al. eds.,
2012)("Cohen's Handbook").  He served in the Department of the Interior ("DOI") for fourteen
years, during which time he "was a principal drafter of the Indian Reorganization Act of 1934, a
litigator, a Special Assistant to the Attorney General, and Associate Solicitor of the Department
of the Interior."  Cohen's Handbook, supra, at xiv.  After resigning from the DOI  in 1948, Mr.
Cohen received the Distinguished Service Award, which is the DOI's highest honor.  See
Cohen's Handbook, supra, at xiv.  Mr. Cohen then engaged in private practice in Washington,
D.C., devoting much of his time to Indian law while also teaching at various law schools and

statute of limitations "would only deny a remedy for then *existing claims*." Response at 15 (emphasis in Response). Jemez Pueblo asserts that the ICCA section which provides a waiver of the government's sovereign immunity for claims accruing after the ICCA's passage does not impose a "money damages only" remedy, because many American Indian Tribes have continued to litigate treaty rights, hunting rights, fishing rights, and land rights in federal court in the years since 1946. Response at 16.

Jemez Pueblo contests the United States' assertion that the Tenth Circuit in <u>Navajo Tribe of Indians v. New Mexico</u> holds that Tribes were required to present claims of existing aboriginal title, principally because the Tenth Circuit does not explain "just how broadly the word 'claim' under the ICCA should be interpreted." Response at 20 (citing <u>Navajo Tribe of Indians v. New Mexico</u>, 809 F.2d at 1464). Moreover, according to Jemez Pueblo, the Tenth

---

continuing to write, until his death on October 19, 1953, at the age of forty-six. <u>See</u> <u>Cohen's Handbook</u>, <u>supra</u>, at xiv.

In describing Mr. Cohen's seminal work, the 1942 <u>Handbook of Federal Indian Law</u>, Felix Frankfurter, Associate Justice of the United States Supreme Court, said:

> Only a ripe and imaginative scholar with a synthesizing faculty would have brought luminous order out of such a mish-mash. He was enabled to do so because of his wide learning in the various fields of inquiry which are relevant to so-called technical legal questions. Learning would not have sufficed. It required realization that any domain of law, but particularly the intricacies and peculiarities of Indian law, demanded an appreciation of history and understanding of the economic, social, political and moral problems in which the more immediate problems of that law are entwined.

<u>Cohen's Handbook</u>, <u>supra</u>, at xiv (quoting Felix Frankfurter, Foreword to Cohen, <u>Dialogue on Private Property</u>, 9 Rutgers L. Rev. 355, 356 (1954)). Mr. Cohen's <u>Handbook of Federal Indian Law</u>, now in its fifth edition, is generally regarded as "the most enduring contribution of this truly eminent scholar." <u>Cohen's Handbook</u>, <u>supra</u>, at xiv.

Circuit's view that Tribes had to convert live title claims into claims for money damages is unprecedented, and lacks support in either Supreme Court or out-of-circuit caselaw. See Response at 22. Jemez Pueblo argues that the Navajo Tribe of Indians v. New Mexico decision conflicts with Supreme Court precedent, as post-1946 cases adjudicating Tribal claims to land and water rights evidence. See Response at 22-26. The Pueblo notes that the United States Court of Appeals for the Eighth Circuit has expressly declined to follow the Tenth Circuit's embrace of the exclusive remedy theory by holding that the QTA -- not the ICCA -- time-bars a Tribe's claim. See Response at 26-27 (citing Spirit Lake Tribe v. North Dakota, 262 F.3d 732 (8th Cir. 2001)). Jemez Pueblo further argues that the United States has taken inconsistent positions on the ICCA's effect on otherwise unextinguished claims to aboriginal title, because the United States by formerly argued that the statute of limitations is inapplicable to foreclose a Pueblo from adjudicating live water rights in New Mexico ex rel. State Engineer v. Abbott, No. CIV 68-7488, 2011 WL 13284602, at *1 (D.N.M. Sept. 14, 2011)(Black, J.), but here expanding the ICCA statute of limitations' "scope and effect," thereby indicating that the United States argues its exclusive remedy theory "as expediency may dictate." Response at 29.

Jemez Pueblo also argues that the proceedings before the ICC in United States v. Pueblo de Zia, do not preclude its claim, because that action was for a separate piece of disputed land jointly held by three pueblos and was not a claim for "compensation for a general taking of all Jemez Pueblo lands." Response at 31-32. Jemez Pueblo thus contends that it never had a "full and fair" opportunity to litigate this claim, which is exclusive to the Valles Caldera. Response at 34. Furthermore, according to Jemez Pueblo, the ICCA's finality provision does not bar the

present claim, because it does not touch the claim that Jemez Pueblo settled in <u>Zia III</u>.  Response at 36.  Moreover, argues Jemez Pueblo, because the Valles Caldera was not the subject of the ICC litigation, neither the payment of the award nor the stipulation of settlement serves as a bar the present suit.  <u>See</u> Response at 37-39.  Jemez Pueblo also adds that nothing in the language of the Preservation Act indicates that Congress intended to extinguish aboriginal title, and, "[i]n fact, the Preservation Act expressly preserved valid existing rights."  Response at 40 (citing § 105(e), 114 Stat. 598).

### 3.    **The United States' Reply.**

The United States replies to Jemez Pueblo's Response by reasserting that Jemez Pueblo's failure to timely file its claim under the ICCA divests the district court of subject-matter jurisdiction and deprives Jemez Pueblo of the opportunity to litigate its claims against the United States.  <u>See</u> United States' Reply and Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiff's Complaint at 1-2, filed June 5, 2013 (Doc. 22)("Reply").  The United States argues that the Motion is a factual challenge to the existence of subject-matter jurisdiction, because it contends that the ICCA's time-limited waiver of sovereign immunity bars the district court from exercising jurisdiction over the suit.  <u>See</u> Reply at 3.  The United States adds that Jemez Pueblo "misunderstands the nature of subject matter jurisdiction," because Jemez Pueblo bears the burden to identify a "waiver of the United States' sovereign immunity."  Reply at 3-4 (citing <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994)(holding that because "[f]ederal courts are courts of limited jurisdiction . . . [i]t is to be

presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction")).

The United States also argues that the ICCA did not operate as a "backhanded" extinguishment of aboriginal title, but instead represented Congress' decision to vest the ICC with exclusive jurisdiction of a limited duration "to resolve with finality all claims against the United States." Reply at 5. The United States contends that the ICCA "provided the only unequivocal expression of the United States' consent to be sued for the subject matter that lies at the heart of this case: historic land claims *against the United States*." Reply at 5 (emphasis in Reply). The waiver, however, according to the United States, was for a period of only five years. See Reply at 5 (citing ICCA § 12 (stating that any claim not filed within the limitations period could not "thereafter be submitted to any court or administrative agency for consideration.")). The United States avers that failure to bring a claim before the ICC did not effectuate an extinguishment, as Jemez Pueblo contends, but rather resulted in losing an opportunity to litigate a dispute against the United States. See Reply at 6. Jemez Pueblo's decades-long litigation before the ICC, according to the United States, is evidence of the ICCA's broad scope, and the payment of the award discharges "all matters that were raised or could have been raised." Reply at 6.

The United States contends that Jemez Pueblo "blurs the distinction" between being foreclosed from litigating the validity of title against the United States and the extinguishment of aboriginal title, which the United States agrees the ICCA decidedly did not effectuate. Reply at 7. The United States argues that the favorable cases cited by Jemez Pueblo involve water rights

claims that were against parties other than the United States, which could not have been litigated before the ICC, because the claims were not against the United States and were therefore outside of the ICCA's jurisdiction. See Reply at 8 n.4. Thus, according to the United States, Jemez Pueblo's only opportunity to sue the sovereign was before the ICC. See Reply at 9. Moreover, the United States notes that Jemez Pueblo's claim of title to the Valles Caldera is cognizable under the ICCA and therefore should have been litigated during the statutorily prescribed time period. See Reply at 10. The United States concludes that the Tenth's Circuit's decision in Navajo Tribe of Indians v. New Mexico supports this position, because the Tenth Circuit specifically concluded that a claim of unextinguished title was cognizable under the ICCA. See Reply at 12 (citing in Navajo Tribe of Indians v. New Mexico, 809 F.2d at 1464).

The United States also contends that the QTA's remedial scheme highlights the flaws in Jemez Pueblo's suit given that a determination adverse to the United States would likely result in the payment of just compensation -- not cession of the property -- which "would be the identical position had [Jemez Pueblo] pursued this claim before the Commission, six decades after the expiration of the United States' waiver of sovereign immunity." Reply at 14. The United States concludes that dismissal pursuant to rule 12(b)(6) is warranted, because holding otherwise will impermissibly enlarge the scope of the waiver of sovereign immunity. Reply at 14 (citing United States v. Nordic Vill., Inc., 503 U.S. 30, 34 (1992)("[T]he Government's consent to be sued must be construed strictly in favor of the sovereign, and not enlarge[d] . . . beyond what the language requires.")).

The United States concedes that monetary compensation is the sole remedy available under the ICCA, however; once Jemez Pueblo accepts the award, the United States is discharged of its liability for any claim that "touched" on or "arose from" the matters previously litigated. Reply at 15. The United States argues that the Eighth Circuit's precedent which Jemez Pueblo cites is "squarely contradicted" by the Eighth Circuit's opinion in Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States. Reply at 16 (citing Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States, 650 F.2d 140, 141 (8th Cir. 1981)("Congress has deprived the district courts of subject matter jurisdiction by *expressly providing an exclusive remedy* for the alleged wrongful taking through the enactment of the Indian Claims Commission Act."(emphasis only in Reply))). Moreover, the Tribe in Spirit Lake Tribe v. North Dakota presented to the ICC an aboriginal title claim "that was ultimately resolved in the Band's favor, demonstrating that historic land claims against the United States and premised on aboriginal title were cognizable under the ICCA." Reply at 16 (citing Spirit Lake Tribe v. North Dakota, 262 F.3d at 732). According to the United States, this precedent supports the argument that the stipulation adopted by Jemez Pueblo extends the bar to all claims that could have been litigated, and, consequently, to Jemez Pueblo's claim in this case. See Reply at 17.

Moreover, the United States argues that dismissal under rule 12(b)(6) is appropriate, because Jemez Pueblo has not pled facts that entitle it to exclusive use, occupancy, and control over the Valles Caldera, and, thus, there is no aboriginal title for the United States to extinguish. Reply at 17. It follows, argues the United States, that the Baca family's settlement of the area precludes establishment of aboriginal title "as a matter of law." Reply at 17 (citing Alabama-

Coushatta Tribe of Tex. v. United States, No. 3-83, 2000 WL 1013532, at *28-29 (Fed. Cl. June 19, 2000)(Tidwell, J.)("Nonetheless, non-Indian settlement of the acreage granted by Spain before the Tribe established aboriginal title would undoubtedly interfere with the Tribe's exclusive use and occupancy of such acreage.")).  According to the United States, statements from the ICC in the Zia III litigation, which concluded that aboriginal title was extinguished by non-Indian settlement and the designation of the Jemez Forest Reserve, support the argument that non-Indian settlement can effectuate aboriginal title extinguishment.  See Reply at 18.  It follows, argues the United States, that issue preclusion prevents Jemez Pueblo from "maintain[ing] an action to supplement the findings of the Commission issued nearly four decades prior."  Reply at 21.

The United States repeats its argument that dismissal pursuant to rule 12(b)(6) is appropriate, because the federal common law of aboriginal title does not furnish Jemez Pueblo with a superior right to the Valles Caldera than the federal government.  See Reply at 21.  According to the United States, aboriginal title is "a creature of federal common law," and therefore cannot displace Congress' legislative directives as expressed in the Preservation Act.  Reply at 22.  Jemez Pueblo, the United States concludes, "has failed to cite a single case" sufficient to show that aboriginal title can "divest the sovereign of its own land."  Reply at 22.

### 4.      Judge Brack's Decision.

The Honorable Robert C. Brack, United States District Judge for the District of New Mexico, granted the United States' motion to dismiss for lack of subject-matter jurisdiction by relying primarily on the Tenth Circuit's opinion in Navajo Tribe of Indians v. New Mexico,

which held that the statute of limitations within the ICCA bars suits against the United States for claims of aboriginal title.  See Pueblo of Jemez I, 2013 WL 11325229, at *5.  Specifically, Judge Brack held that Jemez Pueblo had a claim against the United States that accrued as a matter of law before 1946 and, therefore, that Jemez Pueblo's sole remedy was to have brought an action before the ICC before the statute of limitations bars the claim.  See Pueblo of Jemez I, 2013 WL 11325229, at *4 ("It is well-established that the ICCA provided the exclusive remedy for pre-1946 Indian tribal land claims against the United States. . . .  In other words, if a Tribe failed to bring a timely claim under the ICCA, it lost its opportunity to litigate its dispute with the United States.").  Moreover, Judge Brack concludes that Jemez Pueblo failed to distinguish its claim from contrary precedent and instead "relie[d] on inapplicable cases involving claims for aboriginal title against parties other than [the United States]." Pueblo of Jemez I, 2013 WL 11325229, at *4.

Regarding the Tenth's Circuit opinion in Navajo Tribe of Indians v. New Mexico, Judge Brack stated that he is "not free to speculate" about how broadly the Tenth Circuit interprets the word "claim" and instead is tasked with ascertaining and applying the Tenth Circuit's holding that the Tribe's claim against the United States is barred, because the claim falls within the ICCA's exclusive jurisdiction and is therefore subject to the ICCA's statute of limitations. Pueblo of Jemez I, 2013 WL 11325229, at *4.  Judge Brack held that Navajo Tribe of Indians v. New Mexico is controlling precedent, and that Jemez Pueblo's inconsistent suggestions that it does not control and that the Tenth Circuit wrongly decided it are "both unpersuasive and unavailing." Pueblo of Jemez I, 2013 WL 11325229, at *4.  Moreover, Judge

Brack found that <u>Navajo Tribe of Indians v. New Mexico</u> is "concordant" with out-of-circuit precedent. <u>Pueblo of Jemez I</u>, 2013 WL 11325229, at *4.

Judge Brack took issue with the fact that Jemez Pueblo asserts both that the Baca heirs received their land grant in 1860 subject to its aboriginal title and also that it did not have a claim against the United States in 1946:

> Plaintiff cannot have it both ways. Either Defendant's grant to the Baca family extinguished aboriginal title or not. If the Baca land grant extinguished Plaintiff's aboriginal title, then aboriginal title was extinguished in 1860 and Plaintiff cannot claim aboriginal title now. On the other hand, if the Baca land grant did not extinguish Plaintiff's aboriginal title, Plaintiff's claim existed prior to 1946 and Plaintiff had the opportunity to avail itself of the remedy afforded by the ICCA and such claim is now barred by the statute of limitations contained in the ICCA.

<u>Pueblo of Jemez I</u>, 2013 WL 11325229, *at 4.

Judge Brack also concludes that ICCA § 22 required Jemez Pueblo to litigate its claim to the Valles Caldera in its prior ICC proceedings when it sought compensation, and received money damages, for the taking and extinguishment of aboriginal title to other Jemez Pueblo lands. See <u>Pueblo of Jemez I</u>, 2013 WL 11325229, at *5. Judge Brack therefore further concludes that, "[b]ecause [the Pueblo] did not comply with the requirements of the ICCA with respect to the subject property, its claim against the United States is barred by sovereign immunity." <u>Pueblo of Jemez I</u>, 2013 WL 11325229, at *5. Moreover, Judge Brack states that the United States' relatively recent acquisition of the Valles Caldera has no affect on his analysis given that "[c]ourts have uniformly held that a tribe cannot obtain review of a historical land claim otherwise barred by the ICCA by challenging present-day actions involving the land." <u>Pueblo of Jemez I</u>, 2013 WL 11325229, at *5.

5.     **Arguments on Appeal.**

Jemez Pueblo appeals to the Tenth Circuit from Judge Brack's final order dismissing the case, arguing that Judge Brack erred in failing to find subject-matter jurisdiction over Jemez Pueblo's claim, because Jemez Pueblo filed its claim pursuant to the QTA and not the ICCA. The United States responds that Judge Brack correctly dismissed the case pursuant to rule 12(b)(1), because ICCA §§ 12 and 22 divest his court of jurisdiction. Jemez Pueblo replies by reasserting that Judge Brack erred when he failed to address Jemez Pueblo's subject-matter jurisdiction under the OTA's sovereign immunity waiver, which, according to Jemez Pueblo, was the only waiver of immunity and source of jurisdiction on which Jemez Pueblo relies on in its Complaint.

a.     **Jemez Pueblo's Appellant Brief.**

Jemez Pueblo filed an appeal to the Tenth Circuit from Judge Brack's final order dismissing the case, arguing that Judge Brack erred in failing to find subject-matter jurisdiction over Jemez Pueblo's claim, because Jemez Pueblo filed its claim pursuant to the QTA and therefore "did not rely on the waiver of immunity in the (now repealed) Indian Claims Commission Act." Brief of Appellant Pueblo of Jemez at 14, filed April 30, 2014 (Doc. 01019242516 on the Tenth Circuit's docket)("Appellant Br."). Jemez Pueblo argues that it does not need to allege a fee simple interest in the disputed property to bring a claim under the QTA. See Appellant Br. at 14 (citing Kinscherff v. United States, 586 F.2d 159, 161 (10th Cir. 1978)). According to Jemez Pueblo, Judge Brack's findings of fact, taken from Jemez Pueblo's Complaint, are sufficient to support Jemez Pueblo's claim to aboriginal title. See Appellant Br.

at 15.  Jemez Pueblo contends that the United States' "attacks on the Pueblo's factual averments can be, and should have been, addressed through evidence at trial."  Appellant Br. at 16 (citing United States v. Santa Fe Pac. R.R. Co., 314 U.S. 339, 345 (1941)("Santa Fe")("Occupancy necessary to establish aboriginal possession is a question of fact to be determined as any other question of fact")).  Jemez Pueblo avers that it brought its claim within the QTA's twelve-year statute of limitations period, and that the claim should be evaluated under that statute and not the ICCA, because the claim accrued only in 2000 when the United States acquired an interest to the Valles Caldera.  See Appellant Br. at 17-18.

Jemez Pueblo argues that Judge Brack ignored the distinction between extinguished and unextinguished title when he decided the factual merits of Jemez Pueblo's claim under rule 12(b)(1) without making the necessary factual determination of when Jemez Pueblo's claim accrued.  See Appellant Br. at 17-19.  Instead, Jemez Pueblo argues, Judge Brack should have allowed Jemez Pueblo to develop a full record on summary judgement or at trial.  See Appellant Br. at 20 (citing Paper, Allied-Indus., Chem. & Energy Workers Intl Union v. Cont'l Carbon Co., 428 F.3d 1285, 1292 (10th Cir. 2005)("[A] court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case.")).  Moreover, Jemez Pueblo asserts that Judge Brack was required to make a factual finding as to the date when Jemez Pueblo's claim arose.  See Appellant Br. at 24.

Jemez Pueblo argues that, because it alleges a present interest in the Valles Caldera, it was not required to seek compensation before the ICC but instead may pursue equitable relief

pursuant to the QTA. See Appellant Br. at 24. Moreover, Jemez Pueblo asserts that it could not have brought a claim for equitable relief in 1946, because the QTA was not enacted until 1972 and because the United States did not at that time have an interest in the Valles Caldera. See Appellant Br. at 25-26.

Jemez Pueblo argues that Judge Brack further erred when he held that the ICCA provides the exclusive remedy for unextinguished Indian land claims, as the ICCA is remedial legislation for takings designed to end the practice whereby Congress required individual Tribes to obtain such legislation on an ad hoc basis. See Appellant Br. at 27-28. Jemez Pueblo identifies seven separate arguments, each of which indicate that the ICCA is not an exclusive remedy: First, the legislative history proves that Felix Cohen, "the author of the definitive treatise on Indian law," informed the House Indian Committee Chairman that the ICCA statute of limitations "would only deny a remedy for *then existing claims.*" Appellant Br. at 28 (emphasis in Appellant Br.). Second, according to Jemez Pueblo, caselaw does not support the United States' assertion that the waiver of sovereign immunity imposes an "exclusive -- money damages only -- remedy" for Indian Tribes alleging unextinguished property rights. Appellant Br. at 28. Third, according to Jemez Pueblo, a "great number" of Indian Tribes have successfully litigated Tribal rights to land and water, chief among them being Congress' enactment of the Alaska Native Claims Settlement Act on December 18, 1971, "the largest land claims settlement in United States history." Appellant Br. at 30. Fourth, according to Jemez Pueblo, the Tenth Circuit's ostensible support for the exclusive remedy theory in Navajo Tribe v. New Mexico does not bar Jemez Pueblo's claim, because that case involved land that was "indisputably taken by the federal

government in 1908 and 1911," which had "clearly accrued as of 1946." Appellant Br. at 35. Fifth, according to Jemez Pueblo, the exclusive remedy theory is contrary to Supreme Court precedent, because the Supreme Court has adjudicated numerous "live" title claims to water and land rights in the years since 1946. Appellant Br. at 42-44. Sixth, according to Jemez Pueblo, the United States has taken inconsistent positions on the ICCA's effect on otherwise unextinguished aboriginal title by previously arguing in favor of the Ohkay Owingeh Pueblo's post-1946 claim to aboriginal water rights in <u>New Mexico, ex rel. State Engineer v. Abbott</u>, 2011 WL 13284602, at *1. <u>See</u> Appellant Br. at 46-47. Seventh, according to Jemez Pueblo, nothing in the ICCA's jurisdictional grant is intended to extinguish valid title claims, and "no decision under the ICCA has ever cited the Act itself as taking or extinguishing Indian title." Appellant Br. at 51. Jemez Pueblo concludes that the Tenth Circuit should reverse Judge Brack and thereby follow the Supreme Court precedent in <u>Tee-Hit-Ton Indians v. United States</u>, wherein the Supreme Court noted the "'compassionate purpose' of the ICCA and federal policy to 'extinguish Indian title through negotiation.'" Appellant Br. at 51-53 (citing <u>Tee-Hit-Ton Indians v. United States</u>, 348 U.S. at 273-74).

    **b.**  **The United States' Response.**

  The United States responds that Judge Brack correctly dismissed the case pursuant to rule 12(b)(1), because ICCA §§ 12 and 22 divest his court of jurisdiction. <u>See</u> Response Brief for the United States at 15, filed July 17, 2014 (Doc. 01019280803 on the Tenth Circuit's docket)("Resp. Br."). ICCA § 12 applies, according to the United States, because Jemez Pueblo's claim accrued no later than 1860, when the United States "unconditionally transferred"

the Valles Caldera to the Baca heirs. Resp. Br. at 15. The United States argues that Judge Brack properly determined the accrual question, based on the United States' conveyance of the land to the Baca heirs, without needing to reach the merits of Jemez Pueblo's claim that it exercised "full dominion" over the Valles Caldera. Resp. Br. at 18. The United States argues that ICCA § 22 applies, because Jemez Pueblo "already litigated its claim to aboriginal title before the ICC" and received payment from the federal government, thereby discharging all future "claims and demands touching any of the matters involved in the controversy." Resp. Br. at 15 (citing ICCA § 22(a)). Again, the United States argues that Judge Brack properly reached this conclusion without considering the merits of Jemez Pueblo's claim, because "there is no overlap between the substantive issue of whether Jemez Pueblo holds continuing aboriginal title and whether Jemez Pueblo's claims of aboriginal title before the ICC touched on its current claim." Resp. Br. at 18.

The United States contends that ICCA § 12 divests Article III courts of jurisdiction over Jemez Pueblo's claim, because its claim existed before 1946, and Congress expressly deprived district courts of jurisdiction over all claims that could have been brought before the ICC, to include suits to quiet title. See Resp. Br. at 20. Claim preclusion applies to Jemez Pueblo, according to the United States, because even unextinguished claims could have been litigated before the ICC. See Resp. Br. at 21. The United States notes that the only remedy available to Tribes was monetary compensation, because Congress desired to ensure that "non-Indians were assured of continuing possession regardless of the outcome of the litigation." Resp. Br. at 22. Furthermore, that the claim accrued before 1946 is evident, because three factors indicate

that the United States acted "inconsistently" with Jemez Pueblo's alleged aboriginal title in 1860: First, the Surveyor General found that these lands were "vacant" before authorizing their transfer to the Baca heirs, in conflict with Jemez Pueblo's claim that they "occupied" the lands at the time. Resp. Br. at 24-25. Second, according to the United States, the United States transferred the disputed lands to the Baca heirs "absolutely, without condition," which necessarily "extinguished any aboriginal title (if any existed)," thereby causing any claim based on aboriginal title to accrue. Resp. Br. at 26. The United States rejects Jemez Pueblo's assertion that the Baca grant is subject to pre-existing interests, because the statutory language contains no such limitation. Resp. Br. at 27 (citing Lane v. Watts, 235 U.S. 17, 22 (1914)). Furthermore, according to the United States, Congress was seeking to provide the Baca heirs with the same rights that they held to the lands in the vicinity of Las Vegas -- rights that aboriginal title does not encumber. See Resp. Br. at 28-29. Moreover, the United States asserts that Jemez Pueblo already conceded in Zia IV that grants of land to homesteaders extinguishes aboriginal title. See Resp. Br. at 30 (citing Zia IV, 474 F.2d at 641). Third, according to the United States, the Baca heirs occupied and used the land pursuant to the transfer from the United States, and such use "was fundamentally inconsistent with the alleged right of occupancy provided by aboriginal title." Resp. Br. at 32. The United States asserts that the Baca heirs' eight decades of use extinguished any claim to aboriginal title. See Resp. Br. at 32-33 (citing United States v. Gemmill, 535 F.2d 1145, 1149 (9th Cir. 1976)("This century-long course of conduct amply demonstrates that the [Tribe's] title has been extinguished.")).

The United States also argues that, contrary to Jemez Pueblo's contentions, the QTA does not provide a separate waiver of sovereign immunity in exception to ICCA § 12's bar on litigating stale claims. See Resp. Br. at 34. Such an exception would require express language in the QTA or support from its legislative history. See Resp. Br. at 34. Furthermore, according to the United States, even if Jemez Pueblo could point to evidence of Congressional intent for the QTA to displace ICCA § 12, the QTA's twelve-year statute of limitations would bar Jemez Pueblo's claim, which accrued in 1860 when the United States first asserted an interest in the Valles Caldera. See Resp. Br. at 36-37 (citing Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 n.23 (1983)("The legislative history is clear that Congress intended to foreclose totally any suit on claims that accrued more than twelve years prior to the effective date of the QTA.")).

The United States contends that, contrary to Jemez Pueblo's assertions, recognizing that the ICCA was the exclusive forum and remedy for Jemez Pueblo's historic land claim in this case does not mean that the ICCA extinguished all Tribal litigation rights. See Resp. Br. at 38. Instead, the ICCA "deprive[s] Article III courts of jurisdiction to entertain historic land claims against the sovereign by enacting a time-limited waiver of sovereign immunity." Resp. Br. at 39. Such a position, according to the United States, does not speak to the merits of the title issue but rather bars Jemez Pueblo from presenting its claim in federal court. See Resp. Br. at 39. The United States notes that the many cases cited by Jemez Pueblo involve claims against a state or a private entity -- not the United States -- and so the ICCA could not apply. See Resp. Br. at 40. Furthermore, argues the United States, post-1946 disputes involving water rights

between Tribes and other State and private parties are not barred, because such disputes were "generally not cognizable before the ICC." Resp. Br. at 40.

The United States argues that ICCA § 22 also bars Jemez Pueblo's suit, because the United States already compensated Jemez Pueblo for its aboriginal title claim. <u>See</u> Resp. Br. at 41. Although Baca Location No. 1 was not that litigation's subject, the Baca ranch's southernmost bounds assisted Jemez Pueblo is establishing ownership of lands that Jemez Pueblo claimed, which the United States argues is sufficient contact to preclude the present litigation. <u>See</u> Resp. Br. at 42-43. Moreover, the United States asserts, the extent of Jemez Pueblo's aboriginal title was "squarely at issue" in the litigation before the ICC, and Jemez Pueblo had a full and fair opportunity to present its entire claim at that time. Resp. Br. 43-44. According to the United States, Jemez Pueblo's failure to litigate the Valles Caldera claim then is not cause to seek "an expansion of its earlier award" now. Resp. Br. at 44.

The United States argues in the alternative that the Tenth Circuit should dismiss Jemez Pueblo's Complaint under rule 12(b)(6), because three factors show that the Complaint fails to state a claim as a matter of law: First, Jemez Pueblo has not pled facts to demonstrate that it exercised "full dominion and control" necessary to establish title to the Valles Caldera between 1860 and 2000. Resp. Br. at 47-48. Second, according to the United States, similar to the creation of the Jemez Forest Reserve in 1905, the passage of the Preservation Act extinguished whatever claim to aboriginal title that existed. <u>See</u> Resp. Br. at 48-49. Third, the United States argues that aboriginal title prevails only against parties other than the United States. <u>See</u> Resp. Br. at 49-50. The United States concludes that a ruling in Jemez Pueblo's favor would upset

Congress' will -- to ensure that the Valles Caldera be accessible to the public, and to the religious and cultural uses of "numerous Native American groups."  Resp. Br. at 51.

c. <strong>Jemez Pueblo's Reply</strong>.

Jemez Pueblo replies by reasserting that Judge Brack erred when he failed to address its subject-matter jurisdiction under the OTA's sovereign immunity waiver, which, according to Jemez Pueblo, is the only waiver of immunity and source of jurisdiction upon which Jemez Pueblo relies on in its Complaint. <u>See</u> Reply Brief of Appellant Pueblo of Jemez at 10, filed September 3, 2014 (Doc. 01019304554 on the Tenth Circuit's docket)("Reply Br.") at 10.  Furthermore, argues Jemez Pueblo, Judge Brack should have used his "inherent authority" as a United States District Judge to decide when the claim against the United States accrued. Reply Br. at 10 (citing <u>Petrella v. Brownback</u>, 697 F.3d 1285, 1292 (10th Cir. 2012)("[A] federal court always has jurisdiction to determine its own jurisdiction.")).  Jemez Pueblo contends that its claim should be analyzed under the QTA, because its interest in the Valles Caldera was not adverse to the United States in 1860 and became so only in 2000, within the QTA's twelve-year jurisdictional limit.  <u>See</u> Reply Br. at 13.

Jemez Pueblo further argues that Judge Brack erred by deciding the factual merits of its claim under rule 12(b)(1) in reliance on two flawed United States' arguments -- that Jemez Pueblo's prior claim before the ICC and monetary payment preclude Jemez Pueblo's title claim to the Valles Caldera, and that Jemez Pueblo's claim accrued before 1946 -- both of which "demonstrate the impropriety of dismissal under rule 12(b)(1) based on jurisdiction instead of full consideration of the merits of the claim at trial or on summary judgement.  Reply Br. at 15-

16. Moreover, Jemez Pueblo contends that the United States neither addresses nor contests "basic concepts of property law" differentiating between a property interest and accrual of a claim, and between litigation to protect existing title and litigation seeking compensation for a taking. Reply Br. at 16-17. Jemez Pueblo adds that any ruling under rule 12(b)(6) should have been made on an adequate factual record and not dismissed at the early stages of the proceedings, because Jemez Pueblo's Complaint alleges sufficient facts to survive a motion to dismiss. <u>See</u> Reply Br. at 17-18. These facts, according to Jemez Pueblo, confirm that Jemez Pueblo's aboriginal title remained intact between 1860 and 2000, that the Preservation Act did not extinguish Indian Title, and that Jemez Pueblo has a legal right to defend its title against the United States' adverse claims or actions, all of which show that the Complaint is legally sufficient to survive a motion to dismiss. <u>See</u> Reply Br. at 18-23.

Jemez Pueblo repeats its argument that Judge Brack further erred when he held that the ICCA provides the exclusive remedy for unextinguished aboriginal land claims, because the ICCA is remedial legislation for takings and Jemez Pueblo had not suffered a taking when Congress passed the legislation in 1946. <u>See</u> Reply Br. at 25-26. Jemez Pueblo further argues that the United States, in alleging that Jemez Pueblo could have brought its claim before the ICC, fails to distinguish between extinguished and unextinguished title, as the only aboriginal title claims that Jemez Pueblo brought to the ICC were those that were extinguished before 1946. <u>See</u> Reply Br. 29-30. Jemez Pueblo argues that neither the evidence nor the law supports the United States' assertion that Jemez Pueblo did not "occupy" the land in the nineteenth century, specifically because the Surveyor-General was not tasked with determining whether the lands

were vacant and because the Surveyor-General's mandate did not include adjudication of aboriginal land claims. Reply Br. at 31. Moreover, Jemez Pueblo argues that the Surveyor-General's use of the term "vacant" meant only that he "had determined that the land was not claimed pursuant to any land grant," and its use was not based on any physical land inspection. Reply Br. at 33. Furthermore, Jemez Pueblo's aboriginal title is not inconsistent with the title granted to the Baca heirs, according to Jemez Pueblo and contrary to the United States assertion, because grants to individuals by the United States do not extinguish aboriginal title. See Reply Br. at 35 (citing United States ex rel. Chunie v. Ringrose, 788 F.2d 638, 642-43 (9th Cir. 1986)). According to Jemez Pueblo, the Baca grant was not a taking or an extinguishment, but rather a quitclaim that did not affect any of Jemez Pueblo's superior aboriginal property interests.[9] See Reply Br. at 36. Jemez Pueblo adds that it could not have had a claim against the United States until after the land was conveyed back to the United States in 2000. See Reply Br. at 36-37. Moreover, the "quit claim" from the United States to the Bacas' is

---

[9]A quitclaim deed is defined as a "deed that conveys a grantor's complete interest or claim in certain real property but that neither warrants nor professes that the title is valid." Quitclaim Deed, Black's Law Dictionary 503 (10th ed. 2014). Furthermore,

A quitclaim deed purports to convey only the grantor's *present interest in the land*, if any, rather than the land itself. Since such a deed purports to convey whatever interest the grantor has at the time, its use excludes any implication that he has good title, or any title at all. Such a deed in no way obligates the grantor. If he has no interest, none will be conveyed. If he acquires an interest after executing the deed, he retains such interest. If, however, the grantor in such deed has complete ownership at the time of executing the deed, the deed is sufficient to pass such ownership . . . . A seller who knows that his title is bad or who does not know whether his title is good or bad usually uses a quitclaim deed in conveying.

Robert Kratovil, Real Estate Law 49 (6th ed. 1974)(emphasis in original).

not "unconditional," Jemez Pueblo argues, because it is "subject to prior valid and preexisting interests," namely, Jemez Pueblo's aboriginal title. Reply Br. at 38. Jemez Pueblo adds that Navajo Tribe of Indians v. New Mexico does not involve impairment of a Tribal right to aboriginal title but rather the Tribe's untimely challenge to the United States' taking of reservation lands before the ICCA's passage. See Reply Br. at 40.

Jemez Pueblo also argues that Judge Brack should have considered New Mexico law to determine when Jemez Pueblo's claim accrued. See Reply Br. at 40 (citing Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d 1165, 1177 (10th Cir. 2010)("[F]ederal courts may properly look to state law as an aid in determining the application of statutory language to specific facts. In particular, questions involving ownership, transfer and title to real estate have traditionally been resolved according to the laws of the state where the realty is located.")). According to Jemez Pueblo, New Mexico law supports its assertion that its claim against the United States did not accrue before the year 2000, because "under New Mexico law the creation of potentially conflicting interests in land does not, in itself, cause a claim to 'accrue.'" Reply Br. at 41 (quoting Wooley v. Shell Petroleum Corp., 1935-NMSC-008, ¶46, 45 P.2d 927, 934. Thus, concludes Jemez Pueblo, Judge Brack erred by entering judgment before entering a finding of fact regarding the date on which Jemez Pueblo's claim accrued under New Mexico. See Reply Br. at 41.

6.      **The Tenth Circuit's Decision.**

The Tenth Circuit concluded that Judge Brack erred in dismissing Jemez Pueblo's quiet title claims. See Pueblo of Jemez v. United States, 790 F.3d at 1147. In doing so, the Tenth Circuit reiterated that, absent a clear-and-unequivocal Congressional intent to extinguish pre-existing aboriginal rights, Jemez Pueblo's aboriginal right of occupancy survives the grant to the Baca heirs. See 790 F.3d at 1162-63. The Tenth Circuit further held that the Baca heirs' occupation of the Valles Caldera, standing alone, may not be sufficient to extinguish aboriginal title, because fee title and aboriginal title can exist simultaneously. See 790 F.3d at 1165. The Tenth Circuit, therefore, remanded the case to Judge Brack for consideration whether Jemez Pueblo "had, and still has, aboriginal title to the land at issue in this case." 790 F.3d at 1165.

After providing a detailed history of aboriginal rights, the Tenth Circuit first turned to the question of subject-matter jurisdiction. See 790 F.3d at 1161. In describing its analysis whether Judge Brack had subject-matter jurisdiction, the Tenth Circuit noted that if Jemez Pueblo

> had a claim against the United States which, as a matter of law, accrued before August 13, 1946 . . . then the district court was correct in holding the claim barred by ICCA § 12 and concluding that it lacked subject matter jurisdiction. If we cannot determine as a matter of law that there was a pre–1946 claim against the government, then the claim is not facially barred by § 12 of the ICCA.

Pueblo of Jemez v. United States, 790 F.3d at 1161. Regardless of the Tenth Circuit's claim accrual analysis, the Tenth Circuit also tasked itself, in accordance with the United States' rule 12(b)(1) argument, to "determine alternatively whether compensation paid to the Jemez Pueblo in prior litigation before the ICC forecloses this claim under the ICCA § 22." Pueblo of Jemez v. United States, 790 F.3d at 1161. The Tenth Circuit then rejected the United States' position that the 1860 land grant and the Surveyor-General's assessment that the lands were vacant

extinguished Jemez Pueblo's aboriginal title, concluding that "[t]he government's arguments ignore the nature of aboriginal title and the last 200 years of Supreme Court jurisprudence."[10] Pueblo of Jemez v. United States, 790 F.3d at 1162. The Tenth Circuit cites numerous Supreme Court and Courts of Appeals decisions which hold that federal land grants pass fee title to grantees subject to aboriginal title. See Pueblo of Jemez v. United States, 790 F.3d at 1162. For example, the Tenth Circuit quotes extensively from Oneida Indian Nation of New York State v. Oneida County, New York, wherein the Supreme Court held that "Indian title . . . could be terminated only by sovereign act." Pueblo of Jemez v. United States, 790 F.3d at 1162 (quoting Oneida Indian Nation of N. Y. State v. Oneida Cty., 414 U.S. at 667). Given this controlling precedent, the Tenth Circuit concludes that, because the United States could not show "clear and unambiguous intent by Congress to allow extinguishment of the aboriginal right of occupancy of the Jemez Pueblo . . . the grant of land to the Baca heirs was valid to convey the fee but the Baca heirs took the title subject to the Jemez Pueblo's aboriginal title." Pueblo of Jemez v. United States, 790 F.3d at 1161-62.

The Tenth Circuit also rejects the United States' assertion that Jemez Pueblo's claim to "actual, exclusive, and continuous" use of the Valles Caldera is "flatly inconsistent" with the Surveyor-General's finding that the land was "vacant," because such an assertion "conflates the

---

[10]The Tenth Circuit notes that it is addressing the United States' arguments through the lens of "the rule of construction recognized without exception for over a century[,] . . . that if there is doubt whether aboriginal title has been validly extinguished by the United States, any doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of the Indians." Pueblo of Jemez v. United States, 790 F.3d at 1162 (internal citation and quotation marks omitted).

factual merits question of establishing aboriginal possession with the jurisdictional question on appeal of when a claim actually accrued." Pueblo of Jemez v. United States, 790 F.3d at 1163. The Tenth Circuit cites the Supreme Court's decision in Santa Fe as evidence that the establishment of the office of Surveyor-General did not institute a policy of non-recognition of aboriginal title, because the Surveyor-General could only make recommendations to Congress, and it was left to Congress to decide what action to take. See Pueblo of Jemez v. United States, 790 F.3d at 1163-64 (citing Santa Fe, 314 U.S. at 348). Thus, according to the Tenth Circuit, because the Surveyor-General had no authority to extinguish aboriginal title, his belief as to vacancy of the lands is irrelevant. See Pueblo of Jemez v. United States, 790 F.3d at 1164.

The United States' argument that the 1860 Act evidenced Congressional intent to effect "absolute and unconditional" transfer not subject to preexisting interests also failed to persuade the Tenth Circuit, because, according to the Tenth Circuit, "the [Supreme] Court has never held that a grant needs to contain specific language stating the land remains subject to aboriginal title." Pueblo of Jemez v. United States, 790 F.3d at 1164. Instead, according to the Tenth Circuit, the Supreme Court has repeatedly concluded that "language [is] required in the grant to clearly show Congress's intent to extinguish aboriginal title." 790 F.3d at 1164. The United States' argument fails, therefore, because the Tenth Circuit "can discern no such language or intent in the 1860 Act." Pueblo of Jemez v. United States, 790 F.3d at 1164.

In addressing the United States' argument that the Baca heirs' use of the Valles Caldera is a cloud on title sufficient to trigger accrual against the United States in 1860, the Tenth Circuit counters that simultaneous occupancy and use of land pursuant to fee title, and aboriginal title,

can occur, because the nature of Indian occupancy differs significantly from non-Indian settlers' occupancy. See Pueblo of Jemez v. United States, 790 F.3d 1143 at 1165. The Tenth Circuit highlights such disparate use when it states that

> it is easy to see how the Surveyor General may have mistakenly believed the lands were vacant even if they were being used by the Jemez for hunting, fishing, and other such activities. Similarly, it is also easy to see how a peaceful and private Indian pueblo might have used portions of this large area of land for its traditional purposes while one agreeable rancher was using portions of it for grazing livestock.

Pueblo of Jemez v. United States, 790 F.3d at 1165. The Tenth Circuit notes that the Complaint makes such allegations and, therefore, the Tenth Circuit concludes that one cannot say that accrual necessarily occurred in 1860. See Pueblo of Jemez v. United States, 790 F.3d at 1165.

The Tenth Circuit notes, however, that, to establish on remand its right of aboriginal occupancy to the Valles Caldera "in 1860 and thereafter," Jemez Pueblo "must show 'actual, exclusive, and continuous use and occupancy for a long time.'" 790 F.3d at 1165-66 (quoting Native Vill. of Eyak v. Blank, 688 F.3d 619, 622 (9th Cir. 2012)). Significantly, according to the Tenth Circuit, the "exclusive" prong of the test is relevant only to the exclusion of other Indian groups and, thus, the Bacas' use does not, as the United States' contends, cloud this prong. See Pueblo of Jemez v. United States, 790 F.3d at 1166. As to the "actual and continuous use" requirement, the Tenth Circuit states that Jemez Pueblo

> must show, as it alleges in its Complaint, that the Jemez people have continued for hundreds of years to use the Valles Caldera for traditional purposes, including hunting, grazing of livestock, gathering of medicine and of food for subsistence, and the like. As the cases make clear, if there was actually substantial interference by others with these traditional uses before 1946, the Jemez Pueblo will not be able to establish aboriginal title. In that circumstance, moreover, the Pueblo would be barred by the ICCA statute of limitations for failing to bring a claim before the ICC.

790 F.3d at 1166.  According to the Tenth Circuit, such a determination is necessarily a factual question.  See 790 F.3d at 1166.

The Tenth Circuit notes that gradual taking by the United States can extinguish aboriginal title.  See 790 F.3d at 1166 (citing United States v. Pueblo of San Ildefonso, 513 F.2d at 1393 ("The Court of Claims' decision in [United States v.]Pueblo of San Ildefonso . . . is illustrative of a situation in which white settlement and use, authorized by the federal government . . . brought about a pre-1946 claim against the United States for failure to protect aboriginal title.")).  The Tenth Circuit notes that, in the Zia I-IV litigation, Jemez Pueblo advanced a gradual taking theory when it "asserted that the United States owed [the Pueblos of Jemez, Zia, and Santa Ana] compensation for having extinguished their aboriginal titles as a matter of fact over time by interfering with their native use and occupancy."  Pueblo of Jemez v. United States, 790 F.3d 1143 at 1167.  In analyzing the Zia I-IV litigation, the Tenth Circuit agreed with the Court of Claims' finding that the creation of the Jemez Forest Reserve "and other conduct of the government sufficiently interfered with the pueblos' traditional ways of living so as to effect a taking of their aboriginal titles."  Pueblo of Jemez v. United States, 790 F.3d at 1168.  The Tenth Circuit stated that it could not reach such a conclusion, however, with respect to the present litigation given that,

> [a]t this point in the current proceedings, neither party has had the opportunity to offer evidence about whether anyone has actually interfered with the Jemez Pueblo's traditional occupancy and uses of the land in question here, before or after 1946.  In sum, on the present record, we cannot say that either the Baca grant or use of the land by the Baca heirs or their successors establish as a matter of law that the Jemez Pueblo had a pre-1946 claim against the government under the ICCA.

790 F.3d at 1168.

The Tenth Circuit clarifies its holding in <u>Navajo Tribe of Indians v. New Mexico</u> by distinguishing the claim in that case from Jemez Pueblo's current claim in two respects, thereby rejecting the United States' assertion that the case is "directly on point." <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1168. First, according to the Tenth Circuit, the claim in <u>Navajo Tribe of Indians v. New Mexico</u> was not one of aboriginal title but rather of title that two presidential Executive Orders granted; the Executive Orders were restricted to conferring to Tribes only "transitory, possessory rights." <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1169. Second, according to the Tenth Circuit, the Navajo Tribe conceded that the President's Executive Orders were intended to extinguish aboriginal title, whereas Jemez Pueblo contends that Congress never extinguished its title and that the United States has not established otherwise. See <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1169. The Tenth Circuit adds that, given that the taking in <u>Navajo Tribe of Indians v. New Mexico</u> occurred in 1911, at a time when the President's actions did not entitle the Navajo to compensation, the Navajo Tribe was on notice in 1946 that it had a claim based on the 1911 Orders. See <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1170.

The Tenth Circuit next rejected the United States' ICCA § 22 argument that the compensation which Jemez Pueblo received in the <u>Zia I-IV</u> litigation foreclosed its claim to the Valles Caldera. See <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1170. The Tenth Circuit concludes that, because

> there is no evidence the Pueblo had a claim against the United States prior to 1946 with respect to the land involved in this action, we disagree with the government that the Jemez Pueblo could have brought its current claims before the ICC in the prior litigation. The government's res judicata argument fails

because the Jemez Pueblo's current claim is a quiet title action to establish that its aboriginal title to different land has not been extinguished.

790 F.3d 1143 at 1171.

As to the United States' alternative argument that Jemez Pueblo's Complaint fails to allege facts sufficient to establish aboriginal title, and should therefore be dismissed under rule 12(b)(6), the Tenth Circuit holds that the Complaint's description of Jemez Pueblo's use of the Valles Caldera over the past 800 years "provides sufficient detail to put the government on notice of its claim of aboriginal title." Pueblo of Jemez v. United States, 790 F.3d at 1172. Moreover, the Tenth Circuit also rejected the United States' assertion that, to survive a rule 12(b)(6) motion, Jemez Pueblo needs to allege that it has "exercised the right to expel the Baca heirs or their successors-in-interest or that the Pueblo exercise[s] full dominion and control over the Baca Ranch." 790 F.3d at 1172. Such a requirement is unnecessary, the Tenth Circuit holds, "so long as the Pueblo alleged that it was also using the land in traditional Indian ways," which it does. Pueblo of Jemez v. United States, 790 F.3d at 1172.

Finally, the Tenth Circuit rejects the United States' contention that the Preservation Act extinguishes aboriginal title "as a matter of law," because "nowhere in the Preservation Act did Congress say it intended to extinguish aboriginal title. Rather, . . . one of the purposes of the Act was to preserve the cultural and historic value of the land . . . while avoiding interference with 'Native American religious and cultural sites.'" Pueblo of Jemez v. United States, 790 F.3d at 1172 (quoting 16 U.S.C. § 698v-3(g)(2)(B)). Moreover, "the warranty deed the government accepted from the Baca successors to create the Preserve specifically excepted from the warrants all prior 'claims of and demands of any Indian nation, tribe, or pueblo.'" 790 F.3d at 1172

(quoting Appellant Br. at 21).  Nevertheless, the Tenth Circuit "leave[s] it to the district court to address . . . in the first instance on remand" whether the National Defense Authorization Act of 2015, 128 Stat. 3292, which designated the Valles Caldera as a unit of the National Park System, "undisputedly extinguished any aboriginal title," as the United States' maintains.  Pueblo of Jemez v. United States, 790 F.3d at 1173 n.21.

### 7.  <u>Jemez Pueblo's MIL 1</u>.

Jemez Pueblo argues that all evidence of land use by other than Jemez Pueblo after 1948 is irrelevant to whether Jemez Pueblo holds continuing aboriginal title to the Valles Caldera.  <u>See</u> MIL 1 at 3. Jemez Pueblo contends that, if it can show that it established aboriginal title through the exclusive use and occupancy of the Valles Caldera, then

> the only remaining issue before the Court will be whether the Pueblo's aboriginal Indian title was ever extinguished by an act of Congress.  If the Court feels the showing has not been made, then extinguishment is not an issue.  Either way, evidence by use of others after 1848 will be irrelevant.

MIL 1 at 3. Jemez Pueblo asserts that "expert testimony and other evidence will prove that Jemez Pueblo established aboriginal Indian title in the Valles Caldera between the thirteenth and eighteenth centuries by exclusive use and occupancy 'for a long time.'"  MIL 1 at 3 (quoting <u>Sac & Fox Tribe of Indians of Okl. v. United States</u>, 383 F.2d 991, 998-99 (Ct. Cl. 1967)).  After establishing aboriginal title, "the only remaining issue to be resolved at trial will be whether that title was extinguished by Spain, Mexico, or the United States Congress."  MIL 1 at 5.

In discussing the law of Indian title, Jemez Pueblo notes that, because of the ICC's structure and jurisdictional limitations, the ICC often based its liability findings on alleged takings incompatible with the law of extinguishment of aboriginal title as stated in <u>Santa Fe</u> and

other controlling Supreme Court decisions. See MIL 1 at 5. Jemez Pueblo recites several additional Supreme Court cases that discuss the inviolable nature of aboriginal title. See MIL 1 at 5-6.

Jemez Pueblo argues that the Indian Trade and Intercourse Act, 25 U.S.C. § 177, establishes that aboriginal title remains intact absent express extinguishment by Congress. See MIL 1 at 7. Furthermore, according to Jemez Pueblo, "[t]here is no exemption from the [Indian Trade and Intercourse] Act's proscription that would allow non-Indian, Indian, or administrative interference to extinguish aboriginal Indian title." MIL 1 at 7. Jemez Pueblo references Santa Fe as "the touchstone" for analysis of whether aboriginal title has been legally extinguished. MIL 1 at 7. According to Jemez Pueblo, Santa Fe requires evidence of "plain and unambiguous Congressional action, a treaty of cession, purchase pursuant to Congressional enactment or Treaty, [or] collective (official) tribal abandonment" to extinguish aboriginal title. MIL 1 at 7-8 (quoting Santa Fe, 314 U.S. at 354-56). Jemez Pueblo contends that ICC caselaw is inapplicable to an Article III court's analysis of title extinction, because "United States Supreme [C]ourt decisions are absolutely clear that once aboriginal Indian title has been established, only the federal government can extinguish title and only in accordance with the clear principle of law stated in *Santa Fe Pacific* and many other Supreme Court decisions." MIL 1 at 9.

Jemez Pueblo argues that the ICC and Court of Claims findings of Indian title takings and extinguishment are "absolutely incompatible" with existing Supreme Court precedent "in countless decisions since the founding of the Republic." MIL at 9. It follows, according to

Jemez Pueblo, that, given this incompatibility, the Court should not follow rulings on aboriginal title extinguishment authorized in the "Article I Court of Claims." MIL 1 at 9. Cases exploring the establishment of Indian title, on the other hand, "are an important addition to the analysis performed by Article III Courts." MIL 1 at 9. Because the ICC was limited to adjudicating compensation for Congressionally authorized extinguishment in the years preceding 1946, asserts Jemez Pueblo, extinguishment analysis is irrelevant to the analysis that present-day Article III courts perform. See MIL 1 at 9-10. Jemez Pueblo notes that the ICC was prone to conclude that takings occurred, because, in the 1940s, "it was widely believed that tribes would soon pass out of existence and be fully assimilated into the dominant society." MIL 1 at 10. Jemez Pueblo argues that, given this political climate, together with "contingent compensation of the claims attorneys, almost no lawyer was motivated to prove continuing Indian title," leading to "spurious" takings claims that provide no guidance to the Court. MIL 1 at 10.

Jemez Pueblo cites a number of ICC cases which describe "methods" of extinguishment based on "tacit stipulations of counsel for both sides that a taking occurred," thereby leaving the ICC to decide only when such taking occurred, which was important for compensation and "counsel's contingent fee." MIL 1 at 11. Jemez Pueblo argues that, "[i]n essence, the ICC and the Court of Claims allowed counsel to make up the law to suit their mutual objectives -- resolution of the claim for the lawyers for the United States, and payment of fees to counsel for the plaintiff tribe." MIL 1 at 12. Jemez Pueblo highlights four "egregious examples" of "non-takings" that resulted in ICC compensation and subsequent citations "as precedent for the

imaginary 'takings' which were the basis of liability": Western Shoshone Identifiable Group v. United States, 11 Ind. Cl. Comm. 387 (1962); Zia I-IV; Gila-River Pima-Maricopa Indian Cmty. v. United States, 24 Ind. Cl. Comm. 301 (1970), aff'd, 204 Ct. Cl. 137 (1974); and United States v. Pueblo of San Ildefonso, 513 F.2d at 1383. MIL 1 at 12-21. For example, Jemez Pueblo argues that "bootstrap logic" "transmuted" an ICC "date of valuation" in Western Shoshone Identifiable Group v. United States into a "date of extinguishment" that the United States Court of Appeals for the Ninth Circuit relied on in United States v. Dann, 873 F.2d 1189 (9th Cir. 1989). MIL 1 at 13-14. Jemez Pueblo further argues that, in the Zia I-IV litigation, the Court of Claims concluded that a taking occurred upon the creation of the Jemez Forest Reserve and the New Mexico Taylor Grazing District No. 2, even though the Executive Order implementing these actions expressly preserved the Pueblos' aboriginal title, a decision that was criticized by the Ninth Circuit in United States v. Dann. See MIL 1 at 14 (citing United States v. Dann, 706 F.2d 919 (9th Cir. 1983), rev'd on other grounds, 470 U.S. 39, (1985)("We do not find in the Taylor Grazing Act any clear expression of Congressional intent to extinguish aboriginal title to all Indian lands that might be brought within its scope.")). Jemez Pueblo argues that, in Gila-River Pima-Maricopa Indian Community v. United States, the ICC "arbitrarily chose 1883 . . . as the 'taking date'" and the Court of Claims affirmed in belief that the ICC "had discretion to simply choose a date." MIL 1 at 15-16 (citing Gila River Pima-Maricopa Indian Cmty. v. United States, 494 F.2d 1386, 1392 (Ct. Cl. 1974)). In United States v. Pueblo of San Ildefonso, the ICC "went a step further than the *Western Shoshone Identifiable Group* and *Zia*[I-V] decisions by combining two specious methods of Indian title extinguishment -- Congressionally

unauthorized Government administrative trespass and 'gradual encroachment of whites.'" MIL 1 at 16-17 (citing <u>United States v. Pueblo of San Ildefonso</u>, 513 F.2d at 1391). Jemez Pueblo adds that a 1978 United States Department of the Interior ("DOI") memorandum, which concludes that "neither the Taylor Grazing Act nor its implementation can operate to extinguish Indian title," supports its position regarding fictitious ICC and Court of Claims takings. MIL 1 at 20-21 (citing Memorandum, Interior Department Deputy Solicitor to Daniel Beard, Deputy Assistant Secretary, Land and Water Resources, "The Relationship of the Taylor Grazing Act to the Extinguishment of Indian Title" (January 6, 1978)("DOI Solicitor's Memorandum")).

Jemez Pueblo argues that Mr. Cohen, whom the Tenth Circuit "favorably cited" in this case, did not believe that all ancestral Indian lands had been taken. MIL 1 at 21. Jemez Pueblo notes that, after leaving the DOI, Mr. Cohen drafted ICC petitions for several Pueblos, all of which "denied that all Indian title outside of established reservation boundaries had been extinguished." MIL 1 at 21-22 (citing Richard W. Hughes, <u>Indian Law</u>, 18 N.M. L. Rev. 403, n.97 (1988)). In <u>Pueblo of Santo Domingo v. United States</u>, for example, Mr. Cohen sought damages sounding in tort for trespass and failure to protect the pueblo's rights of use and occupancy. <u>See</u> MIL 1 at 22. Jemez Pueblo states that, only after Mr. Cohen's death in 1953 did succeeding counsel for the pueblos stipulate "to title 'takings,' and the resultant United States liability to pay monetary takings damages." MIL 1 at 22.

Jemez Pueblo contends that, once established, neither Indian nor non-Indian trespass, nor federal interference, can extinguish aboriginal title, "short of conquest," which has not been alleged in this case. <u>See</u> MIL 1 at 22. For this reason, according to Jemez Pueblo, cases where

counsel for both parties presumed a taking of Indian title are not applicable to the Court's analysis in this case.  See MIL 1 at 23.  Instead, Jemez Pueblo asserts that the Court should look to "controlling precedent established by Article III Courts," which is "clear in its requirement that Congressionally unauthorized use, transfer, occupation and even seizure of aboriginal Indian title lands by federal administrative fiat and non-Indian interference with Indian use and occupancy simply does not, and cannot, effect an extinguishment of aboriginal Indian title."  MIL 1 at 23 (citing Pueblo of Jemez v. United States, 790 F.3d at 1161 ("[T]he [Supreme] Court held that aboriginal possession and occupancy of an Indian tribe survived a course of Congressional legislation and administrative action that had proceeded on the assumption that the area in question was unencumbered public land." (internal quotation marks omitted)).

Jemez Pueblo argues that United States v. Pueblo of San Ildefonso and Zia I-IV are not precedent for a claim that non-Indian or Indian trespass can extinguish aboriginal title, because those cases involve fictitious takings and the Tenth Circuit in this case "confirmed existing Article III Court precedent holding that adverse administrative action does not compromise Indian title." MIL at 23-24 (citing Pueblo of Jemez v. United States, 790 F.3d at 1165). Furthermore, according to Jemez Pueblo, the Tenth Circuit rejected the general proposition that unauthorized governmental activities and trespass by non-Indians and non-Jemez Indians can extinguish aboriginal title.  MIL 1 at 25.

In light of its interpretation of the Tenth Circuit's opinion in this case, Jemez Pueblo argues that the Court should exclude general evidence beyond that which is relevant to extinguishment, because the only relevant evidence that the Court should consider is evidence

showing that a sovereign extinguished Jemez Pueblo's aboriginal title. <u>See</u> MIL 1 at 25. It follows, according to Jemez Pueblo, that, because the United States gained control of the Valles Caldera in 1848, and because Article III courts "have never wavered from the requirement that only Congress can extinguish aboriginal title," the only relevant evidence is evidence related to the period prior to 1848. MIL 1 at 25. According to Jemez Pueblo, "[t]here is no such evidence." MIL 1 at 25. In so arguing, Jemez Pueblo contends that "all testimony by the United States['] proposed expert Dr. Terence Kehoe must be excluded," because

> Dr. Kehoe's proposed testimony does not have a direct and demonstrable connection to the issue of aboriginal Indian title because it concerns use of the lands in question from 1863 to the present. None of his proposed testimony goes to the issue of Congressional action taken to extinguish the Jemez Pueblo's title. His proposed testimony therefore is irrelevant, and any probative value it might have is substantially outweighed by a danger of confusing the issues, undue delay and wasting time.

MIL 1 at 26. Jemez Pueblo notes that the specifics of Dr. Kehoe's proposed testimony, the majority of which "relates to the period between 1918 and 2000," to include "his opinion that other Indians sometimes entered the area." MIL 1 at 26. Jemez Pueblo concludes that "[n]one of this evidence in any way addresses Congress or Congressional action. It therefore is irrelevant . . . and should be excluded." MIL 1 at 27.

      **8.**     <u>**The United States' Response to MIL 1.**</u>

The United States responds that Jemez Pueblo's arguments fail, because the Tenth Circuit instructs the Court to determine whether Jemez Pueblo's use of the Valles Caldera is exclusive as to other Tribes and whether Jemez Pueblo's use suffered interference after Congress granted the land to the Baca heirs in 1860. <u>See</u> United States' Memorandum in Opposition to

Plaintiff's Motion in Limine at 7, filed August 31, 2018 (Doc. 249)("MIL 1 Response"). The United States notes two central questions that the Tenth Circuit identified: first, whether Jemez Pueblo can establish that it "exercised aboriginal occupancy of the Valles Caldera in 1860 and afterward," and, second, whether Jemez Pueblo's aboriginal title "was ever extinguished by treaty, sword, purchase, by the exercise of complete dominion adverse to the right of occupancy, or by other means." MIL 1 Response at 7 (citing Pueblo of Jemez, 790 F.3d at 1165). It follows, according to the United States, that, "because it asks this Court to flout that guidance," Jemez Pueblo's motion "is poorly taken." MIL 1 Response at 7.

The United States acknowledges that the Tenth Circuit "held that the grant of the Valles Caldera to the Baca family, without more, did not extinguish aboriginal title to the land, assuming the Jemez maintained Aboriginal possession at the time." MIL 1 Response at 7-8 (citing Pueblo of Jemez, 790 F.3d at 1163). To establish aboriginal title, notes the United States, Jemez Pueblo must show "exclusive" and "actual and continuous" use of the Valles Caldera. MIL 1 Response at 8. The United States states that to show exclusive use, Jemez Pueblo must prove that it used the Valles Caldera for "traditional purposes" and "to the *exclusion of other Indian groups*." MIL 1 Response at 8 (emphasis in original)(citing Pueblo of Jemez, 790 F.3d at 1166). The showing for actual and continuous use, on the other hand, requires that Jemez Pueblo prove that it used the Valles Caldera "without substantial interference by others" before 1946, an inquiry that the United States asserts "can overlap with the question whether a tribe's aboriginal title has been extinguished." MIL 1 Response at 8-9.

The United States rejects Jemez Pueblo's assertion that "[w]hether non-Indians (or Indians) interfered with [Jemez Pueblo's] continuing use and occupancy is not an issue," arguing instead that a Tribe which physically abandons land has lost aboriginal title.  MIL 1 Response at 9.  The United States adds that Jemez Pueblo does not provide argument for its assertion that use by other Tribes after 1848 is irrelevant, and references reports that show "abundant evidence" of the Pueblos' of Zia, Santa Ana and Jemez joint use "for many centuries."  MIL 1 Response at 10-11.  Moreover, according to the United States, "it is a matter of common sense that worship and use by other Tribes in recent times (i.e., since the mid-19th Century) is evidence of similar usage in earlier times, particularly where the usage is religious and therefore the subject of centuries-old traditions and beliefs."  MIL 1 Response at 11.

The United States argues that Jemez Pueblo's MIL 1 is "flatly inconsistent" with the Tenth Circuit's remand decision, because Jemez Pueblo is asking the Court to ignore the exact evidence that the Tenth Circuit instructed the Court to obtain.  MIL 1 Response at 11-12 (citing Pueblo of Jemez, 790 F.3d at 1168 ("[N]either party has had the opportunity to offer evidence about whether anyone has actually interfered with [Jemez Pueblo's] traditional occupancy and uses of the land in question here, before or after 1946.")).  Furthermore, the United States argues that such instruction also requires inquiry into whether Jemez Pueblo suffered substantial interference with its traditional uses of the Valles Caldera.  See MIL 1 Response at 12-13.

The United States contends that the Kehoe Report documents in detail how Jemez Pueblo's use of the Valles Caldera was severely restricted during the land's 140 years of private ownership under the Baca heirs and their successors-in-interest.  See MIL 1 Response at

13. Moreover, according to the United States, Jemez Pueblo has already admitted to such constraint. MIL 1 Response at 13. Specifically, asserts the United States, the Kehoe Report highlights how eighteen Pueblos sued the "Energy Department" and, in the process, all eighteen Pueblos -- including Jemez Pueblo -- "admitted that they 'do not contest the ownership of -- nor do they seek any interest in -- [the Dunigan's] land.'" MIL 1 Response at 13 (quoting Pl.s' Resp. to Intervention Mot. of Dunigan Enters., Jemez v. Sec'y of Energy, 81-cv-113, at 2 (D.D.C. Nov. 18, 1981)). The Kehoe Report also discusses how the Baca heirs' successors-in-interest restricted Jemez Pueblo animal hunting, grazing, and religious pilgrimage in the Valles Caldera, all of which, according to the United States, addresses the Tenth Circuit's directives on remand. See MIL 1 Response at 14-15.

The United States argues that Jemez Pueblo's analysis of relevant caselaw is "deeply flawed," beginning with Santa Fe, which the United States asserts is distinct from this case, because it involves the forcible removal of a Tribe to a reservation from its ancestral land and not actual interference by private land owners. MIL 1 Response at 15-16. What is relevant from Santa Fe, argues the United States, is the Supreme Court's holding that the Tribe surrendered aboriginal title to its non-reservation land once the Tribe requested and received reservation land elsewhere. See MIL 1 Response at 16 (citing Santa Fe, 314 U.S. at 356-358). According to the United States, this holding indicates that

> it is perfectly possible for Jemez to "relinquish[] tribal rights in lands," . . . or for other tribes to transform exclusively-held land into jointly-held land, [and that] evidence that other tribes routinely used the Valles Caldera after 1848 could well establish that whatever aboriginal interests Jemez may have once had in the Caldera have been lost.

MIL 1 Response at 16 (quoting <u>Santa Fe</u>, 314 U.S. at 358).

The United States accuses Jemez Pueblo of trying "to sweep under the rug" all of the Tenth Circuit's cited caselaw which holds that "federal conveyance of land to private parties, and encroachment on traditional Tribal use, can evidence extinguishment of aboriginal title." MIL 1 Response at 16. The United States contends that, of the four cases which Jemez Pueblo cites as "egregious examples" of "non-takings," the first three are not among those which the Tenth Circuit relies on in this case. MIL 1 Response at 17. Furthermore, <u>United States v. Pueblo of San Ildefonso</u>, the one Court of Claims case that both Jemez Pueblo and the Tenth Circuit discuss, is "examined at considerable length" in the Tenth Circuit's opinion and "identified as controlling." MIL 1 Response at 17.

The United States argues that the extinguishment analysis performed by the ICC and Court of Claims is not "beneath the dignity of an Article III court," as Jemez Pueblo suggests, but rather the "very line of cases" that the Tenth Circuit has asked the Court to consider. MIL 1 Response at 17-18. For example, Jemez Pueblo argues that, consistent with its analysis of <u>United States v. Pueblo of San Ildefonso</u>, the Tenth Circuit "specifically instructed that if the Baca grant (and subsequent transfers) resulted in actual interference with Jemez's use of the Valles Caldera, the Pueblo's aboriginal title claim fails." MIL 1 Response at 18. The United States argues that, contrary to Jemez Pueblo's assertion, the quoted language in the Tenth Circuit's opinion is not dicta; "[i]t is the law of the case." MIL 1 Response at 19. The Court is therefore obliged, according to the United States, to follow "all legal rules and principles identified by the appellate body." MIL 1 Response at 19 (citing Bryan A. Garner et al., <u>The Law</u>

of Judicial Precedent 459 (2016)("When a case has been heard and determined by an appellate court, the legal rules and principles laid down as applicable to it bind the trial court in all further proceedings in the same lawsuit. They cannot be reviewed, ignored, or departed from.")).

> **9.**      **Jemez Pueblo's Reply in Support of MIL 1.**

Jemez Pueblo replies that the United States conflates the important element to establish aboriginal title -- exclusive use and occupancy -- with the elements required to maintain or extinguish that title, "thereby fatally confusing the analysis required for the latter two." Plaintiff Pueblo of Jemez's Reply in Support of Motion in Limine to Exclude Certain Evidence at 1, filed September 12, 2018 (Doc. 261)("MIL 1 Reply"). The Court, therefore, argues Jemez Pueblo, should admit only evidence of activity after 1848 that is relevant either to loss of aboriginal title by abandonment or to Congressional extinguishment. See MIL 1 Reply at 1. Jemez Pueblo adds that it has not assumed that aboriginal title has been proven, contrary to the United States' assertions, but rather that it will present such evidence at trial. See MIL 1 Reply at 2.

Jemez Pueblo contends that although the United States concedes that only treaty, purchase, conquest, or the exercise of complete dominion and control may extinguish aboriginal title, the United States does not claim that its evidence of use after 1860 goes to any of these extinguishment methods. See MIL 1 Reply at 2. Jemez Pueblo argues that the United States asserts "a non-existent distinction" between this case and Santa Fe by implying that non-Indian trespass extinguished aboriginal title in that case when the Supreme Court makes clear that the basis for its conclusion that title was extinguished was the Tribe's request for, and acceptance of,

a reservation, which the Court characterized as a "quid pro quo" land exchange.  MIL 1 Reply at 3-4.

Jemez Pueblo reasserts its position that only surrender, or release and relinquishment, neither of which has occurred in this case, can extinguish aboriginal title.  See MIL 1 Reply at 4.  Instead of addressing this law, Jemez Pueblo asserts, the United States "cites a single article I case" to support its argument that governmental interference may extinguish aboriginal title.  MIL 1 Reply at 5.  According to Jemez Pueblo, only an overt Congressional act may extinguish aboriginal title, and, apart from such an act, "Indian title is the best title in the Anglo-American property law system.   Once established, it cannot be lost through unauthorized administrative seizure, adverse possession, sale, or tax forfeiture.  It is good as against all but the sovereign."  MIL 1 Reply at 5 (citing Oneida Indian Nation of N. Y. State v. Oneida Cnty., 414 U.S. at 667).

Jemez Pueblo argues that ICC caselaw is inapplicable to this "Article III Court's" extinguishment analysis, because "Article I courts are inferior tribunals with strictly limited jurisdiction."   MIL 1 Reply at 6.  It follows, according to Jemez Pueblo, that Article I court decisions cannot be treated as controlling precedent on extinguishment of Tribal property rights and that any such rulings "are of no import in this pending litigation."  MIL 1 Reply at 6 (citing United States v. Dann, 706 F.2d at 928).  Moreover, Jemez Pueblo avers that the ICC was also a tribunal of limited jurisdiction, and, although it could accept a taking stipulation, if the taking was contested, then the ICC was without power to proceed.  See MIL 1 Reply at 6.

Jemez Pueblo notes that the Federal Rules of Evidence allow for expert testimony only when such testimony is relevant and reasserts its position that Dr. Kehoe's testimony is irrelevant, because it will show only that Jemez Pueblo's use of the Valles Caldera was "severely restricted during the land's 140 years of private ownership," which is not the applicable extinguishment standard. MIL 1 Reply at 8. Moreover, Jemez Pueblo argues that Dr. Kehoe "largely admitted at deposition that Jemez Pueblo's use of the lands at issue was continuous, and never abandoned." MIL 1 Reply at 8.

Jemez Pueblo argues that the Tenth Circuit's mandate requires this Court to follow and apply settled Article III court precedent, i.e., precedent holding that to establish its aboriginal title, Jemez Pueblo must prove exclusive use and occupancy, and that to extinguish aboriginal title, Congress must have expressly revoked it. See MIL 1 Reply at 8. Jemez Pueblo contends that the Tenth Circuit is unaware that the Pueblos in United States v. Pueblo of San Ildefonso asserted that their aboriginal title was intact, and sought damages for trespass and breach of trust for failure to protect their use and occupancy -- a position that subsequent claims attorneys, who filed stipulations that transformed the damages claims into fictitious takings claims, later changed. See MIL 1 Reply at 10. Jemez Pueblo argues that, unlike the claim in this case, those cases involve a stipulation that did not require adjudication that title was ever extinguished. See MIL 1 Reply at 10. Jemez Pueblo asserts that the Tenth Circuit's "requirement of perpetual exclusivity . . . is, at most, dicta," which encompasses the Tenth Circuit's discussion of the holdings in Zia I-IV, United States v. Pueblo of San Ildefonso, Pueblo of Taos v. United States, and Pueblo of Nambe v. United States. MIL 1 Reply at 10. Moreover, the Tenth Circuit's

opinion in this case cannot be read to instruct the Court to take evidence in support of a "gradual taking" theory, argues Jemez Pueblo, because such a theory "is inconsistent with controlling Article III Supreme Court law." MIL 1 Reply at 10-11. Jemez Pueblo concludes that the rule of mandate doctrine is "applied at the sound discretion of the trial court to effectuate the proper administration of justice," and, therefore, the Court should follow "controlling Article III court law" regarding the specific facts required to show extinguishment of aboriginal title, i.e., either Tribal abandonment or plain and unambiguous Congressional action. MIL 1 Reply at 12.

      **10.**   **The Hearing.**

The Court held a hearing on September 14, 2018. See Transcript of Proceedings Pretrial Conference and Motions Hearing at 1:7 (taken September 14, 2018), filed September 21, 2018 (Doc. 277)("Tr."). Jemez Pueblo began by asserting its position that its exclusive use and occupancy of the Valles Caldera "was established prior to Spanish entry . . . and that use has been continuous to the present day since pre-history." Tr. at 60:19-23 (Luebben). The United States countered that "the Valles Caldera has never been exclusively owned by anyone." Tr. at 61:5-7 (Dykema). Jemez Pueblo argued that the United States has put "the cart before the horse" in insisting that Jemez Pueblo establish exclusive use and occupancy after 1860 and that, by implication, evidence before 1860 is irrelevant. Tr. at 61:17-18 (Luebben). Jemez Pueblo adds that it will establish exclusive use and occupancy before 1860, and thus the United States evidence is irrelevant. See Tr. at 61:20-22 (Luebben).

Jemez Pueblo explained that this case involves the history of not only aboriginal title and Spanish colonial law, but also the history of the ICC and of Tribal claims going back to the

United States' founding. See Tr. at 61:24-62:4 (Luebben). Jemez Pueblo cited to similarities between this case and United States v. Dann, wherein the ICC held that the Western Shoshone Indians lost aboriginal title to their land base "by gradual encroachment of Whites, settlers and others." Tr. at 62:12-14 (Luebben). Jemez Pueblo argued that, as a result of the court's holding in United States v. Dann, the claims attorneys lacked a specific taking date and therefore stipulated to July 1, 1872, a date on which, Jemez Pueblo argued, "nothing ever happened . . . . There were hardly any White people around in the great basin, and it was a hell of a hot day. Other than that, there was nothing to hang the notion of extinguishment on." Tr. at 62:14-22 (Luebben). Jemez Pueblo contended that it was the payment of the award that extinguished the title, and not anything that happened in the nineteenth century. See Tr. at 63:11-14 (Luebben). Jemez Pueblo explained that this process was repeated for many other Tribes, and argued that, "but for the proceedings and awards in the Indian Claims Commission, Indian title to hundreds of millions of acres in the western United States was otherwise never extinguished." Tr. at 63:7-10 (Luebben). Jemez Pueblo further questioned the legitimacy of ICC takings findings:

> And rather than providing a remedy for ancient wrongs as Congress promised when it enacted the Indian Claims Commission, the ICC became an engine to quiet title to Indian lands in favor of the United States and on the cheap. The ICC could not quiet title in favor of tribes and return land to their control, it could only award compensation. And the attorneys were paid a contingent fee from whatever award they obtained. They were, thus, incentivized to prove the loss of as much land as possible in order to maximize their fee.

Tr. at 63:17-25 (Luebben).  This process, Jemez Pueblo explained, "has created a veritable fountain of confusion around the issues of aboriginal title," leading to Tribal members' ignorance of their own rights.  Tr. at 64:1-6 (Luebben).

Jemez Pueblo argued that, ICC aside, "Indian title is the best title in Anglo-American property law," because it is "not subject to taxation, tax forfeiture, adverse possession, improvident sale, condemnation, or involuntary extinguishment without Congressional action."  Tr. at 64:9-13 (Luebben).  Jemez Pueblo asked the Court to view this case through the lens of property law -- not Indian law -- and specifically requested that the Court observe the "ordinary rules of property conveyance," which require "an actual conveyance, not trespass or gradual encroachment."  Tr. at 64:19-65:4 (Luebben).  Jemez Pueblo repeated that the principle of adverse possession does not apply to aboriginal title.  See Tr. at 65:4-5 (Luebben).  Jemez Pueblo asserted that only the United States can convey aboriginal title, and only after Congressional extinguishment or Tribal abandonment.  See Tr. at 65:5-8 (Luebben).  Jemez Pueblo further requested that the Court respect the rules of extinguishment of aboriginal title as "incorporated into the common law by the Article III courts."  Tr. at 65:8-10 (Luebben).  Jemez Pueblo averred that the ICC's gradual encroachment approach to takings "is an egregious aberration of Anglo-American property law that reflects the profoundly racist assumption that permeated the Indian Claims Commission proceedings and implemented the dominant cultural imperative that Indians must lose their lands."  Tr. at 65:11-18 (Luebben).

Jemez Pueblo argued that this case consists of only three questions: (i) whether Jemez Pueblo established aboriginal title by exclusive use and occupancy before 1860; (ii) whether

Jemez Pueblo has continued to use and occupy the Valles Caldera into the present day, i.e., whether Jemez Pueblo has abandoned its aboriginal title; and (iii) whether Congress has extinguished Jemez Pueblo's aboriginal title. See Tr. at 65:21-66:1 (Luebben). According to Jemez Pueblo, further evidence regarding whoever else may have used the Valles Caldera "only confuses the issue." Tr. at 66:4-5 (Luebben).

Jemez Pueblo asserted that the Tenth Circuit's opinion in this case reveals the applicable caselaw, principally the law of aboriginal title extinguishment, which the Supreme Court outlines in Santa Fe, and of which Mr. Cohen was the architect. See Tr. at 66:17-67:4 (Luebben). Jemez Pueblo discussed Mr. Cohen's stature as a scholar of Indian law, his contributions to the ICCA, and his principled refusal to represent Tribes before the ICC. See Tr. at 67:4-25 (Luebben). Jemez Pueblo explained how, under Santa Fe, there are only four ways to extinguish aboriginal title: "Plain and unambiguous Congressional action; a treaty of cession, voluntary by the Tribe; purchase pursuant to a Congressional act under a treaty; and intentional Tribal abandonment." Tr. at 68:6-10 (Luebben).

Jemez Pueblo rejected the United States' proposition that Santa Fe held that trespass by White settlers extinguished the Tribe's aboriginal title, arguing instead that the suit was to enjoin interference with the Tribe's unextinguished aboriginal title. See Tr. at 68:12-21 (Luebben). In further rejecting the United States' reliance on the ICC gradual takings theory, Jemez Pueblo asserted that ICC rulings were administrative in nature and therefore inferior to Article III courts, especially the Supreme Court, and also guided by questionable motives: "[T]he claims attorneys in order to get paid; the United States in order to quiet title." Tr. at 68:22-69:17 (Luebben).

Jemez Pueblo noted that every ICC award for an alleged taking was based either on an express or an implied stipulation of extinguishment. See Tr. at 70:17-19 (Luebben). Jemez Pueblo referred the Court to the original petition in Pueblo of San Ildefonso v. United States, which Mr. Cohen drafted, that seeks compensation not for a taking but for damages for the failure of the United States to abide by its trust obligations to protect the Pueblo's land, and for trespass by non-Indians, including the United States. See Tr. at 70:25-71:8 (Luebben). Jemez Pueblo noted that, after Mr. Cohen's death in 1953, other attorneys filed stipulations for the San Ildefonso, Santa Clara, and Santo Domingo Pueblos, all of which stated -- for the first time -- that title had been extinguished. See Tr. at 71:11-15 (Luebben). Jemez Pueblo asserted that the Pueblo's governing council never approved the stipulation in the matter of Pueblo of Santo Domingo v. United States, although the Pueblo was unable to set aside the stipulation in subsequent litigation.[11] See Tr. at 71:20-23 (Luebben).

Jemez Pueblo noted that the takings in these cases were not adjudicated judicial findings, and that the only adjudication was to determine United States' liability based on the takings date. See Tr. at 71:24-72:2 (Luebben). Jemez Pueblo added that the plaintiffs in these cases wanted a later date to maximize the historical appraisal value, while the United States "wanted an earlier date to minimize compensation." Tr. at 72:2-4 (Luebben). Jemez Pueblo argued that this process reached "its height of absurdity" in Western Shoshone Identifiable Group v. United States and in Gila River Pima-Maricopa Indian Community v. United States, wherein the Court

---

[11]Thomas E. Luebben, counsel for Jemez Pueblo in this case, was attorney of record for Santo Domingo Pueblo in Pueblo of Santo Domingo v. United States, 647 F.2d 1087 (Ct. Cl. 1981).

of Claims determined that the takings were effectuated by "gradual encroachment of White settlers" and "quote, 'a fit of absentmindedness,' unquote, by the trustee." Tr. at 72:4-12 (Luebben).  Jemez Pueblo referred the Court to the 1978 DOI memorandum under which "any analysis of the Taylor Grazing Act, its history and purpose, brings one to the ultimate conclusion that neither the Taylor Grazing Act nor its implementation can operate to extinguish Indian title." Tr. at 72:23-73:2 (Luebben).

Jemez Pueblo rejected the United States' contention that the Tenth Circuit's opinion in this case mandates application of the ICC gradual encroachment decisions, because the ICC lacked -- and never claimed to have -- jurisdiction to extinguish title on its own authority. <u>See</u> Tr. at 73:3-13 (Luebben). Jemez Pueblo argued that the decision in <u>United States v. Dann</u> supports its position, because, in that case, the Supreme Court held that the Tribe's land claims "were not terminated until the preclusion provision of Section 22(a) of the Indian Claims Commission Act was triggered by payment of the ICC award." Tr. at 73:14-18 (Luebben). Jemez Pueblo notes that this decision is distinct from a quiet title action, whereby a court's decree concludes the title adjudication, because the litigation in <u>United States v. Dann</u> did not end until the award was paid, and even then the Tribe's claim to aboriginal title was precluded -- not explicitly extinguished. <u>See</u> Tr. at 73:14-24 (Luebben). It follows, argued Jemez Pueblo, that "if the United States had ever opposed a tribal allegation of a taking on the merits . . . the ICC would have lacked jurisdiction to adjudicate that title." Tr. at 74:2-5 (Luebben).

Jemez Pueblo asserted that the extent of the Tenth Circuit's holding is that neither the 1860 Baca grant nor the 2000 Preservation Act extinguished aboriginal title. <u>See</u> Tr. at 74:10-12

(Luebben). Therefore, according to Jemez Pueblo, because the issue whether trespass or interference can extinguish aboriginal title was not before the Tenth Circuit, the Court is not required to take evidence of interference with Jemez Pueblo's use and occupancy by the Baca heirs, "or even other Indians." Tr. at 74:12-17 (Luebben). Jemez Pueblo argued that the only remaining issues are whether Jemez Pueblo established aboriginal title before 1860 and whether Congress extinguished, or Jemez Pueblo abandoned, that title. See Tr. at 74:8-10 (Luebben). Jemez Pueblo noted that, should it prevail in this suit, it has proposed that the Valles Caldera "be made into the first tribal cultural national park with aboriginal title held by the Pueblo and a co-management agreement with the National Park Service, whereby it would continue to be fully opened to the public and all pre-existing rights would be respected." Tr. at 74:20-25 (Luebben).

The Court questioned Jemez Pueblo about its statement that this is a property law case and not an Indian law case, because the cases in the table of authorities in MIL 1 struck the Court as being cases of important Indian law and not of property law. See Tr. at 76:1-7 (Court). Jemez Pueblo responded that the cases which the Court references are "property cases that deal with aboriginal title," which is unique, in part, because aboriginal title is subject to extinguishment, and the Fifth Amendment to the United States Constitution does not protect that title. Tr. at 76:8-13 (Luebben). Jemez Pueblo further explained that this case is a property case, because, once Jemez Pueblo establishes aboriginal title, issues of trespass or interference become irrelevant given that the only question is whether Jemez Pueblo abandoned -- or Congress extinguished -- its title. See Tr. at 76:15-19 (Luebben). Moreover, attention to chain of title is important, asserted Jemez Pueblo, because nothing in Anglo-American property law dictates that

trespass can extinguish aboriginal title and effect conveyance to the United States. See Tr. at 76:19-23 (Luebben). Jemez Pueblo concluded that this case is a "very straightforward" property law case: if it cannot establish aboriginal title, "then the case is over," and if it can establish aboriginal title, "then the interference is merely trespass, and the only question is whether Congress extinguished it or the Pueblo abandoned it." Tr. at 76:25-77:8 (Luebben).

The United States responded that the Tenth Circuit's opinion in this case is dispositive as to Jemez Pueblo's requests in MIL 1, because, although the Tenth Circuit held that the 1860 Baca grant could not per se extinguish aboriginal title, it remanded the case to determine whether aboriginal title ever existed, and, assuming that such title did exist, whether the Baca grant resulted in substantial interference with Jemez Pueblo's use of the Valles Caldera. See Tr. at 77:23-78:19 (Dykema). The Court asked the United States whether the Tenth Circuit's decision means that Jemez Pueblo can have aboriginal title while the Baca heirs used the Valles Caldera as a ranch. See Tr. at 78:20-23 (Court). The United States responded in the affirmative and referred the Court to the Tenth Circuit's discussion of how aboriginal title to the Valles Caldera could persist if, for example, "a peaceful and private Indian pueblo . . . used portions of this large area of land for its traditional purposes, while one agreeable rancher was using portions of it for grazing livestock." Tr. at 79:10-13 (Dykema). The Court asked the United States whether, according to its analysis of the Tenth Circuit's opinion, the Court must "look at what occurred after 1860 to determine whether . . . the Bacas having [the Valles Caldera] allowed [Jemez Pueblo] to continue to have title." Tr. at 80:2-5 (Court). The United States responded in the affirmative and stated that this case "was remanded specifically for this Court to take that

evidence." Tr. at 80:6-7 (Dykema). The United States quoted from the Tenth Circuit's opinion in this case that whether Jemez Pueblo can prove that it had aboriginal title "in 1860 and thereafter is a fact question to be established on remand," and that, to establish aboriginal title, Jemez Pueblo "must show actual exclusive and continuous use and occupancy for a long time." Tr. at 80:9-19 (Dykema). The United States conceded that the exclusivity requirement applies only to other Tribes' use and not to "the whole world," as it had previously argued on appeal. Tr. at 80:23-24 (Dykema).

The United States asserted that Jemez Pueblo cannot satisfy the continuous use and occupancy requirement "if the Bacas or their successors, the Bonds or the Dunigans, substantially interfered with . . . the traditional uses of the property." Tr. at 81:2-8 (Dykema). Moreover, averred the United States, if there is evidence of others' substantial interference with Jemez Pueblo's traditional uses of the Valles Caldera before 1946, not only can Jemez Pueblo not establish aboriginal title but its claim would also be time-barred. See Tr. at 81:16-22 (Dykema). Thus, actual interference with traditional occupancy and uses before or after 1946 is the question on remand. See Tr. at 81:24-82:2 (Dykema).

The United States rejected Jemez Pueblo's "low regard" for the ICC and Court of Claims cases that the Tenth Circuit cited, and argued instead that the Tenth Circuit "specifically ruled that the Court of Claims cases on extinguishment provide guidance for the resolution of the case on remand." Tr. at 82:3-13 (Dykema). The United States noted that, although the ICC "typically only had to determine the date on which extinguishment happened," it also had to define extinguishment, which the Court of Claims did when ruling on the ICC decisions that the

-69-

Tenth Circuit has adopted as "governing authority" in this case. Tr. at 82:14-20 (Dykema). The United States disagreed that the Tenth Circuit's discussion of the ICC and Court of Claims cases is dicta, because "anything in those decisions that provide guidance as to the legal principles to be applied is . . . the mandate of the Court." Tr. at 82:21-25. In rejecting Jemez Pueblo's interpretation of United States v. Dann, the United States countered that "the question here is not whether the ICC had the power to extinguish, but . . . the ICC's decisions as to what constitutes extinguishment by the federal government." Tr. at 83:1-7 (Dykema). Further support for this position, asserted the United States, is seen in Pueblo of Nambe v. United States and Pueblo of Taos v. United States, wherein the court held that creation of a national park effected extinguishment by "limiting the access and the freedom of access of those pueblos to the land in question." Tr. at 83:8-15 (Dykema). The United States argued that the Tenth Circuit has instructed the Court to take as guidance the ICC and Court of Claims cases which suggest that, contrary to Jemez Pueblo's assertions, aboriginal title does not "continue[] ad infinitum unless Congress expressly extinguishes it." Tr. at 83:16-20 (Dykema). The United States added that Jemez Pueblo's position is "at war with common sense," because "it implies that . . . aboriginal title continues even if other tribes occupied the land to [Jemez Pueblo's] exclusion, even if [Jemez Pueblo] ceased all use, even if the private owners to whom Congress gave the land put up a fence and precluded all use by [Jemez Pueblo] for 150 years." Tr. at 84:13-21 (Dykema). The United States added that the Indian Nonintercourse Act, 25 U.S.C. § 177, is irrelevant to these proceedings, because it was enacted "to prevent the government's Indian wards from improvidently disposing of their lands and becoming homeless public charges," i.e. to give the

federal government a role in aboriginal title extinguishment. Tr. at 84:22-85:10 (Dykema). "The federal government here had a role," argued the United States; "[t]hey gave the land to the Bacas." Tr. at 85:10-11 (Dykema).

As to Jemez Pueblo's discussion of the mandate doctrine, the United States averred that "the remand to take evidence on substantial interference or not is a part of the Court's mandate, the Tenth Circuit's mandate, as is the Court of Appeals' instruction that the case law of the Court of Claims and the ICC regarding what accomplishes extinguishment is providing guiding law." Tr. at 85:15-19 (Dykema). The United States agreed with Jemez Pueblo that the mandate rule is "nothing more than a specific application of the Law of the Case Doctrine," but added that "the doctrine stands for the proposition that an appellate decision on an issue must be followed in all subsequent trial court proceedings unless [there is] presentation of new evidence or [an] intervening change in the controlling law." Tr. at 85:21-86:6 (Dykema).

The United States argued that this case is not one of gradual encroachment of non-Indian settlers, but rather of "an act by Congress giving this land, in fee, to private parties, and a decision by the Tenth Circuit that if the result of that was substantial interference with [Jemez Pueblo's] traditional use of the property, aboriginal title -- whatever aboriginal title may have once existed is gone." Tr. at 86:9-14 (Dykema). The Court asked whether this reasoning makes sense to the United States. See Tr. at 86:15 (Court). The United States responded in the affirmative, and referred the Court to Pueblo of Nambe v. United States and Pueblo of Taos v. United States, because those cases suggest that, "if the act of Congress results in a substantial encroachment upon that original estate, then Congress has acted in a way to accomplish

extinguishment." Tr. at 86:16-24 (Dykema). The Court opined that, although it is inclined to agree with the United States' understanding of the Tenth Circuit's mandate in this case, it is unsure whether it agrees with the Tenth Circuit's analysis of the relevant caselaw. See Tr. at 87:2-5 (Court).

## LAW REGARDING ABORIGINAL TITLE

Aboriginal title, or original Indian title, refers to American Indian land occupancy rights premised on exclusive use and occupancy of a particular territory at the time of first European contact, and to an entitlement arising subsequent to such contact under the governing European sovereign's laws, which are derived largely from international law concepts that prevailed before the American Revolution. See Pueblo of Jemez v. United States, 790 F.3d at 1151-56 (discussing Indian law and aboriginal title history); Felix Cohen, Original Indian Title, 32 Minn. L. Rev. 28, 43-44 (1947)("Our concepts of Indian title derive only in part from common law feudal concepts. In the main, they are to be traced to Spanish origins, and particularly to doctrines developed by Francisco de Vitoria, the real founder of modern international law."). A Tribe establishes aboriginal title by "immemorial occupancy . . . to the exclusion of other Indians," i.e., by continually and exclusively fishing, hunting, gathering, and otherwise occupying lands. Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 338-39 (1945). Aboriginal title exists at the United States' pleasure, and the United States may effectuate aboriginal title extinguishment "by treaty, by the sword, by purchase, by the exercise of complete domination adverse to the right of occupancy, or otherwise." Santa Fe, 314 U.S. at 347. Although Congress has the exclusive power to extinguish aboriginal title, intent to do so

must be "plain and unambiguous," and will not be "lightly implied." Santa Fe, 314 U.S. at 346, 354. Notwithstanding this requirement, several federal courts have held that Congressional acts in anticipation of settlement and public use, and actual settlement, by non-Indians are factors that may effect extinguishment. See, e.g., United States v. Gemmill, 535 F.2d at 1147; United States v. Pueblo of San Ildefonso, 513 F.2d at 1391; Gila River Pima-Maricopa Indian Cmty. v. United States, 494 F.2d at 1386.

## 1. Establishment of Aboriginal Title.

Among the ways that American Indian Tribes may acquire real property interests is through possession and exercise of sovereignty,[12] and, within the bundle of recognized property rights,[13] aboriginal title refers to land claimed by sovereignty, rather than by letters patent or

---

[12]The Supreme Court has delineated six ways in which Tribes may acquire interest in real property: possession and exercise of sovereignty; action of a prior government; by treaty; by act of Congress; by executive action; or by purchase. See Montana v. United States, 450 U.S. 544, 559 (1981).

[13]The common law of real property recognizes particular estates in land that comprise the permissible forms in which real property is held. See Joseph William Singer, Property §§ 7.1-7.7, at 299-344 (5th ed. 2016). These estates describe particular bundles of rights and obligations, some of which owners can vary and some of which owners cannot vary. See Singer, Property §§ 7.1-7.7, at 299-344. In the American legal landscape, the real property interests that American Indian Tribes hold "represent a unique form of property right, one that is shaped by the federal trust over tribal land and statutory restraints against alienation." See Cohen's Handbook of Federal Indian Law § 5.04[3][a] at 995 (Nell Jessup Newton et al. eds., 2012)("Cohen's Handbook")(discussing the federal government's interest in tribal land as a trustee's fee title and the tribal interest as beneficial ownership under trust). Approximately "56.2 million acres of land are now held in trust by the United States for Indian Tribes and individuals." Cohen's Handbook § 15.01, at 995. That amount is about two percent of the landmass of the continental United States. See An Introduction to Indian Nations in the United States, Nat'l Cong. of Am. Indians, 13 (Nov. 11, 2003), http://www.ncai.org/about-tribes/Indians_101.pdf.

other formal conveyance.[14]   Aboriginal title preexists the formation of the United States.

See Santa Fe 314 U.S. at 347 ("Nor is it true, as respondent urges, that a tribal claim to any

particular lands must be based upon a treaty, statute, or other formal government action.");

Cramer v. United States, 261 U.S. 219, 229 (1923)("The fact that such right of occupancy finds

no recognition in any statute or other formal governmental action is not conclusive."). See also

Native Vill. of Eyak v. Blank, 688 F.3d 619, 622 (9th Cir. 2012)("Aboriginal rights don't depend

on a treaty or an act of Congress for their existence.");  Sac & Fox Tribe of Indians of Okl. v.

United States, 383 F.2d at 998-99 (stating that aboriginal title is not "frozen" as of the date of

discovery or the date of establishment of the United States).   Aboriginal title is established

through exclusive occupation of historic Indian lands.  See Santa Fe, 314 U.S. at 345 ("If . . . the

lands in question . . . were included in[] the ancestral home of the Walapais in the sense that they

constituted definable territory occupied exclusively by the Walapais (as distinguished from lands

wandered over by many tribes), then the Walapais had 'Indian title.'").  See also Native Vill. of

Eyak v. Blank, 688 F.3d at 622 ("[T]he Villages have the burden of proving 'actual, exclusive,

and continuous use and occupancy 'for a long time' of the claimed area.")(quoting Sac & Fox

Tribe of Indians of Okl. v. United States, 383 F.2d at 998)).  Moreover, "occupancy necessary to

establish aboriginal possession is a question of fact."  See Santa Fe 314 U.S. at 345.

The Supreme Court consistently has held that Tribes have a "legal as well as just claim to

retain possession," of the land that they have historically occupied within the United States.

_____

[14]Letters patent is defined as a "document granting some right or privilege, issued under governmental seal but open to public inspection."  Letters Patent, Black's Law Dictionary 1046 (10th ed. 2014).

Johnson v. M'Intosh, 21 U.S. 543, 574 (1823).  Moreover, this right exists independent of the United States' recognition.[15]  See Holden v. Joy, 84 U.S. 211, 244 (1872)("[T]he Indians as tribes or nations, have been considered as distinct, independent communities, retaining their original, natural rights as the undisputed possessors of the soil, from time immemorial.").

Early Supreme Court decisions built the framework for understanding the relationship of the United States to Tribes and Tribal property.  For example, in Johnson v. M'Intosh, the Marshall Court[16] adopted a rule of international law known as the "discovery doctrine" and explained how that doctrine functions alongside United States law.  See 21 U.S. at 572-74.  Under the discovery doctrine, European nations claimed the right to acquire land rights from American Indians, exclusive both of other European nations and of their own subjects.  See 21 U.S. at 573 ("[D]iscovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession.").  The Supreme Court in Johnson v. M'Intosh held that Tribal conveyances to private parties in 1773 and 1775 did not convey fee simple title to the lands, because English law forbade alienation of aboriginal title without the Crown's consent.  See 21 U.S. at 594.  Thus, later conveyances of the fee in those lands by the United States superseded the Tribe's prior conveyances.  See 21 U.S. at 603-04.  The Supreme Court described the Tribal interest in the

_____

[15]Both international law and other common-law countries' law recognize aboriginal title. See, e.g., UN Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295, U.N. Doc. A/RES/61/295 (Sept. 2007); Mabo v. Queensland II (1992) 175 C.L.R. 1 (Austl.)(holding that "native title" exists and that Australia's common law recognizes native title).

land as a "title of occupancy," "rights of occupancy," and "right of possession," 21 U.S. at 583, 587, 588, and characterized the interest of the United States as successor to the discoverer as the "fee," "absolute title," and the "absolute ultimate title," 21 U.S. at 588.

The discovery doctrine invalidated aboriginal title alienation without the European sovereign's consent or the United States' consent, or that of the original thirteen states,[17] as successor-in-interest. See Oneida Indian Nation v. Cty. of Oneida, 414 U.S. at 670; Seneca Nation of Indians v. Christy, 162 U.S. 283, 828 (1896). Alongside the restraint on alienation was the exclusive power to purchase Indian land, traditionally called the "right of preemption."[18] Johnson v. M'Intosh, 21 U.S. 571 n.5. The discovery doctrine also provided a mechanism to

---

[16]The "Marshall Court" refers to the Supreme Court of the United States from 1801 to 1835, when John Marshall served as the fourth Chief Justice of the United States. See Bernard Schwartz, A History of the Supreme Court 43-44 (1993).

[17]An earlier Supreme Court decision established that the thirteen original states had succeeded England's fee interest in aboriginal title. See Fletcher v. Peck, 10 U.S. 87, 142-43 (1810). See also Seneca Nation v. New York, 382 F.3d 245, 265 (2d Cir 2004)(holding that title to Seneca lands that England acquired in 1764 passed to New York after the American Revolution). This doctrine changed with the adoption of the Constitution of the United States of America, whereby the United States gained exclusive power over Indian affairs. See Worcester v. Georgia, 31 U.S. at 558, 8 L. Ed. 483 (1832). See also Oneida Indian Nation v. New York, 194 F. Supp. 2d 104, 146 (N.D.N.Y. 2002)(Kahn, J.)("Any rights [in Indian land] possessed by the State prior to ratification of the Constitution were ceded by the State to the federal government by the State's ratification of the Constitution."). Congress formally exercised its exclusive power over Tribal lands in the 1790 Nonintercourse Act by forbidding any transfer of title to lands Indians or Tribes held to any person or state, "whether having the right of pre-emption to such lands or not," unless made by treaty held under federal authority. Act of July 22, 1970, § 4, 1 Stat. 137.

[18]Right of Preemption is defined as a "potential buyer's contractual right to have the first opportunity to buy, at a specified price, if the seller chooses to sell within the contracted period." Right of Preemption, Black's Law Dictionary 1521 (10th ed. 2014).

validate the United States' previous acquisitions of Tribal land "by purchase or conquest." Johnson v. M'Intosh, 21 U.S. at 587.

Three additional Marshall Court opinions address aboriginal title and further elaborate on the nature of Tribal rights to property: Cherokee Nation v. Georgia, 30 U.S. 1 (1831); Worcester v. Georgia, 31 U.S. 515 (1832); and Mitchel v. United States, 34 U.S. 711 (1835). In Cherokee Nation v. Georgia, the Supreme Court affirmed that "the Indians are acknowledged to have an unquestionable, and heretofore unquestioned, right to the land they occupy, until that right shall be extinguished by a voluntary cession to our government." 30 U.S. at 32. In Worchester v. Georgia, the Supreme Court discussed extensively the doctrine of discovery and the nature of aboriginal title, and noted that, while the sovereign interest permitted the European sovereign to issue land grants still subject to aboriginal title, the issuance of a grant was insufficient by itself to extinguish such title. See 31 U.S. at 546. Until the European sovereign purchased the land from a given Tribe, the grant "asserted a title against Europeans only and was considered as blank paper so far as the rights of natives were concerned." 31 U.S. at 546. In Mitchel v. United States, the Supreme Court upheld the validity of title acquired from an Indian Tribe in present-day Florida, because Spain had ratified the Tribal sale and thereby extinguished aboriginal title to the property. See 34 U.S. at 751-53. The Supreme Court affirmed the notion that aboriginal title was "as sacred as the fee simple of the whites" and analogized the sovereign's right as an "ultimate reversion in fee" subject to the Tribe's "perpetual right of occupancy." 34 U.S. at 746, 756.

Although refusing to accord American Indians full sovereignty and title over their lands, the Marshall Court cases nevertheless afforded great respect to aboriginal title. See, e.g., Johnson v. M'Intosh, 21 U.S. at 574 (stating that aboriginal title makes a Tribe's members "the rightful occupants of the soil, with a legal as well as just claim to retain possession of it."). The Supreme Court respected the Tribal right to retain possession, provided Tribes remained at peace with the United States. See Johnson v. M'Intosh, 21 U.S. at 591 ("[T]he Indian inhabitants are to be considered merely as occupants, to be protected, indeed, while in peace, in the possession of their lands"). These cases further recognized Tribal sovereignty over Tribal lands by asserting that Tribal members and others who acquired land from Tribes were subject to Tribal law. See Johnson v. M'Intosh, 21 U.S. at 593 ("The person who purchases lands from the Indians, within their territory, incorporates himself with them, so far as respects the property purchased; holds their title under their protection, and subject to their laws."). In contrast, only the United States could extinguish aboriginal title, with purchase being the preferred acquisition method. See Johnson v. M'Intosh, 21 U.S. at 586. While Congress and the President did not always follow these principles, the Supreme Court consistently reiterated and applied them to protect aboriginal title. See, e.g., Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 235 (collecting cases); Holden v. Joy, 84 U.S. at 244 (stating that aboriginal title is "absolute, subject only to the [federal] pre-emption right of purchase."); Chouteau v. Molony, 57 U.S. 203, 203 (1853)(interpreting Spanish fee grant as confirming easement granted previously to Tribe).

A Tribe asserting aboriginal title may bring a federal common-law action to enforce ownership rights. See, e.g., Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 235-36

(collecting cases). Moreover, the Supreme Court has stated that occupancy necessary to establish aboriginal possession is a question of fact, determined as any other question of fact. See Santa Fe, 314 U.S. at 359-60 ("As we have said, occupancy necessary to establish aboriginal possession is a question of fact."). The Court of Claims has concluded that factual support for an aboriginal title claim may include: evidence that no other Tribes claimed or used the areas involved, a neighboring Tribe's recognition of ownership, earlier official European sovereign recognition of the Tribe's exclusive title, and expert testimony of historians in the field of American history. See Otoe & Missouria Tribe v. United States, 131 F Supp. 265, 289-91 (Ct. Cl. 1955).

2.     **Scope and Limits of Aboriginal Title.**

The requirement that aboriginal title be based on possession or occupancy, as opposed to official documentation, raises important questions about the nature and extent of possession required to support aboriginal title. Since the earliest Spanish conquests, opponents of American Indian property rights argued that hunting, gathering, and other uses that involved only occasional human presence were not sufficient to constitute possession. See, e.g., Johnson v. M'Intosh, 21 U.S. 543, 567 ("On the part of the defendants, it was insisted, that the uniform understanding and practice of European nations, and the settled law, as laid down by the tribunals of civilized states, denied the right of the Indians to be considered as independent communities, having a permanent property in the soil."). Opponents of such rights argued that courts should declare Indian lands vacant and available to the first Europeans to put them to commercial use. See Johnson v. M'Intosh, 21 U.S. at 588-89. Alternatively, they argued that

hunting rights should be nonexclusive, similar to fishing rights in public lands.  See Johnson v. M'Intosh, 21 U.S. at 567-71 (citing as justification the scholarship of notable European authors Locke, Grotius, Montesquieu, and de Vattel[19]).  The Marshall Court, however, rejected these arguments in Johnson v. M'Intosh and again in Mitchel v. United States, both of which recognized aboriginal title based on traditional Tribal use alone.  See Johnson v. M'Intosh, 21 U.S. at 569-70; Mitchel v. United States, 34 U.S. at 746 (1835)("[T]heir hunting grounds were as much in their actual possession as the cleared fields of the whites.").

In treaties with the United States, the limit of aboriginal title corresponded with the limit of a Tribe's exclusive possession that other Tribes respected, i.e. with a Tribe's national boundaries; therefore, proof of exclusive and continuous occupation of the land determines the boundary of land claimed under aboriginal title.[20]  See, e.g., United States v. Alcea Band of Tillamooks, 329 U.S. 40, 40 (1946); Santa Fe, 314 U.S. at 345; Pueblo of Jemez v. United States, 790 F.3d at 1165.  See also Yankton Sioux Tribe of Indians v. South Dakota, 796 F.2d 241, 243 (8th Cir. 1986)("In order to establish aboriginal title, an Indian tribe must show that it actually, exclusively, and continuously used the property for an extended period of time.").  Thus, to establish the extent of a land claim under aboriginal title, a Tribe must show that it "used and occupied the land to the *exclusion of other Indian Groups*."  Pueblo of Jemez v. United States,

---

[19]These scholars all shared a preference for land use patterned after the European labor theory of property, i.e., that interests in real property originate from the exertion of labor upon natural resources.  See S. James Anaya, Indigenous Peoples in International Law 11-16 (1996).

[20]Moreover, a Tribe may prove exclusive and continuous occupation by reference to adjacent land ceded by the Tribe.  See, e.g., United States v. Elliott, 131 F.2d 720, 724 (10th Cir. 1942).

790 F.3d at 1165-66 (emphasis in original)(quoting Pueblo of San Ildefonso, 513 F.2d at 1394);

Native Village of Eyak, 688 F.3d at 624 ("Exclusivity is established when a tribe or a group

shows that it used and occupied the land to the *exclusion* of other Indian groups." (emphasis in

original)).  This requirement means that the Tribe must have behaved as an owner of the land by

exercising dominion and control.  See Santa Fe, 314 U.S. at 345.  See also Native Vill. of Eyak

v. Blank, 688 F.3d at 623 ("The tribe or group must exercise full dominion and control over the

area, such that it 'possesses the right to expel intruders,' . . . as well as the power to do so."

(quoting Osage Nation of Indians v. United States, 19 Ind. Cl. Comm. 447, 489 (1968))).  The

Court of Claims has explained that

> [i]mplicit in the concept of ownership of property is the right to exclude others.
> Generally speaking, a true owner of land exercises full dominion and control over
> it; a true owner possesses the right to expel intruders . . . .  True ownership of land
> by a tribe is called in question where the historical record of the region indicates
> that it was inhabited, controlled or wandered over by many tribes or groups.
> Ordinarily, where two or more tribes inhabit an area no tribe will satisfy the
> requirement of showing such "exclusive" use . . . .

United States v. Pueblo of San Ildefonso, 513 F.2d at 1394 (quoted by the United States Court of

Federal Claims[21] in Wichita Indian Tribe v. United States, 696 F.2d 1378, 1385 (Fed. Cir.

1983)).

---

[21]"[I]n the Federal Courts Improvement Act of 1982, Congress established the United
States Claims Court to replace the old Court of Claims, pursuant to its Article I powers. . . .
Claims Court judges, unlike the life-tenured Article III judges who sit in district courts, serve for
limited terms of 15 years."  Bowen v. Massachusetts, 487 U.S. 879, 908 n.46 (1988)(citing 28
U.S.C. §§ 171-172).  In 1992, the United States Claims Court name was changed to the United
States Court of Federal Claims.  See U.S. Court of Federal Claims: The People's Court, The
Federal Lawyer, Oct. 2007, at 29.  Court of Federal Claims appeals "are taken to the United
States Court of Appeals for the Federal Circuit and a judgement there is conclusive unless
reviewed by the Supreme Court on writ of certiorari.  Decisions of the Court of Claims are

The Court of Federal Claims has noted that "the general rule of exclusive use and occupancy is subject to three exceptions: (1) the joint-and-amicable-use exception; (2) the dominated use exception; and (3) the permissive use exception."[22] Alabama-Coushatta Tribe of Texas v. United States, No. 3-83, 2000 WL 1013532, at *12 (Fed. Cl. June 19, 2000). The joint-and-amicable-use exception provides that "two or more tribes or groups might inhabit an area in 'joint and amicable' possession without erasing the 'exclusive' nature of their use and occupancy," and without interrupting establishment of aboriginal title. Strong v. United States, 518 F.2d at 561 (quoting United States v. Pueblo of San Ildefonso, 513 F.2d at 1394). "To qualify for treatment under 'joint and amicable' occupancy, the relationship of the Indian groups must be extremely close." Strong v. United States, 518 F.2d at 561. The Court of Claims described such a relationship in Sac & Fox Tribe v. United States:

> Originally the Sac and Fox Nation consisted of two separate and identifiable tribes of Indians belonging to the Algonquin stock. Around 1735, due to their mutual hostility and conflict with the French, they formed a close and intimate alliance, politically and socially, so that from thence forward they have been dealt with and referred to as a single nation both in their relationship with other Indian tribes and in treaty negotiations and other matters with the United States.

315 F.2d at 995. Although the joint possessors must show their relationship is a "close and intimate alliance, politically and socially," Strong v. United States, 518 F.2d at 562, it is not

---

binding precedent on both its appellate and trial court successors." U.S. Court of Federal Claims: The People's Court, supra, at 29.

[22]The Court of Claims, Claims Court, and Court of Federal Claims cases that discuss the joint-and-amicable-use exception, the dominated use exception, and the permissive use exception to the exclusive-use-and-occupancy rule are not binding precedent; however, the Court concludes that these cases have persuasive value with respect to joint aboriginal title claims, and thus will assist the Court in its disposition of the case.

necessary for the Tribes to show that they are completely merged, see United States v. Pueblo of San Ildefonso, 513 F.2d at 1395 ("There are no holdings of this court which say that two Indian tribes or groups, each a separate 'entity' and each with its own separate lands, can never assert joint ownership to other lands which are commonly used and occupied."). For example, the evidence in United States v. Pueblo of San Ildefonso showed that two Indian groups objectively believed that they shared common ownership of the land "in joint tenancy under a 1770 land grant from the Spanish Crown," and the court held that the Tribes used and occupied the land in joint-and-amicable possession. See United States v. Pueblo of San Ildefonso, 513 F.2d at 1395-96. The joint-and-amicable use exception does not apply, however, when "each tribe had separate lands, [and] there was no community of interest in the lands," because

> [t]he [Tribes] did not consider themselves, and were not treated, as a single or closely integrated entity, but rather as separate political groups which were friends or allies (for the most part). Their use of the same lands may have been in common, like much of Indian use of the midwestern and western regions -- but the Commission could properly decide that it was not proved to be truly joint, and therefore that each separate tribe's claim to Indian title would have to be tested on its own distinct basis.

Strong v. United States, 518 F.2d at 562. Thus, mere cooperation among two or more Tribes is insufficient to prove joint-and-amicable possession. See Strong v. United States, 518 F.2d at 562.

The dominated use exception to the exclusive use rule recognizes that, where another Tribe commonly uses the land with the claimant Tribe, proof of the claimant Tribe's dominance over the other Tribe preserves its exclusive use of the land. See United States v. Seminole Indians of Fla., 180 Ct. Cl. 375, 383-86 (1967). The claimant Tribe's dominance illustrates its

ability to exclude other Tribes from the area, even if it never chooses to exercise that ability.  See United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383.  In United States v. Seminole Indians of Florida, for example, the Court of Claims explained that the Seminole Indians obtained aboriginal title to the Florida peninsula, notwithstanding the presence of other Indian tribes, because there was

> little question that, in their occupation of the land, the Seminoles held a virtual "monopoly." While expert witnesses concede the contemporaneous existence of other Indians in Florida . . . these scattered groupings were few and far between, and the record offers no evidence to suggest that Seminole dominion was ever challenged by these vestiges of aboriginal cultures. Instead, the pattern that prevailed was one of cultural assimilation -- the Seminoles simply absorbing these "foreign" elements into their own ranks.

United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383.  Thus, the dominant use exception prevails in situations where one Tribe culturally assimilates another Tribe or otherwise exercises complete dominion over "scattered groupings" of other Indians that appear "few and far between."  United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383.

The permissive use exception to the exclusive use rule acknowledges that other Indian Tribes could have "rang[ed] over large portions" of the claimant Tribe's land without defeating the exclusive nature of the claimant Tribe's use, as long as the other Tribes' presence was with the claimant Tribe's permission.  Wichita Indian Tribe v. United States, 696 F.2d 1378, 1385 (Fed. Cir. 1983).  The United States Court of Federal Claims in Wichita Indian Tribe v. United States explained that, in light of the other Tribes' friendly relations and trading activities, it required more specific evidence than that of shared hunting grounds to "justify a finding of a lack of exclusive use of all the Texas lands."  696 F.2d at 1385.  Similarly, in Spokane Tribe of

<u>Indians v. United States</u>, the Court of Claims admonished the ICC to "adequately consider whether [the] use by other Indians was by permission and at the sufferance of the [claimant Tribe], or as a matter of right; if the former, the alien visits would not diminish the appellant's Indian title." <u>Spokane Tribe of Indians v. United States,</u> 163 Ct. Cl. at 68-69. In <u>Strong v. United States</u>, the Court of Claims affirmed the ICC's finding that the claimant Tribe's presence was "overwhelmingly predominant and lasted a long time. Those incidents of use and occupancy by other Indians [the court views] as permissive or as so sporadic as not to be inconsistent with [the claimant tribe's] use and occupancy." <u>Strong v. United States</u>, 518 F.2d at 565. To satisfy the permissive use exception, permission need not be explicit, but may be inferred from the record as a whole. See <u>Strong v. United States</u>, 518 F.2d at 572. The Court of Claims in <u>Strong v. United States</u> found that a Tribe other than the claimant Tribe had two settlements in the claim area and inferred permissive use, stating that

> [t]here is evidence that the Wyandot had given permission to other Indian tribes to use their lands in Ohio, and we think the record, taken as a whole, supports the inference that the Ottawa were in the Sandusky area with the consent of the Wyandot. Permissive use by the Ottawa did not diminish the title of the Wyandot, and by the same token, such use gave the Ottawa no interest in the land.

<u>Strong v. United States</u>, 518 F.2d at 572.

The Court of Federal Claims has noted that "a claimant tribe's non-exclusive use of one segment of the claim area is not automatically imputed to the whole claim area." <u>Alabama-Coushatta Tribe of Texas v. United States</u>, No. 3-83, 2000 WL 1013532, at *14 (Fed. Cl. June 19, 2000). See <u>Wichita Indian Tribe v. United States</u>, 696 F.2d at 1385 (finding that the "sphere of Osage influence capable of disrupting the Wichitas' exclusivity of use . . . did not extend to

the southern border of Oklahoma.").  Thus, a court may find that a claimant Tribe had exclusive use of certain portions of the claim area, but failed to prove exclusive use of other portions.  See e.g., Sac & Fox Tribe of Indians of Okl. v. United States, 315 F.2d at 901-06; Strong v. United States, 518 F.2d at 565-69.

When disputes require the Supreme Court to determine the extent of Tribal lands, the Supreme Court applies the canons of construction applicable to treaties with Indian nations and to statutes regulating Indian affairs.[23]  See, e.g., Choctaw Nation of Indians v. United States, 318

---

[23]The Supreme Court has developed canons of construction to assist lower courts in interpreting Indian treaties; for example, in Choctaw Nation of Indians v. United States, 318 U.S. 423 (1943), the Court stated:

> Of course, treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. Especially is this true in interpreting treaties and agreements with the Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.

Choctaw Nation of Indians v. United States, 318 U.S. at 431-32 (internal quotation marks and citations omitted).  See also Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 247 ("The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.  Thus, it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." (internal quotations and citations omitted)).  The Supreme Court affirmed these canons in Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 119 (1999), wherein the Supreme Court held that, when construing Indian treaties, a court should

> look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties. In this case, an examination of the historical record provides insight into how the parties to the Treaty understood the terms of the agreement. This insight is especially helpful to the extent that it sheds light on how the [Tribal] signatories to the Treaty understood the agreement because we

U.S. 423 (1943). The Supreme Court and the federal Courts of Appeals have also resolved Tribal boundary disputes by applying general rules for resolution of ambiguities of deeds and patents. See, e.g., Meigs v. M'Clung's Lessee, 13 U.S. 11, 17-18 (1815)(holding that unilateral action of United States' agents cannot give meaning to bilateral treaty); City of New Town v. United States, 454 F.2d 121, 125 (8th Cir. 1972)(holding that administrative action may not alter boundaries of an Indian reservation). Although the Secretary of the Interior has no inherent authority to resolve Tribal boundary disputes, courts have given significant weight to administrative recognition of tribal boundaries. See, e.g., DeCoteau v. Dist. Cty. Court, 420 U.S. 425, 442-44 (1975)(citing DOI opinion as support for determination of reservation borders). Cf. Op. Sol. Interior, M-36539 (Nov. 19, 1958)("In determining the boundaries of an Indian reservation[,] the recognition by the Interior Department of a boundary as such for many years will be deemed controlling."); Op. Sol. Interior, 57 Interior Dec. 219 (1940)(granting authority to enter into agreement fixing boundaries of allotted and ceded tribal lands). Errors in United States' land surveys, however, are a recurring source of Tribal land claims.[24] See, e.g., Or. Dep't of Fish & Wildlife v. Klamath Tribe, 473 U.S. 753, 756-57 (1985); Creek Nation v. United

_____

interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them.

Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. at 196 (internal quotation marks and citations omitted).

[24]At least one Tribe has benefitted from a surveying error. See Yankton Sioux Tribe v. Gaffey, 14 F. Supp. 2d 1135, 1146 (D.S.D. 1998)(Piersol, J.)(Treaty with Tribe set aside 400,000 acres of reservation land, but "when the reservation was surveyed, it actually contained 430,495 acres").

<u>States</u>, 302 U.S. 620 (1938); <u>Pueblo of Sandia v. Babbitt</u>, 231 F.3d 878 (D.C. Cir. 2000);

<u>Seminole Nation v. United States</u>, 102 Ct. Cl. 565, 618-21 (1944); <u>Pueblo of Taos v. Andrus</u>,

475 F. Supp. 359 (D.D.C. 1979)(Gasch, J.).

### 3.      <u>Extinguishment of Aboriginal Title.</u>

The basic rule governing alienation of American Indian land is that only the United

States can extinguish aboriginal title.[25]   <u>See</u> 25 U.S.C. §177.   <u>See also</u> 25 C.F.R. § 152.22(b);

<u>Santa Fe</u>, 314 at 347.   The United States holds most Tribal property in trust.[26]   <u>See</u> <u>Cohen's</u>

<u>Handbook</u>, <u>supra</u> note 8, § 15.03 at 997-99.   The United States, or the state government in the

case of the original thirteen states, holds the "fee" interest -- the right of preemption -- while the

Tribe holds the "title of occupancy" or beneficial title.   <u>See</u> <u>Cohen's Handbook</u>, <u>supra note 8</u>, §

---

[25]Consequently, a seller or buyer of Tribal land must show authority in federal law to allow a transfer of the interest from the Tribe, while at common law restraints on alienation of fee interests are upheld only in limited circumstances.  <u>See</u> Restatement (Second) of Property § 4.1 cmt. a. (Am. Law. Inst. 1977)(discussing the common-law presumption of alienability). The restraint evolved from the national and international law of the European nations that colonized the Americas.  <u>See</u> <u>Johnson v. M'Intosh</u>, 21 U.S. at 592-94.  As detailed above, the discovering European sovereign, or its successor by war or purchase, asserted the exclusive right to acquire Indian land. <u>See</u> <u>Johnson v. M'Intosh</u>, 21 U.S. at 592-94.  The transfer of the United States' fee interest to a private purchaser became a fee simple interest whenever Congress extinguished the aboriginal title, regardless of the status that title might have had under Tribal law.  Had this not been the case, courts would have lacked jurisdiction to settle conclusively the property interests that the Tribe conferred.  <u>See</u> <u>Chouteau v. Molony</u>, 57 U.S. at 217-18 (dispute whether purchase from Tribe was fee or lesser interest); <u>Johnson v. M'Intosh</u>, 21 U.S. at 592-94 (Tribes had allegedly treated purported sale to plaintiffs as revoked).

[26]Over a period of many decades, the formal terminology for aboriginal title changed from the Marshall Court-era's right of occupancy/fee title characterization to the concept of the United States holding Tribal land in trust.  <u>See</u> <u>Cohen's Handbook</u>, <u>supra</u> note 8, § 15.09 at 1053. Trust terminology is now explicit in statutes and court decisions, and "more accurately reflects the nature of tribal ownership interests in tribal land, which is limited by the power of the United States to forbid or condition alienation."  <u>Cohen's Handbook</u>, <u>supra</u> note 8, § 15.09 at 1053.

15.03 at 997-999. The Supreme Court has held that although the sovereign can alienate the right of preemption without Tribal consent,[27] only Congress, or a presidential act ratified by Congress, can extinguish aboriginal title, no matter which sovereign holds the right of preemption. <u>Buttz v. Northern Pac. R.R.</u>, 119 U.S. at 65 (1886). Thus, the exclusive right to extinguish aboriginal title rests with the United States. <u>See</u> <u>Oneida Indian Nation v. Cty. of Oneida</u>, 414 U.S. at

---

[27]The view that the United States could not extinguish aboriginal title without the affected Tribe's voluntary consent permeates the Marshall Court cases, likely because it accords with the spirit of the property law right of preemption, which consists of the right to purchase a property interest in preference to all others when the current holder chooses to sell. <u>See</u> Right of Preemption, <u>Supra</u> note 17. For example, in <u>Johnson v. M'Intosh</u>, the Supreme Court noted that the United States has the exclusive power to "acquire" aboriginal tribal title. <u>Johnson v. M'Intosh</u>, 21 U.S. at 603. In <u>Cherokee Nation v. Georgia</u>, the Supreme Court clarified the meaning of "acquire" by noting that "the Indians are acknowledged to have an unquestionable, and heretofore unquestioned, right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government." <u>Cherokee Nation v. Georgia</u>, 30 U.S. at 17. Furthermore, in <u>Worcester v. Georgia</u>, the Supreme Court stressed that purchase was the preferred method of acquisition of Tribal land, with conquest a legitimate method of acquisition only in the case of Indian Tribes' unjustified war of aggression. <u>See</u> <u>Worcester v. Georgia</u>, 31 U.S. at 546 ("The power of war is given only for defense, not for conquest."); <u>id.</u> at 580 ("The soil, thus taken, was taken by the laws of conquest, and always as an indemnity for the expenses of the war, commenced by the Indians.").

Although before 1887, the United States formally acted only with Tribal consent, that consent was often corrupted by coercion and deception. <u>See</u> <u>Cohen's Handbook</u>, <u>supra</u> note 8, § 1.03 at 23-24. After enactment of the General Allotment Act of 1887, consent became yet more attenuated and was at times ignored. <u>See</u> <u>Cohen's Handbook</u>, <u>supra</u> note 8, § 1.04 at 72-75. During those periods, Tribes were rarely able to seek judicial protection of their ownership interests. <u>See</u> <u>Cohen's Handbook</u>, <u>supra</u> note 8, § 1.04 at 72-75. Notwithstanding the de facto policy of non-protection of aboriginal title, the Supreme Court continued to affirm the "voluntary cession" requirement until the 1903 case of <u>Lone Wolf v. Hitchcock</u>, 187 U.S. 553 (1903), wherein the Supreme Court held that Congress had the power to take Tribal property without the Tribe's consent and in violation of treaty promises. <u>See</u> 187 U.S. at 565. The Supreme Court further stated that Congress' decision to take Tribal property is a political question not subject to judicial review. <u>See</u> <u>Lone Wolf v. Hitchcock</u>, 187 U.S. at 565 ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government.").

667("Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States."); Santa Fe, 314 U.S. at 347; Buttz v. Northern Pac. R.R., 119 U.S. at 68; Johnson v. M'Intosh, 21 U.S. at 586.

Although the principle that the United States has the exclusive power to extinguish aboriginal title has remained unchanged, the Supreme Court unequivocally has rejected the view that the process by which the United States extinguishes title is nonjusticiable:

> [I]t seems that the Court's conclusive presumption of congressional good faith [in Lone Wolf v. Hitchcock] was based in large measure on the idea that relations between this Nation and the Indian tribes are a political matter, not amenable to judicial review. That view, of course, has long since been discredited in takings cases.

United States v. Sioux Nation, 448 U.S. 371, 413 (1980)(citing Lone Wolf v. Hitchcock, 187 U.S. 553, 565 (1903)).[28] Nevertheless, the Supreme Court continues to state that Congress is authorized to extinguish aboriginal title when it chooses to do so, notwithstanding treaty promises to the contrary.[29] See, e.g., Idaho v. United States, 533 U.S. 262, 277 (2001); United States v. Sioux Nation, 448 U.S. at 415 n.29.

---

[28]International law also rejects the nonjusticibility of aboriginal title extinguishment, for example, The United Nations Declaration on the Rights of Indigenous Peoples provides significant protection for indigenous peoples' right to the lands and resources they have traditionally owned and prevents the taking of such lands without due process and compensation. See, e.g., The United Nations Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295, U.N. Doc. A/RES/61/295 (Sept. 13, 2007), adopted by the General Assembly on September 13, 2007.

[29]Historically, when Tribes sought compensation for their land, they confronted numerous barriers, including the United States' sovereign immunity, the passage of time, and the difficulty of gaining access to the courts. See Cohen's Handbook, supra note 8, § 5.06[2] at 437-

Moreover, because aboriginal title is based on proof of continuous possession, a number of cases have held Tribal abandonment can result in the loss of aboriginal title, but only if such abandonment is voluntary.[30]  See Santa Fe, 314 U.S. at 349; Williams v. City of Chicago, 242 U.S. 434, 438 (1917); Buttz v. Northern Pac. R.R., 119 U.S. at 55.  Rather than serving as the basis for title extinguishment, voluntary abandonment most frequently figures in disputes over which of two Tribes owns disputed territory.  See Six Nations v. United States, 173 Ct. Cl. 899 (1965). Notably, as discussed supra at 71-75, the Court of Claims repeatedly has held that claims of aboriginal title may survive evidence of joint ownership by two or more tribes.  See, e.g., United States v. Pueblo of San Ildefonso, 513 F.2d at 1395; Strong v. United States, 518 F.2d at 561; United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383-86.

Although Congress has the power to extinguish aboriginal title, intent to do so must be "plain and unambiguous," and will not be "lightly implied."  Santa Fe, 314 U.S. at 346, 354.

---

38.  Aboriginal title has had practical judicial protection only since the 1920s, after federal policy shifted away from the effort to eliminate Tribal land ownership.  See Cohen's Handbook, supra note 8, § 1.05 at 79-80.  According to present-day Congressional policy, Congress may alienate Indian land by an act of eminent domain, by an arranged purchase of the property, or by other agreement, such as payment of a judgment rendered in a claim for damages.  See United States v. Dann, 470 U.S. at 45-50.  See also Cohen's Handbook, supra note 8, § 5.06[3] at 430-40 (discussing ICCA's statutorily-imposed compensation scheme).

[30]Forcible removal is not voluntary abandonment.  See Santa Fe, 314 U.S. at 355-56 ("No forfeiture can be predicated on an unauthorized attempt to effect a forcible settlement on the reservation unless we are to be insensitive to the high standards for fair dealing in light of which laws dealing with Indian rights have long been read.").  In two nineteenth century cases involving Spanish land grants, the Supreme Court notes that the voluntary-abandonment requirement derives from the discovery doctrine.  See United States v. Fernandez, 35 U.S. 303, 304 (1832) (relying on Johnson v. M'Intosh, 21 U.S. at 543; United States v. Arredondo, 31 U.S. 691, 747-48 (1832)("[I]f [abandonment was] voluntary, the dominion of the crown over it was

The Supreme Court consistently holds that Congress' intent to extinguish aboriginal title must express on the face of the legislative act or treaty authorizing extinguishment, or be clear from the surrounding circumstances.  See, e.g., Mattz v. Arnett, 412 U.S. 481, 505, (1973); Santa Fe, 314 U.S. at 353-54; Jones v. Meehan, 175 U.S. 1, 1 (1899).  Indeed, most federal land grants explicitly provide that the grantee cannot take possession until aboriginal title is extinguished. See, e.g., Oneida Indian Nation of New York v. New York, 691 F.2d at 1075 ("Until Indian title is extinguished by sovereign act, any holder of the fee title or right of preemption, either through discovery or a grant from or succession to the discovering sovereign, remains subject . . . to the Indian right of occupancy, and the Indians may not be ejected."); Buttz v. Northern Pac. R.R., 119 U.S. at 68 (railroad grant provided for extinguishment of aboriginal title by government "as rapidly as might be consistent with public policy and the welfare of the Indians").  In ambiguous cases regarding the interpretation of statutes and treaties that arguably extinguished aboriginal title, the federal courts have applied the Indian law canon that Tribal property rights are preserved unless Congress's intent to the contrary is clear and unambiguous.  See, e.g., Cty of Oneida v. Oneida Indian Nation, 470 U.S. at 246-47 (interpreting federally approved treaties ceding additional land to New York as not sufficiently clear to extinguish title to land in question); Cramer v. United States, 261 U.S. at 227 (interpreting exception in grant to railroad for lands "otherwise disposed of" to include lands occupied by Indians, in light of federal policy "from the beginning to respect the Indian right of occupancy"); Pueblo of Jemez v. United

---

unimpaired in its plenitude; if by force the Indians had the right whenever they had the power or inclination to return.").

States, 790 F.3d at 1164 (rejecting United States' argument that aboriginal title is extinguished if federal land grant does not contain "language that the grant was subject to pre-existing interests," and affirming that "federal land grants pass fee title to the grantees subject to aboriginal title").

See also Cohen's Handbook, supra note 8, § 2.02[1] at 113 ("The basic Indian law canons of construction require that treaties, agreements, statutes, and executive orders be liberally construed in favor of the Indians and that all ambiguities are to be resolved in their favor.").

Notwithstanding the requirement that only Congress can extinguish aboriginal title, the Supreme Court has held that payment of a judgment rendered in a claim for damages is sufficient to effect extinguishment. See United States v. Dann, 470 U.S. at 45-50.[31] Moreover, several

---

[31]In United States v. Dann, the government brought a trespass action against two Western Shoshone Indians, Mary and Carrie Dann, for violating the Taylor Grazing Act by grazing their livestock on public land without a permit. See United States v. Dann, 470 U.S. 39, 43 (1985). The United States based its title to the land on an ICC decision, see Western Shoshone Identifiable Group v. United States, 40 Indian Cl. Comm'n 318, 318 (1977), in which the ICC entered judgment in the amount of $26 million for the United States' taking of Western Shoshone Indians' aboriginal title to land located in California, Colorado, Idaho, Nevada, Utah, and Wyoming. See Western Shoshone Identifiable Group v. United States, 40 Indian Cl. Comm'n at 318. Although no single act of taking occurred, the ICC found that the United States had treated the property as public land. See Shoshone Tribe v. United States, 11 Indian Cl. Comm'n, 387, 416 (1962)(stating that gradual encroachment by whites, settlers, and others resulted in taking of Indian lands by United States for its own use). In related litigation in Temoak Band of Western Shoshone Indians v. United States, 29 Indian Cl. Comm'n 5 (1972), a Shoshone attorney stipulated that the United States took all the Tribe's Nevada land on July 1, 1872, to simplify the case so that the ICC could assess damages. See Temoak Band of W. Shoshone Indians v. United States, 29 Indian Cl. Comm'n 5, 6 (1972). Those involved in the claims case, including the Tribe's attorney, apparently believed that the claim involved only land held by non-Indians at the stipulation date. See United States v. Dann, 572 F.2d 222, 224 (9th Cir. 1978)(stating that most Western Shoshone Indians still live within land described in the Treaty of Ruby Valley, which defined the boundaries of the their land). The Danns, however, were not members of the Temoak Band of Western Shoshones or the entity known as the Western Shoshone Identifiable Group, a group created solely to bring a claim case, and had supported unsuccessful efforts to intervene in the case to exclude claims for present possessory

-93-

rights. See Western Shoshone Legal Defense & Educ. Ass'n v. United States, 531 F.2d at 497. One of the original claimants, the Temoak Band, attempted to stay the proceeding in 1977 and thereafter discharged its attorney to stop the claim from proceeding. See Temoak Band of W. Shoshone Indians v. United States, 593 F.2d 994, 997 (Ct. Cl. 1979). Nevertheless, the United States argued that the ICC case barred the Dann sisters' claim to aboriginal title. See United States v. Dann, 572 F.2d at 225 (noting United States' claim that the ICC decision estopped Danns from asserting that Indians retained "beneficial ownership" of Western Shoshone's Nevada lands).

The Ninth Circuit vindicated the sisters' claim by applying general claim preclusion principles. See United States v. Dann, 572 F.2d at 225-26. The Ninth Circuit held that claim preclusion did not attach because the decision was not final until Congress paid the compensation owed to the Tribe. See United States v. Dann, 572 F.2d at 225-26. The Danns, therefore, were not precluded from litigating the title issue, because the title issue was never raised or litigated before the ICC. See 572 F.2d at 225-26. Instead, the issue litigated was the extent of the Western Shoshone's holdings before "the arrival of the white man." F.2d at 225-26. The Ninth Circuit concluded that "the extinguishment question was not necessarily in issue, it was not actually litigated, and it has not been decided." F.2d at 226-27. The only issue decided, according to the Ninth Circuit, was the extent to which the Western Shoshone claimed title before non-Indian contact. See 572 F.2d at 226. The ICC did not decide that Congress had extinguished their title, and the stipulation established only a date of taking for purposes of valuation. See 572 F.2d at 226.

The Supreme Court reversed the Ninth Circuit by issuing a decision based exclusively on statutory interpretation of the ICCA. See United States v. Dann, 470 U.S. at 44-45. Because the ICCA provides that payment of the claims will fully discharge all of the United States' obligations, the Supreme Court viewed its task as merely to determine whether crediting the judgment award to a Tribal account in the United States Treasury qualified as payment. See 470 U.S. at 44. The Supreme Court applied trust law principles to determine whether payment had been made: payment to a trustee is payment to the beneficiary, so when the United States as defendant handed the money to itself as trustee, payment occurred. See 470 U.S. at 47-50. Although on remand the Danns won the right to retain the land containing their homestead, they lost their grazing land. See United States v. Dann, 873 F.2d 1189, 1200 (9th Cir. 1989)(holding that the Dann sisters' individual land title was restricted to land that they or their descendants occupied before 1934, and restricting animal number and type that could graze), cert. denied, 493 U.S. 890 (1989).

Scholars have criticized the Supreme Court's decision in United States v. Dann for sidestepping a discussion of the more difficult issues regarding why a decision entered on behalf of a group that was formed just for the purpose of bringing ICC litigation should bind the Dann sisters, whose Band had continuously occupied the land. See Kristine L. Foot, United States v. Dann: What It Portends for Ownership of Millions of Acres in the Western United States, 5 Pub. Land L. Rev. 183, 183 (1984); Nell Jessup Newton, Indian Claims in the Courts of the Conqueror, 41 Am. U. L. Rev. 753, 854 (1992). Then-Professor -- now Dean -- Nell Jessup

courts have held that Congressional acts in anticipation of settlement and public use, and actual settlement, by non-Indians are factors that may effect aboriginal title extinguishment.  See, e.g., United States v. Gemmill, 535 F.2d at 1147; United States v Pueblo of San Ildefonso, 513 F.2d at 1391; Gila River Pima-Maricopa Indian Cmty. v. United States, 494 F.2d at 1386; Plamondon ex rel. Cowlitz Tribe of Indians v. United States, 467 F.2d 935, 937 (Ct. Cl. 1972).

In Plamondon ex rel. Cowlitz Tribe of Indians v. United States, the Court of Claims, when tasked with deciding only whether the lands in question were taken in 1855 or 1863, explained first that the limited settlement by non-Indians on the Cowlitz land up to 1855 was not sufficient to extinguish the Tribe's aboriginal title; settlement was minimal and did not disrupt the Cowlitz way of life, and, in fact, land patents were not issued to claimants on Cowlitz lands until several years after 1855.  See 467 F.2d at 937-38.  By 1863, the Court of Claims found, however, that non-Indians had substantially settled the Cowlitz land, that the non-Indians greatly

---

Newton of Notre Dame Law School, for example, commented that the Supreme Court's opinion is "most notable for what it did not say," specifically that the Supreme Court did not take up the Dann sisters' argument that to permit the United States to use the ICC's judgment against them would result in permitting judicial extinguishment of aboriginal title, i.e., that the judgment would effect a taking of Indian land when only Congress has the authority to confiscate such land.  See Newton, supra, at 829-30 (citing Brief for Respondent at 25-29, United States v. Dann, 470 U.S. 39 (1985)(No. 83-1476)).  Dean Newton further notes that

> most of the Court's opinion focused on Congress' intent to settle all the ancient claims in enacting the Indian Claims Commission Act.  Whether the method chosen might violate fundamental principles of fairness was simply not of interest to the Court.  Of greatest concern to the Court was to dispatch these claims cases once and for all.

Newton, supra, at 854 (citing Robert Woodward & Scott Armstrong, The Brethren 57-58, 359 (1979)(stating that Burger Court denigrated Indian claims cases by calling them "teepee" and "peewee" cases)).

outnumbered the Indians, that the Indians intermingled with the non-Indians and no longer maintained an independent existence, and that they were thus deprived of the exclusive use and occupancy of their aboriginal lands.  See 467 F.2d at 936-37.  This finding, when combined with the establishment of a reservation for the Cowlitz, and evidence of Congressional intent to foreclose treaty negotiations and subject the Cowlitz land to public sale, led the Court of Claims to affirm the ICC's finding of an 1863 taking date.  See 467 F.2d at 937.

Additional Court of Claims support for aboriginal title extinguishment absent express Congressional intent is seen in Gila River Pima-Maricopa Indian Community v. United States, wherein American Indian claimants -- who had conceded before the ICC that their aboriginal title was extinguished -- argued that, until the enactment of the Taylor Grazing Act of 1934, the only extinguishment of aboriginal title to the claimed lands occurred by the individual entries of settlers, tract by tract, onto the land in the ICC award area.  See 494 F.2d at 1392.  In considering the date at which extinguishment occurred, the Court of Claims stated that the ICC was

> faced with a difficult task.  Unlike some other cases, there was here no formal cession by the Indians, no express indication by Congress (or its delegate) of a purpose to extinguish at a specified time, and no single act (or contemporaneous series of acts) of the Federal Government which indisputably erased native ownership at one swoop.  The Indian appellants say that, in these circumstances, the presumption of the *Santa Fe* opinion requires the tribunal to hold that there was no general taking at all until some unequivocal action by Congress (such as, they concede but only arguendo, the Taylor Grazing Act of 1934).  We think, however, that this is a case in which the history of the award area is such that the Commission could permissibly stop short of an uncontroverted and unmistakable sign from Congress.

494 F.2d at 1392.  The Court of Claims found that the ICC had the discretion to choose, as the taking date, an Executive Order issued in 1883, which doubled the size of the existing

reservation, because the Executive Order indicated that the United States believed that all the rightful tribal land was now within the reservations and that the 1883 extension was an effort to keep for the Indians the lands that they were then occupying and using. See 494 F.2d at 1392 ("At that moment, it could be said, the Government called a final halt because in its eyes the Pima-Maricopa group did not own the territory outside of the reservation, and any Indian claim to it was and should be rejected."). Thus, the Court of Claims affirmed the ICC's conclusion that the extent of non-Indian settlement, coupled with an Executive Order that Congress "impliedly ratified," marked the extinguishment of aboriginal title to all of the Tribe's outlying lands. 494 F.2d at 1394 ("In the context of this history, it is proper to imply a Congressional delegation of some of its plenary power over Pima-Maricopa affairs to the executive branch.").

The claim for failure to protect aboriginal title in United States v. Pueblo of San Ildefonso arose after the United States created a reservation for thirteen Pueblos on their historic lands, included other Tribal lands in a national forest reserve, and, over many years, granted the Pueblos' remaining lands to non-Indian settlers under the public land laws. See 513 F.2d at 1383. The Court of Claims concluded that the reservation's creation by itself was not sufficient to extinguish tribal title to lands not included in the reservation borders. See 513 F.2d at 1388. Extinguishment occurred only when federal land laws granted non-Indians the right to settle particular lands. See 513 F.2d at 1391. The United States argued that substantial "non-Indian interference with [the Indians'] exclusive use and occupancy of aboriginal land title areas" extinguished tribal title. 513 F.2d at 1386-87. The Court of Claims rejected the argument that non-Indian encroachment could result in the loss of aboriginal title when the affected tribe did

not voluntarily abandon the land, see 513 F.2d at 1390, and affirmed that private individuals' actions cannot affect aboriginal title, see 513 F.2d at 1387 ("[T]ermination of Indian title is exclusively the province of the United States."). The Court of Claims held that there must be "clear and convincing evidence of an intent to extinguish" aboriginal title and that "the fact that some entries [by non-Indians] were allowed in the plaintiffs' aboriginal areas is evidence of official negligence, or lack of knowledge of the plaintiffs' areas, rather than an intent on the part of the United States to abolish their whole titles." 513 F.2d at 1390. Nevertheless, the court affirmed the ICC extinguishment award based on the dates when the aboriginal areas were included in what later became the Santa Fe National Forest and when individual non-Indian settlers entered tribal lands under the public land laws, concluding that

> there are no fine spun or precise formulas for determining the end of aboriginal ownership. Unquestionably, the impact of authorized white settlement upon the Indian way of life in aboriginal areas may serve as an important indicator of when aboriginal title was lost. But such authorized settlement is only one of various factors to be considered in determining when specific lands were "taken." *Gila River*, *supra*, 494 F.2d at 1391, 204 Ct. Cl. at 146.

United States v Pueblo of San Ildefonso, 513 F.2d at 1390. See generally Tlingit & Haida Indians v. United States, 177 F. Supp. 452 (Ct. Cl. 1959)(holding that the establishment of forest reserves constituted a taking of land historically used and occupied by the claimant Indians); Pueblo of Nambe v. United States, 16 Ind. Cl. Comm. 393 (1965)(same); Pueblo of Taos, 15 Ind. Cl. Comm. 666 (1965)(same).

In United States v. Gemmill -- the only United States Court of Appeals case to consider factors other than express Congressional intent as evidence of aboriginal title extinguishment -- members of the Pit River Indian Tribe were arrested for trespass and theft of United States

government property after they removed Christmas trees from the Shasta Trinity National Forest. See 535 F.2d at 1149. Other tribal members were arrested for trespass when they sought to stop logging in the Lassen National Forrest, which the members considered sacred Tribal lands. See 535 F.2d at 1147. The members contended that their Tribe possessed unextinguished aboriginal title to the land in question; however, the Ninth Circuit concluded that four events taken together demonstrated Congressional intent sufficient to extinguish their Tribe's aboriginal title. See 535 F.2d at 1149. The first event was passage of the California Land Claims Act of 1851, Act of March 3, 1851, ch. 41, 9 Stat. 631 ("California Land Act"), which required all persons claiming lands by virtue of Spanish or Mexican title grants to present their claims to a special commission or lose their rights. See 535 F.2d at 1148. Although Tribal claims were based on aboriginal possession and occupancy, rather than a grant from Spain or Mexico, the Supreme Court interpreted the statute as requiring the Indians in the area to present their claims to the federal government. See 535 F.2d at 1148 ("In *Barker v. Harvey* . . . and *United States v. Title Ins. & Trust Co.* . . . , the Supreme Court upheld fee titles based on· patents against challenges by Mission Indians who had not presented their claims to the 1851 Commission"). Thus, a federal statute interpreted by the Supreme Court constituted sufficient Congressional intent to extinguish aboriginal title when the Tribes in question failed to comply with the statutory claim procedures. See 535 F.2d at 1148.

Second, the United States engaged in prolonged military confrontation with the Pit River Indians in the 1850s and 1860s, which culminated in a decisive military defeat in 1867. See 535 F.2d at 1148. The United States then removed the Pit River Indians from their lands by force.

See 535 F.2d at 1149. Third, in another express act, the federal government included the lands

in question in the Shasta Trinity and Lassen National Forests. See 535 F.2d at 1149 (citing the

Court of Claims holding in United States v. Pueblo of San Ildefonso that the designation of land

as a forest reserve is itself effective to extinguish aboriginal title). Fourth, the Tribe brought a

damages claim against the United States before the ICC for taking its lands, and the ICC

awarded the Tribe compensation. See 535 F.2d at 1149 (citing Pit River Indians v. United

States, 7 Ind. Cl. Comm. 815). In concluding that the Tribe previously had acknowledged the

extinction of its aboriginal title, the Ninth Circuit opined:

> The exact date on which Indian title has been extinguished is often difficult to
> determine. (*See United States v. Pueblo of San Ildefonso*, *supra*, at 1391.) The
> four events we have recounted amply illustrate that problem. Any one of these
> actions, examined in isolation, may not provide an unequivocal answer to the
> question of extinguishment. However, the activity of the federal government,
> beginning with the ambiguous Act of 1851 and culminating in the payment of the
> compromise settlement, has included expulsion by force, inconsistent use, and
> voluntary payment of compensation agreement. (*See Santa Fe, supra*, 314 U.S. at
> 347, 62 S.Ct. at 252, 86 L.Ed. at 270.) This century-long course of conduct amply
> demonstrates that the Pit River Indian title has been extinguished.

United States v. Gemmill, 535 F.2d at 1149.[32]

## RELEVANT LAW REGARDING EXPERT TESTIMONY

---

[32]The United States District Court for the District of Alaska cited the United States v.
Gemmill decision in United States v. Atlantic Richfield Co., 435 F. Supp. 1009, as an application
of the "complete dominion" theory, i.e., that the United States may extinguish aboriginal title
"by exercise of complete dominion adverse to the right of occupancy," as the Supreme Court
stated in Santa Fe. 435 F. Supp. 1009, 1019 (D. Alaska 1977)(Fitzgerald, J.)(quoting Santa
Fe, 314 U.S. at 347; United States v. Gemmill, 535 F.2d at 1149)("The Ninth Circuit recently
applied the 'complete dominion' theory in United States v. Gemmill . . . to conclude that a
tribe's aboriginal title had been extinguished de jure."). The Court does not agree that the Ninth
Circuit in United States v. Gemmill applies the complete dominion theory, and the Court is
unaware of any other federal court opinion to make this assertion.

"Since the Supreme Court of the United States decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011) (Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, whether the opinion testimony is the product of a reliable methodology." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224. "<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224.

### 1. **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only

experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").  An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."  LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.  See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).  Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").  See United States v. Edwards, No. CR 16-3068, 2017 WL 4857441, at *13 (D.N.M. Oct. 25, 2017)(Browning, J.).

**2.**    **The Standard in Daubert v. Merrell Dow Pharm., Inc.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . . ). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . . ). In making this determination, the district court must decide

> "whether the reasoning or methodology underlying the testimony is scientifically valid . . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . . ). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case . . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.

In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharm., Inc., to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharm., Inc., will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, a court must focus generally on "principles and methodologies, and not on the conclusions generated." <u>Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC</u>, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing <u>Daubert v. Merrell Dow Pharm.</u>, Inc., 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC</u>, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. <u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 881. The Tenth Circuit noted in <u>Hollander v. Sandoz Pharmaceuticals Corp.</u>, 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under <u>Daubert</u>, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the <u>Daubert</u> manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances . . . . Thus, when coupled with this deferential standard of review, <u>Daubert</u>'s effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

<u>Hollander v. Sandoz Pharm. Corp.</u>, 289 F.3d at 1206. The Ninth Circuit noted in <u>Claar v. Burlington Northern Railroad Co.</u>, 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion

of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (D.N.M. Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis. At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling

Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field."). See United States v. Edwards, 2017 WL 4857441, at *14-15.

### 3.  Necessity of Evaluating an Issue Under Daubert v. Merrell Dow Pharm., Inc.

The restrictions in Daubert v. Merrell Dow Pharm., Inc. apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the Frye[33] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal

_____

[33]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

Rule of Evidence 201." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[34] and in fact some courts have indicated their acceptance of it."). See United States v. Edwards, 2017 WL 4857441, at *16; United States v. Harry, 20 F. Supp. 3d 1196, 1226 (D.N.M. 2014)(Browning, J.); United States v. Chapman, 59 F. Supp. 3d 1194, 1212-13 (D.N.M. 2014)(Browning, J.).

## ANALYSIS

The Court will deny Jemez Pueblo's MIL 1, because the Tenth Circuit has expressly instructed the Court to consider evidence of use of the Valles Caldera by other than Jemez Pueblo after 1848. In accordance with the Tenth Circuit's mandate, the Court concludes that evidence of use after 1848 is relevant to: (i) whether Jemez Pueblo can establish that it held aboriginal title to the Valles Caldera; and (ii) whether, assuming that Jemez Pueblo can establish that it held aboriginal title, substantial interference effectuated extinguishment of that title.

---

[34]PCR stands for polymerase chain reaction, which the expert witness used to replicate bacteria DNA, "a process that would allow her to identify whether such bacteria were present in various environmental samples." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.

Because the Kehoe Report contains relevant evidence of other than Jemez Pueblo's use of the Valles Caldera, the Court will not exclude the substance of the Kehoe Report.

## I. THE TENTH CIRCUIT INSTRUCTS THE COURT TO TAKE EVIDENCE OF USE OF THE VALLES CALDERA AFTER 1848.

The Tenth Circuit expressly instructed the Court to consider evidence whether Jemez Pueblo held aboriginal title after 1848. See Pueblo of Jemez v. United States, 790 F.3d at 1165 ("Whether the Jemez Pueblo can establish that it exercised its right of aboriginal occupancy to these lands in 1860 and thereafter is a fact question to be established on remand, where it will have the opportunity to present evidence to support its claim."). Specifically, the Tenth Circuit instructed the Court to consider evidence necessary to determine whether Jemez Pueblo's use of the Valles Caldera was exclusive as to other Indian tribes. See 790 F.3d at 1165 ("[T]he 'exclusive' part of the test mean[s] . . . that in order to establish aboriginal title, a tribe must show that it used and occupied the land to the *exclusion of other Indian groups.*" (internal quotation marks omitted)(emphasis in original)). The Tenth Circuit also instructed the Court to consider whether Jemez Pueblo's use of the Valles Caldera suffered interference after Congress granted the land to the Baca family in 1860. See 790 F.3d at 1166 ("[I]f there was actually substantial interference by others with these traditional uses before 1946, the Jemez Pueblo will not be able to establish aboriginal title."). The Court will decline to ignore the express directives of the Tenth Circuit, will therefore deny MIL 1, and will consider evidence of use by other than Jemez Pueblo after 1848. As the Court understands the Tenth Circuit's mandate, there are two areas where evidence of use of the Valles Caldera after 1848 is relevant: (i) aboriginal title establishment, and (ii) aboriginal title extinguishment.

## A. EVIDENCE OF USE OF THE VALLES CALDERA AFTER 1848 IS RELEVANT TO WHETHER JEMEZ PUEBLO CAN ESTABLISH THAT IT HOLDS ABORIGINAL TITLE TO THE VALLES CALDERA.

Jemez Pueblo has not proven that it holds aboriginal title to the Valles Caldera.  See Pueblo of Jemez v. United States, 790 F.3d at 1147 ("On remand, the Jemez Pueblo will have to prove that it had . . . aboriginal title to the land at issue in the case.").  To establish aboriginal title, Jemez Pueblo must demonstrate by a preponderance of the evidence "actual, exclusive, and continuous use and occupancy" of the Valles Caldera for a long period of time.  Sac & Fox Tribe of Indians of Okla. v. United States, 383 F.2d at 998.  In its opinion in this case, the Tenth Circuit notes that the "exclusive part of the test" does not pertain to the Baca heirs' use of the Valles Caldera, but rather means "only that in order to establish aboriginal title, a tribe 'must show that it used and occupied the land to the *exclusion of other Indian groups.*'"[35]  Pueblo of Jemez v. United States, 790 F.3d at 1165-66 (emphasis added by the Tenth Circuit in Pueblo of Jemez v. United States)(quoting Pueblo of San Ildefonso, 513 F.2d at 1394)).  Hence, post-1848 evidence of use of the Valles Caldera by other Pueblos, for example, the Pueblos of Zia and Santa Ana, could frustrate Jemez Pueblo's ability to satisfy the exclusivity requirement necessary to establish aboriginal title.  Such evidence is therefore relevant.

---

[35]The Court notes that the Court of Claims has held repeatedly that two or more Indian bands or groups joint-and-amicable use, dominated use, or permissive use of the same land may evidence joint aboriginal title.  See supra at 78-82.  Cf. United States v. Pueblo of San Ildefonso, 513 F.2d at 1394 ("Ordinarily, where two or more tribes inhabit an area no tribe will satisfy the requirement of showing such 'exclusive' use and occupancy as is necessary to establish ownership by Indian title.").  Although the Court of Claims' conclusions in the cases that discuss these exceptions do not bind the Court, the Court will consider such conclusions for their persuasive value with respect to joint aboriginal title arguments.

To show "actual" and "continuous" use, according to the Tenth Circuit, "Jemez Pueblo must show, as it alleges in its Complaint, that the Jemez people have continued for hundreds of years to use the Valles Caldera for traditional purposes, including hunting, grazing of livestock, gathering of medicine and of food for subsistence, and the like."[36] Pueblo of Jemez v. United States, 790 F.3d at 1166. Jemez Pueblo argues that "expert testimony and other evidence will prove that Jemez Pueblo established aboriginal Indian title in the Valles Caldera between the 13th and 18th centuries by exclusive use and occupancy 'for a long time.'" MIL 1 at 4 (citing Sac & Fox Tribe of Indians of Okl. v. U.S., 383 F.2d at 992. The United States contends that it will present evidence

> that multiple Tribes worshipped and used the Valles Caldera for many centuries. That fact, if proven, defeats Plaintiff's claim. And it is a matter of common sense that worship and use by other Tribes in recent times (i.e., since the mid-19th Century) is evidence of similar usage in earlier times, particularly where the usage is religious and therefore the subject of centuries-old traditions and beliefs.

MIL 1 Response at 11.

---

[36]In the same paragraph, the Tenth Circuit states that

> As the cases make clear, if there was actually substantial interference by others with these traditional uses before 1946, the Jemez Pueblo will not be able to establish aboriginal title. In that circumstance, moreover, the Pueblo would be barred by the ICCA statute of limitations for failing to bring a claim before the ICC.

790 F.3d at 1166. Although the Court agrees that "substantial interference" by others with Jemez Pueblo's traditional uses of the Valles Caldera would indeed prevent Jemez Pueblo from establishing aboriginal title to the Valles Caldera, the Tenth Circuit's reference to the ICCA statute of limitations for failure to bring a claim for loss of aboriginal title leads the Court to conclude that the Tenth Circuit is referring to title extinguishment -- not establishment -- because each of the cases that the Tenth Circuit cites in this context speak to whether the ICC claimants' aboriginal title was extinguished and not established. See 790 F.3d at 1166-68.

The Court agrees with the United States that evidence of other Pueblos' traditional uses after 1848 could support an argument that such traditional uses began before the nineteenth century and thereby defeat Jemez Pueblo's claim to aboriginal title. The opposite is also true, as evidence of Jemez Pueblo's traditional use alone, or, theoretically, in amicable and exclusive accord with other Pueblos, could support its claim to aboriginal title by inference that such practices began many years before 1848. Hence, the Court further agrees with the United States in its interpretation of Santa Fe, insofar as Santa Fe stands for the proposition that "it is perfectly possible for Jemez to 'relinquish[] tribal rights in lands,' [314 U.S.] at 358, or for other tribes to transform exclusively-held land into jointly-held land." MIL 1 Response at 16. Nevertheless, Jemez Pueblo argues that it will provide evidence sufficient to establish aboriginal title before 1848, see MIL 1 at 3, and that it never abandoned the land, see MIL 1 Reply at 8. The Court likely will allow Jemez Pueblo's pre-1848 evidence, but will not foreclose the United States from presenting post-1848 evidence which indicates that other Tribes were using the Valles Caldera, and, by inference, had used it for many centuries.

**B.     EVIDENCE OF USE BY OTHER THAN JEMEZ PUEBLO AFTER 1848 IS RELEVANT TO WHETHER JEMEZ PUEBLO LOST ABORIGINAL TITLE BY SUBSTANTIAL INTERFERENCE.**

Assuming that Jemez Pueblo can establish that it historically held aboriginal title to the Valles Caldera, evidence of land use after 1848 is relevant to whether Jemez Pueblo's aboriginal title remains unextinguished. "On remand, the Jemez Pueblo will have to prove that it . . . still has aboriginal title to the land at issue in the case." Pueblo of Jemez v. United States, 790 F.3d at 1147. It is axiomatic that only Congress can extinguish aboriginal title: "The threshold rule,

of course, is that termination of Indian title is exclusively the province of the United States. And in this regard, the 'power of Congress is supreme.'" United States v. Pueblo of San Ildefonso, 513 F.2d at 1387 (quoting Santa Fe, 314 U.S. at 347). Another principle is that "the time fixed for the 'taking' of specific lands depends upon the particular facts, circumstances and history of each case," United States v. Pueblo of San Ildefonso, 513 F.2d at 1387, and, in this case, the Tenth Circuit has directed the Court to determine whether there was "actually substantial interference by others" with Jemez Pueblo's traditional uses of the Valles Caldera "before 1946," Pueblo of Jemez v. United States, 790 F.3d at 1166. The Tenth Circuit's opinion mentions that substantial interference could result from "white settlement and use, authorized by the federal government both statutorily and in fact." 790 F.3d at 1166 (citing United States v. Pueblo of San Ildefonso, 513 F.2d at 1393). Hence, this statement indicates that aboriginal title extinguishment could result, not from an explicit act of Congress,[37] but rather from the substantial interference of Congressionally authorized non-Indian settlement.[38]

---

[37]The Court is aware that the Supreme Court has held that congressional intent to extinguish aboriginal title must be "plain and unambiguous," and will not be "lightly implied." Santa Fe, 314 U.S. at 346, 354. The Court is also aware that the Supreme Court repeatedly has held that the intent to extinguish aboriginal title must be expressed on the face of the legislative act or treaty authorizing extinguishment, or be clear from the surrounding circumstances. See, e.g., Mattz v. Arnett, 412 U.S. 481, 505, (1973); Santa Fe, 314 U.S. at 353-54; Jones v. Meehan, 175 U.S. 1, 1 (1899). The Court therefore seeks to apply the Tenth Circuit's mandate in a way that emphasizes Congressional intent to effectuate aboriginal title extinguishment, as the surrounding circumstances evidence.

[38]Post-1848 evidence is also relevant to whether Jemez Pueblo abandoned its aboriginal title. Generally, property abandonment brings the right of continued occupancy to an end. See Williams v. Chicago 242 U.S. 434, 437 (1917). Because aboriginal title is based on possession, a Tribe may voluntarily abandon historic Indian land not included within a reservation. See, e.g., Santa Fe, 314 U.S. at 349; Williams v. City of Chicago, 242 U.S. 434, 438 (1917); Buttz v.

To support the proposition that "white settlement and use, authorized by the federal government," can extinguish aboriginal title, the Tenth Circuit quotes heavily from United States v. Pueblo of San Ildefonso, see Pueblo of Jemez v. United States, 790 F.3d at 1166, and the Court therefore agrees with the United States that United States v. Pueblo of San Ildefonso is controlling precedent in this case, see MIL 1 Response at 17 ("[T]he Court of Appeals identified [United States v. Pueblo of San Ildefonso] as controlling."). The Court of Claims in United States v. Pueblo of San Ildefonso discussed how the "impact of authorized white settlement upon the Indian way of life in aboriginal areas may serve as an important indicator of when aboriginal title was lost. But such authorized settlement is only one of various factors to be considered in determining when specific lands were taken," 535 F.2d at 1390, and the Court of Claims found that Congress gradually extinguished aboriginal title over time by creating a reservation for thirteen Pueblos on their historic lands, including other tribal lands in a national forest reserve, and granting the Pueblos' remaining lands to non-Indian settlers under the public land laws, see 513 F.2d at 1383. Significantly, the Court of Claims concluded that creation of the reservation by itself was insufficient to extinguish aboriginal title to lands not included in the reservation borders. See 513 F.2d at 1388. Extinguishment occurred only when federal land laws granted non-Indians the right to settle particular lands. See 513 F.2d at 1391. The Court of Claims

---

Northern Pac. RR, 119 at 55; Mitchel v. United States, 34 U.S. at 746. See also supra at 87-88. Jemez Pueblo concedes, however, that the Court should permit post-1848 evidence of abandonment, and, therefore, post-1848 evidence of abandonment is not at issue in MIL 1. See MIL 1 Reply at 4 ("Jemez Pueblo's position is not that Indian title cannot be 'surrendered' -- but it can only be 'surrendered' by abandonment."). Cf. id. at 1 ("This Motion focuses only on . . . whether Jemez Pueblo's Indian title has been lost by abandonment or Congressional

rejected the argument that non-Indian encroachment could result in the loss of aboriginal title

when the affected Tribe did not voluntarily abandon the land in question, see 513 F.2d at 1390,

and affirmed that the actions of private individuals cannot affect aboriginal title, see 513 F.2d at

1387 ("[T]ermination of Indian title is exclusively the province of the United States.").  The

Court of Claims held that there must be "clear and convincing evidence of an intent to

extinguish" aboriginal title, and that "the fact that some entries [by non-Indians] were allowed in

the plaintiffs' aboriginal areas is evidence of official negligence, or lack of knowledge of the

plaintiffs' areas, rather than an intent on the part of the United States to abolish their whole

titles."  513 F.2d at 1390.  The Court of Claims concluded that

> there are no fine spun or precise formulas for determining the end of aboriginal
> ownership. Unquestionably, the impact of authorized white settlement upon the
> Indian way of life in aboriginal areas may serve as an important indicator of when
> aboriginal title was lost. But such authorized settlement is only one of various
> factors to be considered in determining when specific lands were "taken." *Gila
> River*, *supra*, 494 F.2d at 1391, 204 Ct. Cl. at 146.

United States v. Pueblo of San Ildefonso, 513 F.2d at 1390.  Hence, the Court of Claims in

United States v. Pueblo of San Ildefonso identifies three factors that can lead to a gradual taking

of aboriginal title by the United States by implication based on Congressional action that:

(i) creates an Indian reservation, (ii) authorizes non-Indian settlement on Tribal lands, and

(iii) designates Tribal lands as part of a national forest reserve.  See 513 F.2d at 1386.  In this

case, the Court will consider these three factors as relevant evidence of extinguishment.

---

extinguishment.  Evidence of activity after 1848 that is not relevant to either of these issues
should not be admissible at trial.").

As further support for the proposition that authorized non-Indian settlement can effectuate gradual taking of aboriginal title by the United States, both the Tenth Circuit in this case and the Court of Claims in United States v. Pueblo of San Ildefonso cite to the Court of Claims' opinion in Gila River Pima-Maricopa Indian Community v. United States.  In Gila River Pima-Maricopa Indian Community v. United States, the Court of Claims stated that the opening of an area for non-Indian settlement only becomes a factor "in an appropriate factual context." 494 F.2d 1391.  Hence, the Court of Claims again narrowed the authorized non-Indian settlement factor, by indicating that non-Indian settlement becomes a factor only in a certain factual context.  The factual context sufficient to find a gradual taking of aboriginal title in Gila River Pima-Maricopa Indian Community v. United States is: (i) Congressional authorization to establish an Indian reservation; (ii) Congressional authorization of non-Indian settlement of historic Indian lands;  and (iii) Congressional ratification of an Executive Order that doubled the size of the reservation, thereby implying Congress' belief that aboriginal title to non-reservation lands was extinguished when the Executive Order was issued.  See 494 F.2d at 1394.  As in United States v. Pueblo of San Ildefonso, the Court of Claims in Gila River Pima-Maricopa Indian Community v. United States required the presence of all three factors taken together to make a takings finding; each factor by itself was insufficient. See Gila River Pima-Maricopa Indian Cmty. v. United States, 494 F.2d at 1393.

The Tenth Circuit also cites the Zia litigation as evidence that aboriginal title may be extinguished "as a matter of fact over time" by interference with aboriginal use and occupancy. Pueblo of Jemez v. United States, 790 F.3d at 1167.  The claim in the Zia litigation arose after

Congress passed the Taylor Grazing Act and the Secretary of the Interior -- pursuant to the Taylor Grazing Act and at the President's direction -- issued an order establishing a grazing district; "the effect of this Order was that [the Pueblos] were now required to obtain grazing licenses and pay grazing fees for the use of lands which they were still using up to the date of said Order, and had been using for livestock grazing from time immemorial." Zia III, 19 Ind. Cl. Comm. at 64. The Court of Claims concluded that "such action on the part of Congress and the President constitutes a taking of petitioners' Indian title lands." 19 Ind. Cl. Comm. at 64. Hence, there is a fourth factor that may contribute to aboriginal title extinguishment: a cabinet-level order, pursuant to a Congressional act, that in some manner encumbers a Tribe's use of their historic lands, either through licensing requirements or the paying of fees. The encumbrance must result from Congress' act or by the President executing Congressional will.

The Court of Claims in the Zia litigation also references another factor that may result in aboriginal title extinguishment: the unilateral designation -- by Congress or by the President -- of Indian land for another public use, such as the creation of a national forest reserve or, again, a grazing district. See 19 Ind. Cl. Comm. at 74. The Tenth Circuit notes that the ICC cases of Pueblo of Nambe v. United States and Pueblo of Taos v. United States stand for the same proposition. See Pueblo of Jemez v. United States, 790 F.3d at 1167. These unilateral actions placed restrictions on the Pueblos' historic use of their land, that is, they prevented the Indians from using the land how they saw fit.

In summary, based on the Tenth Circuit's mandate in this case, the Court has identified five factors, none of which by itself is dispositive, that could support a finding that the United

States substantially interfered with aboriginal title over time so as to effectuate a gradual taking absent express Congressional intent: (i) the creation of an Indian reservation; (ii) Congressionally authorized non-Indian settlement of historic Tribal lands; (iii) a Congressionally ratified Executive Order increasing the size of reservation lands set aside for exclusive Indian use; (iv) a cabinet-level order, pursuant to a Congressional act, imposing restrictions on Indian use of their historic lands; and (v) Congressional or executive action designating Tribal land for conservation, recreation, or commercial use, such as a forest reserve, grazing district, or the like. Importantly, each of the factors found in the cases cited by the Tenth Circuit involve some action on the part of Congress, either directly or through the President, that significantly affects an Indian Tribe's use of their historic lands. In this way, the Court of Claims never completely abrogated Congressional intent to extinguish aboriginal title, but rather found that Congressional intent was implied based on various actions offensive to aboriginal use and possession. Because, in this case, neither party has suggested that Congress has expressly extinguished aboriginal title to the Valles Caldera, the Court will consider evidence of use after 1848 helpful insofar as such evidence speaks to the five above-mentioned factors, each of which support the Tenth Circuit's mandate to consider evidence of "substantial interference by others" with Jemez Pueblo's traditional use of the Valles Caldera.[39]  Pueblo of Jemez v. United States, 790 F.3d at 1166.

_____

[39]The Court is unconvinced that the United States can take aboriginal title "as a matter of fact over time by interfering with . . . native use and occupancy," Pueblo of Jemez v. United States, 790 F.3d at 1167, and, but for the Tenth Circuit's mandate in this case, the Court would apply controlling Supreme Court law as requiring clear-and-convincing evidence of plain and unambiguous Congressional intent to effect such extinguishment. The Court agrees with Jemez Pueblo that the ICC and Court of Claims cases where both parties stipulated to the United States taking of aboriginal title do not provide sufficient precedential value to control the Court in this

case. First, the Court of Claims opinions do not bind the Tenth Circuit and, without the Tenth Circuit's directive, this Court. At most, they are merely persuasive authority and, on a clean slate, they are not very persuasive, because the issue whether a taking occurred was neither contested nor adjudicated in the Court of Claims' opinions. The Court further agrees with Jemez Pueblo that the attorneys before the ICC had no incentive to litigate whether a taking occurred, as a stipulation to that effect "suit[ed] their mutual objectives -- resolution of the claim for the lawyers for the United States, and payment of fees to counsel for the plaintiff tribe." MIL 1 at 12. The Court concludes that controlling Supreme Court caselaw requires express Congressional intent to extinguish aboriginal title, and that such intent must be obvious on the face of a Congressional statute.

The Supreme Court has stated repeatedly that the sole entity with the power to extinguish aboriginal title is Congress. See Santa Fe, 314 U.S. at 347 ("Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme.); Buttz v. Northern Pac. R.R., 119 U.S. at 68 ("The ultimate fee . . . was in the crown previous to the Revolution . . . and subject to grant. . . . In the grant . . . now before us, congress was not unmindful of the title of the Indians . . . and it stipulated for its extinguishment by the United States."); Beecher v. Wetherby, 95 U.S. 517, 525 (1877)("The fee was in the United States . . . . The grantee . . . would take only the naked fee, and could not disturb the occupancy of the Indians: that occupancy could only be interfered with or determined by the United States."); Johnson v. M'Intosh, 21 U.S. at 586 ("The ceded territory was occupied by numerous and warlike tribes of Indians; but the exclusive right of the United States to extinguish their title, and to grant the soil, has never, we believe, been doubted."). Hence, private parties cannot extinguish aboriginal title by encroaching on Tribal land. See Santa Fe, 314 U.S. at 354. Extinguishment of Indian title requires Congress' sovereign act. See Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 247 ("Absent explicit statutory language . . . this Court accordingly has refused to find that Congress had abrogated Indian treaty rights. . . . The Court has applied similar canons of construction in nontreaty matters." (emphasis added)(internal citation and quotation marks omitted)). The touchstone is Congress' intent. See Santa Fe, 314 U.S. at 354. Moreover, "an extinguishment cannot be lightly implied in view of the avowed solicitude of the United States for the welfare of its Indian wards." Santa Fe, 314 U.S. at 354. The Supreme Court held in the 1985 case of County of Oneida v. Oneida Indian Nation of New York State that "congressional intent to extinguish Indian title must be 'plain and unambiguous,' and will not be 'lightly implied.'" Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 247-48 (emphasis added)(citation omitted)(quoting Santa Fe, 314 U.S. at 346, 354). It further noted that, "[r]elying on the strong policy of the United States 'from the beginning to respect the Indian right of occupancy,'. . . it '[c]ertainly' would require 'plain and unambiguous action to deprive the [Indians] of the benefits of that policy.'" Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 248 (emphasis added)(quoting Santa Fe, 314 U.S. at 345-46).

The Supreme Court has never endorsed the theory that United States may take aboriginal title through substantial interference over time, despite having had an opportunity to comment on this theory in United States v. Dann. Notably, the Supreme Court sidestepped this issue and

instead decided <u>United States v. Dann</u> based on the ICCA's claim preclusion provisions. <u>See United States v. Dann</u>, 470 U.S. at 44-45. <u>See also</u> <u>supra</u> at 83 n.24. In an article critical of the <u>United States v. Dann</u> decision, Dean Nell Jessup Newton comments that the Supreme Court's opinion is "most notable for what it did not say," specifically, that the Supreme Court did not address the Danns' argument that to permit the United States to use the ICC's judgment against them would result in permitting judicial extinguishment of aboriginal title. Newton, <u>Indian Claims in the Courts of the Conqueror</u>, 41 Am. U. L. Rev. at 829-30 (citing Brief for Respondent at 25-29, <u>United States v. Dann</u>, 470 U.S. 39 (1985)(No. 83-1476)). By deciding the case on the claim preclusion theory -- and not on the gradual taking theory -- the Supreme Court left open the question whether the gradual taking theory is applicable to claims that fall outside the ICCA's jurisdiction.

Given the Supreme Court's decision not to comment on the gradual takings theory in <u>United States v. Dann</u>, the Court is concerned that the Tenth Circuit's mandate to consider evidence of "substantial interference" is an intolerably vague standard that runs the risk of lightly implying Congressional intent to extinguish aboriginal title. <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1166. Hence, the Court would, on a clean slate, require evidence of express extinguishment like that seen in the Act of March 3, 1851, 9 Stat. 631, which Congress passed to ascertain and settle certain land claims in California. <u>See</u> <u>Santa Fe</u>, 314 U.S. at 350 (discussing the Act of March 3, 1851). Under § 13 of the Act of March 3, 1851,

> all lands the claims to which shall not have been presented to the commissioners, appointed to receive and act upon all petitions for confirmation of land claims, 'within two years after the date of this act, shall be deemed, held, and considered as part of the public domain of the United States.

<u>Santa Fe</u>, 314 U.S. at 350 (internal quotation marks omitted)(quoting Act of March 3, 1851). The Supreme Court interpreted the Act of March 3, 1851, in <u>Barker v. Harvey</u>, 181 U.S. 481 (1901), where the plaintiff claimed title under two Mexican grants of land that two Indians alleged was subject to their aboriginal title rights. <u>See</u> 181 U.S. at 490. The Supreme Court held that the Indians' claims were barred, because the Indians had not presented them to the claims commission within the time that § 13 specified. <u>See</u> 181 U.S. at 490. In discussing <u>Baker v. Harvey</u>, the Supreme Court in <u>Santa Fe</u> stated that "the Act of 1851 was interpreted as containing machinery for extinguishment of claims, including those based on Indian right of occupancy." <u>Santa Fe</u>, 314 U.S. at 350. The Court concludes that such machinery is the appropriate vehicle for aboriginal title extinction and disagrees that the gradual taking theory is the appropriate standard when, as in this case, the question whether a taking occurred is the subject of the litigation before the Court. Nevertheless, the Court interprets the Tenth Circuit's mandate as requiring the Court to consider evidence of "substantial interference" with Jemez Pueblo's traditional use of the Valles Caldera, regardless whether Jemez Pueblo can demonstrate that it possesses aboriginal title to those lands.

Aside from the Tenth Circuit's opinion in this case, the Court is aware of only a single federal Court of Appeals decision -- outside the ICC context -- to suggest that the United States can take aboriginal title by substantial, Congressionally-authorized interference with a Tribe's traditional use of its historic lands.  See United States v. Gemmill, 535 F.2d at 1149.  In United States v. Gemmill, the Ninth Circuit concluded that four events considered together demonstrated Congressional intent sufficient to extinguish the Pit River Tribe's aboriginal title.  See 535 F.2d at 1149.  The first event was passage of the California Land Act, which required all persons claiming lands by virtue of Spanish or Mexican title grants to present their claims to a special commission or to lose their ownership rights.  See 535 F.2d at 1148.  Second, the United States engaged in prolonged military conflict with the Pit River Indians in the 1850s and 1860s, which culminated in the Tribe's defeat and in the Tribe's involuntary removal from its historic

---

Notwithstanding the Tenth Circuit's mandate, the Court expresses its concern that, by failing to acknowledge the unique factual circumstances surrounding the Court of Claims' takings findings, the Tenth Circuit has overemphasized the Court of Claims cases' precedential value.  For this reason, the Court emphasizes in the Memorandum Opinion and Order that all evidence of aboriginal title extinguishment must also evidence Congressional intent, if not on the face of the statute -- as the Court would prefer -- then through evidence of substantial Congressionally authorized interference, as discussed in greater detail in the above section of the Court's analysis.

Finally, while the Court has tried to lay out specifically what the Tenth Circuit requires, and the Court has also stated that it does not think that the Tenth Circuit correctly analyzed the applicable, controlling aboriginal title extinguishment law -- the Supreme Court precedent -- the Court also takes the opportunity to state what it would decide on a clean slate, if it were Chief Justice John Marshall confronting the issue in the early days of the Republic.  The Court agrees, as a starting point, that aboriginal title is, in the words of the Marshall Court, "as sacred as the fee simple of the whites"; courts must take this statement seriously.  What taking that principle seriously would mean is that taking of aboriginal title by the United States must be express and not implied by the circumstances.  On a clean slate, the Court would not adopt the gradual taking theory but would require evidence of clear and unambiguous Congressional intent to extinguish aboriginal title, and require that such intent be obvious on the face of a Congressional statute.

lands.  See 535 F.2d at 1148-49.  Third, the federal government included the lands in question in the Shasta Trinity and Lassen National Forests.  See 535 F.2d at 1149.  Fourth, the Tribe brought a damages claim against the United States before the ICC for the taking of its lands, and, in an agreement settling all California Indians' outstanding aboriginal title claims, the ICC awarded the Tribe compensation.  See 535 F.2d at 1149 (citing Pit River Indians v. United States, 7 Ind. Cl. Comm. 815).  In concluding that the Tribe previously had acknowledged the extinguishment of its aboriginal title by accepting the ICC award, the Ninth Circuit opined:

> The exact date on which Indian title has been extinguished is often difficult to determine.  (*See United States v. Pueblo of San Ildefonso, supra,* at 1391.)  The four events we have recounted amply illustrate that problem.  Any one of these actions, examined in isolation, may not provide an unequivocal answer to the question of extinguishment.  However, the activity of the federal government, beginning with the ambiguous Act of 1851 and culminating in the payment of the compromise settlement, has included expulsion by force, inconsistent use, and voluntary payment of compensation agreement.  (*See Santa Fe, supra,* 314 U.S. at 347, 62 S.Ct. at 252, 86 L.Ed. at 270.)  This century-long course of conduct amply demonstrates that the Pit River Indian title has been extinguished.

535 F.2d at 1149.  Although the Court is uncomfortable with finding a taking based on a "century-long course of conduct," the Court concedes that each of these four events independently suggests Congressional intent to extinguish the Pit River Tribe's aboriginal title. 535 F.2d at 1149.  Hence, if Jemez Pueblo can establish aboriginal title to the Valles Caldera, then the Court will consider, as helpful to the Court's extinguishment analysis, evidence substantially similar to the four events in United States v. Gemmill, i.e., evidence of: (i) a federal statute requiring Jemez Pueblo to present its land claims before a Congressionally authorized commission or lose them; (ii) a war or conflict between Jemez Pueblo and United States, with forcible relocation of Jemez Pueblo thereafter; (iii) the inclusion of Jemez Pueblo's lands in a

federal reserve; and (iv) Jemez Pueblo's acceptance of an ICC award for the United States' taking of all of their historic lands. Notably, these events are coterminous with Supreme Court precedent that payment of a judgment rendered in a claim for damages is sufficient to effect aboriginal title extinguishment, see United States v. Dann, 470 U.S. at 44-45, and with the nondispositive factors that the Court has gleaned from the Court of Claims opinions which the Tenth Circuit cited in this case, as discussed in detail above.

## III. THE KEHOE REPORT CONTAINS RELEVANT EVIDENCE OF USE OF THE VALLES CALDERA AFTER 1848.

The Court will consider as relevant evidence Dr. Terence Kehoe's expert report, which details use of the Valles Caldera by other than Jemez Pueblo after 1848. The Federal Rules of Evidence "contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." Sec. & Exch. Comm'n v. Goldstone, 233 F. Supp. 3d 1149, 1165 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402 & 403). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible." Sec. & Exch. Comm'n v. Goldstone, 233 F. Supp. at 1165. Rule 702 allows testimony by an expert witness only if that testimony "will help the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. 702(a). The trial judge is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 597. The second inquiry "is related to the first. Under the relevance prong of the Daubert analysis, the court must

ensure that the proposed expert testimony logically advances material aspects of the case . . . .

The evidence must have a valid connection to the disputed facts in the case" as a precondition to admissibility. Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LAM, 2009 WL 3241555, *8-9 (D.N.M. Aug 25, 2009)(Browning, J.).

Jemez Pueblo argues that Dr. Kehoe's proposed testimony is irrelevant, because it "concerns use of the lands in question from 1863 to the present. None of his proposed testimony goes to the issue of Congressional action taken to extinguish the Jemez Pueblo's title." MIL 1 at 26. Jemez Pueblo concedes, however, that "a significant portion of Kehoe's proposed testimony addresses his opinion that other Indians sometimes entered the area." MIL 1 at 27. Moreover, the United States argues that, in compiling his expert report, Dr. Kehoe "studied, among other things, use of the Valles Caldera lands by other Tribes and interference with Jemez's use of the Valles Caldera during the years when the Baca, Bond, and Dunigan families owned the land." MIL 1 Response at 13. The Court concludes that the Kehoe Report discusses early 20th century Valles Caldera religious use by not only Jemez Pueblo but also Zia, Santo Domingo, Sandia, Cochiti, Tesuque, Pojoaque, San Ildefonso, Santa Clara, and San Juan Pueblos. See Kehoe Report at 19-20, 29-30, 42-43. Although use of the Valles Caldera by non-Indians may indeed be less relevant to the Court's title-extinguishment analysis, evidence of use by other Pueblos speaks to whether Jemez Pueblo can establish aboriginal title and is thus in accord with the Tenth Circuit's directives on remand. See Pueblo of Jemez v. United States, 790 F.3d at 1147 ("On remand, the Jemez Pueblo will have to prove that it had, and still has, aboriginal title to the

land at issue in the case."). The Court, therefore, will not exclude the substance of Dr. Kehoe's report.

**IT IS ORDERED** that the requests in the Plaintiff's Motion in Limine to Exclude Certain Evidence, filed August 17, 2018 (Doc. 236), are denied. The Court will consider evidence of land use by other than Jemez Pueblo after 1848 as relevant to whether Jemez Pueblo holds aboriginal title to the Valles Caldera. Furthermore, the Court will admit the substance of the expert report that Dr. Terence Kehoe authored.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Thomas E. Luebben, Jr.
Law Offices of Thomas E. Luebben
Sandia Park, New Mexico

--and--

Randolph H. Barnhouse
Justin J. Solimon
Christina S. West
Veronique Richardson
Dianna Kicking Woman
Karl E. Johnson
Tierra Marks
Barnhouse Keegan Solimon & West LLP
Los Ranchos de Albuquerque, New Mexico

*Attorneys for the Plaintiffs*

Jeffrey Wood
  Acting Assistant Attorney General
Peter K. Dykema
Matthew Marinelli
Jacqueline M. Leonard
Amarveer Brar
Kenneth Rooney
Kristofor R. Swanson
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Washington, D.C.

*Attorneys for the Defendant United States of America*

Kirk R. Allen
Elizabeth Reitzel
Miller Stratvert P.A.
Albuquerque, New Mexico

*Attorneys for the Intervenor Defendant*