## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF JEMEZ, a federally
recognized Indian Tribe,

      Plaintiff,

vs.                                                                                    No. CIV 12-0800 JB\JFR

UNITED STATES OF AMERICA,

      Defendant,

and

NEW MEXICO GAS COMPANY,

      Defendant-in-Intervention.

### MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** comes before the Court on the Plaintiff Pueblo of Jemez' Opposed

Motion and Memorandum in Support of its Motion to Reconsider and Alter Final Decision, filed

September 28, 2019 (Doc. 405), filed in redacted form October 7, 2019 (Doc. 409)("Motion").

The Court held hearings on the Motion on December 12, 2019, January 28, 2020, and February

18, 2020.  See Clerk's Minutes at 1, filed December 12, 2019 (Doc. 436); Clerk's Minutes at 1,

filed January 28, 2020 (Doc. 444); Clerk's Minutes at 1, filed February 18, 2020 (Doc. 449).  The

primary issue is whether Plaintiff Pueblo of Jemez is entitled to aboriginal title to: (i) Banco

Bonito; (ii) Redondo Meadows; (iii) the western two-thirds of Valle San Antonio; and (iv) sub-

---

[1]On August 17, 2020, the Court issued a Sealed Memorandum Opinion, (Doc. 398)("Sealed
Opinion").  In response to the Court's request, the parties proposed that the Court redact portions of
the Sealed Opinion.  See Plaintiff Pueblo of Jemez's Proposed Redactions to the Court's Sealed
Memorandum Opinion and Order, filed August 31, 2020 (Doc. 459); United States' Proposed
Redactions to the Court's August 17, 2020 Sealed Memorandum Opinion, filed August 31, 2020
(Doc. 460).  This public version of the Memorandum Opinion Order is the redacted version of the
Sealed Opinion.  The Court has made no other changes to the public opinion other than the redactions.

areas on Redondo Mountain.  The Court concludes that: (i) rule 59(e) of the Federal Rules of Civil Procedure bars Jemez Pueblo from seeking title to areas other than Banco Bonito; (ii) Jemez Pueblo may not seek aboriginal title to very small sub-areas when it has not proven aboriginal title to the surrounding areas; (iii) Jemez Pueblo's Valle San Antonio use was not exclusive; (iv) Jemez Pueblo's Redondo Meadows use was not exclusive; (v) Jemez Pueblo has not established aboriginal title to the geothermal project area within the Valles Caldera; and (vi) Jemez Pueblo has not established aboriginal title to Banco Bonito.

## SUPPLEMENTAL FINDINGS OF FACT

All parties have submitted proposed findings of fact.  See United States' Proposed Findings of Fact and Conclusions of Law on Reconsideration, filed March 20, 2020 (Doc. 450)("U.S. Proposed Findings"); Plaintiff Pueblo of Jemez's Proposed Supplemental Findings of Fact and Supplemental Conclusions of Law, filed March 20, 2020 (Doc. 451)("Jemez Pueblo Proposed Findings").  The Court has carefully considered all three sets of proposed findings and accepts some of those findings, rejects some, and finds some facts that no party brought to its attention. The Court sets forth its findings below.

### 1.     The Valles Caldera National Preserve's Geography.

572.    The Valles Caldera is a volcanic crater in the center of the Jemez Mountains in the State of New Mexico.[2]  See Trial Transcript at 75:1-5 (taken Oct. 29, 2018), filed December 20, 2018)(Doc. 337)("Oct. 29 Tr.")(Fogleman); Pueblo of Jemez Expert Witness Report by William Fogleman at 4-5 (undated), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. 187

---

[2]The Court made 571 findings in its previous Memorandum Opinion and Order, see Pueblo of Jemez v. United States, 430 F. Supp. 3d 943, 1082 (D.N.M. 2019)(Browning, J.), and it begins its Supplemental Findings of Fact with ¶ 572.

("Fogleman Report").

573.   The caldera rim is approximately twelve to thirteen miles in diameter.  See Oct. 29 Tr. at 76:12-15 (Fogleman); Fogleman Report at 4.

574.   Banco Bonito is a geographic area in the Valles Caldera's southwestern corner.  See Valles Caldera National Preserve Map at 1, (undated), admitted December 3, 2018, at trial as United States' Ex. DX-VG.

575.   To Banco Bonito's north is Redondo Border, Redondo Meadows, and Redondo Creek.  See Valles Caldera National Preserve Map at 1.

576.   Redondo Creek flows through Redondo Meadows, immediately north of Banco Bonito.  See Valles Caldera National Preserve Map at 1.

577.   Immediately northeast of Banco Bonito is Redondo Peak, which is the tallest mountain in the Valles Caldera.  See Valles Caldera National Preserve Map at 1; Oct. 29 Tr. at 77:12-19 (Fogleman); Fogleman Report at 4.

578.   East of Banco Bonito is South Mountain and the Valle Grande, a large meadow. See Valles Caldera National Preserve Map at 1.

579.   In July, 2000, the United States purchased approximately 90,000 acres within and surrounding the Valles Caldera to create the Valles Caldera National Preserve.  See Warranty Deed and Assignment of Rights Under Warranty Deed and Reciprocal Conservation and Access Easement between Dunigan Enterprises et al and United States of America at 1 (July 25, 2000), admitted October 29, 2018, at trial as United States' Ex. DX-IG.  See also Pueblo of Jemez v. United States, 430 F. Supp. 3d 943, 1031 n.120 (D.N.M. 2019)(Browning, J.).

580.   Jemez Pueblo and historic Jemez villages are directly south of Banco Bonito, and

further south is Pueblo of Zia.  See Oct. 30 Tr. at 447:16-448:12 (taken Oct. 30), filed December 20, 2018 (Doc. 338)("Oct. 30 Tr.")(Liebmann); Pueblo of Jemez Expert Witness Report by Dr. Matthew Liebmann at 8 (March 23, 2018), admitted Oct. 29, 2018, at trial as Jemez Pueblo's Ex. PX-188 ("Liebmann Report"); Pueblo of Jemez v. United States, 430 F. Supp. 3d at 964 (mapping Pueblos and Tribes surrounding the Valles Caldera).



Figure 1.  Landscape Features of the Valles Caldera

- 4 -

2.      **Other Tribes' and Pueblos' Historic Use of the Valles Caldera.**

581.    There are two historic Tewa settlements in close proximity -- but outside -- the Valles Caldera.  See Anschuetz Rebuttal Report at 14; Trial Tr. at 4275:9-16 (taken November 19, 2018), filed February 12, 2019 (Doc. 359)("Nov. 19 Tr.")(Anschuetz, Marinelli).

582.    Those Tewa fieldhouses are to the southeast of the Valles Caldera, and Banco Bonito is in the southwest.[3]  See Ana Steffen Rebuttal Report of Liebmann Report at 5 (dated May 21, 2018), admitted October 29, 2018, at trial as United States' Ex. DX-RZ ("Steffen Rebuttal Report")).

583.    Other Tribes view the entire Valles Caldera as sacred and use the Valles Caldera for their cultural purposes.  See e.g., Trial Transcript at 5072:8-25 (taken Dec. 3, 2018), filed February 18, 2019 (Doc. 363)("Dec. 3 Tr.")(Anschuetz, Marinelli)(testifying that the Pueblo of San Felipe's traditionally used land include "the entirety" of the Valles Caldera); id. at 4086:7-12 (Kehoe)(testifying that Jicarilla Apache's 1958 aboriginal title claim included the Valles Caldera's entirety); id. at 2781:24 (Suina)(agreeing that the entire Valles Caldera is an area of religious and cultural significance to the Pueblo of Cochiti; Kurt Anschuetz, Ph.D. Expert Report at 191 (March 22, 2018), admitted October 29, 2018, at trial as United States' Ex. DX-RP ("Anschuetz Report")("Members of several affiliated communities, including Zia, Santa Clara, San Ildefonso, and Kewa are known to have gathered varied plant resources, hunted game animals, harvested

---

[3]The United States argues that "[n]on-Jemez Tribes occupied the Preserve's entire western portion through hunting, gathering, and cultural, and religious practices regardless of whether they farmed the area."  U.S. Supplemental Response ¶ 3, at 4.  As the United States has not presented evidence that non-Jemez Tribes lived in Banco Bonito or in the western portion of the Valles Caldera, as opposed to using resources on and around it, the Court has not altered Jemez Pueblo's proposed fact.

birdfeathers, and collected rocks and minerals in the Valles Caldera. Some locations . . . are marked with shrines shared by different communities."); id. at 163-91 (discussing numerous Tribe's pilgrimages, ceremonies, shrines, pathways, and agricultural and cultural practices within the Valles Caldera; Pueblo of Santa Clara v. United States, Dkt. 356, Map of Santa Clara Pueblo's Aboriginal Lands Claim prepared by the Bureau of Land Management at 1 (dated July, 1967), admitted October 29, 2018, at trial as United States' Ex. DX-DO (illustrating that Pueblo of Santa Clara's 1967 aboriginal title claim extends well into the Valles Caldera but do not entirely encompass it); Nov. 19 Tr. at 4090:23-4091:7 (Kehoe)(testifying that Santa Clara Pueblo, Jicarilla Apache, and Pueblo of San Ildefonso had all filed claims for some portion of the Valles Caldera).

584.   Tribes' hunted and gathered throughout the Valles Caldera.  See, e.g., Florence Hawley Ellis, Religious Freedom of Zia and Jemez Pueblos vs. Use of Geothermal Power from Mt. Redondo at 47 (June 1981), admitted November 29, 2018, at trial as United States' Ex. DX-FC ("Religious Freedom")(describing ▇▇▇▇▇▇ as a hunting ground for Zia Pueblo); id. at 58, 69, 76 (describing Zia Pueblo's herb gathering ▇▇▇▇▇▇▇); Valles Caldera National Preserve Map (illustrating ▇▇▇▇▇▇ hunting); Pueblos of Zia, Jemez, and Santa Ana v. ICC, Docket No. 137, Transcript of Testimony at 52 (taken Dec. 5, 1956)(Mann, Toya), admitted October 29, 2018, at trial as United States' Ex. DX-CK ("Zia, Jemez, and Santa Ana Pueblos v. ICC")(noting that Pueblo of Santa Ana and Zia Pueblo shared hunting areas in the Valles Seco with Jemez Pueblo).

585.   Zia Pueblo occupied the Valles Caldera before Jemez Pueblo.  See Trial Transcript at 2042:18-2045:12 (taken Nov. 7, 2018), filed January 15, 2019 (Doc. 344)(J. Lucero)("Nov. 7 Tr."); Trial Tr. at 4832:6-13 (taken Nov. 30, 2018), filed February 18, 2019 (Doc. 362)("Nov. 30

Tr.")(Anschuetz); Interview with Governor Carl Brent Schildt, Lt. Governor Jerome Lucero, and Francisco Toribio, with Joseph A. Little, Eq., and Lisa A. Franceware, Esq., Pueblo of Zia at 2 (Nov. 11, 2017), admitted October 29, 2018, at trial as United States' Ex. DX-RI (stating that Zia Pueblo came "through Mesa Verde and Chaco Canyon, and into the Jemez Mountains as the First Zia People searched for their home at the site of the Pueblo where we know it to be today")("Zia Interview"); Pueblo of Jemez v. United States, 430 F. Supp. 3d at 965 n.17.

586.   Zia Pueblo has used the Valles Caldera from "time immemorial" through at least 1981.   Nov. 30 Tr. at 4701:19 (Anschuetz)(paraphrasing Zia Pueblo Governor Lucero past comments as "Zia has a cultural, historical relationship [with the Valles Caldera] that begins way in the past, time immemorial, [and] continues to the present"); Religious Freedom at 51 (noting that, as of 1981, ████████████████████████████████████████████); Florence Hawley Ellis & Andrea Ellis-Dodge, Religious Use of the Valles Caldera by Zia and Jemez Pueblos at 83 (dated 1981), admitted November 29, 2018, at trial as United States' Ex. DX-EZ ("Valles Caldera Religious Use")(noting that Zia Pueblo members "regularly visited" ██████ ██████ in the past); Anschuetz Report at 168 ("Some of our members continue to trek to the Valles Caldera . . . during various times of the years for our traditional practices."); id. at 179 (noting that then-Zia Pueblo Lieutenant Governor Jerome Lucero claimed in 2018 that some Zia Pueblo members continue to use the Valles Caldera without specifically stating that these members continued to use the Valles Caldera's western portion).

587.    Zia Pueblo uses the Valles Caldera as a "ceremonial open-air religious structure" or "cathedral."[4]  Valles Caldera Religious Use at 45-46.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1045-46.

588.    Santa Clara Pueblo uses the Valles Caldera as its "cultural sanctuary, . . . grocery store, . . . pharmacy, . . . [and] life line."  Valles Caldera National Preserve Management Act Tribal Consultation with Santa Clara at 1 (dated Apr. 23, 2015), admitted December 3, 2018, at trial as United States' Ex. DX-ON ("Santa Clara Consultation").

589.    The Zia Pueblo's most important source of plants ███████████████.  See Valles Caldera Religious Use at 11, 83.

590.    Zia Pueblo also ███████ around Redondo Creek through at least 1980.  See Valles Caldera Religious Use at 83.

591.    Zia Pueblo has consulted with the United States on issues throughout the Valles Caldera National Preserve.  See Zia Tribal Consultation Meeting Notes at 1-3 (dated Feb. 12, 2002), admitted November 14, 2018, at trial as United States' Ex. DX-IV ("Zia Consultation Notes"); Trial Transcript at 5263:18-5264:3 (taken Dec. 5, 2018), filed February 19, 2019 (Doc. 365)("Dec. 5 Tr.")(Marinelli, Silva-Bañuelos).

592.    Zia Pueblo's consultation included the pipeline that traverses Valle San Antonio. See Zia Consultation Notes at 2; Kulisheck, Jeremy 2003 VCNP -- Banco Bonito Hazardous Fuels Reduction Project at 11 (dated 2003), admitted October 29, 2018, at trial as United States' Ex. DX-JN ("Heritage Report").

---

[4]Santa Clara Pueblo's conception of the entire Valles Caldera as a single cathedral or sanctuary is consistent with the Court's observation during its site visit that the Caldera walls divide the Caldera from the space outside the Caldera walls.

593.    Zia Pueblo[5] used: (i) place no. 25, ███████████████████████████

███████████████████ in the middle of the geothermal development area that many Tribes

used, compare Exhibit D at 6, filed September 28, 2019 (Doc. 405-4)(mapping ███████████

██████████████████); Pueblo of Jemez Expert Witness Report by Dr. TJ Ferguson at

179 (dated March, 22, 2018), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX-190

("Ferguson Report"), with Religious Freedom at 50 (stating that Zia Pueblo used ██████████

████████████████████); (ii) place no. 46, ██████████████████████████,

a half-mile from Redondo Peak, compare Exhibit D at 7 (mapping ████████████████

███████████████  ████████████); Ferguson Report at 200 (same), with Religious

Freedom at 46 (stating that Zia Pueblo members would "████████████████████

████████████████████████████"); and (iii) place no. 49, a

███████████████████, ██████████████████████████, compare Exhibit

D at 8 (mapping a ████████████████████); Ferguson Report at 203 (same), with

Religious Freedom at 45 (stating that Zia Pueblo used ██████████████████"). See

also Religious Freedom at 58-59 (stating that Zia Pueblo used ██████████████████

███████████); id. at 50 (stating that Zia Pueblo used "███████████████" in the Valles

Caldera).

594.    Zia Pueblo heavily used sites in the Valles Caldera's western portion and regularly

traversed the Valles Caldera's western portion for hundreds of years.  See Pueblo of Jemez v.

---

[5]The United States proposed that "many tribes, including Zia" used ████████.  See U.S.
Proposed Findings ¶ 21, at 10.  The United States does not cite record evidence supporting a
finding that Tribes other than Zia Pueblo used ██████████.  Accordingly, the Court did not
include references to Tribes other than Zia Pueblo in this Finding of Fact.

United States, 430 F. Supp. 3d at 965 n.18 (noting that the Court declines to adopt Jemez Pueblo's proposed fact that Jemez Pueblo pushed Zia Pueblo out of the Valles Caldera); Nov. 30 Tr. at 4700:15-4701:20 (stating that Zia Pueblo has had a connection with the Valles Caldera since "time immemorial"); Interview Notes of Peter Pino by Kurt F. Anschuetz, Ph.D. at 1-2 (dated 2011), admitted October 29, 2018, at trial as United States' Ex. DX-MH (discussing Zia Pueblo's historical migration); Expert Report of Rory Gauthier at 14-16 (dated March 22, 2018), admitted October 29, 2018, at trial as United States' Ex. DX-RR ("Gauthier Report")(discussing and dating Keres and Tewa archeological sites in the Valles Caldera).

595.    Zia Pueblo members have been going to ▮▮▮▮▮▮▮▮ for centuries.  See Anschuetz Report at 170 (noting that the Zia Pueblo ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮); Religious Freedom at 46, 49-50 (discussing Zia Pueblo ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮); Valles Caldera Religious Use at 62 (same); Florence Hawley Ellis, Redondo Peak, the Valles Caldera, and Pueblo Religion at 26, 32-33 (1981), admitted November 29, 2018, at trial as United States' Ex. DX-FA (describing how ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮).



596.    At least two Zia Pueblo societies make pilgrimages from Zia Pueblo to San Antonio Mountain.[6] See Religious Freedom at 48 (stating that the Zia Pueblo Fire Society collect herbs on

---

[6]The United States proposes that "[a]t least three ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," and it cited Religious Freedom at 50-52 to support this proposed additional fact.  U.S. Proposed Findings ¶ 6, at 2.  The cited material supports only that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, see Religious Freedom  at 50-52, and so the Court alters the United States' proposed fact to better reflect the record.

███████████████████); id. at 51-52 (describing the Zia Pueblo ████████

████████████████).

597.     Zia Pueblo pilgrimages include trips between ████████████████████

████.   See Valles Caldera Religious Use at 58-59 (describing Zia Pueblo ████████

████████████████████████████, and the surrounding area); Trial

Tr. at 4644:9-22 (taken Nov. 29, 2018), filed February 18, 2019 (Doc. 361)("Nov. 29

Tr.")(Anschuetz)(discussing these pilgrimages).

598.     Zia Pueblo members made pilgrimages to ████████ into the twentieth century.

See Ellis Zia Map (noting that the Zia Pueblo ██████████████████████

████████████); Valles Caldera National Preserve Map; Religious Freedom at 53

(stating that Zia Pueblo ██████████████████████████).

599.     Zia Pueblo has specifically used the Preserve's western portion containing the four

areas at issue in Jemez Pueblo's motion; Zia Pueblo members have ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████,⁷ ████████████.   See Final Environmental Impact Statement -- Geothermal

---

⁷Jemez Pueblo proposes that the Court

[M]ade no finding that another tribe used the Valle San Antonio.  However, the
Court, relying on the United States' ceramics expert, Mr. Gauthier, made one broad
finding that all Pueblos used the "northern portion" of the Valles Caldera. FOFs ¶
91, at 50. In the western two-thirds of Valle San Antonio, Mr. Gauthier identified

Demonstration Program, 50 MW Power Plant, Baca Ranch, Sandoval and Rio Arriba Counties, New Mexico at 213-14 (1980), admitted October 29, 2018, at trial as United States' Ex. DX-EU (stating that Zia Pueblo had identified sacred religious sites within Baca Location No. 1, but it had declined to identify where); Zia, Jemez, and Santa Ana Pueblos v. ICC at 52 (noting that Jemez Pueblo, Santa Ana Pueblo, and Zia Pueblo share hunting grounds in the Valle Seco); U.S Expert Witness Report of Dr. Terence Kehoe at 31-32 (dated March 23, 2018), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX-193 ("Kehoe Report")(stating that Zia Pueblo shared hunting grounds with Jemez Pueblo in the Valle Seco); Ellis Zia Map (including ██████████ ████████████████████████████████████ within Zia Pueblo's culturally significant areas); Religious Freedom at 58-59 (describing the Zia Pueblo's ███████████ ████████████); id. at 45-46 (noting the Zia Pueblo's ████████████████ ████████████████████████████████████████████████ ████████); id. at 49-50 (stating that the Zia Pueblo ████████████████████ ████████████); Zia, Jemez, and Santa Ana Pueblos v. ICC at 31 (stating that there are "very important [Zia Pueblo] ██████████████████████████████); id. at 64-65 (testifying that Jemez Pueblo, Santa Ana Pueblo, and Zia Pueblo all used the area west of Redondo Peak); Jacqueline L. Stark, Historic Routes of the Valles Caldera Nat'l Preserve from 1876-1953 at 27 (December 10, 2009)(pages 1-28 admitted October 29, 2018, at trial as United States' Ex. DX-

---

only one site, ██████████, as Keres, which consists of a single sherd dated between 1700 and 1800s.

Jemez Pueblo Proposed Findings ¶ 26, at 14.  Although the Court did not make findings in the Memorandum Opinion and Order concerning the Valle San Antonio, it does so now and concludes that Jicarilla Apache, Navajo Nation, Santa Clara Pueblo, and Zia Pueblo all used the Valle San Antonio.  See FOF ¶¶ 609-10, 612-14, at 20-21, 23-25.

LL)("Historic Routes")(mapping "San Antonio Creek" hot springs either in Valle San Antonio or west of San Antonio Mountain).

600.   The Valle Grande is an area of cultural significance to Zia Pueblo, and it calls the Valle Grande area "████████."  Ellis Zia Map at 1.

601.   Zia Pueblo has ████████████████████.  See Pino Interview Notes at 11 ("When the federal government purchased the Valles in 2002, ████████████

████████████████████████████████████████

████████████ (quoting Peter Pino)); Dec. 5 Tr. at 5234: 20-23 (Brar, Ziehe)("I later learned that the Zia Pueblo ████████████████████████████

████████████); Anschuetz Report at 166 ("Obtaining permission from the VCNP, ████████████████████████████████████

████████████████████████████████████████

████████); id. at 168 ("[Zia Pueblo] Community members ████████████████

████████████████████████████████████████

████████████).

602.   Zia Pueblo has had to rebuild its shrine at least twice after it was desecrated or destroyed.  See, e.g., Memorandum Opinion and Order ¶¶ 384-88, at 180-84;[8] Trial Tr. at 4631:20-4632:7 (taken Nov. 20, 2018), filed February 12, 2019 (Doc. 360)("Nov. 20 Tr.")(Anschuetz, Marinelli)(describing the aftermath of ████████████████); Pino Interview Notes at 11.

---

[8]Instead of citing the published and public version of its opinion in Pueblo of Jemez v. United States, the Court cites its Memorandum Opinion and Order with reference to its paragraph and page numbers in this instance and hereinafter where it cites material that the parties redacted.

603.  By 2002, ██████████████████████████████████████████████. See,
e.g., Nov. 7 Tr. at 2019:9-2020:17 (Marinelli, Lucero)(affirming that, ███████████
████████████████████████████████); id. at 2060:17-25 (Lucero)("████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████"); Dec. 3 Tr. at
5080:25-5082:25 (Marinelli, Anschuetz)(describing Zia Pueblo's assertions that ██████████
████████████████████████████); Dec. 5 Tr. at 5219:6-12 (Marinelli, Silva-
Bañuelos)("█

████████████████████████████ Pino Interview Notes at 11 ("When
the federal government purchased the Valles in 2002, ██████████████████████

████████████████████████████████ ████ ████████████████

████████████████ (quoting Peter Pino)).

604.  Jemez Pueblo ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

See, e.g., Trial Tr. at 3899:23-3901:9 (taken Nov. 16, 2018), filed February 11, 2019
(Doc. 358)("Nov. 16 Tr.")(Leonard, deBuys)("████████████████████████

████████████████████████████████████████████████████████████████

████████ ████████████████████████████████"); id. at 3900:20-3901:7 (deBuys)("████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ████

████████████████████████████"); Dec. 5 Tr. at 5234:25-5234:3 (Brar, Ziehe)("█

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████ "); id. at 5236:9-12 (Brar, Ziehe)("

████████████████████████████████████████████████████████████

██████████████████████████████████ ").

605.   Banco Bonito ████████████████████████████████████████ .

See generally Florence Hawley Ellis & Richard Hughes, A Preliminary Report on the Impacts of

Geothermal Power Development in the Valles Caldera of NM on the Religious Practices and

Beliefs of the Pueblo Indians (dated 8/18/1980), admitted October 29, 2018, at trial as Jemez

Pueblo's Ex. PX-110; Ellis Map from Dkt. 137 Sites Supporting the Land Claim of the Pueblos of

Zia, Jemez and Santa Ana (undated), admitted October 30, 2018, at trial as Jemez Pueblo's Ex.

PX-118; Deposition of Florence Hawley Ellis in Abousleman[9] litigation (undated), admitted

October 29, 2018, at trial as Jemez Pueblo's Ex. 280; Florence Hawley Ellis, The Early Water

Works of Three Jemez Valley Pueblos: Jemez, Zia and Santa Ana (1983-1987), admitted October

29, 2018, at trial as Jemez Pueblo's Ex. PX-286; Ellis Zia Map at 1.

606.   Zia Pueblo members traversed Banco Bonito as part of their customary use of the

Valles Caldera.[10]  See Valles Caldera National Preserve Map; Valles Caldera Religious Use at 58-

---

[9]United States on behalf of the Pueblos of Jemez, Santa Ana, and Zia v. Abousleman, No. CIV 83-1041 (D.N.M), is ongoing litigation concerning water rights in the Jemez River basin.

[10]Banco Bonito is a geographic area in the Valles Caldera's southwestern corner.  See Valles Caldera National Preserve Map.  To Banco Bonito's north is Redondo Border, Redondo Meadows, and Redondo Creek.  See Valles Caldera National Preserve Map.  Northeast of Banco Bonito is Redondo Peak.  See Valles Caldera National Preserve Map.  East of Banco Bonito is South Mountain, and just past South Mountain is Valle Grande.  See Valles Caldera National Preserve Map.

The parties vigorously contest the extent of Zia Pueblo's Banco Bonito use.  Jemez Pueblo notes correctly that ████████████████████████████████████████████████

███████████████.  Jemez Pueblo Supplemental Response at 6.  The United States asserts that Jemez Pueblo would not skirt Banco Bonito while travelling between its cultural sites in the Valles Caldera given that doing so would often lead to much longer journeys.  See U.S. Proposed Findings ¶¶ 4, 6, at 2, 3.  There is no evidence of specific trails on or near the Banco Bonito that any other Tribe or Pueblo besides Jemez Pueblo has used, which is consistent with Jemez Pueblo's concentrated occupation in the southwestern corner of the Valles Caldera.  Nevertheless, the United States argues that "Jemez's suggestion that other Tribes did not walk to the multitude of sacred religious sites that they visited in the Preserve's western portion serves only to highlight the impropriety of Jemez's effort to subdivide the Preserve after trial."  U.S. Supplemental Response ¶ 11, at 8.  It argues that no other conclusion is possible than that non-Jemez Pueblo members walked through the Banco Bonito, "following logical paths to places of great importance."  U.S. Supplemental Response ¶ 11, at 9.  This argument does not dispute Jemez Pueblo's proposed fact either explicitly or implicitly.  See Anschuetz Report at 33-35; Map utilized in court by witness Pauline Correo, admitted December 13, 2018, at trial as Jemez Pueblo Ex. PX-573; Map that witness Thurman Loretto used in court, admitted December 13, 2018, at trial as Jemez Pueblo Ex. PX-574; Map utilized in court by witness Thurman Loretto, admitted December 13, 2018, at trial as Jemez Pueblo Ex. PX-575; Map that witness David Yepa used in court, admitted December 13, 2018, at trial as Jemez Pueblo Ex. PX-576.

Zia Pueblo is hesitant to discuss its Valles Caldera use with the United States.  It has chosen to risk Jemez Pueblo control of all or part of the Valles Caldera rather than reveal particular information about its cultural and religious practices to outsiders, which, it believes, would destroy their value.  See Zia Interview at 2 (explaining Zia Pueblo's reasoning behind its reluctance to cooperate with the United States); Dec. 12 Tr. at 55:9-14 (Marinelli)(noting that the United States does not expect to get any more information from Zia Pueblo and Santa Clara Pueblo).  Accordingly, the record does not contain direct evidence whether Zia Pueblo has or had Banco Bonito trails or otherwise uses or used the area.  The record contains, however, sufficient circumstantial evidence for the Court to make the finding in the text.  See Criminal Pattern Jury Instructions Prepared by the Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, § 1.07, at 29, 2011 Edition (updated Feb. 2018)("As a general rule, the law makes no distinction between direct and circumstantial evidence.  The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.").

Despite Zia Pueblo's reticence to cooperate, the record contains substantial evidence concerning Zia Pueblo's Valles Caldera use, from which the Court can infer its use of specific areas.  There is significant documented Zia Pueblo land use surrounding Banco Bonito.  Dr. Ellis noted, for example, that Zia Pueblo ██████████ ████████████████████████████████████████████ FOF ¶ 589, at 8.  Dr. Ellis also reported that Zia Pueblo's religious ceremonies commonly involve ████████ ████████████████████████████████████████████ ███████████████████████ Valles Caldera Religious Use at 59.  Dr. Ellis identifies ████████████████████████████ ██████████████████████████.  See Ellis Zia Map at 1.  Zia

Pueblo's ███████████████████████████████████. See Valles Caldera Religious Use at 58-59; FOF ¶ 598-99, at 11-12.  Religious Freedom at 53. ██████████████████████████████████ See Redondo Peak, the Valles Caldera, and Pueblo Religion at 26, 32-33; FOF ¶ 595, at 10. ███████████████████████████████ ████████████ See Ellis Zia Map at 1; FOF ¶ 600, 13. ███████████ █████████████████ See Religious Freedom at 45; FOF ¶ 593, at 9.  The record, thus, places Zia Pueblo in areas ████████████████████████████████████████

The trail evidence from the trial also places Zia Pueblo near Banco Bonito.  Zia Pueblo is directly south of Banco Bonito and Redondo Peak, see Oct. 30 Tr. at 447:16-448:12; Liebmann Report at 8, and ██████████████████████████████, see Nov. 7 Tr. at 2026:22-2027:2 (Lucero, Marinelli); FOF ¶¶ 606, 647, at 15-18, 39-40. ███████████ ████████████████████████████████████████████████ See Nov. 7 Tr. at 2027:13-15 (Lucero).  Former Zia Pueblo governor Jerome Lucero, who testified about █████ ███████████████████████████████████████████████ See Nov. 7 Tr. at 2027:13-15 (Lucero). █████████████████████ See Nov. 7 Tr. at 2026:25-2027:2 (Lucero).  The Valles Caldera's geography makes it reasonably likely for trails ████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████ See Map that witness Thurman Loretto used in court at 1 (undated), admitted December 13, 2018, at trial as Jemez Pueblo's Ex. PX 575 ("Loretta Map")(marking with a red line ████████████████████████); Ferguson Report at 180, 246. ████████████████████████████████████████████ See Ferguson Report at 131, 232. ██████████████████████████████ see FOF ¶ 595, at 10, ███████████████████████████████████ see Nov. 29 Tr. at 4651:3-5 (Anschuetz)("[██████████████████████████████]").

The Tenth Circuit's Pattern Jury Instructions tell jurors that, "[w]hile you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in light of common experience."  Criminal Pattern Jury Instructions, § 1.07, at 29.  One reasonable inference is that, █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████ Another "reasonable inference" is that Zia Pueblo would generally take the shortest, least energy-intensive route while travelling between █████████████████████ ██████████████████████████ Criminal Pattern Jury Instructions, § 1.07, at 29.  See U.S. Proposed Findings ¶ 6, at 3 (proposing this Finding of Fact). See Transcript excerpts from videos on day 1, 2 and 3 of trial from Roney and Liebmann depositions at 87:2-22 (dated Oct. 28, 2018), admitted November 20, 2018, at trial as United States Ex. DX-VE (noting that Redondo Peak represents an obstacle to travelling in the Valles Caldera); Oct. 29 Tr. at 60:1-3 (Fogleman, Marinelli)(noting that meadows are easier to traverse than

9, 82 (discussing Zia Pueblo use of the Valles Caldera's western portions); Ellis Zia Map at 1 (displaying areas of cultural significance to Zia Pueblo; <u>Religious Freedom</u> at 45, 53 (discussing Zia Pueblo's religious pilgrimages and its Valles Caldera use); <u>Redondo Peak, the Valles Caldera, and Pueblo Religion</u> at 26, 32-33 (noting █████████████████████████); Nov. 7 Tr. at 2026:22-2027:15 (Lucero, Marinelli)(discussing ███████████████); Loretta Map at 1 (██████████████████████); Ferguson Report at 103. Nov. 29 Tr. at 4651:3-5 (Anschuetz)(████████████████████ ████████████████████ Ellis Zia Map[11] at 1).

607.    Jemez Pueblo and Zia Pueblo stated in the ICC and geothermal litigation that Jemez Pueblo, Zia Pueblo, and Santa Ana Pueblo had a common, non-exclusive interest in the western portion of the Preserve's lands.  <u>See</u> <u>High Altitude Adaptations</u> at 27 (noting that the area bounded by Cuba, Chicoma Peak, Bernalillo and Mesa Prieta "is traditionally recognized as a joint use area for the three pueblos of Zia, Santa Ana, and Jemez which have cooperatively utilized the region

---

forests).  The fastest, least difficult route between ████████████████████ ██ travels through Banco Bonito.  <u>See</u> Valles Caldera Nation Preserve Map.  This way avoids the long route around Redondo Peak's northeastern sections.  <u>See</u> Valles Caldera Nation Preserve Map.  Especially after Jemez Pueblo stopped farming on the Banco Bonito in the seventeenth century, there is no reason for Zia Pueblo to avoid using the Banco Bonito.  In light of all this evidence, the Court therefore concludes that a preponderance of the evidence supports finding that Zia Pueblo members traversed Banco Bonito as part of their customary use of the Valles Caldera.

[11]Jemez Pueblo argues that the Ellis Zia Map ████████████████████ ████████████████████████.  <u>See</u> Feb. 18 Tr. at 7:18-8:20 (West).  Dr. Ellis wrote in <u>Valles Caldera Religious Use</u> that, ████ ████████████████████████ ██████████  <u>Valles Caldera Religious Use</u> at 58.  The Court is confident, therefore, that the Ellis Zia Map is a reliable indicator of Zia Pueblo's presence and use.

since prehistoric times"); id. at 44 (stating that Baca Location No. 1 is part of the aboriginal homeland for Santa Ana Pueblo and Zia Pueblo, whose use was similar to Jemez Pueblo's); Zia, Jemez, and Santa Ana Pueblos v. ICC at 65 (testifying that Jemez Pueblo, Santa Ana Pueblo and Zia Pueblo used the area west of Redondo Peak together and that the three Pueblos "have commonly worked together" through the centuries); Santa Fe Nat'l Forest Ethnographic Assessment at 142 (Jan. 22, 2016), admitted December 3, 2018, at trial as United States' Ex. DX-VF ("Ethnographic Assessment")(illustrating Santa Ana Pueblo's traditional use area as stretching from the Preserve's southeast corner to its northwest corner).

608.    Santa Clara Pueblo consults on and visits sacred sites throughout the Preserve, including sites in the Preserve's western portion; for hundreds of years, Santa Clara Pueblo's visits to sacred sites have included 

. See Ethnographic Assessment at 137-38 (confirming that Santa Clara Pueblo has sacred sites

); Anschuetz Report at 179 ("Santa Clara members mention

"); Final Geothermal EIS at 213 (stating that Santa Clara Pueblo has sacred sites within the geothermal project area but declines to say where these sites are located); Notes of Meeting: Santa Clara Pueblo Annual Consultation Meeting at 3 (dated June 26, 2005), admitted October 29, 2018, at trial as United States' Ex. DX-KP (noting that Santa Clara Pueblo is particularly interested in consulting with the Parks Service on Valles Caldera National Preserve trails to mountain tops and to high elevations); Pueblo of Santa Clara Tribal Council Resolution No. 2016-129 at 3 (Dec. 16, 2016), admitted October 29, 2018, at trial as United States' Ex. DX-

QG ("Santa Clara Res.")("[W]e can say that the entire area that is now known as the Valles Caldera is still used by the Pueblo's Traditional leaders today"); Dec. 3 Tr. at 5114:13-21 (Chavarria, Marinelli)(testifying that Santa Clara Pueblo attempted to keep the 2011 Los Conchas forest fire away from ███████████████████████████████ ██████ because these areas have cultural significance to the Santa Clara Pueblo's religious activities).

609.    Santa Clara Pueblo entered the Valles Caldera through ████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████. Historic Routes at 3, 14, 24, 27 (illustrating Santa Clara Pueblo routes ██████████████████████████████████████████ ███); id. at 15 (labelling portion of Valle San Antonio west of Rito de los Indios as "Valle Santa Clara"); Valles Caldera National Preserve Map (illustrating Rito de los Indios intersecting with Valle San Antonio); Nov. 29 Tr. at 4600:21-4601:20 (Anschuetz, Marinelli)(testifying that Santa Clara Pueblo members made pilgrimages to ████████████████); Oct. 29 Tr. at 137:5-140:1 (Fogleman, Marinelli)(testifying that the Valles Caldera was historically accessed from the northeast).

610.    Santa Clara Pueblo members traversed Valle San Antonio, Redondo Peak, and the geothermal project area as part of their customary use of the Valles Caldera.[12]   See Santa Clara Res. at 3; Anschuetz Report at 179; Ethnographic Assessment at 137-38.

---

[12]The United States proposes as a Finding of Fact that "Santa Clara's use of the entire Preserve therefore caused its members to traverse the Valle San Antonio, 'Redondo Meadows,' and Redondo Peak areas at issue in Jemez's motion for reconsideration."  U.S. Proposed Findings ¶ 11, at 6.  As with the evidence concerning Zia Pueblo's Valles Caldera use, there is no evidence placing Santa Clara Pueblo in certain parts of the Valles Caldera.  Although Santa Clara Pueblo also discourages its members from speaking about its Valles Caldera use, see Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1035-36, 1043, the trial evidence suggests that Santa Clara Pueblo's activities in the Valles Caldera were primarily based on ███████████████████ ███, see Pueblo of Santa Clara v. United States, Docket 356, Map of Santa Clara Pueblo's Aboriginal Lands Claim prepared by the Bureau of Land Management at 1 (dated July, 1967), admitted October 29, 2018, at trial as United States' Ex. DX-DO (excluding the Valles Caldera's southwestern corner from Santa Clara Pueblo's claim); Ferguson Report at 76 ("People from Santa Clara Pueblo used the northeastern portion of the Valles Caldera to graze livestock."); id. at 125 (noting Santa Clara Pueblo's obsidian collection from the Valles Caldera); Final Environmental Impact Statement at 167-68 (noting Santa Clara Pueblo's pilgrimages to Redondo Peak); Hearings on the Draft Environmental Impact Statement -- Geothermal Demonstration Program, Baca Ranch, Sandoval and Rio Arriba Counties, New Mexico, Before the All Indian Pueblo Council at 49:3-50:3 (dated Aug. 16, 1979), admitted October 29, 2018, at trial as United States' Ex. DX-EQ, ("AIPC Hearings")(Tafoya)(asserting that Santa Clara Pueblo uses ███████████ and has other sacred locations within the Valles Caldera); Dec. 3 Tr. at 5043:4-504:16 (Marinelli, Chavarria)(discussing Santa Clara Pueblo's statement that, as part of its "ongoing relationship" with the Valles Caldera, it gathers obsidian, collects plants, hunts animals, and visits Redondo Peak); id. at 5355:25–5357:11 (Marinelli, Silva-Bañuelos)("I observed them pointing at different peaks, and saying how this would work, because all of these various peaks were visible from that location.  And that included Redondo Peak; it included Cerro Pelado on the Forest Service side; it included Cerro del Medio; and then some other peaks."); Anschuetz Report at 178 ("Santa Clara Pueblo Governor J. Michael Chavarria, reports that his community still uses obsidian -- ██████████████████████████████████ -- gathered during his Pueblo's activities in the VCNP.").

Aside from general statements from Santa Clara Pueblo that it uses the entire Valles Caldera, see Valles Caldera National Preserve Management Act Tribal Consultation with Santa Clara at 1 (dated Apr. 23, 2015), admitted December 3, 2018, at trial as United States' Ex. DX-ON ("Santa Clara Consultation"); Santa Clara Res. at 3 (stating that the "entire area that is now known as the Valles Caldera is still used by the Pueblo's Traditional leaders today,"), there is no evidence that Santa Clara Pueblo uses the area known as Redondo Meadows southeast of Redondo Peak and just north of Banco Bonito.  The evidence which the United States cites as support for

611.    A non-Jemez Pueblo Tribe peeled the bark from at least one tree on Banco Bonito;[13]

peeling trees for food was a common practice among Jicarilla Apache and other Tribes, but Jemez

_____

its proposed Finding of Fact that Santa Clara Pueblo used the geothermal project area in Jemez Pueblo's proposed Redondo Meadows polygon notes that there are ███████████████████
██████████████████████████.  See Final Environmental Impact Statement at 213, 692-693; U.S. Proposed Findings ¶ 10, at 5.  Accordingly, the Court has modified the United States' proposed fact to reflect the Court's finding that Santa Clara Pueblo traditionally used the Valle San Antonio and Redondo Peak, but not Redondo Meadows.

[13]The parties have heavily contested the meaning of a peeled tree on the Banco Bonito. The United States proposed as fact that it "is exceedingly likely that trees on Banco Bonito were peeled by non-Jemez tribes, particularly Jicarilla, as two of Jemez's experts understood peeling trees to be a common practice among Jicarilla but had no knowledge of Jemez's members ever peeling trees."  U.S. Proposed Findings at 8.  Jemez Pueblo proposes that

> Determining ethnic affiliation from a peeled tree is improper because anyone could peel a tree and there is no ethnic marker for such use.  Peeled trees are associated with a number of ethnic groups because it was a widespread practice of many Pueblos, including Jemez Pueblo, during periods of starvation.  Peeled trees on Banco Bonito are not evidence of any particular tribal use, including but not limited to, the people of the Jicarilla Apache.

Jemez Pueblo Proposed Findings ¶ 16, at 9 (citing Oct. 31 Tr. at 663:4-12 (Liebmann, West); Roney Depo. at 78:16-79:19.  The Court adopts neither party's proposed fact.
     The evidence that the United States cites does not support finding that Jicarilla Apache are more likely to have peeled the Banco Bonito tree than other Tribes that are known to peel trees. Liebmann testified that he did not know whether peeled trees are commonly associated with Jicarilla Apache.  See Oct. 31 Tr. at 603:20-21 (Liebmann).  When asked whether peeling trees is commonly associated with Jicarilla Apache, Roney testified that "I think it's associated with a number of ethnic groups.  Yeah, Jicarilla Apache definitely -- definitely used that."  Roney Depo. at 79:4-6.  The only other evidence the United States cites -- that Jicarilla Apache claimed aboriginal title to the Valles Caldera -- is evidence that the Jicarilla Apache used the Valles Caldera, but it does not clearly support finding that they were more likely than any other local Tribe who peeled trees to have peeled the tree in question.  See U.S. Proposed Findings at 8.
     The record Jemez Pueblo cited does not support finding that peeling trees for food was a Jemez Pueblo practice.  Liebmann testified only that "it's possible" that Jemez Pueblo peeled the tree.  Oct. 31 Tr. at 663:12 (Liebmann).  Because some Tribes are commonly known to peel trees, and because Jemez Pueblo is not one of them, see Roney Depo. at 78:16-79:19, the Court concludes that a Tribe other than Jemez Pueblo peeled the tree on Banco Bonito.

Pueblo members are not known to have peeled trees.  See Transcript excerpts from videos on day 1, 2 and 3 of trial from Roney and Liebmann depositions at 78:16-79:19 (taken Oct. 28, 2018), admitted at trial as United States' Ex. DX-VE ("Roney Depo.")(testimony from John Roney that there is a peeled tree on Banco Bonito, that peeled trees are associated with a number of ethnic groups, but he does not know if Jemez Pueblo peeled trees); Trial Tr. at 603:12-24 (taken Oct. 31, 2018), filed December 20, 2018 (Doc. 339)("Oct. 31 Tr.")(Liebmann)(testifying that he had not heard of peeled trees being associated with Jemez Pueblo).

612.    In using the entire Valles Caldera "often" for hunting, Valle Grande at 17, Jicarilla Pueblo members traversed the Valle San Antonio and Redondo Peak;[14] Jicarilla Apache members ██████████████████████████████  from the north also would traverse the Valle San Antonio.  See Ethnographic Assessment at 91 (stating that Redondo Peak is sacred to the Jicarilla Apaches, ██████████████████████████████████████████████████ ████  and that the Jicarilla Apache hunt in the Jemez mountains); Oct. 31 Tr. at 618:16-619:9

---

[14]The United States proposes that "Jicarilla members traversed the Valle San Antonio, 'Redondo Meadows,' Redondo Peak, and Banco Bonito."  U.S. Proposed Findings ¶ 15, at 7.  The evidence that it cites in support does not allow the Court to find that Jicarilla Apache Nation traversed Banco Bonito or the Redondo Meadows area that Jemez Pueblo now claims.  The evidence supports finding that Jicarilla Apache traversed Valle San Antonio ██████████ ████████████████████, see, e.g., Ethnographic Assessment at 91, but it does not support finding that Jicarilla Apache Nation traversed the two more southern areas at issue here -- Banco Bonito and the Jemez Pueblo's new Redondo Meadows claim.  Evidence that Jicarilla Apache consulted on the Valles Caldera's north-south corridor that does not specify which particular parts of the corridor contain areas special to Jicarilla Apache, does not support finding that Jicarilla Apache used Banco Bonito and Redondo Meadows.  See Letter from Jicarilla Apache Tribe to Valles Caldera Trust Regarding Response to Road B Repairs on VCNP (dated June 27, 2003), admitted November 13, 2018, at trial as United States' Ex. DX-JS (requesting consultation); Nov. 13 Tr. at 2917:2-17 (Marinelli, Steffen)(describing the north-south corridor project's scope and Jicarilla Apache Nation's involvement); Valles Caldera National Preserve Map (illustrating the Valles Caldera's roads).

(Liebmann, Marinelli)(discussing evidence suggesting that the Jicarilla Apache took obsidian from the Valles Caldera).

613.    The Navajo Nation used and traversed Valle San Antonio in using the Valles Caldera lands to hunt, gather, and worship.[15]  See Valle Grande at 17 (stating that Navajo Nation "routinely used the range, and especially the Valle Grande, as a route connecting their homelands to the Rio Grande Valley" and that they rustled sheep from ranchers along the Rio Grande through the 1880s and then "herded them back to the mountains of western New Mexico through the heart of the Jemez"); id. at 16 (noting that although Jemez Pueblo grazed herds in the Valle Grande, shepherds camped in the surrounding forests to protect their livestock from Navajos); Ethnographic Assessment at 163-66 (noting that the Navajo Nation considers ███████████ in the Valles Caldera to be a site of major importance); id. at 95 (stating that the Navajo Nation consider the Jemez Mountains area to be a "neutral zone and place for collecting obsidian, including the Valles Caldera" and that springs in the area are traditional cultural property); Trial Tr. at 1956:14-1957:17 (taken Nov. 6, 2018), filed January 15, 2019 (Doc. 343)("Nov. 6 Tr.")(Ferguson)(describing a Navajo Nation raid on Jemez Pueblo and Jemez Pueblo's subsequent efforts to track the raiders).

---

[15]The United States proposed that the "Navajo used and traversed Valle San Antonio and 'Redondo Meadows,' at a minimum, in using the Preserve lands to hunt, gather, and worship." U.S. Proposed Findings ¶ 16, at 7.  The United States did not support this proposed fact with specific evidence concerning Jemez Pueblo's Redondo Meadows area, and so the Court will not adopt this fact for Redondo Meadows.

614.    On at one least one occasion, successful Navajo Nation raiders traversed Valle San

Antonio on the way to the Cuba area.[16]  See Nov. 6 Tr. at 1956:14-1957:17 (Ferguson)(describing

a Navajo Nation raid on Jemez Pueblo and Jemez Pueblo's subsequent efforts to track the raiders).

615.    The often hostile Navajo Nation would also make pilgrimages to ████████

████████.[17]  High Altitude Adaptations at 125 (noting that Navajo Nation is recognized as

making pilgrimages to ██████████ ); In the Matter of the Petition of the Public Service Company

of New Mexico for Authorizations Necessary to Participate in Baca Unit 1, Public Service

Company of New Mexico, Case No. 1562, Transcript of Proceedings at 100 (taken Nov. 7,

1980)(Lucero), admitted October 29, 2018, at trial as United States' Ex. DX-EX ("In re PNM

---

[16]The United States proposes that "Navajo drove Jemez from the Valles Caldera at least twice."  U.S. Proposed Findings ¶ 16, at 7.  The United States previously proposed this fact, see Proposed Findings of Fact by the United States of America ¶ 56, at 18, filed April 15, 2019 (Doc. 386), and Court previously found this fact, see Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1000.  In finding this fact, the Court cited Nov. 6 Tr. at 1958:24-1961:19 (Ferguson, Marinelli).  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1000.  Upon re-reviewing the record, however, the record does not support the United States' proposed fact and the Court's initial finding.  Ferguson testified to one incident that C. Toya described in which Navajo Nation members attacked a group of Jemez Pueblo men and stole their cattle.  See Nov. 6 Tr. at 1956:14-1957:17.  The trial testimony does not describe a second incident, nor is it clear that the attack occurred in the Valles Caldera.  See Nov. 6 Tr. at 1960:12-18 (Ferguson)(suggesting that the attack occurred outside the Valles Caldera, but the chase occurred within the Valles Caldera).  Ferguson was testifying to two instances where Jemez Pueblo members drove Navajo Nation members from the Valles Caldera, not two instances where Navajo Nation members drove Jemez Pueblo from the Valels Caldera.  See also Nov. 6 Tr. at 1957:18-21 (Ferguson, Marinelli)(noting that Ferguson concluded that there were two instances in which Jemez Pueblo drove Navajo Nation members from the Valles Caldera).  Accordingly, the Court will not adopt the United States' proposed fact, and it will delete its previous fact.

[17]The United States proposes that the Navajo Nation used the Redondo Creek area.  The source it cites for this proposition, High Altitude Adaptations at 125, does not support the United States' proposed fact.  High Altitude Adaptations states that several other Tribes and Pueblos have used Redondo Creek, but, as for the Navajo Nation, it only says that they "are also recognized as making pilgrimages ████████ ."  High Altitude Adaptations at 125.  Accordingly, the Court does not adopt the United States' fact as originally proposed.

Authorizations")(stating that most Navajo Nation medicine men used ███████); Trial Tr. at 1370:101371:1 (taken Nov. 4, 2018), filed January 11, 2019 (Doc. 341)(Leonard, Whatley)(testifying about a "trespass" incident where Navajo men attacked a Spaniard in the Valles Grande, and Jemez Pueblo warriors pursued the Navajo raiders from the area).

616.    The Navajo Nation would travel through and use the Valles Caldera's southeast corner, and the "Old Navajo Trail" traversed that corner.  Rebuttal to Report of Matthew Liebmann by Rory Gauthier at 16 (dated May 21, 2018), admitted October 29, 2018, at trial as United States' Ex. DX-SB ("Gauthier Rebuttal Report")(depicting a projected Old Navajo Trail in the Preserve's southeastern corner); Kurt Anschuetz and Thomas Merlan, More Than a Scenic Mountain Landscape: Valles Caldera National Preserve Land Use History at 27 (dated 2007), admitted October 29, 2018, at trial as United States' Ex. DX-KX ("VCNP Land Use History")(noting Navajo Nation's use of the Valle Grande); Letter from the Navajo Nation, Traditional Culture Program to Jeff Cross, Executive Director, Valles Caldera at 1 (dated April 10, 2008), admitted October 29, 2018, at trial as United States' Ex. DX-LG (noting the Navajo Nation's traditional names for the Valle Grande and the Jemez Mountains).

617.    Tewa and Navajo Nation populations have used several historic trails that originated around 1250 C.E. on the Valles Caldera's eastern boundary, but these trails do not extend into the western portion of the Valles Caldera where the Banco Bonito is located.[18]  See

---

[18]The United States argues that "Tewa and Navajo trails extend into the Preserve's western portion because both the Tewa and Navajo frequented the Preserve's western portions."  U.S. Supplemental Response ¶ 10, at 8.  The map that the Court finds credible, and on which this Finding of Fact is based, shows these historic trails ending in the Preserve's eastern edges.  See Gauthier Report at 16.  This finding is not inconsistent with the United States' reminder that "Tewa and Navajo members walked and rode from the portions of their trails identified in the Court's opinion to the places they used throughout the Preserve's western portion."  U.S. Supplemental

Pueblo of Jemez v. United States, 430 F. Supp. 3d at 969; Historic Routes at 1; Gauthier Report at 16.

618.    Navajo Nation members constructed hogans[19] in the Preserve's northwest corner. See This Enchanted Land -- The Jemez Mountain Wonderland -- Los Alamos Scientific Laboratory at the University of California at 4 (dated Sept. 1961), admitted October 29, 2018, at trial as United States Ex.' DX-CV (stating that the area's "longtime range manager also recalls discovering Navajo Nation hogans along a ridge bordering Valle Toledo").

619.    The Navajos were particularly formidable in 1860, when Baca Location No. 1 was granted to the Baca heirs.  See Nov. 16 Tr. at 4004:25-4005:20 (Kehoe, Marinelli)(testifying that the Navajo Nation was a formidable military force in 1860 and were raiding Hispanic towns and pueblos along the Rio Grande Valley).

620.    Jicarilla Apache worshipped ███████████, hunted throughout the Valles Caldera, made the Valles Caldera dangerous for Jemez Pueblo, consulted regarding portions of the Valles Caldera, and claimed the entire Valles Caldera as part of its aboriginal territory.  See Trial Tr. at 4086:7-12 (Kehoe)(testifying that Jicarilla Apache's 1958 aboriginal title claim included the Valles Caldera's entirety); Nov. 19 Tr. at 5257:5-8 (Silva-Bañuelos)(testifying that Jicarilla Apache, among other Tribes, consulted with the federal government regarding the Valles Caldera National Preserve); Trial Tr. at 2917:2-17 (taken Nov. 13, 2018), filed January 30, 2019 (Doc. 353)("Nov. 13 Tr.")(Marinelli, Steffen)(describing the north-south corridor project's scope

---

Response ¶ 10, at 8.

[19]A Navajo hogan is a "traditional dwelling and ceremonial structure of the Navajo Indians of Arizona and New Mexico." Hogan, Encyclopaedia Britannica, https://www.britannica.com/topic/hogan (last accessed August 13, 2020).

and Jicarilla Apache Nation's involvement); id. at 585:22-586:25 (Liebmann, Marinelli)(testifying

that Jicarilla Apache were among the Tribes that made the Valles Caldera dangerous for Jemez

Pueblo in the seventeenth century).

621.    The Governor of Santa Clara Pueblo ███████ in Valle San Antonio, Redondo

Meadows, or Banco Bonito.[20]   See Valles Caldera National Preserve Map (depicting ███████



███████████████████████████████ ).

622.    Cochiti Pueblo, Jicarilla Apache, San Ildefonso Pueblo, Santa Clara Pueblo, and

Zia Pueblo did not farm sites or live within the claim area.[21]   See Trial Tr. at 2431:20-23 (taken

Nov. 8, 2018), filed January 22, 2019 (Doc. 350)("Nov. 8 Tr.")(Gauthier, West)(testifying that

there is no ceramic evidence that other Tribes or Pueblos farmed in the Valles Caldera).

---

[20]Jemez Pueblo asserts:

> Governor Chavarria's testimony ███████ in the claim area is inconsistent
> with testimony by Dennis Trujillo that Governor Chavarria never made requests to
> go hunting or access the VCNP boundaries for religious or cultural activities, except
> for the lands Santa Clara purchased because those lands form part of the Santa Clara
> watershed.

Jemez Pueblo Proposed Findings ¶ 32, at 17-18.  There is no inconsistency.  Governor Chavarria
testified to ███████████ before 2000.  See, e.g., Dec. 3 Tr. at 5104:12-16 (Chavarria,
Marinelli); id. at 5107:18-20 (Chavarria, Marinelli); id. at 5111:9-13 (Marinelli).  Trujillo first
began his employment with the Valles Caldera Trust in January, 2002.  See Dec. 13 Tr. at 5426:17-
19 (Miano, Trujillo).

[21]During trial, Jemez Pueblo asked Gauthier: "Is there any other ceramic evidence which
would demonstrate that any other tribe was farming within the Valles Caldera National Preserve?"
Nov. 9 Tr. at 2431:20-22 (West).  Gauthier responded: "No."  Nov. 9 Tr. at 2431:23 (Gauthier).
Gauthier was asked only about ceramic evidence -- his expertise.  See Nov. 9 Tr. at 2431:20-22
(West).

623.   The Cochiti Pueblo ██████████████████████████████████████

██████████████████████.[22]   See Trial Tr. at 2724:22-2725:15 (taken Nov.

9, 2018), filed January 25, 2019 (Doc. 351)(Suina, West); Letter from Anastasia Steffen to Michael

Pecos at 1 (Oct. 23, 2012), admitted November 11, 2018, at trial as United States' Ex. DX-ND

("Steffen Letter").

624.   On one occasion in 1863, Jemez Pueblo submitted to the United States' authority[23]

in the area between Valle Grande and Walatowa.   See Kehoe Report at 64-68 (transcribing Letter

---

[22]Jemez Pueblo proposes that "Banco Bonito was not a customary use area for Cochiti
Pueblo." Jemez Pueblo Proposed Findings ¶ 7, at 5. Governor Suina's testimony, on which Jemez
Pueblo bases this proposed fact, was limited to his personal understanding. He testified that he
did not know all of the places that Cochiti Pueblo members go, because ██████████████████
██████████████. See Nov. 9 Tr. at 2726:18-23 (Marinelli). Asked whether, under ordinary
circumstances, Cochiti Pueblo ████████████████████████████████████, Governor
Suina testified that "[w]e would get it in the general area. And then further down, and it is there,
as well." Nov. 9 Tr. at 2726:2-3 (Suina).

[23]The United States proposes as a Finding of Fact that, "[r]ather than dominating the
Preserve's southwest corner, the evidence establishes that Jemez 'submit[ted] to Santa Clara
Pueblo, San Ildefonso Pueblo, and the Ute Tribe's authority' in the area between Valle Grande and
Walatowa -- in or near Banco Bonito -- in 1863." U.S. Proposed Findings ¶ 12, at 6 (quoting
Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1229). The Court noted in Pueblo of Jemez
v. United States in a Conclusion of Law that "Jemez Pueblo submit[ed] to Santa Clara Pueblo, San
Ildefonso Pueblo, and the Ute Tribe's authority," during this 1863 incident. 430 F. Supp. 3d at
1229.
   On September 20, 1863, fifty Indians from Santa Clara Pueblo, San Ildefonso Pueblo, and
the Ute Tribe entered the U.S. Army's camp on the Valle Grande to report that Navajo had stolen
their livestock. See Kehoe Report at 64. Lieutenant P.A. Russell and four other soldiers set off
with the Indian groups to pursue the Navajo, and they tracked them overnight to a Jemez Pueblo
village. See Kehoe Report at 64-65. The tracking party surrounded the village and killed a Navajo
who tried to escape in the morning. See Kehoe Report at 65. The tracking party entered the town
and killed four more Navajo. See Kehoe Report at 65. The Jemez Pueblo Governor and a Jemez
chief then asked to speak with the tracking party and demanded to know on whose authority the
U.S. Army and the Indians had entered the village. See Kehoe Report at 65-66. After some
negotiation, the tracking party leaders asked the Jemez Pueblo governor for permission to search
the town for Navajo. See Kehoe Report at 66. Jemez Pueblo refused. See Kehoe Report at 66.

from Lt. P.A. Russell to Capt. Ben Cutler (dated Oct. 1, 1863)); Nov. 16 Tr. at 4008:23-4016:11

(Kehoe, Marinelli)(describing the letter).

625. Native Americans use natural resources as they travel over land. See Dec. 3 Tr. at

5018:4-8 (Anschuetz).

626. Since approximately 1960, members of many Tribes have crossed Banco Bonito on

state route 4 -- passing through the small portion of the Valles Caldera containing field houses --

without Jemez Pueblo's permission. See Grant of Right of Way Easement from Frank Bond and

Son, Inc. to State of New Mexico (dated June 8, 1960), admitted October 29, 2018, at trial as

---

At this point, Lieutenant Russell told Jemez Pueblo's leaders that the U.S. Army "was under the impression [Jemez Pueblo] were friends of the United States" and that he "could not but regard" refusal to search as "an act of enmity to the United States" and that "if conflict was inevitable the consequences must rest with them." Kehoe Report at 67. Lieutenant Russell states that, "[s]eeing that I was determined upon this course with or without their consent, the Governor yielded." Kehoe Report at 67. The tracking party searched the village and killed another eight Navajo men while taking twenty women and children prisoner. See Kehoe Report at 67.

Because Jemez Pueblo rejected the tracking party's requests to search the village, and because Jemez Pueblo relented only when Lieutenant Russell suggested that this decision could cause problems with the United States and that the tracking party likely would search the village regardless, the evidence does not support finding that Jemez Pueblo submitted to Santa Clara Pueblo, San Ildefonso Pueblo, and the Ute Tribe's authority. The Court has altered the United States' proposed fact to reflect that Jemez Pueblo submitted to the United States' authority. It notes, however, that its initial conclusion, that Jemez Pueblo submitted "to Santa Clara Pueblo, San Ildefonso Pueblo, and the Ute Tribe's authority," Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1229, was part of the premise for a larger conclusion, that "[t]he record also does not support an inference that other Pueblos' Valles Caldera use was subject to Jemez Pueblo's permission, because such use was deliberate, longstanding and substantial, that is, not sporadic or to facilitate trade." Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1228. Even without finding that Jemez Pueblo submitted to Santa Clara Pueblo, San Ildefonso Pueblo, and the Ute Tribe's authority in 1863, the conclusion still stands that other Pueblos' Valles Caldera use was not subject to Jemez Pueblo's permission.

United States Ex. DX-CT; Steffen Rebuttal Report at 4 (mapping route 4 in relation to field houses); VCNP Foundation Document sign-in sheet (dated Dec. 1, 2015), admitted December 3, 2018, at trial as United States' Ex. DX-PF (showing that Santa Clara Pueblo members, among others, attended a Valles Caldera National Preserve meeting in Jemez Springs); Nov. 7 Tr. at 2059:15-19 (Lucero)(suggesting that Zia Pueblo members have, in the past, driven through the Preserve).

### 3.    Jemez Pueblo's Use of the Sub-Areas At Issue in the Motion.

626.    Between 1300 and 1700 C.E., ancestral Jemez people built thirty-five villages and thousands of fieldhouses in the northern Rio Jemez watershed.  See, e.g., Nov. 6 Tr. at 1796:18-1797:22 (Ferguson)(affirming that ancestral Jemez Pueblo people spent part of each year farming within the Valles Caldera); Liebmann Report at 6.

627.    Ancestral Jemez Pueblo members occupied their fieldhouses not only for agricultural purposes, but also to hunt, to gather, to move about the landscape, and to demarcate territory.  See Oct. 30 Tr. at 448:4-24 (Liebmann)(characterizing Jemez Pueblo's ancestral fieldhouses as summer homes); Liebmann Report at 10-11 (asserting that ancestral Jemez people constructed fieldhouses on the Banco Bonito to mark their territory).

628.    Jemez Pueblo occupied 100 fieldhouses on the Banco Bonito throughout a 400-year period, most of which Jemez Pueblo occupied between 1500-1650 C.E.  See Oct. 30 Tr. at 447:4-14 (West, Liebmann); Trial Tr. at 5770:9-11 (taken Dec. 13, 2018), filed February 19, 2019 (Doc. 366)("Dec. 13 Tr.")(Liebmann); Liebmann Report at 9-10.

629.    Jemez Pueblo built and exclusively occupied the fieldhouses in Banco Bonito.  See, e.g., VCNP Land Use History at 28, 71 (discussing Jemez Pueblo's construction and use of the fieldhouses).

630.    Jemez Pueblo's Banco Bonito farming largely or entirely ceased around 1650.[24]

See Liebmann Report at 14 (suggesting that the Banco Bonito fieldhouses were tied to Nanishagi,

Unshagi, and Hot Springs Pueblo); id. at 43 (noting that Nanishagi was occupied from 1350 to

1500 and Unshagi was occupied from 1325 to 1605); Michael Elliott, Overview and Synthesis of

the Archeology of the Jemez Province, New Mexico at 181 (dated 1986), admitted October 29,

2018, at trial as Jemez Pueblo's Ex. PX 122 (stating that Hot Springs Pueblo was occupied from

1350 to 1500, Nanishagi occupied from 1350 to 1500, and Unshagi occupied from 1350 to 1650);[25]

Nov. 6 Tr. at 1911:20 (Ferguson)(agreeing that Jemez Pueblo has not farmed the Banco Bonito for

several centuries).

---

[24]The United States proposes that "Jemez never farmed the entire Banco Bonito.  Jemez farmed a portion of Banco Bonito's western edge within the Preserve in a non-continuous manner. And Jemez's limited farming largely or entirely ceased on some date between 1425 and 1605." U.S. Proposed Findings ¶ 18, at 8.  The United States has not adequately supported the first two sentences of its proposed fact with record evidence.  Its citations are largely to evidence concerning the dates of Jemez Pueblo's occupation of the Banco Bonito fieldhouses.  Accordingly, the Court will not adopt the fact as proposed.

[25]The dates that Elliott and Liebmann provide in their written reports as the last occupation of Unshagi differ.  While Liebmann's report states that Unshagi occupation terminated in 1605, Elliott says Unshagi was occupied until 1650.  Liebmann clarified at trial that he did not think that Unshagi was unoccupied after 1605, but in his opinion 1605 was the last date of construction and that "I would state the terminal date of Unshagi to be somewhat later, probably the 1620s, when they got reduced out of there."  Oct. 30 Tr. at 567:12-14 (Liebmann).  He also agreed that the Banco Bonito fieldhouses were occupied between 1500 and 1650.  See Oct. 30 Tr. at 565:7-12 (Liebmann).

    Because Elliott's Overview and Synthesis of the Archeology of the Jemez Province, New Mexico states that Jemez Pueblo occupied Unshagi until 1650, the record contradicts the United States' proposed fact that "Jemez's limited farming largely or entirely ceased on some date between 1425 and 1605."  U.S. Proposed Findings at 8.  Liebmann testified at trial that he believed that the Banco Bonito fieldhouses were occupied between 1500 and 1650, see Oct. 30 Tr. at 565:4-12 (Liebmann, Marinelli), and so, because Liebmann's most recent statement on the issue suggests agreement on the fact that Jemez Pueblo's farming ceased around 1650 rather than 1605, the Court alters the United States' proposed fact to better reflect the record.

631.    Jemez Pueblo people were the only Tribal people ever to occupy Banco Bonito.[26]

See Trial Tr. at 441:1-14 (Liebmann, West)("[A]ncestral Jemez people, are the only people to

occupy the VCNP, because they're the only people who built these -- this permanent architecture

within the bounds of the VCNP . . . they have the signature that we would expect in their

ceramics."); id. at 456:11-14 (Liebmann, West)("[T]here is no evidence for anyone else occupying

the VCNP."); id. at 460:3-8 (Liebmann, West)("[T]his is the only evidence we find for occupation

in the area, and all of this architectural evidence is associated with ancestral Jemez people.").

632.    There is little non-Jemez Pueblo pottery in Redondo Meadows and Banco Bonito.[27]

See Gauthier Report at 8-9 (identifying Tewa pottery in Redondo Meadows and Banco Bonito);

---

[26]The United States purports to dispute this fact, arguing that Jemez Pueblo uses the word "occupation" in "an unduly narrow" way.  U.S. Supplemental Response ¶ 2, at 3.  It argues that Tribes "traversed the entire western portion of the Preserve lands for many cultural purposes for centuries."  U.S. Supplemental Response ¶ 2, at 3.  Because the United States presents no evidence, however, that any other Tribe or Pueblo lived on the Banco Bonito, the Court adopts Jemez Pueblo's proposed fact.  The fact that the pottery found on the Banco Bonito primarily is affiliated with Jemez Pueblo further supports this Finding of Fact.  See Gauthier Report at 18 ("Towa ceramic types are the most common type found in the southwest portions of the VCNP in the Banco Bonito area."); Nov. 8 Tr. at 2372:1-2373:2 (Gauthier, Leonard)(stating that the "great majority of Jemez sherds -- Towa sherds -- are located in the extreme southeast corner"); Nov. 8 Tr. at 2391:17-20 (Gauthier, Leonard)("[H]ere in the Banco Bonito, yes, we do see the isolated Jemez sherds, and we also see the concentration of Towa sherds.").

[27]Jemez Pueblo proposes:

   Apart from identifying one sherd in Redondo Meadows as "unknown", Mr. Gauthier does not identify any ceramics by any other tribe other than Jemez Pueblo in Redondo Meadows.  If the Court accepts this fact, then Order FOF 86 should be amended because cited evidence does not support non-Jemez ceramics in Banco Bonito or Redondo Meadows.

Jemez Pueblo Proposed Findings ¶ 33, at 18 (citing Gauthier Report at 8).  Gauthier's map identifies "Tewa/Keres" fragments at ███████.  Gauthier Report at 8.  See Pottery Table at 2 (discussing the four sherds found at ███████).  This site is within Redondo Meadows.  See Ferguson Report at 204 (documenting the extent of Redondo Meadows); Jemez Pueblo Proposed Findings at 17 (illustrating the area Jemez Pueblo considers to be Redondo Meadows for this Motion's purposes).  Gauthier also notes that Tewa sherds have been found on the Banco Bonito.

Pottery Table at 2 (undated), admitted November 8, 2018, at trial as United States' Ex. DX-RT (logging four Tewa or Keres sherds found in Redondo Meadows); Nov. 8 Tr. at 2391 (Gauthier)(testifying that there are "three other Tewa sherds over in the Banco Bonito, also").

633.    After the 1680 Pueblo Revolt, significant changes occurred which make it difficult to determine the cultural affiliation of post-1680 Pueblo Revolt ceramics, because Jemez Pueblo potters stopped producing Black-on-White ceramics and started making pottery like those pieces made by other Pueblos.[28]   See Mathew Liebmann, Pueblo of Jemez Expert Witness Rebuttal Report of Rory Gauthier's Initial Report at 3 (May 16, 2018), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX-196 (Liebmann Rebuttal Report); Dec. 5 Tr. at 5546:7-5547:11 (West, Liebmann); Nov. 8 Tr. at 2457:16- 2458:6 (West, Gauthier).

634.    Also, at the same time, Jemez Pueblo members increased their trade with Keres and Tewa peoples resulting in Keres and Tewa ceramics entering Jemez villages and areas Jemez

---

See Listing of log numbers associated to individual artifacts at 2 (undated), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX-105 (identifying log number 3787 as a Tewa sherd found on Banco Bonito); Nov. 8 Tr. at 2391 (Gauthier)(testifying that there are "three other Tewa sherds over in the Banco Bonito, also."). Accordingly, the Court will not amend its fact, and it alters Jemez Pueblo's proposed fact to better reflect the record.

[28]It is widely accepted that these changes make it more difficult to determine the cultural affiliation of archaeological sites based on the ceramic record after 1680, because the ceramic data in post-1680 Jemez Pueblo sites looks similar to the ceramic data in post-1680 Keres and Tewa sites. See Dec. 13 Tr. at 5542:5-16 (Liebmann, West)(stating that, after the 1680 Pueblo Revolt, "Jemez assemblages include many more glaze wares and Historic period Tewa ceramics"); Dec. 13 Tr. at 5546:7-12 (Liebmann)("[I]f we look within the Classic period . . . it's dominated by Jemez Black-on-White and the decorated wares assemblage, with very, very few sherds that are not characteristically found at ancestral Jemez sites); id. at 5546:13-20 (West)("And then we look at sites that date to the late 1600s, probably post-Revolt, this is where we see a spike in ancestral Tewa pottery, and large percentages of Rio Grande Glazeware. So there is a shift that is roughly coincident with the Pueblo Revolt and the ceramic pattern at ancestral Jemez sites.").

Pueblo occupied.[29]  See Liebmann Rebuttal Report at 3; Gauthier Rebuttal Report at 9; Oct. 30 Tr. at 410:11-411:8 (Liebmann).

635.    Archeologists have surveyed ninety-five percent of the Banco Bonito.[30]  See Nov. 13 Tr. at 3023:11-3024:4 (Marinelli, Steffen).

636.    Valles Caldera National Preserve staff have not collected all the sherds in Banco Bonito for its collection, because information from the hundreds of Jemez Black-on-White sherds found on Banco Bonito became redundant; only some of these sherds have been analyzed and recorded through cultural resource reports filed with a state depository for archeologists.[31]  See Trial Tr. at 2431:24-2433:16 (Gauthier, West)("In the Banco Bonito, not all sherds were collected, simply because they felt it was redundant information."); Cultural Resources Surveys and Sites (showing areas of cultural survey).

---

[29]The United States objects to Jemez Pueblo's characterization of the increase in trade as "dramatic."  U.S. Supplemental Response ¶ 27, at 16.  At trial, Liebmann testified that, before the 1680 Revolt, only three percent of pottery was traded, but that after the Revolt, about twenty percent was traded.  See 410:18-411:3 (Liebmann).  These numbers speak for themselves, although the Court has omitted the word "dramatic" from Jemez Pueblo's proposed finding of fact as imprecise and subjective.

[30]Jemez Pueblo proposes: "Archeologists have surveyed ninety-five (95%) of the Banco Bonito, and it is unlikely that further architecture will be found."  Jemez Pueblo Proposed Findings ¶ 1, at 1.  The trial transcript it cites supports the first clause, that archeologists have surveyed ninety-five percent of Banco Bonito, but it provides no support for finding it is likely or unlikely that more architecture will be found.  See Nov. 13 Tr. at 3023:11-3024:4 (Marinelli, Steffen).  Although the United States does not specifically dispute this fact, see U.S. Supplemental Response ¶ 1, at 2, the Court will not make a factual finding concerning the probability of further Banco Bonito discoveries.

[31]The United States' expert did not consider roughly 700 Jemez Pueblo sherds.  See Nov. 8 Tr. at 2433:21-2434:7 (Gauthier, West); id. at 2440:5-7 (Gauthier, West).

637.     Three non-Jemez Pueblo sherds have been found on the Banco Bonito.  <u>See</u>
Gauthier Report at 9.

638.     Jemez Pueblo used Redondo Meadows ███████████.  <u>See</u> Oct. 29 Tr. at
208:4-9 (Tosa)(stating that, according to ████████████████████████

████████████████████ <u>id.</u> at 1813:17-21 (Ferguson)(identifying Redondo Meadows

as a the '████████████"); Ferguson Report at 118 (stating that Jemez Pueblo farmed in

Redondo Meadows according to oral traditions); <u>id.</u> at 118 (stating that one Jemez Pueblo member



███).[32]

639.     Other than Jemez Pueblo's claim to Redondo Peak, the areas at issue in Jemez

Pueblo's reconsideration motion lie outside of the 200 acres that Jemez Pueblo unsuccessfully

asked Congress to permit Jemez Pueblo to purchase when Congress acquired the Preserve.  <u>See</u>

Jemez Pueblo Land Use Plan -- IRMP at 142 (2007), admitted October 29, 2018, at trial as United

---

[32]The United States proposes that "Jemez failed to establish that it used, much less
exclusively used, large portions of its expanded 'Redondo Meadows' polygon."  U.S. Proposed
Findings ¶ 20, at 9.  In support of its contention that Jemez Pueblo did not use large portions of its
new Redondo Meadows polygon, the United States cites Trial Tr. at 3702:22-3703:5 (taken Nov.
15, 2018), filed February 11, 2019 (Doc. 357)("Nov. 15 Tr.")(C. Toya), in which Christopher Toya
states that there is no banana yucca ████████████.  The United States presumably cites
this evidence to discredit Eusebio Toya's statements that ████████████████
██████████ <u>See</u> Ferguson Report at 118.  C. Toya's trial testimony does not, however, discredit
E. Toya's past statements.  C. Toya testified that there is no banana yucca when he "go[es] out
there today," Nov. 15 Tr. at 3702:24 (C. Toya), not that banana yucca has never grown in that area.
He also hypothesized that yucca had disappeared because of climate change and the reintroduction
of elk.  <u>See</u> Nov. 15 Tr. at 3702:25-3703:3 (C. Toya).  Further, as other evidence places Jemez
Pueblo in Redondo Meadows, the Court has not adopted the United States' proposed fact.

States' Ex. DX-KW (stating that Jemez Pueblo requested permission to purchase 200 acres, or roughly a third of a square mile, on top of Redondo Peak in 1998).

640. Jemez Pueblo's longtime archaeologist mapped Jemez Pueblo's understanding of its purported exclusive use area to exclude several of the areas at issue in the Motion. See Map of Whatley GIS Data at 1 (undated), admitted November 2, 2018, at trial as United States' Ex. DX-SL)(illustrating Jemez Pueblo's exclusive use area as covering the southwest corner of the Valles Caldera and some parts of the Preserve's western edge such as San Antonio Mountain, but not the majority of Jemez Pueblo's Valle San Antonio and Redondo Meadows claim).

641. The United States condemned a perpetual and assignable easement through the Valles Caldera lands in 1999 prior to transferring the pipeline easement. See Final Judgment, United States v. 49.77 Acres of Land, More or Less, Situated in Sandoval County, State of New Mexico, and Baca Land and Cattle Company, Inc., et al., (dated Oct. 18, 1999), admitted October 29, 2018, at trial as United States Ex. DX-HY; Complaint, United States v. 49.77 Acres of Land, More or Less, Situated in Sandoval County, State of New Mexico, and Baca Land and Cattle Company, Inc., et al., (dated July 12, 1999), admitted October 29, 2018, at trial as United States Ex. DX-HU.

642. The United States' gas pipeline easement through Valle San Antonio was recorded on April 11, 1951. See 95-Mile Gas Line Easement Los Alamos, New Mexico -- AEC Tract No. 26 (Warranty Deed of Easement)(dated Apr. 11, 1951), admitted October 29, 2018, at trial as United States' Ex. DX-BY; Heritage Report at 11 (describing the pipeline route).

643.   Jemez Pueblo has ███████████████.[33]  See Redondo File at 9 (2001),

admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX-240.

644.   ████████████████████████████████████████

███████████████████████████.[34]  See, e.g., Nov. 6 Tr. at 1872-1873:20-9 (Ferguson);

Ferguson Report at 102-03.

645.   ████████████████████████████████.  See Trial Tr. at 968:12-25 (taken

Nov. 1, 2018), filed January 11, 2019 (Doc. 340)("Nov. 1 Tr.")(Loretto); Nov. 6 Tr. at 1877:11-

20 (Ferguson); Nov. 20 Tr. at 4361:6-17 (V. Gachupin); id. at 4363:10-12 (V. Gachupin); id. at



[33]Jemez Pueblo proposes as a fact that ███████████████████████████████
████████████████████████████████████████████████████████████
███████   Jemez Pueblo Proposed Findings ¶ 19, at 10.  In support of this finding, Jemez Pueblo
cites Redondo File at 9.  The page that Jemez Pueblo cites contains a photograph███████ three
lines of text describing when and where the photograph was taken, and the caption "███████
███████"  Redondo File at 9.  This information does not support Jemez Pueblo's proposed fact
that ████████████████████████████████  Further, the United States asserts that ███
██████████████████████  See U.S. Supplemental Response ¶ 19, at 12 (citing
Zia, Jemez, and Santa Ana Pueblos v. ICC at 30-31 (noting that Jemez Pueblo's witness ████████
███████).  Accordingly, the Court will not adopt Jemez Pueblo's proposed fact.

[34]Jemez Pueblo proposes that it is the only Tribe or Pueblo that ████████████████
████████████████████████████████████████████████████████████
███████  Jemez Pueblo Proposed Findings ¶ 23, at 11.   The Court will not adopt the fact, because
████████████████████████████████████████████████████████████
███████████████████████.  See Fogleman Report at 9 (mapping the Valles Caldera's hydrology);
Ferguson Report at 163, 198, 248-50.  ████████████████████████████████████
████████████████████████████████████  See Religious Freedom
at 45-46, 48-49 (noting that Zia Pueblo ████████████████████████████████).
The Court concludes that the preponderance of evidence supports finding that Zia Pueblo has used
████████████████████████████████████████████████████████████
███████████████████

- 38 -

4367:17-4370:1 (V. Gachupin); id. at 4369-4370:1 (V. Gachupin); Map Utilized in Court by Witness Virgil Gachupin at 1 (undated), admitted December 12, 2018, at trial as Jemez Pueblo's Ex. PX 581 (outlining in blue the spring's location); Ferguson Report at 112-13.

646.    Jemez Pueblo is the only Tribe or Pueblo that has  .[35] See Oct. 29 Tr. at 214:22-216:10 (Tosa); Map that Paul Tosa[36] used in court at 1 (undated), admitted December 13, 2018, at trial as Jemez Pueblo's Ex. PX 571 (marking with a black X ); Nov. 6 Tr. at 1870:19-1871:11 (Ferguson); id. at 1876:18-1877:1 (Ferguson); Ferguson Report at 101-02; id. at 116-17; id. at 129-30.

647.    Aside from ,[37] the only specific evidence of non-Jemez Pueblo trails in the Valles Caldera limits non-Jemez Pueblo trails to the Valles Caldera's eastern side.  See Nov. 7 Tr. at 2026:22-2027:15 (Lucero)(discussing

---

[35]The United States disputes this fact, and it argues that Jemez Pueblo cannot argue soundly that no other Tribes traversed Redondo Meadows, because "there is overwhelming evidence" that other Tribes hunted, gathered, worshipped, and travelled in the Redondo Meadows area.  U.S. Supplemental Response ¶ 30, at 17.  The United States' argument does not specifically contradict Jemez Pueblo's fact, by, for example, offering examples of other trails that non-Jemez Pueblos or Tribes used.  The Court will address the United States' argument concerning this fact's relevance in the Analysis section.

[36]Paul Tosa is a Jemez Pueblo member and was Jemez Pueblo's second witness at trial. See Oct. 29 Tr. at 147:22-153:15 (Solimon, Tosa)(testifying about Tosa's background).

[37]Jemez Pueblo's proposed fact reads: "The only specific evidence of trails in the Valles Caldera other than Jemez Pueblo, limits non-Jemez trails to the eastern side of the Valles Caldera, which does not encompass Redondo Meadows."  Jemez Pueblo Proposed Findings ¶ 31, at 17. The United States notes in response that Lt. Governor Jerome Lucero testified about the existence .  See Nov. 7 Tr. at 2026:22-2027:15 (Lucero). Accordingly, the Court has altered Jemez Pueblo's proposed fact.

); Gauthier Rebuttal Report at 16 (depicting known non-Jemez Pueblo trails in the Valles Caldera's eastern side).

648.   The geothermal project area does not entirely encompass Redondo Meadows, and it does not include any of Valle San Antonio, Banco Bonito, or █████████████████████████ ████████████.[38]  See High Altitude Adaptations at 5; Final Geothermal EIS at 47, 60.

## SUPPLEMENTAL CONCLUSIONS OF LAW

465.   The Court will now state its conclusions of law.  The Court will begin by summarizing the case's relevant procedural history.  It will then set out the law regarding issues relevant to its analysis.  The Court will then present that analysis.[39]

## PROCEDURAL BACKGROUND

466.   Litigation surrounding Jemez Pueblo's claims to the Valles Caldera National Preserve has lasted for over eight years.  See Jemez Pueblo's Complaint to Quiet Title to Aboriginal Indian Land, filed July 20, 2012 (Doc. 1)("Complaint"); Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1082-1149 (summarizing the case's procedural history).  The Court held

---

[38]Jemez Pueblo proposes that the Court find that "[t]he Geothermal project area does not encompass Redondo Meadows, Valle San Antonio, Banco Bonito, or the Jemez Shrine and Jemez trails on Redondo Mountain."  Jemez Pueblo Proposed Findings ¶ 34, at 18.  The United States disputes Jemez Pueblo's proposed fact, citing a map of the geothermal project in High Altitude Adaptions to argue that the project area does "encompass" Redondo Meadows.  U.S. Supplemental Response ¶ 34, at 19.  Comparing the Redondo Meadows maps at page 17 in Jemez Pueblo Proposed Findings with the maps illustrating the geothermal project area, see High Altitude Adaptations at 5; Final Geothermal EIS at 47, 60, shows that the geothermal project area includes, but does not surround the Redondo Meadows area to which Jemez Pueblo asserts title.  Accordingly, the Court slightly alters Jemez Pueblo's proposed fact to reflect that the geothermal project area includes parts of, but does not encompass, Redondo Meadows.

[39]The Court made 464 conclusions in its previous Memorandum Opinion and Order, see Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1229, and it begins its Supplemental Conclusion of Law with ¶ 465.

a bench trial concerning Jemez Pueblo's claims on October 29-November 20, 2018; November 29

November 30, 2018; December 3, 2018; December 5, 2018; and December 13, 2018. See Clerk's

Minutes at 1-3, filed October 29, 2018, entered December 14, 2018 (Doc. 336). The Court issued

its Memorandum Opinion, Findings of Fact, Conclusions of Law, and Order, on August 31, 2019,

and denied Jemez Pueblo's aboriginal claims to the Valles Caldera. See Pueblo of Jemez v. United

States, 430 F. Supp. 3d at 953. Jemez Pueblo filed its Motion twenty-eight days later. See Motion

at 1.

      **1.**      **Closing Arguments.**

      467.    On May 7, 2019, the Court heard closing arguments from the bench trial. See

Transcript of Hearing at 4:4-9 (taken May 7, 2019), filed August 8, 2019 (Doc. 395)("May 7 Tr.").

The Court asked the United States: "If there's a heavy concentration of Jemez Pueblo in a portion

of the Preserve, is it possible to find that the Jemez has an aboriginal title to a portion, but not the

entire Preserve?" May 7 Tr. at 80:18-22 (Court). The United States agreed that "it is legally

possible for you to find that" Jemez Pueblo has aboriginal title to a portion of the Valles Caldera,

but it said that such a finding "is factually impossible on this record." May 7 Tr. at 80:23-25

(Marinelli). Jemez Pueblo stated later that "this Court could give part of the claim area, if it chose

to do so, and we would just point out that when we assembled our Findings of Fact, we did it by

different areas, so the Court could consider different areas in its opinion." May 7 Tr. at 160:18-23

(West).

      **2.**      **The Memorandum Opinion, Findings of Fact, Conclusions of Law, and Order.**

      468.    The Court denied Jemez Pueblo's claims to the Valles Caldera on August 31, 2019,

in a 530-page opinion. See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 953, 1205-29.

The Court did not award Jemez Pueblo aboriginal title to the Valles Caldera or any sub-area within

the Valles Caldera.  See 430 F. Supp. 3d at 1229.  It concluded that, "[a]lthough the evidence proves that Jemez Pueblo has actually and continuously used the Valles Caldera for a long time, the evidence also shows that many Pueblos and Tribes also used the Valles Caldera in ways that defeat Jemez Pueblo's aboriginal title claim." Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1197.

### 3.    The Motion.

469.    On September 9, 2019, Jemez Pueblo filed its Motion.  Specifically, Jemez Pueblo asks the Court to reconsider its ruling and grant Jemez Pueblo aboriginal title to four discrete areas within the Valles Caldera: (i) Banco Bonito; (ii) Redondo Meadows; (iii) the western two-thirds of Valle San Antonio; and (iv) sub-areas on Redondo Mountain.  See Motion at 2-3.  Jemez Pueblo first argues that, to establish aboriginal title, a Tribe must prove "actual, exclusive, and continuous use and occupancy" of the land in question "for a long time."  Motion at 3 (citing Pueblo of Jemez v. United States, 790 F. 3d 1143, 1165 (10th Cir. 2015)).   Jemez Pueblo asserts that it "continuously maintained exclusive use and occupancy" of the four discrete areas during a "relevant period" of time extending from the thirteenth century to the arrival of the Spanish in 1542, comparing that length of time favorably with those time periods found sufficient in previous aboriginal title cases.  Motion at 4-5 (citing Cramer v. United States, 261 U.S. 219 (1923)(seven years); Sac & Fox Tribe of Indians of Okla. v. United States, 383 F.2d 991, 999 (Ct. Cl. 1963)(less than twenty-five years); United States v. Seminole Indians of Fla., 180 Ct. Cl. 375, 387 (1967)(fifty years)).  Jemez Pueblo contends that, during this relevant period, its use in those four areas was dominant as to other Tribes and that evidence of other Tribes' land use outside this timeframe does not defeat their claim of exclusive use within that timeframe.  See Motion at 3.  Jemez Pueblo argues that evidence of its traditional use alone is sufficient to support its claim to exclusive use

- 42 -

during the relevant period, and the record contains "little or no evidence" of use by other Tribes' in these sub-areas.  Motion at 5 (citing Pueblo of Jemez v. United States, 350 F. Supp. 3d 1052, 1115-16 (D.N.M. 2018)(Browning, J.)).  Next, Jemez Pueblo argues that evidence sufficient to defeat its claim to exclusive use and occupancy of these discrete sub-areas requires proof of a physical presence in the area, and "not merely a religious or spiritual interest."  Motion at 5-6 (citing Pueblo of Jemez, 790 F. 3d at 1166 (citing United States v. Pueblo of San Ildefonso, 513 F.2d 1383, 1385-86 (Ct. Cl. 1975))).  Jemez Pueblo contends that neither evidence of other Tribes' spiritual connection to these sub-areas nor their general use of areas beyond those areas in question is enough to defeat Jemez Pueblo's claim to exclusive and dominant use of these sub-areas during the relevant time period.  See Motion at 6.  Jemez Pueblo argues that the absence of evidence of other Tribes' use of these four discrete areas during the relevant period means that it need prove only its own exclusive use and occupancy.  See Motion at 7.

470.  As for the use of these areas after the establishment of Jemez Pueblo's aboriginal title during the relevant period, Jemez Pueblo argues that other Tribes' use did not rise to the level needed to show Jemez Pueblo's abandonment or other Tribes' conquest.  See Motion at 7.  As a result, Jemez Pueblo asserts that other Tribes' subsequent use has not extinguished its title.  See Motion at 7.  Jemez Pueblo says that the Court has discretion to award aboriginal title to Jemez Pueblo of "certain portions of the claim area" and asserts that the United States agreed with this at the trial.  Motion at 8.

471.  Jemez Pueblo further argues that evidence of its physical control or dominion over the claim area be construed in the Tribe's favor and that its burden of proof is not "extreme."  Motion at 8 (citing United States v. Seminole Indians of Fla., 180 Ct. Cl. at 386).  It contends that

evidence countering its dominant use must be "specific," and, where there is none, "the claimant tribe need only show its own use and occupancy."  Motion at 9.  Next, Jemez Pueblo presents evidence in support of its exclusive, dominant use of the four areas it urges the Court to reconsider.

          **a.**       **Jemez Pueblo's Claim to Banco Bonito.**

472.    Jemez Pueblo cites the Pueblo of Jemez v. United States in support of its claim of exclusive, dominant use of Banco Bonito.  Motion at 9 (citing Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1207).  According to Jemez Pueblo, the Court found evidence of Jemez Pueblo's occupation of 100 fieldhouses on Banco Bonito over a 400-year period, and "acknowledges that the fieldhouses in Banco Bonito are significantly closer to ancestral Jemez villages than any other tribal village."  Motion at 9-10.  Jemez Pueblo asserts that, even the United States' experts, Dr. Kurt Anschuetz and Dr. Anastasia Steffen, acknowledge Jemez Pueblo's use and occupancy of Banco Bonito.  See Motion at 10.

473.    While the Court rejected Jemez Pueblo's argument that no archaeological evidence of other Tribes' architecture exists in the Valles Caldera at large, Jemez Pueblo responds to this finding with the proposition that, within Banco Bonito, the only architectural evidence of occupation is attributable to Jemez Pueblo.  See Motion at 11 (citing Pueblo of Jemez v. United States, 430 F. Supp. 3d at 973 n.34); Architecture in Footnote 34, filed September 28, 2019 (Doc. 405-5)).  Similarly, Jemez Pueblo asserts that evidence of a Navajo Hogan elsewhere in the Valles Caldera does not contradict exclusive architectural evidence of Jemez Pueblo's occupancy on Banco Bonito.  See Motion at 11.  Given that ninety-five percent of Banco Bonito has been surveyed, in comparison to thirty-one percent of the rest of the Valles Caldera, Jemez Pueblo dismisses concerns that architectural evidence belonging to other Tribes may yet be found within

Banco Bonito itself.  See Motion at 11 (citing Nov. 13 Tr. at 3023:11-3024:4).  In the same vein, Jemez Pueblo asserts that evidence of Keres and Tewa[40] fieldhouses and farming found outside the Banco Bonito area on the Valles Caldera's eastern and southeastern boundaries is entirely irrelevant to Jemez Pueblo's aboriginal title claim to the Banco Bonito.  See Motion at 12.

---

[40]Keres and Tewa are two indigenous Pueblo groups that are culturally distinct from each other and the Towa indigenous Pueblo group to which Jemez Pueblo belongs.  See Pueblo of Jemez v. United States, 430 F. Supp. at 966-72 (describing historic Keres and Tewa presence in the Valles Caldera).  The Keres Pueblos speak languages that belong to the Keresan language family and include the Pueblos of Chochiti, Kewa (formerly Santo Domingo), San Felipe, Santa Ana, Zia, Acoma, and Laguna, while the Tewa Pueblos speak the Tewa language, which belongs to the Tanoan language family, and include the Pueblos of Nambe, Ohkay Owingeh, Pojoaque, San Ildefonso, and Tesuque.  See Anschuetz Report at 68.  Another Tanoan language is Towa, which the Jemez Pueblo people speak.  See Anschuetz Report at 68.  The languages that the Keres, Tewa, and Towa Pueblos speak are not mutually intelligible.  See Towa (Jemez) Language, Native Languages of the Americas, http://www.native-languages.org/towa.htm (last visited April 20, 2019)("Though these languages are closely related, speakers of one cannot fully understand speakers of another (similar to German and English speakers).").



Figure 2.  Jemez Pueblo's Claim to Banco Bonito.

474.    Jemez Pueblo urges the Court to reconsider its conclusion that evidence of other

Tribes' ceramics on Banco Bonito is substantial in quantity.  See Motion at 12.  Jemez Pueblo

suggests that the Court's reliance on FOF ¶ 86, at 48,[41] is misplaced, because it is based on

---

[41]In FOF ¶ 86, at 48, the Court stated: "Although archeologists predominantly have found
Tewa-affiliated sherds in the Valles Caldera's southeast and south-central areas, archeologists have

evidence from Cerro de Medio which is far to the east of Banco Bonito, it contradicts the Court's other FOFs about the dominance of Jemez Pueblo's ceramics on Banco Bonito, and it relies on Rory Gauthier's[42] flawed methodology.  See Motion at 13.  Jemez Pueblo noted that, at trial, the United States conceded that "archeologists associate most Banco Bonito sites with Jemez Pueblo's ancestors," Motion at 13 (citing Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1112), and also agreed that ceramic evidence of Jemez Pueblo occupation was "exclusively confined to Banco Bonito," Motion at 13 (citing Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1140).  Jemez Pueblo cites supportive testimony by the United States' expert, Gauthier, which establishes that Towa[43] ceramic types -- associated exclusively with Jemez Pueblo -- were the most common ceramic in the Banco Bonito area, showing evidence of Jemez Pueblo's exclusive use of Banco Bonito for seasonal farming in that area in the 1600s.  Motion at 14 (citing Nov. 8 Tr. at 2370, 2372-74, 2391, 2393, 2431, 2484 (Leonard, Gauthier)).  Nonetheless, Jemez Pueblo highlights inconsistencies between Gauthier's conclusions about Tewa sherds on Banco Bonito and his own notes.  While at trial Gauthier testified that there were "three other Tewa sherds over in the Banco Bonito."  Jemez Pueblo asserts that one of these three sherds -- identified as item 3787 -- was described in Gauthier's notes as "[f]ive sherds, thick Jemez B/W or possible biscuit."  Motion at

---

found such sherds as far west the Banco Bonito and Redondo Meadows."  Pueblo of Jemez v. United States, 430 F. Supp. 3d at 978.

    [42]Rory Gauthier testified as an expert on the United States' behalf; he is a New Mexico archeologist with over forty years of experience in analyzing southwest Native American ceramics. See Expert Report of Rory Gauthier at 8 (dated March 22, 2018), admitted October 29, 2018, at trial as United States' Ex. DX-RR.

    [43]Towa refers to Jemez Pueblo's language.  Jemez Pueblo is the only Indian group that speaks Towa; Towa is part of the Kiowa-Tanoan language family found in New Mexico, Kansas, Oklahoma, and Texas.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 961 n.13.

15.  See id. at 15 n.8 (quoting Gauthier Pottery Spreadsheet (June 25, 2018), admitted November 8, 2018, at trial as United States' Ex. DX-RW; Collection Log Tab, Row 347).  Jemez Pueblo draws the Court's attention to inconsistencies between Gauthier's notes and his report in terms of sherds' origins and the numbers asserted, and it criticizes him for failing to take into account alternative explanations for the existence of Tewa ceramics on Banco Bonito, such as trade during the Pueblo Revolt, or changes in Jemez Pueblo pottery design after Spanish contact.  See Motion at 15-16.  Additionally, Jemez Pueblo contends that Gauthier "admits that he did not consider over 700 other pieces of [Jemez Pueblo] pottery found in Banco Bonito," but relied on the Valles Caldera National Preserve's collection of sherds that did not include Jemez pottery, because they were so "numerous and redundant."  Motion at 16.  Jemez Pueblo asserts that Gauthier's analysis did not consider survey reports, such as the Banco Bonito Survey, which are separate ceramic analyses independent from the Valles Caldera National Preserve's collection.  See Motion at 16 (citing Jacqueline L. Stark, Banco Bonito Survey 2010 (Dec. 1, 2011), admitted October 30, 2018, at trial as Jemez Pueblo's Ex. PX-178 ("Banco Bonito Survey")).  Jemez Pueblo argues that, even if there were three or four Tewa sherds in Banco Bonito as Gauthier asserted, those numbers do nothing to eclipse the 175 Jemez sherds he considered, let alone the 700 additional Jemez Pueblo sherds he did not.  See Motion at 16.  Jemez Pueblo concludes that, given the disparity in the number of Jemez Pueblo and other sherds on Banco Bonito, Jemez Pueblo's use "dominated other tribes, and a Tewa presence was not 'substantial.'"  Motion at 17 (quoting Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1221).

475.  Next, Jemez Pueblo urges the Court to reconsider its conclusions about Zia Pueblo's use of trails on Banco Bonito given Jemez Pueblo's extensive trail network there.  See

Motion at 17.  Jemez Pueblo cites the Court's findings that it constructed an "extensive trail network" to connect fieldhouses on Banco Bonito with thirty-five large, ancestral Jemez Pueblo villages.  Motion at 17 (citing Pueblo of Jemez v. United States, 430 F. Supp. 3d at 969, 972, 1057).  Jemez Pueblo argues that the Court also found that "██████████████████████████ ████████████████████████████████" and that ████████████████████████████ ██████████████████████████████████████ Motion at 17 (citing Memorandum Opinion and Order ¶ 463, at 213).  Additionally, Jemez Pueblo asserts ████████████████ ██████████████████████████████████████████████████████████████ ███████████████████ Motion at 17 (citing Memorandum Opinion and Order ¶¶ 463-64, at 213).  Jemez Pueblo asserts the Memorandum Opinion and Order confirm its "████████████ ██████████████████.  Motion at 17-18 (citing Pueblo of Jemez v. United States, 430 F. Supp. 3d at 972, 1057-58).  Jemez Pueblo suggests that there are only a few facts placing Zia Pueblo on Banco Bonito and that these facts are inconsistent.  See Motion at 18.  It argues that evidence of Zia Pueblo "passing through" Banco Bonito on the way ████████████  misinterprets Dr. Anschuetz' testimony, is mere speculation, or, at most, represents permissive use, Motion at 18 (citing Memorandum Opinion and Order ¶ 281, at 178-79).  See Motion at 18 n.10.

476.    Jemez Pueblo argues that other FOFs contradict FOF ¶ 381, at 178-79, which finds that Zia Pueblo crossed the Banco Bonito en route to █████████████████████████ ██████████████████████  See Motion at 19.  Jemez Pueblo affirms the Court's conclusion that Zia Pueblo's southern route through the Valle Grande was independent from Jemez Pueblo routes, see Motion at 20 (citing Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1226), but critiques what it asserts is the Court's misstatement of the routes as passing through Banco

Bonito rather than Valle Grande, <u>see</u> Motion at 20 (citing Memorandum Opinion and Order ¶¶ 380-81, at 178-79).  Jemez Pueblo argues also that FOF ¶ 380, at 178 -- "Zia Pueblo attaches great spiritual significance to the Jemez River, including its Valles Caldera tributaries and headwaters" -- is not specific enough to establish Zia's use of Banco Bonito.  Motion at 20.  In conclusion, Jemez Pueblo argues that Zia Pueblo use of trails does not defeat its exclusive and dominant use of Banco Bonito at least before 1650, if not at any time.  <u>See</u> Motion at 20.

### b.    <u>Jemez Pueblo's Claim to Redondo Meadows</u>.

477.    Second, Jemez Pueblo urges the Court to reconsider its ruling regarding the discrete sub-area of Redondo Meadows.  <u>See</u> Motion at 20.  Jemez Pueblo asserts that the Court's FOFs about its exclusive Banco Bonito use during the relevant period also support its use of Redondo Meadows: Jemez Pueblo is the only Pueblo that ███████████████████████████ ████████████████████████████████████.  <u>See</u> Motion at 20-21 (citing Memorandum Opinion and Order ¶¶ 479-81, at 220-21).  Jemez Pueblo cites the Court's FOFs indicating that it is the ██████████████████████████████, <u>see</u> Motion at 21 n.14 (citing <u>Pueblo of Jemez v. United States</u>, 430 F. Supp. 3d at 967-68), while other Tribes and the public access the Valles Caldera from the east and south, <u>see</u> Motion at 21 n.15.



Figure 3.  Jemez Pueblo Claim to Redondo Meadows.

478.    Jemez Pueblo argues that the evidence advanced by the United States to show non-Jemez Pueblo use of Redondo Meadows is the same evidence that Jemez Pueblo argues is unreliable in its section on Banco Bonito.  <u>See</u> Motion at 12.  Jemez Pueblo asserts that no witness testified to non-Jemez Pueblo use of Redondo Meadows, nor does any other evidence exist to prove it.  <u>See</u> Motion at 22.  Jemez Pueblo states that Zia Pueblo's routes do not pass through either

Banco Bonito or Redondo Meadows but lead to ███████████████████████████████

███   See Motion at 22.

        c.        **Jemez Pueblo's Claim to the Western Two-Thirds of Valle San Antonio.**

      479.    Third, Jemez Pueblo asks the Court to reconsider its rulings as to the western two-thirds of Valle San Antonio, asserting its exclusive and dominant use of the area in the relevant time period.  See Motion at 22.  Jemez Pueblo asserts that "[all] the Court's findings pertaining to the Valle San Antonio sub-area describe Jemez use."  Motion at 22.  Jemez Pueblo points to the Court's FOFs about ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████   Motion at 22 (citing Memorandum Opinion and Order ¶¶ 485, 493, 495, at 223-25).  The Court found that the Valle San Antonio is a ████████████████████████

████████████████████████████████████████████████████████.  Motion at 22 (citing Memorandum Opinion and Order ¶ 485, at 222).  Valle San Antonio is also home to ██

███████████████████████████████████████████████████████   Motion at 22 (citing Memorandum Opinion and Order ¶ 488, at 223).



Figure 4.  Jemez Pueblo's Claim to the Valle San Antonio.

480.    Jemez Pueblo argues that the Court's FOFs about the northern part of the Valles Caldera are "not specific" to the Valle San Antonio.  Motion at 23.  Those FOFs, it argues,  apply to the northeast and northcentral area, specifically, ███████████████████.  See Motion at 23.  The only fact supporting non-Jemez use of the western two-thirds of the Valle San Antonio, Jemez Pueblo suggests, boils down to one Keres ceramic sherd that Gauthier identifies in Figure 7 of his report as a "Keres-affiliated" site.  Motion at 23 (citing Pueblo of Jemez v. United States, 430 F. Supp. 3d at 979; Nov. 8 Tr. at 2444:14-16 (West, Gauthier)).  Gauthier dated the sherd from

between 1700 and the 1800s, see Motion at 23 (citing Pottery Table at 2), despite testifying that

he did "not know what a Jemez ceramics assemblage looked like after the Pueblo Revolt," Motion

at 23-24. Jemez Pueblo casts aspersions on Gauthier's ability to conclude that Jemez Pueblo did

not make the pot from which the sherd came, characterizing his testimony as "non-specific and

limited." Motion at 23-24. Because FOF ¶ 91, at 50,[44] forms the basis for the Court's statement

that the "ceramics record . . . demonstrates that ancestral Tewa and Keres peoples use the Valles'

Caldera's northern portions," Motion at 23, Jemez Pueblo urges the Court to reconsider that its use

of the western two-thirds of the Valle San Antonio was "exclusive and dominant." Motion at 24.

481.   Jemez Pueblo argues that evidence of possible Zia Pueblo and Santa Ana Pueblo

use of ▮▮▮▮▮▮ comes from the Indian Claims Commission ("ICC") action, which does

not clearly reference the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See Motion

at 25. Jemez Pueblo dismisses this evidence of other Pueblo use of the ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ is moot, because Zia Pueblo abandoned its claim. See Motion at 25. In support of

this argument, Jemez Pueblo points to the Court's findings that ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮, see Motion at 25 (citing

Memorandum Opinion and Order ¶ 385, at 181-82), and also conducted ceremonies at another

shrine, see Motion at 25. Jemez Pueblo contends that the Court's finding that "▮▮▮▮

▮▮▮▮▮▮▮▮▮" is based on evidence about ▮▮▮▮▮

---

[44]In FOF ¶ 91, at 50, the Court finds: "Tewa, Keres, and Towa speakers all used the Valles Caldera's northern portion between 1200 and 1750 C.E.; Jemez Pueblo was not the Valles Caldera's northern portion's dominant Tribal user." Pueblo of Jemez v. United States, 430 F. Supp. 3d at 979.

███████████████████████████. Motion at 25 n.19 (citing Memorandum Opinion and Order ¶ 47 n.16, at 20.

        **d.**      **Jemez Pueblo's Claim to Discrete Sub-Areas on Redondo Mountain.**

    482.    Finally, Jemez Pueblo asks the Court to reconsider its title to discrete sub-areas on Redondo Mountain: ███████████, and █████████████████. See Motion at 24-27. Jemez Pueblo argues that its ████████████████████████████. Motion at 24. Jemez Pueblo asserts that it has exercised exclusive and dominant use of █████████████ ███████████████████████████████████████████████ ████████████. See Motion at 25.



Figure 5. Jemez Pueblo's Claim to Redondo Peak.

483.    Next, Jemez Pueblo asserts that it ███████████████████████

███████████████    Walatowa[45] ████████████████████████████████

███████████████.   See Motion at 26; Trails Argument, filed September 28, 2019 (Doc.

405-9)(citing Memorandum Opinion and Order ¶ 445, at 209).   It also points to ███████████████,

████████████████████████████████████████████████████.   See

Motion at 26 (citing Memorandum Opinion and Order ¶ 458, at 212).   Jemez Pueblo argues that

these trails "are part of the extensive Jemez Pueblo trail network confirmed by the Order" and were

used during the relevant period.   Motion at 27.   Jemez Pueblo argues that, because there is no

finding or record evidence of ████████████████████████████████████,

Jemez Pueblo exercised exclusive and dominant use of these areas.   See Motion at 27.

---

[45]Walatowa is the name of the village in which many Jemez Pueblo members reside.   The
Spanish established Walatowa in 1620 and consolidated Jemez Pueblo members from the area into
the village.   See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 993.



Figure 6.  Jemez Pueblo Claimed Pilgrimage Trails.

484.    Last, Jemez Pueblo identifies ███████████████████████████

█████████████████████████████████████████.  <u>See</u> Motion at 27 (citing

Memorandum Opinion and Order ¶ 464, at 213).  ███████████████████████

███████████████████████████████████████████.  <u>See</u>

Motion at 27.  Jemez Pueblo concludes that there is no evidence contradicting Jemez Pueblo's

exclusive and dominant use ████████████.  <u>See</u> Motion at 27.  In conclusion, Jemez Pueblo

requests that the Court grant its motion and reconsider Jemez Pueblo's aboriginal title to the four

discrete areas of the Valles Caldera.  <u>See</u> Motion at 27.



Figure 7. ███████████████████████████.

4.       **The Response.**

485.     The United States filed a response.  <u>See</u> United States' Opposition to Plaintiff's Motion for Reconsideration, filed October 29, 2019 (Doc. 416)("Response").  The United States urges the Court to deny Jemez Pueblo's motion to reconsider for five reasons and it makes one procedural argument.  The United States argues that: (i) Jemez Pueblo never possessed aboriginal title to "any portion" of the Valles Caldera; (ii) Jemez Pueblo was not the exclusive aboriginal user of the Valles Caldera; (iii) Jemez Pueblo's attempt to subdivide its original claim into smaller areas is procedurally inappropriate; (iv) Jemez Pueblo did not show that the Court misapprehended the facts or made a legal error; (v) rule 15 of the Federal Rules of Civil Procedure preclude Jemez Pueblo's claims to Redondo Meadows and the western two-thirds of the Valle San Antonio; and (vi) Jemez Pueblo's exhibits exceed page limits and should be struck.  <u>See</u> Response at 1, 3, 14, 16-17, 20, and 23.

> a.       **The United States Argues That Jemez Pueblo Never Possessed Aboriginal Title to Any Portion of Valles Caldera.**

486.     The United States asserts that Jemez Pueblo's "belated effort to subdivide the Preserve into 90 polygons" fails because it cites no supportive precedent for subdividing "hunting grounds into small polygons" and claiming title to some of those areas.[46]  Response at 3.  The United States reasons that neither hunting grounds nor plant-gathering areas can be subdivided. <u>See</u> Response at 3-4 (citing <u>Valles Caldera Religious Use</u> at 83; Valles Caldera National Preserve

---

[46]In the Pueblo of Jemez Expert Witness Report by Dr. TJ Ferguson at 82 (dated March, 22, 2018), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX-190 ("Ferguson Report"), Dr. TJ Ferguson maps roughly forty different polygons onto the Valles Caldera.  In addition to these polygons, Ferguson maps roughly another fifty places of cultural significance such as shrines, trails, and streams.  <u>See</u> Ferguson Report at 154-246.

Map (undated), admitted December 3, 2018, at trial as United States' Ex. DX-VG; Religious

Freedom at 47). It asserts that other, adverse Tribes such as the Santa Clara Pueblo, San Ildefonso

Pueblo, and the Jicarilla Apache use the entire Preserve, and view it as sacred. See Response at 4

(citing Proposed Findings of Fact by the United States of America ¶¶ 313, 456-61, filed April 15,

2019 (Doc. 386)("U.S. FOFs"); Nov. 29 Tr. 4615:9-4616:7). Next, the United States addresses

each of the four sub-areas that Jemez Pueblo claims in its Motion.

       487.    The United States argues that Jemez Pueblo overstates its own Valles Caldera use

while ignoring the uses of other Tribes; it asserts that other Tribes' use of Banco Bonito was

"properly addressed . . . elsewhere in the Opinion." Response at 4 (citing Pueblo of Jemez v.

United States, 430 F. Supp. 3d at 978). The United States disputes that Jemez farmed the "entire

Banco Bonito," as Jemez' Motion suggests. Response at 5 (citing Motion at 14). It states that

Jemez Pueblo's fieldhouses were located only on Banco Bonito's "western portion," which is

insufficient to substantiate Jemez Pueblo's claim to the whole polygon. Response at 5 (citing

Steffen Rebuttal Report).

       488.    The United States asserts that Jemez Pueblo mischaracterized its experts'

testimony. See Response at 5. For example, the United States asserts that Dr. Steffen "did not

refer to Banco Bonito as Plaintiff's," but instead "critiqued Plaintiff's focus on fieldhouses as the

only evidence of aboriginal occupation," adding that she worked with Cochiti Pueblo by

███████████████████████████████████. Response at 5 (citing Motion at 10;

Steffen Rebuttal Report at 3, 6; Steffen Letter at 1; Letter from Marie E. Rodriguez to Governor

Joseph H. Suina (Feb. 4, 2014), admitted at trial as United States' Ex. DX-NP ("Rodriguez

Letter")). The United States argues that Dr. Anschuetz' testimony supports and does not diminish

███████████████████████████████████████████████████████

████████████████████████████.   See Response at 5-6 (citing Motion at 10, 18-20;

Anschuetz Report at 201).  The United States repeats Dr. Anschuetz' testimony that all Zia Pueblo

members ████████████████████████████████████████████

███████████████████████████████ See Response at 6 (citing Motion at 20;

Anschuetz Report at 170-72, 207; Religious Freedom at 46, 49; Nov. 29 Tr. at 4640:19-4643:8

(Anschuetz, Marinelli)).  The United States concludes that Zia Pueblo has "███████████████

█████████████████████████ for centuries," Response at 6 (citing U.S. FOFs ¶ 369, at 103;

Nov. 29 Tr. at 4651:1-5 (Anschuetz, Marinelli)), and argues that Florence Hawley Ellis' evidence

that ███████████████████████████████████████████, Response

at 6 (citing Ellis Zia Map (dated 1981), admitted November 6, 2018, at trial as United States' Ex.

DX-EY; U.S. FOFs ¶ 521).  According to the United States, Zia Pueblo's use of "███████

███████████████████████████" supports this conclusion.  Response at

6.

489.   Similarly, the United States contends that Zia Pueblo members travel through

███████████████████████████████████████████████████,

see Response at 6 (citing Religious Freedom at 50-52), and argues that, if Jemez Pueblo can present

its own trails as evidence of use, then so can Zia Pueblo, see Response at 6 (citing Motion at 26-

27).  The United States questions Jemez Pueblo's "unsupported assertion" that Zia Pueblo

members would "███████████████████████████████████████████

████, Response at 6 (citing Motion at 19), arguing instead that Jemez, Zia and Santa Ana

Pueblos "previously understood" they had a "common interest" in Banco Bonito, Response at 7 (citing U.S. FOFs ¶¶ 465-67, at 126-29).

490.    Next, the United States addresses Jemez Pueblo's argument that high levels of Jemez Pueblo pottery have been found on Banco Bonito by stating that sherds of non-Jemez Pueblo pottery have been found in "six different locations in Banco Bonito and Redondo Meadows," and four Tewa and Keres sherds have been found in Redondo Meadows.   Response at 7 (citing Gauthier Report at 8; Pottery Table at 2).   In contrast, the United States contends that Jemez Pueblo bases its claim to the Valle San Antonio on one sherd of Jemez pottery and an unsupported assertion that post-1700 Keres pottery in the area is related to Jemez Pueblo.   See Response at 7 (citing Gauthier Report at 8; Pottery Table at 7).   The United States asserts that, combined with "other knowledge about Keres and Tewa cultural and religious practices," the pottery record contradicts Jemez Pueblo's claim to exclusive use of Banco Bonito.   Response at 7-8.

491.    The United States points to evidence that other Tribes "made Banco Bonito dangerous" for Jemez Pueblo, such as the Jicarilla Apache, which "conceived of itself as the exclusive owner of Banco Bonito."   Response at 8 (citing U.S. FOFs ¶¶ 137-39, at 36-37). According to the United States, Jemez Pueblo did not dominate the southwest corner of the Valles Caldera, but instead "submit[ted] to Santa Clara Pueblo, San Ildefonso Pueblo, and the Ute Tribe's authority" in or near Banco Bonito in 1863.   Response at 8 (quoting Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1225, 1229; U.S. FOFs ¶ 64, at 20).

492.    The United States disputes Jemez Pueblo's claim to exclusive use of Redondo Meadows, citing the eighteen Pueblos' suit challenging the Baca geothermal project, whose area overlaps with Jemez Pueblo's Redondo Meadows polygon.   See Response at 8 (citing Final

Environmental Impact Statement -- Geothermal Demonstration Program, 50 MW Power Plant, Baca Ranch, Sandoval and Rio Arriba Counties, New Mexico at 47 (Jan. 1, 1980), admitted October 29, 2018, at trial as United States' Ex. DX-EU ("Final Geothermal EIS"); Union Oil Company, Baca Project: Geothermal Demonstration Power Plant, Final Report at 12 (dated Dec. 1, 1982), admitted November 19, 2018, at trial as United States' Ex. DX-FS)).  The United States cites the Court's FOFs that Redondo Creek is a "joint use area," and suggests that the Court can supplement its findings with the testimony of Jemez Pueblo's witnesses "further establishing that other Tribes used and use the area Plaintiff now calls 'Redondo Meadows.'"  Response at 9.  It says that Jemez Pueblo's expert Lois Weslowski wrote that Santa Ana Pueblo and Zia Pueblo value the Baca geothermal project area "in much the same way as the Jemez," and they consider it part of their aboriginal homeland and use it for ceremonial and procurement.  Response at 9 (citing Craig Baker & Joseph C. Winter, High Altitude Adaptations Along Redondo Creek at 44 (June 9, 1981), admitted November 1, 2018, at trial as Jemez Pueblo's Ex. PX-28 ("High Altitude Adaptations")).  The United States also notes that Ellis states that Redondo Creek -- which "flows through Redondo Meadows" -- is an important ███████████████████████████ Response at 9 (citing Valles Caldera Religious Use at 81-83; Valles Caldera National Preserve Map).  The United States highlights Cochiti Pueblo, Santa Clara Pueblo, and Zia Pueblo use in the geothermal development area, and asserts that Zia Pueblo's opposition made it clear that it had sacred sites there.  See Response at 9 (quoting Final Geothermal EIS at 213).

493.   Next, the United States points to Zia Pueblo's use of █████████████ ████████████████████████████████, see Response at 9 (citing U.S. FOFs ¶¶ 391-96, 605, at 109-10, 174; Valles Caldera National Preserve Map at 1; Religious

<u>Freedom</u> at 50-52; Nov. 29 Tr. at 4644:5-4643:8 (Anschuetz, Marinelli)), and attacks what it characterizes as Jemez Pueblo's "suggestion . . . that Zia's  pilgrimage routes ████████████ ███████████████ as incorrect, Response at 10 (citing Motion at 22).  The United States suggests that Santa Ana Pueblo and Zia Pueblo's hunting grounds in the Valle Seco present evidence that those members walked through Redondo Meadows, because that area is between Redondo Meadows and the Valle San Antonio.  <u>See</u> Response at 10.

494.     The United States asserts that Jemez Pueblo's witness, Lois Weslowski, and "other consultants" found that Cochiti Pueblo, Pueblo of Pojoaque, San Ildefonso Pueblo, San Juan Pueblo, Santa Clara Pueblo, and the Pueblo of Tesuque used Redondo Meadows for plant gathering, ritual purposes and "other ceremonial needs."  Response at 10 (citing High Altitude Adaptations at 44).  It also asserts that Santa Clara Pueblo's use of the geothermal project area for ███████████████ defeats Jemez Pueblo's claim to exclusive use of Redondo Meadows.  <u>See</u> Response at 10 (citing U.S. FOFs ¶ 128, at 34; Final Geothermal EIS at 694; Nov. 29 Tr. at 4586:6-18 (Anschuetz, Marinelli)).

495.     The United States suggests that Jemez Pueblo is also incorrect in alleging exclusive use of the western two-thirds of the Valle San Antonio, pointing to Santa Clara Pueblo's visits to ██████████████████.  <u>See</u> Response at 10 (citing Motion at 22; Dec. 3 Tr. at 5112:24-5114:21 (Chavarria, Marinelli); Valles Caldera National Preserve Map at 1).  It also notes that Jemez Pueblo excluded the Valle San Antonio when it mapped its territory at the time of the Spanish Entrada and that Jemez Pueblo referred to Redondo Peak as "the boundary of lands it held in common with Zia and Santa Ana."  Response at 10 n.13.  The United States asserts that Santa Clara Pueblo traveled ██████████████████████████████

████████████████████████████████.”  Response at 11 (citing U.S. FOFs ¶¶ 313,

521, at 83-84, 151).  It suggests that Jemez Pueblo's stories of "hostile Navajo" in the Valle San

Antonio also defeat Jemez Pueblo's claim to exclusive use of the Valle San Antonio, as do Navajo

routes to Redondo Peak.  Response at 11 (citing Nov. 6 Tr. at 1955:11-1958:10; U.S. FOFs ¶¶ 51,

55-56, 64-66, 301, 441, 445-47, 520, 571, at 17-18, 20-21, 78, 119-20, 150-51, 168; High Altitude

Adaptations at 44).

496.    The United States questions the distinction that Jemez Pueblo draws between the

Valle San Antonio, and ████████████████████████████████████

████████████████████████████  Response at 11 (citing Motion at 23; Valles

Caldera National Preserve Map at 1).  The United States notes that Ellis' map included portions of

the Valle San Antonio in his map of Zia Pueblo locations.  See Response at 11 (citing Nov. 29 Tr.

4463:13-4465:1 (Anschuetz, Marinelli); Ellis Zia Map at 1).  The United States points to evidence

before the ICC that Santa Ana Pueblo and Zia Pueblo use ████████████████████

████████████████████████  Response at 11 (citing Zia, Jemez, and Santa Ana

Pueblos v. ICC at 31, 33; Historic Routes at 27.

497.    Finally, the United States rebuts Jemez Pueblo's claim to sub-areas of Redondo

Peak by asserting "overwhelming evidence that all of Redondo Mountain is a commons" and

heavily used by "a multitude of Tribes for centuries."  Response at 12.  The United States contends

that other Tribes used the Valles Caldera before Jemez Pueblo, and so Jemez Pueblo cannot claim

aboriginal title as the first user of Redondo Peak, nor can it meet its burden of showing exclusive

use when other "often-adverse" Tribes also used it.  Response at 12.  The United States also

questions whether Jemez Pueblo asserts a claim to just one shrine or to the entire peak; the United

States argues that, in the event Jemez Pueblo claims only one shrine, Jemez Pueblo has not

supported this proposition with any legal authority that "aboriginal title can be sliced so finely."

Response at 12-13.  It adds that ████████████████████████████████████████████

████████████████████████████████████████████████.  Response at 13 (citing DX-

SI-79).  ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████.  Response at 13.

498.    The United States counters Jemez Pueblo's suggestion that ████████████████

████████████████████████████████████  ████████████████████████

████████████████████████  Response at 13 (citing <u>Religious Freedom</u> at 45-46, 48-50).

The United States similarly dismisses Jemez Pueblo's claims of ████████████████████

████████████████████████  by asserting Zia Pueblo use.  <u>See</u> Response at 13 (citing Motion at 27;

<u>Religious Freedom</u> at 45-46, 48-50, 58; U.S. FOFs ¶¶ 34, 331, 368, 394, at 13, 90-91, 103, 109).

The United States characterizes Jemez Pueblo's attempt to purchase 200 acres on Redondo Peak

in 2000 as "an explicit admission to Congress that it lacked title to Redondo Peak" and Congress'

rejection of that offer as an independent basis for rejecting Jemez Pueblo's claims.  Response at

13-14.

> **b.    The United States Argues That Jemez Pueblo Was Not the Exclusive Aboriginal User of the Valles Caldera Through 2000.**

499.    The United States contends that Jemez Pueblo misstates and misapplies aboriginal

title law "in an effort to establish and then freeze aboriginal title," and does not meet its burden of

establishing exclusive use of even "a single parcel" of the Valles Caldera, because other adverse

Tribes used those lands before Jemez Pueblo, and have continued to use them since.  Response at

14.  The United States criticizes Jemez Pueblo's attempt to "reframe" its claim to aboriginal title arising from a "relevant period" as being "poorly-defined" and "legally unsound."  Response at 14.  It argues that this reframing attempts to "define away" other Tribes' use of the Valles Caldera before and after the "relevant period," which Jemez Pueblo defines as between the thirteenth century and the Spanish colonial period.  Response at 14 (citing Motion at 4-5).  The United States contends that Jemez Pueblo does not support its assertion that aboriginal title "can be frozen for over 300 years," particularly given that Jemez Pueblo was "unable to prevent adverse Tribes from traversing, gathering resources from, and worshipping" in the Valles Caldera during this period.  Response at 14-15.

500.    Next, the United States argues that, if true, Jemez Pueblo's assertion that aboriginal title can be lost only through abandonment, conquest, or Congressional extinguishment defeats Jemez Pueblo's claims.  See Response at 15 (citing Motion at 4).  In that case, Zia Pueblo and not Jemez Pueblo would have aboriginal title to the Valles Caldera -- including the four areas at issue -- because Zia Pueblo used them first and Jemez Pueblo has not proven that it conquered Zia Pueblo or any other Tribe.  See Response at 15 (citing Matthew J. Liebmann, From Landscapes of Meaning to Landscapes of Signification in the American Southwest, 82 American Antiquity 651 (2017), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX 154; Zia Interview at 2; Motion at 4-5).  In addition to Zia Pueblo's prior Valles Caldera use, the United States points to ceramic evidence of prior Tewa use.  See Response at 15.  The United States reiterates that "many often-adverse Tribes" used the areas at issue in the past several hundred years without permission from or being dominated by Jemez Pueblo and points to Spain's "decimation" of Jemez' Pueblo's population as further evidence of Jemez' inability to dominate other Tribes.  Response at 15.

501.     The United States suggests that Jemez Pueblo's attempts to prove it had title through 2000, when Jemez Pueblo argues Congress took title, are defeated by: (i) evidence of other Tribes' use of the specific areas in question before Jemez Pueblo's occupation; (ii) other Tribe's use of those areas between 1300 and 1700; and (iii) hostility from other Tribes towards Jemez Pueblo after 1700.  See Response at 16.  Specifically, the United States argues that the Jicarilla Apache Tribe, Navajo Nation, San Ildefonso Pueblo, Santa Clara Pueblo, and the Ute Tribe used the land at issue, and these Tribes "either could have or did dominate" Jemez Pueblo within the Valles Caldera at that time.  Response at 16.  The United States argues that, as a result of other Tribes' relative strength, Jemez Pueblo has not proven that it maintained aboriginal title through 2000.  See Response at 16.

> **c.     The United States Argues That Jemez Pueblo's Use of a Motion to Reconsider to Reframe Its Claim to Discrete Sub-areas of the Valles Caldera is Inappropriate.**

502.     The United States argues that Jemez Pueblo's use of a motion to reconsider under rule 59(e) of the Federal Rules of Civil Procedure is inappropriate, because rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."  Response at 17 (quoting Nelson v. City of Albuquerque, 921 F.3d 925, 929 (10th Cir. 2019)(citing Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008)).  The United States accuses Jemez Pueblo of performing an "about-face from its former position" of claiming title to the entire Valles Caldera National Preserve.  Response at 17.  It states that Jemez Pueblo is now erroneously arguing that there is insufficient evidence that other Tribes used the four sub-areas the Pueblo now claims in the Motion.  See Response at 17.

       **d.**     **The United States Argues That Jemez Pueblo Failed to Prove That the <u>Court Misapprehends the Facts or Made a Legal Error</u>.**

503.   The United States contends that the Court's Final Judgment "specifically addressed" whether Jemez Pueblo exclusively used the sub-areas in question.  Response at 17.  The United States argues that the Court's review should be narrow in focus and that, because both the United States and the Court spent significant time and resources "thoroughly litigating" this case, the Court should deny the motion in the interests of conserving future expenditure.  Response at 18 (citing <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 308 F.R.D. 410, 435 (D.N.M. 2015)(Browning, J.)).  To illustrate the litigation's thoroughness, the United States details the enormous amount of time and resources that the Court spent litigating the case, which included: two years of discovery; fifty-seven depositions; many motions, including a summary judgment; a twenty-one-day trial where thirty-one witnesses testified and 700 exhibits were admitted; hundreds of pages of post-trial filings; and the Court's 530-page Opinion.  <u>See</u> Response at 18.

504.   The United States asserts that the Court "examined and rejected" Jemez Pueblo's claim to exclusive use of Banco Bonito.  Response 18 n.19.  According to the United States, the Court found that at least Zia Pueblo also used Banco Bonito, the "Spanish concentrated Jemez 20 miles away in Walatowa," and Jemez Pueblo recognized Zia Pueblo's use of Banco Bonito "in common" with Jemez Pueblo.  Response at 18-19.  In addition, the United States notes that the Court determined that at least fifteen Tribes use Redondo Peak and the surrounding areas.  <u>See</u> Response at 19.  The United States contends that Jemez Pueblo has made the same arguments and presented the same evidence as it did at trial.  <u>See</u> Response at 19.  The United States also asserts that Jemez Pueblo did not notify the Court or other parties that it intended to assert aboriginal title to Banco Bonito and Redondo Mountain as discrete sub-areas.  <u>See</u> Response at 20.

### e.   The United States Argues that Rule 15(b) Precludes Jemez Pueblo's <u>Claims to Redondo Meadows and the Valle San Antonio</u>.

505.   The United States next argues that Jemez Pueblo is seeking judgment on claims that were neither pled nor tried.  <u>See</u> Response at 21.  It contends that the Court "cannot allow such post-trial maneuvering to undo the results of a full trial (following years of discovery)."  Response at 21.  They argue that rule 15 of the Federal Rules of Civil Procedure govern where evidence deviates from the pleadings, and that, under rule 15, the Court can only adjudicate unpled claims: (i) where the unpled issue was tried by the parties' express or implied consent; or (ii) upon a post-trial motion to conform the pleadings to the evidence.  <u>See</u> Response at 21.  The United States asserts that, because there is no post-trial pleading in this case, and because granting one would be highly prejudicial to the parties, Jemez Pueblo must argue that its aboriginal claims were tried by express or implied consent.  <u>See</u> Response at 21-22.  The United States asserts that Jemez Pueblo's claims to Banco Bonito and Redondo Peak were tried by consent, because they were the subject of Jemez Pueblo's summary judgment motion.  <u>See</u> Response at 22.  It argues that Jemez Pueblo's claims to Redondo Meadows and the Valle San Antonio were not tried by consent, and evidence related to these areas came up at trial only because they were relevant to Jemez Pueblo's claim to the entirety of Valles Caldera.  <u>See</u> Response at 22.

### f.   The United States Argues That the Court Should Strike Jemez Pueblo's <u>Exhibits for Exceeding Page Limits</u>.

506.   Finally, the United States argues that several of Jemez Pueblo's exhibits "evade Local Rule 7.5," because they "consist entirely of single-spaced text critiquing several of this Court's findings of fact."  Response at 23.  The United States says that these are not exhibits but are instead portions of Jemez Pueblo's brief, and were inserted as exhibits to reduce spacing and

to skirt the Court's spacing requirements.  <u>See</u> Response at 23.   Alternatively, the United States

says that the exhibits are unpersuasive.  <u>See</u> Response at 23-24.

### 5.     **The Reply**.

507.     In reply, Jemez Pueblo argues first that the United States has conceded arguments

to which the United States has not responded.  <u>See</u> Pueblo of Jemez's Reply in Support of its

Motion to Reconsider and Alter Final Decision at 7-9, filed November 22, 2019

(Doc. 433)("Reply").  Jemez Pueblo argues that the United States concedes by omission: (i) that

other Tribes' use must include actual, physical presence to affect Jemez Pueblo's aboriginal title

claim, <u>see</u> Reply at 7; (ii) that "the absence of specific evidence of use of an area by other tribes,

in the face of specific evidence of Jemez use, confirms Jemez's title to the specific area at issue,"

Reply at 8; (iii) that established aboriginal title can only be lost to other Tribes via conquest or

abandonment, <u>see</u> Reply at 8; and (iv) the legal requirements for "dominant use," Reply at 9.

Jemez Pueblo then addresses the United States' arguments.  <u>See</u> Reply at 9.

508.     Jemez Pueblo first addresses its Banco Bonito use.  <u>See</u> Reply at 9-13.  It argues

that, contrary to the United States' assertions, the Steffen Letter and the Rodriguez Letter show

that the Cochiti Pueblo "did not customarily use Banco Bonito and only did so when its ███████

███████████████████████████████."  Reply at 9 (citing Nov. 8 Tr. at 2724:16-

2726:15).  Next, Jemez Pueblo asserts that the United States' contention that it "'farmed the entire

Banco Bonito' is a mischaracterization" of its position, Reply at 10 (quoting Response at 14), and

also that the record reflects that several witnesses referred to Banco Bonito as Jemez', Reply at

10-11 (citing Steffen Rebuttal Report at 2-6; Nov. 14 Tr. at 3302:24-3306:9; Nov. 8 Tr. at 2374:11-

15; <u>id.</u> at 2393:2-3; <u>id.</u> at 2431:13-23; <u>id.</u> at 2484:16-18).  Jemez Pueblo also disputes that Zia

Pueblo used Banco Bonito, <u>see</u> Reply at 11-12,  and contests the United States' reliance on Dr.

Anschuetz for this point, because, "█████████████████████████████████

█████████████████████████████████████, Reply at 11 (citing Kurt Anschuetz, Ph.D.

Expert Rebuttal Report at 33-34 (March 21, 2018), admitted October 29, 2018, at trial as United

States' Ex. DX-SA ("Anschuetz Rebuttal Report"); Nov. 29 Tr. at 4651:1-5). Nor, Jemez Pueblo

argues, are any ██████████████████████████████████████████████████████████████

██████████████ Reply at 12 (citing Anschuetz Report at 170-72; Religious Freedom at 46, 49). Jemez

Pueblo argues that the United States' contention that the Jicarilla Apache used Banco Bonito is

unprovable, because the United States relies only on evidence that trees were "peeled," but

"archeologists cannot determine ethnic affiliation from a peeled tree and that it could be evidence

of Jemez Use." Reply at 12 (citing Oct. 31 Tr. at 663:4-12; Roney Depo.)). Finally, Jemez Pueblo

contends that the United States does not address evidence concerning Banco Bonito ceramics and

that Rory Gauthier suggests several times that "Jemez ceramics dominated Banco Bonito." Reply

at 13 (citing Gauthier Report at 8, 18; Nov. 8 Tr. at 2370:4-7; id. at 2372:1-10; id. at 2372:22-

2373:2; id. at 2391:17-20).

509.   Jemez Pueblo then turns to its claim to Redondo Meadows. See Reply at 13-14. It

argues that the Court and the United States have relied heavily on maps from past "geothermal

litigation" to refute Jemez Pueblo's claim. Reply at 13. Jemez Pueblo argues that these maps

"show that the site was situated on and near Redondo Creek, not in Redondo Meadows which is

west of the Creek." Reply at 13 (citing Geothermal Litigation Maps, filed November 22, 2019

(Doc. 433-1)). Moreover, Jemez Pueblo contends that the United States' "other citations are

irrelevant to Redondo Meadows." Reply at 14 (citing Response at 12-13; Valles Caldera National

Preserve Map; EZ-81-83; <u>Religious Freedom</u> at 50-52; <u>In re PNM Authorizations</u> at 100); Nov. 29 Tr. at 4644:5-4645:8).

510.    Jemez Pueblo next challenges the United States' arguments regarding the western Valle San Antonio.  <u>See</u> Reply at 14-16.  Jemez Pueblo argues that the United States' additional evidence to bolster the Court's findings are "conflicting, irrelevant, and ambiguous."  Reply at 14. As an example of "irrelevant" evidence, Jemez cites the United States' reliance on the Ellis Zia Map, the Gauthier Rebuttal Report at 16, and the Dec. 3 Tr. at 5112:24-5114:21.  Reply at 15.  As examples of conflicting or contradictory evidence, Jemez Pueblo argues that the Valles Caldera National Preserve Map contradicts the United States' arguments and Dr. Anschuetz' testimony -- which other record evidence contradicts.  <u>See</u> Reply at 14-15.  Jemez Pueblo argues that, "[g]iven that the Court used DX-OY,[47] a map marked by Mr. Whatley during his deposition, as evidence of Jemez exclusive use areas, the same weight should be given to DX-VG as evidence for Santa Clara's use area outside of the sub-areas."  Reply at 15.  Jemez Pueblo also challenges the United States' reliance on testimony of Dr. Terence Kehoe, because he admitted that he was not sure that the Santa Clara Pueblo used San Antonio Mountain, Rio San Antonio, or Valle San Antonio. Reply at 16 (citing Nov. 19 Tr. at 4131:10-4132:15).  Jemez Pueblo then argues that <u>Historic Routes</u>, contrary to the United States' argument, "contains no suggestion that Santa Clara traverses that area, nor does it suggest that Santa Clara has ever used any of the other 'historic and modern trails.'"  Reply at 16.  Jemez also argues that <u>Zia, Jemez, and Santa Ana Pueblos v. ICC</u>, "is also

---

[47]DX-OY is a Valles Caldera National Preserve map, dated Oct. 1, 2015, which the Court admitted at trial on November 2, 2018.

too ambiguous to support that Zia or Santa Ana used this area," because the geographic features mentioned in that cited transcript are not within the claim area.  Reply at 16.

511.    Jemez Pueblo then argues that the United States has not disproved Jemez Pueblo's claim to aboriginal title on discrete areas on Redondo Mountain.  See Reply at 16-18.  First, Jemez Pueblo contends that the "springs identified in Jemez's Motion are not the same springs discussed by Defendant."  Reply at 17.  It argues that Religious Freedom, on which the United States relied, misidentifies springs' locations and discusses different springs.  See Reply at 17.  The springs that Dr. Ellis mentions in Religious Freedom "are not addressed in Jemez's MTR."  Reply at 17.  As for its claim ████████████████████████, Jemez Pueblo contends that the United States "provides no supporting citation," Reply at 16, for its assertion that "many Tribes who traverse Banco Bonito and Redondo Peak . . . must cross ███████████████████" Response at 16. Jemez Pueblo argues that Jemez Pueblo is the only Tribe that knows of its location, and therefore "exclusive use is clear."  Reply at 17.  Finally, Jemez Pueblo argues that the United States' arguments concerning Congress' 2000 rejection of Jemez Pueblo's attempt to purchase 200 acres in the area, and its argument that Redondo Mountain is a "Commons" area "are irrelevant to whether there is evidence of other tribes using these areas."  Reply at 18.

512.    Jemez concludes its Reply by arguing that the Exhibits it attached to its Motion are properly before the Court.  See Reply at 18-19.  Jemez Pueblo states that "exhibits are a total of 16 pages, well within the 50-page limit, and no agreement was necessary before filing."  Reply at 19.  Jemez Pueblo adds that, to "the extent the Court agrees with Defendant concerning the additional text, not only is this issue not before the Court, but the Court should use its discretion

to accept the text as proper."  Reply at 19 (citing Chavez v. Bd. of Cty. Comm'rs of Sierra Cty.,

No. CIV 11-1008 JB/LAM, 2012 WL 2175776, at *6 (D.N.M. May 30, 2012)(Browning, J.)).

> **6.    The December 12, 2019, Hearing.**

513.    The Court held a hearing on the Motion on December 12, 2019.  See Clerk's

Minutes at 1, filed December 12, 2019 (Doc. 436).  The Court began the hearing by stating its

concern that a recent case from the United States Court of Appeals for the Tenth Circuit has altered

the standard for post-trial motions to reconsider.  See Hearing Transcript at 4:1-6:15, (taken Dec.

12, 2019), filed December 19, 2019 (Doc. 437)("Dec. 12 Tr.")(Court)(citing Nelson v. City of

Albuquerque, 921 F.3d 925 (10th Cir. 2019)).  Before it began its opening argument, Jemez Pueblo

stated that it would brief the issue for the Court.  See Dec. 12 Tr. at 7:6-9 (West).

514.    Jemez Pueblo argued that the Motion "is attempting to really narrow the scope on

this issue of whether the Court should have considered discrete sub-areas within the claim area."

Dec. 12 Tr. at 8:22-25 (West).  It argued that the United States Court of Federal Claims' opinion

in Alabama-Coushatta Tribe of Texas v. United States, No. 3-83, 2000 WL 1013532 (Fed. Cl. June

10, 2000), establishes that a claimant Tribe's nonexclusive use of one segment of the claim area is

not automatically imputed to the whole claim area.  See Dec. 12 Tr. at 9:3-22 (West).  It also cited

Sac & Fox Tribe of Indians of Oklahoma v. United States, 383 F.2d 991 (Ct. Cl. 1967), as it argued

that, "just because there is evidence of the non-claimant tribe's use in one area, it does not extend

into another area of the area claimed."  Dec. 12 Tr. at 9:25-10:2 (West).  Jemez Pueblo then stated

that it would discuss each specific sub-area for which it now asserts aboriginal title.  Dec. 12 Tr.

at 10:18-11:2 (West).

a.   **Argument Regarding Banco Bonito.**

515.   Jemez Pueblo stated that it wants the Court to review some of its Findings of Fact

and Conclusions of Law from Pueblo of Jemez v. United States, 430 F. Supp. 3d 943.  See Dec.

12 Tr. at 13:2-6 (West).  It noted that Conclusion of Law ¶¶ 406[48] and 435,[49] in combination with

------------------------------------

[48]In Conclusion of Law ¶ 406, the Court stated:

Jemez Pueblo showed at trial that it actually and continuously used and occupied the Valles Caldera for a long time in its traditional Indian ways.  Ancestral Jemez Pueblo members migrated to the Jemez Mountains in the 1200s and, between 1300 and 1700 C.E., built within the northern Rio Jemez watershed thirty-five villages and thousands of fieldhouses -- primarily for agricultural purposes -- approximately 100 of which were on the Banco Bonito in the Valles Caldera's southwest quadrant.  See supra FOFs ¶¶ 52, 64, 66, at 25, 36.  Ancestral Jemez people typically occupied their fieldhouses for at least ninety days during growing seasons, although they also used these fieldhouses to hunt game, to gather medicinal plants, to move about the landscape, and to demarcate territory.  See supra FOFs ¶¶ 67-68, at 36-37.  Moreover, Jemez peoples left distinctive Jemez Black-on-white pottery throughout the Valles Caldera, and harvested obsidian from the Valles Caldera's Cerro del Medio quarry.  See supra FOFs ¶¶ 82, 99, 107-109, at 47, 53, 57-58.  The Court therefore concludes that Jemez Pueblo showed at trial actual and continuous Valles Caldera use for a long time.

Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1207.

[49]In Conclusion of Law ¶ 435, the Court stated:

Jemez Pueblo works closely with Valles Caldera staff to facilitate its ability to actually and continuously use the Valles Caldera, and both the Valles Caldera Trust and the National Park Service have recognized Jemez Pueblo's continuous Redondo Peak use and have incorporated such use into their respective resource management practices.  See supra FOFs ¶ 474, at 216.  For example, Jemez Pueblo has made at least thirteen requests to access Redondo Peak for pilgrimages and other ceremonial activities, which Valles Caldera staff typically grant, and, when non-Indians request access to Redondo Peak, the National Park Service attempts to determine if the request will conflict with a scheduled Jemez Pueblo activity, and, should conflict exists, Valles Caldera staff requests that the non-Indian either choose another day or forego activity that might disturb Jemez Pueblo's Redondo Peak use.  See supra FOFs ¶¶ 475-77, at 217-19.  Moreover, on at least one occasion, Valles Caldera staff discussed having a Jemez Pueblo member accompany non-Indian researchers to Redondo Peak's summit.  See supra FOFs ¶

Finding of Fact ¶ 69[50] "show that Jemez had physical control and domination over this area in Banco Bonito," Dec. 12 Tr. at 14:23-24 (West), and that witnesses for the United States agreed with "that Banco Bonito should be associated with Jemez Pueblo," Dec. 12 Tr. at 14:25-15:1 (West). See id. at 15:2-16:7 (West)(citing Steffen Rebuttal Report; Kurt VCNP Land Use History at 28, 71. Jemez Pueblo argued that "the Court has not found that any other tribe occupied the Banco Bonito," Dec. 12 Tr. at 16:8-10 (West), and that evidence of other Tribal use in the surrounding area is not specific enough to defeat Jemez Pueblo's dominant use argument, see Dec. 12 Tr. at 16:8-17 (West).

516.    Jemez Pueblo then discussed the footnote 34 in Pueblo of Jemez v. United States, 430 F. Supp. 3d at 973 n.34, in which the Court rejected one of Jemez Pueblo's proposed findings. See Dec. 12 Tr. at 17:4-18 (West). Jemez Pueblo argued that the Court erred, and it disputed the evidence on which the Court relied in reaching its conclusion. See Dec. 12 Tr. at 17:11-18 (West). Jemez Pueblo stated that Dr. Liebmann's testimony does not support the United States' proposed Finding of Fact that Dr. Liebmann discovered Navajo Nation architecture in the Valles Caldera.

---

476, at 217-18.   The Valles Caldera Trust and the National Park Service have consulted with Jemez Pueblo regarding Jemez Pueblo's architectural and archaeological interests in the Banco Bonito, La Jara Creek, and Upper Jaramillo Creek, and, on at least one occasion, conducted a field visit with Jemez Pueblo to inspect proposed sites for a scientific device.   See supra FOFs ¶¶ 484, 514, at 221-22, 228-29.   Such consultations further evince to the Court Jemez Pueblo's sincere, longstanding relationship with the Valles Caldera.

Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1218.

[50]In Finding of Fact ¶ 69, the Court finds: "Jemez Pueblo occupied the 100 fieldhouses on the Banco Bonito throughout a 400-year period, most of which Jemez Pueblo occupied between 1500-1650 C.E."   Pueblo of Jemez v. United States, 430 F. Supp. 3d at 973.

See Dec. 12 Tr. at 18:23-19:10 (West).  Further, while one Los Alamos employee newsletter suggests that a local ranger manager found Navajo Nation hogans on a ridge bordering the Valle Toledo, "no expert archaeologist in this case -- and there were multiple of them, I believe four -- ever testified of finding architecture of a Navajo Hogan."  Dec. 12 Tr. at 19:17-20 (West).  Jemez Pueblo argued that even if an archaeologist had testified to finding Navajo Nation hogans in the Valle Toledo, the Valle Toledo is a great distance away from Banco Bonito.  See Dec. 12 Tr. at 19:20-20:4 (West).  Jemez also asserted that this evidence of Navajo Nation use also contradicts a Finding of Fact in the Memorandum Opinion and Order's footnote 84, which found that the Navajo Nation never built a permanent settlement within the Jemez Mountains.  See Dec. 12 Tr. at 20:4-13 (West)(citing Pueblo of Jemez v. United States 430 F. Supp. 3d at 996 n.84).   Given archeologist's extensive surveyance of Banco Bonito, Jemez Pueblo argued that "it's very unlikely there is any other architecture on Banco Bonito which would support another tribe's occupation or defeat the evidence showing Jemez dominant use of this area."  Dec. 12 Tr. at 21:17-20 (West).  Jemez Pueblo turned to Findings of Fact ¶¶ 72 and 73, and argued that, while the Court found that there were non-Jemez fieldhouses near Banco Bonito's clearing area, these fieldhouses were actually to the east and southeast.  See Dec. 12 Tr. at 21:21-22:10 (West)(citing Nov. 30 Tr. at 4725). Jemez Pueblo cited the Anschuetz Rebuttal Report in support.  See Dec. 12 Tr. at 22:11-23:4 (West).  It argued that the record shows that "there is no evidence of any other tribe occupying this area with any specificity."  Dec. 12 Tr. at 23:10-11 (West).

517.   Jemez Pueblo then addressed Banco Bonito ceramics.  See Dec. 12 Tr. at 23:15 (West).  Jemez Pueblo said that "[t]his is the one instance, I think, that we're a bit concerned that the Court's conclusion of law was a bit unclear from our reading of it, or a bit ambiguous."  Dec.

12 Tr. at 23:17-20 (West)(citing Conclusion of Law ¶ 442). Jemez Pueblo told the court that it found Conclusion of Law ¶ 442 unclear and contradictory, because "on one hand it appears to say that the [Jemez Pueblo] pottery dominated, but yet saying that there are substantial quantities of Tewa pottery." Dec. 12 Tr. at 24:2-5 (West). The Tribe then discussed Finding of Fact 86, on which this Conclusion of Law is based, and argued that its conclusions about ceramics do not support Conclusion of Law ¶ 442. See Dec. 12 Tr. at 24:11-25:1. Jemez Pueblo then asserted that Conclusions of Law ¶¶ 125 and 243 potentially represent admissions by the United States that "archaeologists associate most Banco Bonito sites with Jemez Pueblo ancestors." Dec. 12 Tr. at 25:11-13 (West). It also argued that the United States conceded that Jemez Pueblo ceramics dominate the Banco Bonito, and the Valles Caldera's southwest corner. See Dec. 12 Tr. at 25:15-26:5 (West). It stated that, even taking the United States' pottery expert at his word, Jemez Pueblo dominated the Banco Bonito. See Dec. 12 Tr. at 26:6-29:1 (West)(citing the Gauthier Report; Trial Tr. at 2370, 2372, 2393, 2431, 2484). Jemez Pueblo then argued that the Court should discredit the Gauthier Report's findings, because of its faulty methodology, see Dec. 12 Tr. at 29:2-31:19 (West)(citing Trial Tr. at 2391, 2432, 2433-34, 2439), and its failure to include prehistoric sites, see Dec. 12 Tr. at 31:20-32:5 (West)(citing Cultural Resources Surveys and Sites, Valles Caldera National Preserve Map (Sept. 30, 2018), admitted November 13, 2018, at trial as United States' Ex. DX-SE).

518.    Jemez Pueblo then discussed Banco Bonito trails. See Dec. 12 Tr. at 32:12-13 (West). It argued that, while it presented "specific and detailed evidence" of its own complex trail system, evidence of other Tribes' trails were "either nonexistent, lack[ed] specificity, or is speculation at best." Dec. 12 Tr. at 32:14 (West); id. at 32:18-19 (West). It noted that the Court's

Findings of Fact ¶¶ 433, 458, 465, 480, 481, and 495 were all specific findings about Jemez Pueblo's trail systems in the area.  See Dec. 12 Tr. at 32:22-34:15 (West).  It also noted that the Court made several general statements about Jemez Pueblo's trail systems.  See Dec. 12 Tr. at 34:16-35:22 (West)(citing Findings of Fact ¶¶ 59, 431, 463-64).  It stated that detailed evidence from multiple witnesses supported these general findings that far outstripped evidence supporting findings that other Tribes had trails in the area.  See Dec. 12 Tr. at 35:23-37:16 (West).  Jemez Pueblo noted that the United States' expert never testified that Zia Pueblo had a Banco Bonito trail.  See Dec. 12 Tr. at 38:7-39:2 (West).

519.  The United States then responded to Jemez Pueblo.  See Dec. 12 Tr. at 42:1 (Marinelli).  The United States began by stating its "view that there is an unbroken chain of Zia use up the west side of the Preserve, reaching from Banco Bonito to the northern part of the Preserve."  Dec. 12 Tr. at 42:5-8 (Marinelli).  It stated that it did not think that Jemez has proven that no one else knew about its trails.  See Dec. 12 at 44:2-16 (Marinelli).  It also asked that the court "flesh out its conclusion of fact so that it notes all of the places that numerous tribes visited throughout the Preserve's western area," Dec. 12 Tr. at 45:13-15 (Marinelli), especially because the United States "did not try to get the Court to enter findings of fact for every one of the thousands of facts in Dr. Ellis' work in the '80s."  Dec. 12 Tr. at 45:25-46:3 (Marinelli).  Other areas the United States asked the Court to add findings on include "farming in the neighborhood of the Valles Caldera southwestern corner," Dec. 12 Tr. at 48:11-13 (Marinelli), and "whether there were distinct routes for Zia to get up to the Valles Caldera," Dec. 12 Tr. at 65:12-13 (Marinelli).

520.  The United States then discussed Jemez Pueblo's Banco Bonito presentation.  See Dec. 12 Tr. at 47:4-9 (Marinelli).  It stated that it did not concede issues in closing arguments, see

Dec. 12 Tr. at 47:9-15 (Marinelli), and that Jemez Pueblo's fieldhouses "were neither permanent nor continuously occupied," Dec. 12 Tr. at 47:16-22 (Marinelli).  After clarifying Dr. Anschuetz' methodology, see Dec. 12 Tr. at 47:24-48:8, the United States discussed "predominance," Dec. 12 Tr. at 49:13 (Marinelli).  The United States argued that "it really doesn't matter if there's a lot of pottery on the Banco Bonito that is Jemez; it matters if Jemez was dominating Banco Bonito.  And as the Court previously held, they weren't."  Dec. 12 Tr. at 49:19-22 (Marinelli).  The United States also noted that the Court should be wary of making conclusions based on the sheer number of sherds, because one Jemez Pueblo vessel produced 49 sherds.  See Dec. 12 Tr. at 49:23-50:10 (Marinelli).  In rebuttal, Jemez Pueblo argued that Zia culture suggests that they have a spiritual tie to Banco Bonito, which is "different than an actual physical presence in the area."  Dec. 12 Tr. at 51:16-17 (West).

### b.    Argument Regarding Redondo Meadows.

521.    Jemez Pueblo then addressed its claims to Redondo Meadows.  See Dec. 12 Tr. at 52:3 (West).  Jemez Pueblo noted that "the Court did not find that any other tribe used Redondo Meadows," and that Findings of Fact ¶¶ 479, 480, and 481 demonstrate that Jemez Pueblo members use this area.  Dec. 12 Tr. at 53:5-6 (West); id. at 52:3-53:10 (West).  Instead, Jemez Pueblo argued, the record reflects that other Tribes had trails on the Valles Caldera's east side, but not on its west side.  See Dec. 12 Tr. at 53:5-54:1 (West).  The Pueblo also stated that ceramic evidence does not show evidence that other Tribes used the area.  See Dec. 12 Tr. at 54:1-56:4 (West).  Jemez Pueblo concluded that, "based on the case law, when there is no evidence of another tribe using Redondo Meadows, the Court must find Jemez exclusivity."  Tr. at Dec. 12 56:5-7 (West).

522.     The United States opposed Jemez Pueblo's arguments.  See Dec. 12 Tr. at 56:16

(Marinelli).  It argued that "many other tribes used the entire caldera to worship and as their

pharmacy and their grocery store."  Dec. 12 Tr. at 56:21-23 (Marinelli).  See id. at 56:23-57:8

(Marinelli).  The United States pointed to a map titled Jemez Places in the Valles Caldera --

Redondo Meadows, filed September 28, 2019 (Doc. 405-2), and said that

> this polygon illustrates several flaws with plaintiff's motion, which is plaintiff's
> effort to shift the way it refers to land at issue in a way that confuses proof of tribal
> use.  Two, plaintiff's inflation of minimal documented use of the Preserve land.
> And three, plaintiff's attempt to hold the United States to a much more demanding
> standard to prove that other tribes use the Preserve lands.

Dec. 12 Tr. at 58:15-22 (Marinelli).  The United States said that Jemez Pueblo has not clearly

defined what part or parts of Redondo Meadows it is claiming aboriginal title to, and this lack of

clarity "makes it impossible for them to carry their burden of proof."  Dec. 12 Tr. at 59:11-12

(Marinelli).  See id. at 58:23-59:10 (Marinelli).  The United States then presented the Valles

Caldera National Preserve Map.  See Dec. 12 Tr. at 59:12-60:13 (Marinelli).  It also presented a

new map from Dr. Steffen, although Jemez Pueblo clarified that the new map was not an exhibit.

See Dec. 12 Tr. at 60:21-61:6 (Court, West).

523.     The United States argued that the Valles Caldera geothermal area "clearly was used

by many tribes" and "encompassed some portion of the actual Redondo Meadows . . . and it

encompassed some portion of Plaintiff's expanded Redondo Meadows polygon."  Dec. 12 Tr. at

61:13-18 (Marinelli).  It stated that Jemez Pueblo "isn't seeking title to that geothermal area, and

that's fatal to its motion to reconsideration on this discrete point."  Dec. 12 Tr. at 61:19-22

(Marinelli).  It also cited DX-EU-213, which states that ███████████████████████████

███████████████████████████████████████████.  See Dec. 12 Tr. at 61:23-62:2 (Marinelli).

The United States then discussed PX-190, at 118, and argued that Jemez Pueblo's evidence does

not support a claim to the exhibits Place 50 and 51.  See Dec. 12 Tr. at 62:7-19.  It also disputed

the strength of evidence from Eusebio Toya.  See Dec. 12 Tr. at 62:20-63:6 (Marinelli).  According

to the United States, Jemez Pueblo was relying on "scant evidence," of its own use, Dec. 12 Tr. at

63:6 (Marinelli), "to recast this case to demand the United States meet a far higher burden of

proving that every square foot of the Preserve was touched by some other tribe."  Dec. 12 Tr. at

63:8-11 (Marinelli).

     524.    The United States then discussed Zia Pueblo use of Redondo Meadows.  See Dec.

12 Tr. at 63:14-64:10 (Marinelli)(citing Valles Caldera Religious Use at 83; Valles Caldera

National Preserve Map).  It argued that, contrary to Jemez Pueblo's suggestion, it would have

walked through Banco Bonito to reach its ███████████████████████████████████████

████  See Dec. 12 Tr. at 64:10-65:18.  Jemez Pueblo's interpretation of Dr. Anschuetz' map is

incorrect, the United States asserted, and Zia Pueblo is actually located south and west of Banco

Bonito and Redondo Meadows.  See Dec. 12 Tr. at 65:23-66:1.  The United States told the Court

that "███████████████████████████████████████████████████████████

██████████████████████████████████████  No other conclusion is

possible.  So Zia also had to cross Banco Bonito to get to the other places."  Dec. 12 Tr. at 66:10-

15 (Marinelli).  It made the same argument regarding Sulfur Springs.  See Dec. 12 Tr. at 67:1-12

(Marinelli).

     525.    The United States then used the Ellis Zia Map "to illustrate all the places that we

can place Zia."  Dec. 12 Tr. at 68:3-4 (West).  See id. at 69:24-70:8 (Marinelli)(discussing Zia

Pueblo religious use in Valles Caldera).  The United States stated that the record shows "Zia

polygons taking up the bulk of the Preserve's western area," Dec. 12 Tr. at 68:19-20 (Marinelli),

and that Zia Pueblo had to walk to these locations, Dec. 12 Tr. at 68:20-22 (Marinelli).  On the

issue of continuous use, the United States disputed footnote 3 in Jemez Pueblo's Reply, which

asserted that Zia Pueblo stopped using the Valles Caldera lands.  See Dec. 12 Tr. at 68:23-69:13

(Marinelli)(citing Finding of Fact ¶¶ 245, 246; PX-233-47).  The United States also clarified its

arguments regarding peeled trees and Jicarilla use of the Valles Caldera.  See Dec. 12 Tr. at 70:9-

71:18. (Marinelli).  Further, the United States argued that Finding of Fact ¶ 277 supports the

conclusion that other Tribes used the area west of Redondo Peak.  See Dec. 12 Tr. at 69:14-23

(Marinelli).  The United States then discussed Dr. Steffen's report on Banco Bonito fieldhouses,

and it noted that it confines fieldhouses to the Banco Bonito's western half, that since 1960, State

Route 4 goes directly through these fieldhouses and that many other tribal members have driven

this road over the years.  See Dec. 12 Tr. at 71:22-72:10 (Marinelli).  It noted further that

Dr. Steffen stated that "'[e]quating masonry structures with occupation suggests a poor

understanding of the archaeological record of the Valles Caldera.'"  Dec. 12 Tr. at 72:24-73:2

(quoting Steffen Rebuttal Report at 6).  Finally, the United States discussed Cochiti Pueblo

Governor Suina's testimony, which the United States argued revealed expansive Valles Caldera

use.  See Dec. 12 Tr. at 73:7-23 (citing Trial Transcript at 2721-23, 2747, 2769 (taken Nov. 9,

2018), filed January 25, 2019 (Doc. 351)).

526.     Jemez Pueblo then argued in rebuttal, and it stated that it had presented its proposed

findings of fact as "an attempt to group what we saw as areas of uses that could be best described

to the Court," and it continued to use the same areas for consistency reasons, not in an attempt to

present new evidence or new arguments. Tr. at Dec. 12 74:23-25.  See id. at 74:11-75:5 (West).

It argued that the Court had already concluded that this part of the Fogleman Report was

inadmissible, <u>see</u> Dec. 12 Tr. at 74:6-15 (West), but that even if the map was not speculative, it shows that Zia trails do not go through Banco Bonito or to Redondo Peak or Valle San Antonio, <u>see</u> Dec. 12 Tr. at 75:24-76:7 (West).  Jemez Pueblo argued that concluding that Zia had trails through Jemez villages is contrary to caselaw, and it is logical to assume that if a trail traverses occupied land, use of the trail is permissive.  <u>See</u> Dec. 12 Tr. at 76:14-25 (West).

527.    Jemez Pueblo discussed Cochiti Pueblo use in the Valles Caldera and argued that the evidence does not show that its use of the Banco Bonito was traditional.  <u>See</u> Dec. 12 Tr. at 77:1-13 (West).  Jemez Pueblo argued that trial testimony instead reveals that Cochiti Pueblo does not customarily use the Valles Caldera.  <u>See</u> Dec. 12 Tr. at 77:14-78:14 (West).  It also asserted that, contrary to the United States' argument, trial testimony reveals that experts could not determine which Tribe had peeled specific trees, <u>see</u> Dec. 12 Tr. at 78:15-81:6 (West), and that Santa Clara Pueblo territory does not include any of the discrete areas to which Jemez Pueblo now seeks title, <u>see</u> Dec. 12 Tr. at 81:7-22 (West).  Last, Jemez Pueblo stated that Valle San Antonio is not within the geothermal study area, and it is not seeking title to the hot spring areas which the United States discussed earlier.  <u>See</u> Dec. 12 Tr. at 81:23-82:19 (West).

528.    The United States noted, in response, that the evidence of Santa Clara Pueblo's use on which Jemez Pueblo relies is solely the Santa Clara Pueblo governor's personal use of the Valles Caldera, and he also testified that the Santa Clara Pueblo used the Valles Caldera's entirety. <u>See</u> Dec. 12 Tr. at 94:17-95:14 (Marinelli); <u>id.</u> at 95:8-10 (Marinelli)("Santa Clara used the Preserve for many purposes, to defeat the entirety of plaintiff's motion for reconsideration.").  It also cited the <u>Ethnographic Assessment</u> at 37756-57, which placed Redondo Peak and the Valles Caldera in Santa Clara Pueblo's territory, <u>see</u> Dec. 12 Tr. at 95:5-96:5 (Marinelli), and it noted that

Dr. Anschuetz' report showed that Santa Clara Pueblo members have used the Valles Caldera's western portion, <u>see</u> Dec. 12 Tr. at 96:9-17 (Marinelli).  The United States contended that Santa Clara Pueblo "considers the entire Preserve to be its grocery store, its pharmacy, and its cultural sanctuary," and is reluctant to provide more specifics than are illustrated in the Valles Caldera National Preserve Map.  Dec. 12 Tr. at 100:18-24 (Marinelli).

529.    The United States also stated that it is not adopting Dr. Fogleman's maps.  <u>See</u> Dec. 12 Tr. at 92:22-93:5 (Marinelli).  It stated that Jemez Pueblo started abandoning Banco Bonito in 1500 and has not occupied Nanishagi or Unshagi since the early 1600s.  <u>See</u> Dec. 12 Tr. at 93:6-13 (Marinelli). The United States then contended that Jemez Pueblo is arguing that Zia Pueblo would not walk through Banco Bonito or Redondo Meadows to get to ███████████████████

████████████████████████████████████████████████████████████████

███.  <u>See</u> Dec. 12 Tr. at 93:17-94:7 (Marinelli).  Instead, the United States asserted that "the only reasonable conclusion is that Zia regularly walked through Banco Bonito" to get to Valles Caldera's western side.  Dec. 12 Tr. at 94:12-14 (Marinelli).

**c.    <u>Argument Regarding Valle San Antonio.</u>**

530.    Jemez Pueblo next moved to its argument regarding its claim to Valle San Antonio. <u>See</u> Dec. 12 Tr. at 82:20-24 (West).  Jemez Pueblo discussed the Courts' Findings of Fact regarding the Valle San Antonio, <u>see</u> Dec. 12 Tr. at 82:25-84:2 (West), and stated that "we do not see findings as to any non-Jemez use in the western two-thirds of the Valle San Antonio," Dec. 12 Tr. at 84:24-25 (West).  It argued that the evidence on which the United States relies, Gauthier's Report, was flawed, because Gauthier could not identify Jemez pottery produced after 1680, <u>see</u>

Dec. 12 Tr. at 85:18-86:13 (West), and there was insufficient evidence overall of other Pueblo pottery to establish non-Jemez use, see Dec. 12 Tr. at 86:14-88:7 (West).

531.    The United States also asserted that Santa Clara Pueblo used the Valle San Antonio. See Dec. 12 Tr. at 100:25-101:11 (Marinelli).  It notes that page three of Historic Routes shows that Indios Creek is the limit of Santa Clara Pueblo's territory and that Indios Creek is on the Valles Caldera's northern border.  See Dec. 12 Tr. at 100:25-101:11 (Marinelli).  The United States contends that several witnesses establish that Santa Clara Pueblo has used the trail leading up Santa Clara Creek through the Valle San Antonio.  See Dec. 12 Tr. at 101:12-16 (Marinelli).

532.    It also contends that Jemez Pueblo testimony establishes that the Navajo Nation has used the Valle San Antonio and that their use did not demonstrate Jemez dominance.  See Dec. 12 Tr. at 101:22 (Marinelli).  The United States also argued that the Navajo Nation used Redondo Peak as well and that Findings of Fact ¶¶ 166 and 167, as well as page 44 of High Altitude Adaptations,  discuss this use and "is at least as strong as the Eagle Society evidence that Jemez relies on."  Dec. 12 Tr. at 102:10-12 (Marinelli).

### d.    Argument Regarding Redondo Peak.

533.    Jemez Pueblo then turned to its argument concerning its claim to Redondo Peak. See Dec. 12 Tr. at 88:8 (West).  It discussed the Court's Findings of Fact concerning ████████ ████████ and noted that the Court did not find that ██████████████ .  See Dec. 12 Tr. at 88:11-90:24 (West).  Jemez Pueblo then turned to trails in the area and discussed Findings of Fact ¶¶ 433, 464, and 466-68.  See Dec. 12 Tr. at 90:25-91:25 (West).  It argued that the expert reports on which the United States relies -- including Dr. Fogleman's maps and Dr. Anschuetz'

reports -- are hypothetical and that multiple witnesses contradict them. See Dec. 12 Tr. at 92:1-18 (West).

534.     The United States first made a general point in response, arguing that, based on the timeframe, it is difficult for Jemez Pueblo to establish title to any land in the Valles Caldera. See Dec. 12 Tr. at 102:21-104:2 (Marinelli). It notes that the Court found that Jemez Pueblo has not established that it conquered Zia Pueblo when Jemez Pueblo arrived in the Valles Caldera. See Dec. 12 Tr. at 103:1-5 (Marinelli). The United States argues that the evidence instead shows that several other Tribes made the Valles Caldera dangerous for Jemez Pueblo and that they used this land adversely. See Dec. 12 Tr. at 103:16-104:3 (Marinelli).

535.     Next, the United States argued that Jemez Pueblo has not established that the ███████████████████████████████████ for a particular time period. See Dec. 12 Tr. at 104:4-11 (Marinelli). It notes that its own proposed findings of fact included a finding that the ███ ██████████████████████████████ ██████████████████. See Dec. 12 Tr. at 104:6-11 (Marinelli). The United States asserted that, because fifteen Tribes have worshipped on Redondo Peak for centuries, and because they all had to drink from creeks, Jemez Pueblo cannot establish title to any particular creek on the mountain. See Dec. 12 Tr. at 104:12-105:6 (Marinelli). All of this, the United States said, suggests that "the only possible conclusion here is that multiple pueblos and tribes traversed the entire Preserve, including the specific areas at issue," Dec. 12 Tr. at 105:7-9 (Marinelli), and that "much of the discussion today just reinforces the inappropriateness of reconsidering the Court's opinion," Dec. 12 Tr. at 105:18-20 (Marinelli).

e.      **Legal Argument.**

536.    The United States next discussed legal issues surrounding the Motion.  See Dec. 12 Tr. at 106:7 (Dykema).  It stated that the United States was doing its best to handle "trial by ambush," because Jemez Pueblo had asserted several claims that were not in the Complaint, were not part of discovery, and were not discussed at trial.  Dec. 12 Tr. at 106:12 (Dykema).  Such claims, the United States argued, are inappropriate for rule 59(e) motions.  See Dec. 12 Tr. at 106:15-18 (Dykema).  The United States asserted that no case or law supports Jemez Pueblo's attempt to assert title to portions of a claim area after arguing and losing its claim to the whole claim area.  See Dec. 12 Tr. at 107:2-12 (Dykema).  The United States then addressed the four cases that Jemez Pueblo uses to support contentions that it may assert title to less than the whole tract to which it initially claimed title.  See Dec. 12 Tr. at 107:13-21 (Dykema).

537.    The United States noted that, in Alabama-Coushatta Tribe of Texas v. United States, the Tribe revised downward its requested claim area after trial in its proposed findings of fact after realizing that it failed to prove exclusive use to twenty-nine percent of the claim area. See Dec. 12 Tr. at 108:1-15 (Dykema).  According to the United States, Jemez Pueblos' attempt to show that the United States did not prove competing usage is "not even close" to this case.  Dec. 12 Tr. at 109:3 (Dykema).  It argued that Wichita Indian Tribe v. United States, 696 F.2d 1378, 1381 (Fed. Cir. 1983), also does not justify Jemez Pueblo's Motion, because that case merely concerned a Court of Appeals' reversal of a district court's application of the wrong standard for permissive usage.  See Dec. 12 Tr. at 109:14-110:8 (Dykema).  Sac & Fox Tribe of Indians of Oklahoma v. United States is also unhelpful to Jemez Pueblo, the United States said, because it concerned a determination that the Tribe had proven aboriginal title to eighty-three percent of a total claim which was all contiguous.  See Dec. 12 Tr. at 110:9-20 (Dykema).  According to the

United States, that sort of claim, for 27.8 million contiguous acres, was "nothing at all like what has been presented here."  Dec. 12 Tr. at 110:23 (Dykema).  Similarly, the United States argued that Strong v. United States, 518 F.2d 556 (Ct. Cl. 1975), also did not justify Jemez Pueblo's Motion, because the Court in that case granted a smaller portion of the claimed area, but it was still "substantial tracts of land, contiguous tracts of land, nothing like the little slivers that the plaintiffs are trying to grab here."  Dec. 12 Tr. at 111:18-20 (Dykema).

538.   The United States then disputed that they had conceded anything at trial or in briefing regarding Jemez Pueblo's ability to assert title to smaller parts of the original claim area.  See Dec. 12 Tr. at 112:9-14 (Dykema).  It asserted that it only conceded that, "[t]o the extent [Jemez Pueblo] raised specific issues, specific areas, sub-areas, in their motion for summary judgment before trial, Tenth Circuit precedent suggests that that is in play."  Dec. 12 Tr. at 112:17-20 (Dykema).  The United States reiterated that Jemez Pueblo had put the Court and all parties on notice about its claims to Redondo Peak and Banco Bonito during and leading up to trial, but it had not notified the Court and parties with any other areas to which Jemez Pueblo is now asserting title.  See Dec. 12 Tr. at 112:15-113:7 (Dykema).  Considering these areas at this stage, the United States asserted, would be the "epitome of prejudice."  Dec. 12 Tr. at 113:9 (Dykema).  The United States argued that rule 15 is the proper mechanism for bringing in new claims, see Dec. 12 Tr. at 113:10-14 (Dykema), but that it is inappropriate where, as here, the plaintiff is attempting to "salvage a lost case by untimely suggestion of new theories of recovery," Dec. 12 Tr. at 113:17-18 (Dykema).

539.   The United States closed its argument by addressing a few loose issues.  See Dec. 12 Tr. at 113:20-22 (Dykema).  It argued that, contrary to Jemez Pueblo's earlier argument, it had

proven that other Pueblos and Tribes used Redondo Peak, and did not regard it as only spiritually significant.  See Dec. 12 Tr. at 113:22-114:17 (Dykema).  It then distinguished Zuni Tribe of New Mexico v. United States, 12 Ct. Cl. 607 (1987), which had concluded that absence of evidence showing other Tribes' use or presence establishes a Tribe's dominance.  See Dec. 12 Tr. at 114:18-115:10 (Dykema).  It argued that Zuni Tribe of New Mexico v. United States does not apply here, because "[t]here is plenty of evidence of other usage."  Dec. 12 Tr. at 115:12-13 (Dykema).  In some cases there is not plenty of evidence of other usage, the United States conceded, but that scarcity was because certain areas were not at issue in the trial.  See Dec. 12 Tr. at 115:13-19 (Dykema).  In addition, the United States made two additional points regarding lack of evidence about other Tribes' Valles Caldera use: (i) the Court found repeatedly that several Tribes used the entire Valles Caldera; and (ii) those Tribes repeatedly told the Court that they did not want to say where they went and what they did in order to keep sacred traditions secret.  See Dec. 12 Tr. at 115:20-116:10 (Dykema).  After discussion between the parties and the Court, the parties agreed to end argument for the day, file a Joint Status Report in January, 2020, and reconvene shortly afterwards to figure out a time to continue.  See Dec. 12 Tr. at 116:11-120:2 (Court, Dykema, Luebben Marinelli, West).

### 7.    The Joint Status Report.

540.    The parties filed their Joint Status Report on January 10, 2020.  See Joint Status Report, filed January 10, 2020 (Doc. 439)("JSR").  The parties state that neither of them wish to reopen the trial to offer more evidence and that any future hearing would be telephonic.  See JSR at 1.  Beyond that agreement, the parties disagree how to continue the hearing, and each provides its own position.  See JSR at 2-7.

541.    Jemez Pueblo requests an additional sixty minutes to present rebuttal argument.

See JSR at 2.  In addition, Jemez Pueblo states that it is reasonable for the Court to request revised or additional findings of fact and conclusions of law regarding the claims that the Motion raises. See JSR at 3.  This task Jemez Pueblo proposes to accomplish "through redlining, showing proposed modifications to existing findings and conclusions, additional proposed findings or conclusions and/or suggested deletions."  JSR at 3.  This proposal would not lead to "endless revisions," JSR at 3, but would, according to Jemez Pueblo, give each party the chance to raise facts that the Court may not have considered about each discrete claim's geography, see JSR at 3-4.  Jemez Pueblo argues against a low limit of new findings of fact and conclusions of law, asserting that it may propose up to forty new findings of fact and ten new conclusions of law.  See JSR at 4.  If the Court allows its request, Jemez Pueblo says that it will not seek any more additional briefing.  See JSR at 4.

542.   The United States does not seek any additional argument, because it says that Jemez Pueblo already exceeded what it originally requested for argument, fully concluded its factual rebuttal, requested at first just five more minutes to rebut legal argument, and because Jemez Pueblo's request "highlights the never-ending and repetitive nature of its litigation efforts by seeking a third bite at arguments it made or could have made both at the May 7, 2019 closing argument and the December 12, 2019 reconsideration argument."  JSR at 3.  As for how to proceed after the hearing on the Motion, the United States asserts that redlining the Court's opinion in Pueblo of Jemez v. United States is "inappropriate, an undue imposition on the Court's resources, and an invitation to endless litigation."  JSR at 4.  The United States contends that such an opportunity would potentially require the Court to review a substantial number of new facts and waste its resources.  See JSR at 5 (citing Anderson Living Tr. v. WPX Energy Prod., LLC, 308

F.R.D. at 435).  The United States suggests, if the Court permits additional filings, a limit of ten

new proposed facts and no more than seven total pages on the issues that the briefing raises.  See

JSR at 6.  Jemez Pueblo, the United States argues, seeks "nothing less than to plunge the Court

and the parties into the morass of endlessly rewriting the Court's opinion."  JSR at 6.  The United

States argues that, given the process Jemez Pueblo already received, the Court should not allow it

any more than the fifty pages of briefing Jemez Pueblo has already filed on the Motion.  See JSR

at 6.

### 8.    The Jemez Pueblo Supplemental Brief.

543.    In response to the Court's comments at the December 12, 2019, Hearing, Jemez

Pueblo filed a supplemental brief on the Tenth Circuit's standard for motions to reconsider in

Nelson v. City of Albuquerque's wake.  See Pueblo of Jemez's Supplemental Memorandum

Regarding Standard For Motions to Reconsider Filed in Support of Jemez Pueblo's Motion to

Reconsider and Alter Final Decision, filed January 17, 2020 (Doc. 442)("Jemez Pueblo

Supplemental Brief").  In the Jemez Pueblo Supplemental Brief, Jemez Pueblo states that the

Court's initial observation that Nelson v. City of Albuquerque is distinct from this case is correct.

See Jemez Pueblo Supplemental Brief at 1.  It cites the concurrence of the Honorable Robert

Bacharach, United States Circuit Judge for the Tenth Circuit, in support of the denial of rehearing

en banc, in which Judge Bacharach states that the panel in Nelson v. City of Albuquerque "'didn't

scuttle the use of Rule 59(e) or upend our jurisprudence on post-judgment motions.'"  Jemez

Pueblo Supplemental Brief at 1 (quoting Nelson v. City of Albuquerque, 925 F.3d at 1198).  Jemez

Pueblo notes that the Honorable Harris Hartz, United States Circuit Judge for the Tenth Circuit, in

dissenting from the denial of en banc consideration, "focuses primarily on the great latitude that

district court judges have under Rule 59(e) to alter their original judgment."  Jemez Pueblo

Supplemental Brief at 1-2 (citing Nelson v. City of Albuquerque, 925 F.3d at 1188-89, 1190,

1192).  Jemez Pueblo also notes that secondary sources examining Nelson v. City of Albuquerque

cite to only its conclusions that filing a second rule 59(e) motion is prohibited.  See Jemez Pueblo

Supplemental Brief at 2-3 (citing 11 Fed. Prac. & Proc. Supplemental Service § 2810.1 Grounds

for Amendment or Alteration of Judgment; Motion to Alter or Amend Judgment (FRCP 59(e));

Rutter Group Prac. Guide Fed. Civ. Trials & Evid. Ch. 20-C at 20:271.3).

544.    Jemez Pueblo further argues that Judge Hartz' concerns about the panel decision in

Nelson v. City of Albuquerque have not played out, because subsequent district court cases have

suggested that the panel opinion did not create a new standard.  See Jemez Pueblo Supplemental

Brief at 3 (citing CNSP, Inc. v. U.S. Forest Serv., No. CIV 17-0814 PJK\KK, 2019 WL 2503199,

at *2 (D.N.M. June 17, 2019)(Kelly, J.); Carlile v. Reliance Std. Ins. Co., No. 2:17-cv-1049, 2019

WL 3860609 (D. Utah July 25, 2019)(Shelby, C.J.)).  It argues that, even "if district courts apply

the constrained interpretation of the Nelson opinion feared by Judge Hartz," parties can still file a

first rule 60 motion rather than a second 59(e) motion.  Jemez Pueblo Supplemental Brief at 4.

Therefore, Jemez Pueblo asserts that, even if the Court concludes that the Nelson v. City of

Albuquerque changed the standard for 59(e) motions, Jemez Pueblo could simply refile its Motion

under rule 59(e).  See Jemez Pueblo Supplemental Brief at 4.  It notes that the panel decision in

Nelson v. City of Albuquerque did not address this issue.  See Jemez Pueblo Supplemental Brief

at 4-5 (citing Nelson v. City of Albuquerque, 921 F.3d at 921).

545.    Next, Jemez Pueblo discusses Banister v. Davis, 140 S. Ct. 1698 (2020), the

Supreme Court of the United States of America case on subsequent rule 59 (e) motions.  See Jemez

Pueblo Supplemental Brief at 5.  Jemez Pueblo states that the Supreme Court limited its grant of

- 94 -

review to the question "[w]hether and under what circumstances a timely Rule 59(e) motion should be recharacterized as a second or successive habeas petition under Gonzalez v. Crosby, 545 U.S. 524 (2005)." Jemez Pueblo Supplemental Brief at 5.

546.    Jemez Pueblo notes that Nelson v. City of Albuquerque "did not address, dispute, or reverse this Court's more basic underlying ruling" that confirmed the rule 59(e) standard. See Jemez Pueblo Supplemental Brief at 6 (citing Nelson v. City of Albuquerque, 283 F. Supp. 3d at 1099 ("There is no sound reason for a district judge to be unable to change a ruling he or she has made if he or she has become concerned that he or she is wrong.")). It asserts that the Court has no reason to change its usual approach to motions to reconsider. See Jemez Pueblo Supplemental Brief at 6. Under this standard, Jemez Pueblo argues that the Court should alter or amend its findings to confirm that Jemez Pueblo established aboriginal title to the four discrete sub-areas it raises in the Motion. See Jemez Pueblo Supplemental Brief at 6-7.

**9.    The U.S. Supplemental Brief.**

547.    The United States also provides a supplemental brief on the issues that the Tenth Circuit's opinion in Nelson v. City of Albuquerque raises. See United States' Supplemental Brief Regarding Nelson v. City of Albuquerque, filed January 17, 2020 (Doc. 443)("U.S. Supplemental Brief"). The United States asserts that Nelson v. City of Albuquerque does not prevent the Court from amending its judgment after trial. See U.S. Supplemental Brief at 1. It argues, however, that Nelson v. City of Albuquerque "highlights that certain motions to amend judgment are improper, and that dissatisfied parties may not abuse the process afforded to them by Rule 59." U.S. Supplemental Brief at 1. Accordingly, the United States argues that Jemez Pueblo cannot "reinvent its case and revisit issues already thoroughly addressed." U.S. Supplemental Brief at 1.

548.    The United States argues that the Court should not allow Jemez Pueblo to replead

its case through a rule 59(e) motion.  <u>See</u> U.S. Supplemental Brief at 2.  It asserts that Jemez Pueblo's Motion pursues the "the exact opposite" strategy as its trial strategy.  <u>See</u> U.S. Supplemental Brief at 3.  The United States contends that, because Jemez Pueblo could have raised these discrete areas in prior briefing, it may not now assert title to these areas in the Motion.  <u>See</u> U.S. Supplemental Brief at 4 (citing <u>Nelson v. City of Albuquerque</u>, 921 F.3d at 929).  It argues that "it would be error for the Court, after extensive discovery, trial, and post-trial briefing, to permit Plaintiff to reinvent and replead its case."  U.S. Supplemental Brief at 4.

550. 549.    The United States also argues that <u>Nelson v. City of Albuquerque</u> "highlights that a court's review of a Rule 59(e) motion should be confined to the motion for reconsideration briefs."  U.S. Supplemental Brief at 5.  It asserts that, while courts may correct clear error, parties may not file new proposed facts and conclusions of law, or redline the Court's opinion.  <u>See</u> U.S. Supplemental Brief at 6.  The United States argues that this re-examination "far exceeds the discrete review of clearly-specified errors envisioned by either the trial or appellate" courts in <u>Nelson v. City of Albuquerque</u>.  U.S. Supplemental Brief at 7.  It asserts that <u>Nelson v. City of Albuquerque</u> "stands for the proposition that a Rule 59(e) motion is not a vehicle for endless, wholesale revision of unsuccessful post-trial briefs" and requests that the Court deny Jemez Pueblo's motion.  U.S. Supplemental Brief at 7.

**10.    <u>The January 28, 2020, Hearing</u>.**

550.    The parties appeared before the Court on January 28, 2020.  <u>See</u> Clerk's Minutes at 1, filed January 28, 2020 (Doc. 444).  The Court addressed the JSR and gave its thoughts on it.  <u>See</u> Transcript of January 28, 2020 Hearing at 3:12, filed March 23, 2020 (Doc. 452)("Jan. 20 Tr.")(Court).  The Court stated that, if Jemez wants an additional hour to argue, it is inclined to give it, despite the United States' opposition.  <u>See</u> Jan. 20 Tr. at 3:12-21 (Court).  The Court stated

that it is not opposed to reconsidering and altering the findings of fact and that rule 52(b) of the Federal Rules of Civil Procedure appears to give it the authority to accomplish these revisions. See Jan. 20 Tr. at 3:22-5:7 (Court).  The Court stated that it is "not going to say no to [redlining its Memorandum Opinion and Order]" but is "not excited about it," Jan 20. Tr. at 5:21-22 (Court), and it is more receptive to making additional findings and conclusions, see Jan. 20 Tr. at 5:8-6:9 (Court).  Last, the Court stated that it was comfortable with Jemez Pueblo's proposed forty additional findings and ten additional conclusions of law.  See Jan. 20 Tr. at 6:16-24 (Court).

551.    Jemez Pueblo briefly responded.  See Jan. 20 Tr. at 7:4 (West).  It stated that it would offer additional findings, and it did not think there were many findings of fact it would seek to revise.  See Jan. 20 Tr. at 7:4-23 (West).  It said that proposing additional findings of fact within thirty days is acceptable and reiterated that it could stick to forty new findings of fact and ten new conclusions of law.  See Jan. 20 Tr. at 8:14-17 (West).

552.    The United States argued that Jemez Pueblo had received enough process on the Motion already and offered to provide the Court what it saw as the consequence of the Court's choice of providing more argument and briefing on the issue.  See Jan. 20 Tr. at 8:20-9:3 (Marinelli).  The Court then explained its rationale behind its decision, stating that a full hearing on the issue is more likely to finally resolve the district court's involvement in the case when it reaches the Tenth Circuit.  See Jan. 20 Tr. at 9:4 -10:18 (Court).  The United States noted that it understood the Court's argument, and it then addressed its "continuing objection" to Jemez Pueblo's litigation decision to assert title to specific areas of the Valles Caldera after discovery and trial.  Jan. 20 Tr. at 11:6 (Marinelli); id. at 10:19-11:25 (Marinelli).  The United States then noted for the Court that allowing forty additional facts would mean an extra twenty-five pages of

briefing, suggesting that Jemez Pueblo's Motion is neither discrete nor targeted.  See Jan. 20 Tr. at 12:1-17 (Marinelli).  It stated that, if Jemez Pueblo could not prove its case in the fifty pages of briefing it had already submitted, it never could prove its case.  See Jan. 20 Tr. at 12:18-13:2 (Marinelli).  The United States then requested an opportunity to respond to any additional briefing the Jemez Pueblo submits.  See Jan. 20 Tr. at 13:3-21 (Marinelli).  The United States also objected to allowing Jemez Pueblo to reopen debate on factual issues, as it had already concluded these issues at the first hearing on the Motion.  See Jan. 20 Tr. at 13:22-14:5 (Marinelli).  Finally, the United States requested clarification first that it would have time to rebut Jemez Pueblo's arguments, because it had to give an abbreviated legal argument at the least hearing, and second that the hearing was merely a status conference rather than an argument.  See Jan. 20 Tr. at 14:23-15:10 (Marinelli).  The United States stated that its preference was to argue another day.  See Jan. 20 Tr. at 16:13-22 (Marinelli).  Jemez Pueblo also stated that it preferred to argue another day. See Jan. 20 Tr. at 17:6-12 (West).  The parties then agreed to submit proposed findings of fact and conclusions of law on March 20, 2020, and responses on April 20, 2020.  See Jan 20 Tr. at 20:22-24 (Court); id. at 22:12-14 (Court).

**11.     The February 18, 2020, Hearing.**

553.     The Court continued argument on the Motion on February 18, 2020.  See Clerk's Minutes at 1, filed February 18, 2020 (Doc. 449).  Jemez Pueblo spoke first.  See Transcript of February 28, 2020 Hearing at 5:16, filed March 23, 2020 (Doc. 453)("Feb. 18 Tr.")(West).  It argued that the United States has not demonstrated any other Tribe used the Valles Caldera areas to which it seeks title and that it has used inapplicable or irrelevant evidence to support its arguments.  See Feb. 18 Tr. at 5:16-20 (West).  It first contended that maps prepared for the geothermal litigation show that the areas to which it claims title are not within the geothermal

project area.  See Feb. 18 Tr. at 6:19-7:17 (West)(citing Report for Jemez Preserve Claim (dated Oct. 13, 2017), admitted October 31, 2018, at trial as United States' Ex. DX-UE; Final Environmental Impact Statement – Proposed Ojo Line Extension, at 12 (Aug. 15, 1986), admitted October 29, 2018, at trial as United States' Ex. DX-FX).  Then Jemez Pueblo disputed the United States' reliance on the Ellis Zia Map, a map that Dr. Ellis created showing Zia Pueblo religious society use of the Valles Caldera.  See Feb. 18 Tr. at 7:18-8:11 (West)(citing R. Hughes and F. Ellis, A Prelim. Rep. on the Impacts of Geothermal Power Development in the Valles Caldera of New Mexico on the Religious Practices and Beliefs of the Pueblo Indians (Aug. 18, 1980) admitted at trial as United States' Ex. DX-EV).  It argued that the map does not prove specific use, but only proves that Zia Pueblo holds these areas sacred.  See Feb. 18 Tr. at 8:12-20 (West).  Although Jemez Pueblo conceded that the report of Dr. Anschuetz shows Zia Pueblo use in the Valle San Antonio, it argued that the underlying data on which the map is based does not show any evidence that Zia Pueblo used the valley.  See Feb. 18 Tr. at 8:21-9:13 (West)(citing Anschuetz Report at 171).

554.   Jemez Pueblo next argued that the United States had shown no evidence of any Zia Pueblo trails on the Valles Caldera's eastern side.  See Feb. 18 Tr. at 9:14-10:2 (West).  It reminded the Court that it had questioned Dr. Fogleman's report's likely trail placement conclusions.  See Feb. 18 Tr. at 10:3-11:5 (West).  Jemez Pueblo argued that the Court should reconsider its position if it believes that "any inferences or judicial notice" is inconsistent.  Feb. 18 Tr. at 11:13:14 (West). It noted that the rebuttal to Dr. Fogleman's testimony does not show any other Tribes' trails traversing Banco Bonito.  See Feb. 18 Tr. at 11:23-12:17 (West)(citing the Anschuetz Rebuttal Report at 33-35).

555.     Regarding the Valle San Antonio, Jemez Pueblo argued that the Valles Caldera National Preserve Map does not demonstrate that Santa Clara Pueblo used the areas to which Jemez Pueblo now assert aboriginal title.  See Feb. 18 Tr. at 12:18-13:3 (West).  Jemez Pueblo argued that the map was poorly drawn, Governor Chavarria testified to ███████████ for the first time at trial, and testimony by Dennis Trujillo rebutted his trial statements.  See Feb. 18 Tr. at 13:3-15:16 (West)(citing and quoting Dec. 5 Tr. at 5427, 5429, 5432).   It then discussed Governor Chavarria's cross-examination in which he described efforts to purchase Santa Clara Pueblo's ancestral land.  See Feb. 18 Tr. at 15:17-16:10 (West).  It noted that this testimony and other Santa Clara Pueblo resolutions show that Santa Clara Pueblo does not claim the entire Valles Caldera, but only a small portion of the Valles Caldera outside any area to which Jemez Pueblo now asserts title.  See Feb. 18 Tr. at 16:11-18:9 (West)(citing Tribal Council, Pueblo of Santa Clara, Resolution No. 97-18 at 1 (dated Oct. 22, 1997), admitted October 29, 2018, at trial as United States' Ex. DX-GZ; Santa Clara Pueblo, Restoration Assessment: Santa Clara Pueblo Lands in the "Baca Location #1" Ranch, New Mexico at 54 (dated May 1, 1998), admitted October 29, 2018, at trial as United States' Ex. DX-HH; Santa Clara Pueblo Letter to Andy Dunigan re: Claims to Baca Location No. 1 (dated Sept. 26, 1997), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX-5).

556.     Jemez Pueblo then addressed the United States' arguments concerning Jemez Pueblo's ██████████████████████████.  See Feb. 18 Tr. at 18:10-12 (West).  It argued that the evidence on which the United States has thus far relied shows that other Tribes were using land outside of Baca location number 1, and not springs on Redondo Mountain. See Feb. 18 Tr. at 18:13-19:18 (West)(citing ICC Docket. 137 (dated Dec. 10, 1051), admitted

October 29, 2018, at trial as United States' Ex. DX-CC; <u>Zia, Jemez, and Santa Ana Pueblos v. ICC</u> at 33).  It then argued that the United States has not shown that ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████.  <u>See</u> Feb. 18 Tr. at 19:19-20:10 (West).  ███████████████

███████████████████████████████████████████████████████████████

███████████████.  <u>See</u> Feb. 18 Tr. at 20:11-22 (West).

557.   Jemez Pueblo then disputed that it was making new arguments concerning its claims to the four discrete sub-areas.  <u>See</u> Feb. 18 Tr. at 20:23-21:3 (West).  It pointed to paragraphs in the Complaint discussing Banco Bonito, Redondo Peak, pilgrimage trails, springs, and the Valle San Antonio.  <u>See</u> Feb. 18 Tr. at 21:4-23:1 (citing Complaint ¶¶ 30-33, 38-39, 45, 47-50, 53, 55, 57, 79, at 6-10, 12).  It also stated that it has recognized New Mexico Gas Company's easement in the Valles Caldera and argued that this recognition does not mean it forfeits its claims to the entire claimed area.  <u>See</u> Feb. 18 Tr. at 23:2-8 (West).  It then noted that the United States had notice of its claims to sub-areas, because multiple Jemez Pueblo members provided maps of their Valles Caldera uses during their depositions.  <u>See</u> Feb. 18 Tr. at 23:9-24:7 (West).  Jemez Pueblo highlights the deposition of Bill Whatley during which he discussed maps showing Valles Caldera sub-areas.  <u>See</u> Feb. 18 Tr. at 24:8-25:2 (West).  Jemez Pueblo notes that the United States' expert Gauthier admits that Jemez Pueblo used some of these sub-areas, <u>see</u> Feb. 18 Tr. at 25:3-17 (West), and it says that its MSJ for title to Banco Bonito and Redondo Mountain put the United States "on notice that Jemez was making the argument for subsections," Feb. 18 Tr. at 26:1-2 (West).  Jemez Pueblo then noted its concern that the United States was trying to cite new caselaw

which it had not had the opportunity to review or to brief.  See Feb. 18 Tr. at 26:18-27:6 (West);

id. at 27:19-28:2 (Luebben).

558.   Jemez Pueblo also reiterated that it had not ambushed the United States, because

the United States had notice of the Banco Bonito and Redondo Mountain sub-areas via the MSJ,

and because other areas it claims were polygons included in Dr. Ferguson's report.  See Feb. 18

Tr. at 30:4-17 (Luebben); id. at 31:8-13 (Luebben).  It asserts that it proved aboriginal Indian title

to the areas claimed based on evidence from trial, see Feb. 18 Tr. at 32:19-24 (Luebben), and that

it

> would be unfair to Jemez and would require prescience to require that Jemez had
> to specifically identify all sub-areas prior to trial as to which it would prove
> aboriginal Indian title if it were not successful as to the whole part, since it couldn't
> know in advance exactly how the evidence would develop at trial.

Feb. 18 Tr. at 32:25-33:6 (Luebben).

559.   Jemez Pueblo then argued that it was attempting a proper motion under rule 59 and

was not attempting to "ambush the Government."  Feb. 18 Tr. at 28:18 (Luebben). It then reviewed

the four cases that are central to its claim: Alabama-Coushatta Tribe of Texas v. United States, Sac

& Fox Tribe of Indians of Oklahoma v. United States; Wichita Indian Tribe v. United States; and

Strong v. United States.  See Feb. 18 Tr. at 28:21-29:18 (Luebben).  It argued that, in each case,

"the tribes claimed significantly larger aboriginal Indian title areas than they were ultimately

compensated for."  Feb. 18 Tr. at 29:19-21 (Luebben).  In contrast to these cases, Jemez Pueblo

characterized its lawsuit as a "live title case" rather than a "dead title" case that concerns takings

by the United States of aboriginal Indian Title.  Feb. 18 Tr. at 31:14-23 (Luebben).

560.   Jemez Pueblo later argued, however, that its claims are "virtually identical" to those

in Wichita Indian Tribe v. United States.  Feb. 18 Tr. at 33:12-16 (Luebben).  It argued that, in

- 102 -

Wichita Indian Tribe v. United States, the United States Court of Appeals for the Federal Circuit held that the Tribe retained title to some of the land for which it originally sought title. See Feb. 18 Tr. at 33:17-34:9 (Luebben)(citing Wichita Indian Tribe v. United States, 696 F.2d at 1385). Analogizing to that case, Jemez Pueblo argues that it clearly established title in the area of the Jemez fieldhouses in the southwest corner of the Valles Caldera. See Feb. 18 Tr. at 34:10-35:6 (Luebben). It argued, citing Wichita Indian Tribe v. United States, 696 F.2d at 1384, that it proved aboriginal title to the Banco Bonito given its history of closely knit and easily accessible fieldhouses in the area. See Feb. 18 Tr. at 35:7-24 (Luebben). Jemez Pueblo further argued that the United States' evidence of other Tribes' use of the Banco Bonito was too general to overcome Jemez Pueblo's lengthy and specific history of use. See Feb. 18 Tr. at 35:25-36:23 (Luebben). Jemez Pueblo urged the Court to review the exhibits it attached to its Motion, which it said illustrate the argument that it established aboriginal title to certain areas. See Feb. 18 Tr. at 36:24-37:4 (Luebben). Jemez Pueblo again cited Wichita Indian Tribe v. United States to argue that distant use by other Tribes and Pueblos would not impinge on Jemez Pueblo's exclusive use and occupancy of the Banco Bonito. See Feb. 18 Tr. at 37:5-38:3 (Luebben)(citing Wichita Indian Tribe v. United States, 696 F.2d at 1385). It asserted that four miles, the distance Keres, Tewa, and other Pueblo members travelled into the Valles Caldera, is sufficient to meet this standard. See Feb. 18 Tr. at 38:4-19 (Luebben). It argued that, as in Wichita Indian Tribe v. United States, the evidence of other Pueblos using parts of the Valles Caldera was not specific enough to justify finding lack of exclusive use. See Feb. 18 Tr. at 39:2-7 (Luebben). Finally, it argued that, it was asking the Court to review the trial record and make specific determinations of what parts of the Valles Caldera it established aboriginal Indian title. See Feb. 18 Tr. at 39:8-22 (Luebben).

561.    Jemez Pueblo next addressed the United States' contention that it was now trying to carve out small parts of the larger tract to which it originally claimed title.  See Feb. 18 Tr. at 39:23-1 (Luebben).  It argued that aboriginal Indian title areas for New Mexico Pueblos are much smaller than those that midwestern and plains Tribes historically occupied.  See Feb. 18 Tr. at 40:15-19 (Luebben).  Jemez Pueblo's original claimed area is "a microcosm of the millions and tens of millions of acres that were at issue" in the four cases it cites.  Feb. 18 Tr. at 40:19-23 (Luebben).  In light of this fact, Jemez Pueblo says it is not surprising that its reduced areas are much smaller than those areas adjudicated in other cases.  See Feb. 18 Tr. at 40:24-41:13 (Luebben).  Jemez Pueblo urged the Court to review carefully Wichita Indian Tribe v. United States.  See Feb. 18 Tr. at 41:14-21 (Luebben).  Jemez Pueblo concluded by arguing that its Motion is the "logical extension" of Conclusion of Law ¶¶ 371 and 453, Feb. 18 Tr. at 42:3 (Luebben); see id. at 42:3-19 (Luebben), and it argued that it could not have been expected "to have anticipated the Court's findings and conclusions that are relevant to its motion for reconsideration prior to trial where the Government had the polygons in the Ferguson report that plaintiff is claiming now," Feb. 18 Tr. at 43:21-25 (Luebben).

562.    The United States then presented its response.  See Feb. 18 Tr. at 45:8 (Dykema).  It stated that there was nothing wrong with citing relevant caselaw in responding to arguments, see Feb. 18 Tr. at 45:12-16 (Dykema), and then argued that the sub-area claims are not properly before the Court, see Feb. 18 Tr. at 45:16-21 (Dykema).  The United States asserted that it presumed the basis for Jemez Pueblo's Motion is to correct "clear error or manifest injustice" under rule 15.  Feb. 18 Tr. at 46:6 (Dykema).  It argued that, when these standards govern a rule 15 motion, litigants may not advance arguments that earlier could have been raised.  See Feb. 18 Tr. at 46:6-

12 (Dykema).   The United States contended that this rule is the law under Supreme Court and

Tenth Circuit precedent, and the Court has followed this precedent in the past.  See Feb. 18 Tr. at

46:13-48:4 (Dykema)(citing  Link v. Wabash R.R., 370 U.S. 626, 633-34 (1962); Minter v. Prime

Equip. Co., 451 F.3d 1196, 1206 (10th Cir. 2006); United States v. Lewis, No. CR 08-0057 JB,

2020 WL 128580, at *20 (D.N.M. Jan. 10, 2020)(Browning, J.)).

      563.     The United States then argued that the Complaint references springs and trails, but

it does not specifically seek title to these geographic features.  See Feb. 18 Tr. at 49:4-23

(Dykema).  It noted that it asked Jemez Pueblo to answer what areas within the Valles Caldera to

which it sought title and that Jemez Pueblo stated that it was seeking the full 99,000 acres in Baca

Location Number 1.  See Feb. 18 Tr. at 49:24-50:25 (Dykema).  The United States then noted that

it made a mistake in conceding that Jemez Pueblo's MSJ preserved its claims to Redondo

Mountain and Banco Bonito.  See Feb. 18 Tr. at 51:2-9 (Dykema).  The United States clarified

that Jemez Pueblo correctly preserved a claim to Banco Bonito, but its claim for Redondo Peak "is

fundamentally different from the claim they made in their summary judgment motion," Feb. 18

Tr. at 51:20-22 (Dykema), because Jemez Pueblo is seeking ███████████████████████

███████████████, see Feb. 18 Tr. at 51:20-52:15 (Dykema).  The United States next discussed

Reed v. Philip Ory Fin. Servs., LLC, 546 F. Supp. 2d 1219 (D. Kan. 2008)(Robinson, J.), and

Owner-Operator Indep. Drivers Ass'n, Inc. v. USIS Commercial Servs., Inc., 537 F.3d 1184, 1190

(10th Cir. 2008), in which courts upheld a rule 15 motion where the issue was clearly flagged

throughout the case.  See Feb. 18 Tr. at 52:16-54:2 (Dykema).  It argued that Jemez Pueblo only

flagged its Banco Bonito claim and that mentioning geologic features in the Complaint is not

enough to later assert title to them, especially considering how small Jemez Pueblo's claims are

now.  See Feb. 18 Tr. at 54:8-55:21 (Dykema).

564.    The United States then argued that it seemed odd to assert aboriginal title to a trail that is only a few feet across, or to a spring, because aboriginal title requires dominance over the property.  See Feb. 18 Tr. at 55:22-56:6 (Dykema).  The United States asked how Jemez Pueblo could control and dominate a spring, a trail, or a shrine when it did not control and dominate the surrounding landscape in which these features were located.  See Feb. 18 Tr. at 56:6-13 (Dykema). Such a conclusion, the United States asserted, would not make sense.  See Feb. 18 Tr. at 56:13-14 (Dykema).  It noted that Jemez Pueblo had not cited any case concluding that an aboriginal claim for a piece of property only a few feet across was possible.  See Feb. 18 Tr. at 56:15-24 (Dykema). The United States then reminded the Court that the Valles Caldera has a unity to it that polygons cannot capture.  See Feb. 18 Tr. at 56:25-57:21 (Court).

565.    Next, the United States discussed rule 59 and rule 52 of the Federal Rules of Civil Procedure; it stated that rule 52(b) is limited similarly to rule 59, and litigants seeking to use it cannot advance new theories.  See Feb. 18 Tr. at 57:22-58:13 (Dykema).  It also argued that the Court would prejudice other Pueblos and Tribes who reluctantly testified at trial but had no notice that Jemez Pueblo would later assert title to more specific areas.  See Feb. 18 Tr. at 59:13-21 (Dykema).  It said that Jemez Pueblo "is trying to lay claim to lands that may very well be sacred to other pueblos without giving those other pueblos the rudiments of due process, namely notice and an opportunity to be heard.  That would be manifest injustice."  Feb. 18 Tr. at 60:2-6 (Dykema).  The United States next argued that a good sign that clear error has occurred is if it manifests itself without needing in-depth analysis or factual review.  See Feb. 18 Tr. at 60:10-16 (Dykema).  It said that the mere fact that Jemez Pueblo spent fifty-four pages arguing its Banco

Bonito claim suggests that clear error did not occur.  See Feb. 18 Tr. at 60:21-61:10 (Dykema).

566.    The United States then reviewed the four cases on which Jemez Pueblo relies.  See Feb. 18 Tr. at 61:11 (Dykema).  It noted that the claimed acreage in Alabama-Coushatta Tribe of Texas v. United States was "continuous and constant, and very substantial," rather than small, individual geologic features.  Feb. 18 Tr. at 62:2-3 (Dykema).  It distinguished Wichita Indian Tribe v. United States as an abandonment case concerning established aboriginal title, whereas abandonment is not at issue here and Jemez Pueblo has not established aboriginal title to any land tract.  See Feb. 18 Tr. at 62:6-63:15 (Dykema).  It noted that it had extensively discussed Sac & Fox Tribe of Indians of Oklahoma v. United States and Strong v. United States at the last hearing, but it added that both cases involved giant tracts of land, and the plaintiffs did not object to smaller portions.  See Feb. 18 Tr. at 63:16-64:13 (Dykema).  The United States then argued that the usage evidence produced at trial does not change the underlying lawsuit's claim.  See Feb. 18 Tr. at 64:14-65:5 (Dykema).  The United States contended that that evidence was relevant to Jemez Pueblo's claim to the entire Valles Caldera.  See Feb. 18 Tr. 64:24-65:5 (Dykema).

567.    The United States then argued that neither Zuni Tribe of New Mexico v. United States nor Caddo Tribe of Oklahoma v. United States, 35 Ind. Cl. Comm. 321, 356-58 (1975), help Jemez Pueblo's case.  See Feb. 18 Tr. at 65:5-10 (Dykema).  The United States argued that, in both cases, there was extensive evidence of use and control.  See Feb. 18 Tr. at 65:11-22 (Dykema).  That is different from this case, the United States contended, and it said that the "case is as though plaintiffs had asserted the claims to the entirety of Texas and after trial, after losing, they fly-speck the record and realize the defendant didn't put in any evidence on usage of San Antonio, so presto, they get San Antonio."  Feb. 18 Tr. at 65:24-66:4 (Dykema).

568.    The Court then asked the United States if it would have tried the case any differently if Jemez Pueblo had expressly presented smaller claims.  See Feb. 18 Tr. at 66:10-16 (Court).  The United States stated that counsel would have worked with other Pueblos to present their uses more specifically.  See Feb. 18 Tr. at 66:17-67:10 (Dykema).  It added that discovery would have been different, as it would have "drill[ed] down into each of the" areas to which Jemez Pueblo asserts title, "rather than just picking and choosing what we could do in the time allowed for the deposition."  Feb 18 Tr. at 67:20-23 (Marinelli).  The United States asserted that discovery also would have been different, because it would have asked more specific questions to Jemez Pueblo.  See Feb. 18 Tr. at 68:1-11 (Marinelli).  The United States also asserted that its outreach to Tribes would have been different, which would have helped the United States address Jemez Pueblo's claims more completely.  See Feb. 18 Tr. at 68:12-69:9 (Marinelli).

569.    The Court then wondered aloud whether it would help the parties "for me to dodge these issues" if the Tenth Circuit reverses the Court.  Feb. 18 Tr. at 69:15-16 (Court).  The United States replied that it had provided the Court with enough evidence to address each area and did not think the Tenth Circuit could overturn findings based on them.  See Feb 18 Tr. at 69:22-70:11 (Marinelli).  Instead, the United States suggested that the Court reinforce its opinion with more evidence.  See Feb. 18 Tr. at 70:12-23 (Marinelli).

570.    The United States then addressed Jemez Pueblo's demonstrative slides from the hearing.  See Feb. 18 Tr. at 72:8-10 (Marinelli)(citing Demonstrative Exhibits, filed February 18, 2020 (Doc. 448)).   It stated that the slides show that the geothermal project area stretched from the north to the west side of Redondo Mountain and covered land belonging to a number of separate Tribes.  See Feb. 18 Tr. at 72:10-20 (Marinelli).  It argued that what Jemez Pueblo calls

Redondo Meadows substantially overlaps the geothermal project area.  See Feb. 18 Tr. at 72:21-74:6 (Marinelli).  The United States noted that Jemez Pueblo disclaimed title to the geothermal area in its Reply, see Feb. 18 Tr. at 74:7-16 (Marinelli), and argued that this concession "disposes" of the its claim to Redondo Meadows, Feb. 18 Tr. at 74:11 (Marinelli).  It further argued that Jemez Pueblo misled the Court by not noting, for demonstrative Exhibit 5, page 45 of Valles Caldera Religious Use, that Zia Pueblo has sacred spiritual sites in the Valles Caldera that it actually uses.  See Feb. 18 Tr. at 75:1-12 (Marinelli).  It then noted evidence of Zia Pueblo use in Jemez Pueblo's demonstrative slides.  See Feb. 18 Tr. at 75:13-76:9 (Marinelli).  It noted that ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

571.    The United States further argued that the easiest, most likely route for  Zia Pueblo to reach its spiritual areas takes members through Banco Bonito.  See Feb. 18 Tr. at 78:15-80:1 (Marinelli).  As it discussed Santa Clara Pueblo's claims to the Valles Caldera, the United States noted that Santa Clara Pueblo has strong claims to land across the whole area -- not just the Valles Caldera's northeast corner, see Feb. 18 Tr. at 80:2-11 (Marinelli), but it still recognizes that the Pueblos share the entire Preserve, see Feb. 18 Tr. at 80:12-81:17 (Marinelli).  The United States asserted that Congress has recognized Santa Clara Pueblo's claim to the area.  See Feb. 18 Tr. at 81:18-82:3 (Marinelli)(citing Nat'l Def. Auth. Act for Fiscal Year 2015 § 3043(b)(3)(C)(iii), 128 Stat. 3292, 3793 (dated Dec. 19, 2014)).  It then argued that, contrary to Jemez Pueblo's earlier assertions, Governor Chavarria's depositions mention ▮▮▮▮▮▮▮▮▮▮ the Valles Caldera, and

this position is consistent with Santa Clara Pueblo's longstanding position on its Valles Caldera uses.  See Feb. 18 Tr. at 82:4-24 (Marinelli).  It noted that it considers Whatley's map a more credible depiction of Santa Clara Pueblo use than his later map, DX-SL.  See Feb. 18 Tr. at 82:25-83:11 (Marinelli)(citing Valles Caldera National Preserve Map at 1 (dated Oct. 1, 2015), admitted November 2, 2018, at trial as United States' Ex. DX-OY; Map of Whatley GIS Data at 1).

572.    Last, the United States argued that, contrary to Jemez Pueblo's earlier assertions, other Pueblos do not recognize the Valles Caldera as exclusively belonging to Jemez Pueblo.  See Feb. 18 Tr. at 83:12-84:6 (Marinelli).  It stated that "the basic fact here is that Redondo Peak is sacred to at least fifteen tribes.  At least fifteen tribes go there."  Feb. 18 Tr. at 84:7-9 (Marinelli).  According to the United States, these other Tribes have used it throughout history without recognizing that the land was Jemez Pueblo's land and these other Tribes have often used the land despite not being on "good terms with Jemez."  Feb. 18 Tr. at 84:16 (Marinelli).  See id. at 84:9-18 (Marinelli).

573.    Jemez Pueblo then responded with its final points.  See Feb. 18 Tr. at 85:1 (Luebben).  It cited United States on Behalf of Zuni Tribe of New Mexico v. Platt, 730 F. Supp. 318 (D. Ariz. 1990)(Carroll, J.), which clarified Santa Clara Pueblo's land acquisition in the Valles Caldera, and cited resolutions from the Congress of American Indians and All Pueblo Council of Governors that support returning the Valles Caldera to the Jemez Pueblo, see Feb. 18 Tr. at 85:1-86:7 (Luebben)(citing NCAI Resolution No. ATL-14-009 at 2 (dated Oct. 2014), admitted November 7, 2018, at trial as Jemez Pueblo's Ex. PX 220; All Pueblo Council of Governors Resolution No. APCG 2014-11 at 2 (dated Aug. 20, 2014), admitted November 7, 2018, at trial as Jemez Pueblo's Ex. PX 219).  Jemez Pueblo then stated that the geothermal litigation does not

show that nineteen Pueblos used the Valles Caldera, but only that some individuals used certain areas.  See Feb. 18 Tr. at 87:3-12 (West).  It disputed the United States' contention that the Valles Caldera National Preserve Map is more credible than Whatley's GIS Map, and directed the Court to Whatley's trial testimony and Dr. Gauthier's cross-examination.  See Feb. 18 Tr. at 87:21-88:10 (West).  Jemez Pueblo then noted that Governor Chavarria admits that he did not identify any ceremonial hunting areas and did not know where Jemez Pueblo's aboriginal lands are.  See Feb. 18 Tr. at 88:11-89:4 (West).  Finally, Jemez Pueblo stated that the trial record does not show that Jemez Pueblo never traded with other Pueblos; Jemez Pueblo argued that the record shows that it traded heavily after 1680.  See Feb. 18 Tr. at 89:5-13 (West).  The Court thanked the parties for their hard work and courtesy during the case, and it promised an opinion on the Motion by the summer's end.  See Feb. 18 Tr. at 90:3-19 (Court).

12.    <strong><u>Subsequent Briefing and the U.S. Supplemental Response</u></strong>.

574.  A month after the February 18, 2020, Hearing, the parties submitted additional Findings of Fact and Conclusions of Law.  See U.S. Proposed Findings at 1; Jemez Pueblo Proposed Findings at 1.  Thirty days later, the United States and Jemez Pueblo filed responses to the opposing party's proposed supplemental Findings of Fact and Conclusions of Law.  See United States' Response to Jemez' Proposed Supplemental Findings of Fact and Supplemental Conclusions of Law, filed April 20, 2020 (Doc. 454)("U.S. Supplemental Response"); Plaintiff Pueblo of Jemez Response to the United States Proposed Findings of Fact and Conclusions of Law on Reconsideration, filed April 20, 2020 (Doc. 455)("Jemez Pueblo Supplemental Response").  Each supplemental response was limited to the page length of proposed findings of fact and conclusions of law brief to which it responds  See Jan 28 Tr. at 21:25-22:1 (Court).  The United States organized the U.S. Supplemental Response as a numbered list of responses and objections

to the proposed Findings of Fact and Conclusions of Law in the Jemez Pueblo Supplemental Response. The Court has addressed the U.S. Supplemental Response in the Factual Background section above.

### 13.    The Jemez Pueblo Supplemental Response.

575.    Jemez Pueblo responded to the United States' Proposed Findings of Fact and Conclusions of Law on Reconsideration with structured argument rather than precise, individual responses. See Jemez Pueblo Supplemental Response at 4-18. It argues that, while its findings are rooted in the evidentiary record, the United States' proposed findings "are irrelevant, do not address actual physical use of another tribe in the sub-areas, obfuscate the record, and are, at times, invented." Jemez Pueblo Supplemental Response at 3. See id. at 3 n.2 (arguing that the record does not support Jicarilla Apache or Navajo Nation members using the Valles Caldera and that FOF ¶ 176, at 87, incorrectly states that Navajo camped on the southwest side of the Valle Grande rather than the southeast side). It argues that the United States' evidence is inconsistent with aboriginal Indian title law and does not defeat Jemez Pueblo's claims to discrete sub-areas. See Jemez Pueblo Supplemental Response at 3. Jemez Pueblo then discusses each sub-area to which it seeks title. See Jemez Pueblo Supplemental Response at 4.

576.    First, Jemez Pueblo argues that none of the United States' proposed findings address the ███████████████████████████████████. See Jemez Pueblo Supplemental Response at 4. It argues that, without a record of another Indian group using these sub-areas, Jemez Pueblo must show only its own use to establish aboriginal title. See Jemez Pueblo Supplemental Response at 4. It also argues that the United States has not shown that Zia Pueblo used the ██████████████ that its Motion identifies. See Jemez Pueblo Supplemental Response at 4.

- 112 -

577.    Second, Jemez Pueblo argues that its Banco Bonito use is exclusive and dominant. <u>See</u> Jemez Pueblo Supplemental Response at 5.  It argues that the United States has only weak -- and contradicted -- support for arguing that other Tribes used the Banco Bonito, and it asserts later that the United States conceded at trial that Jemez Pueblo was the exclusive user of Banco Bonito. <u>See</u> Jemez Pueblo Supplemental Response at 5, 8 (citing <u>VCNP Land Use History</u> at 28, 71; Steffen Rebuttal Report at 2, 4-5, 7; Gauthier Report at 8; Nov. 8 Tr. at 2370:4-7, 2372:1-10, 2372:22-2373:2, 2374:11, 2391:17-20, 2393:2-3, 2484:16-18).  It again states that evidence of peeled trees does not confirm that Jicarilla Apaches used the Banco Bonito, and it argues that, contrary to the United States proposed finding ¶ 25, "[d]riving on a state road built in modern times is not an aboriginal use of Banco Bonito."  Jemez Pueblo Supplemental Response at 6.  It also contests Zia Pueblo's Valles Caldera use, arguing that "[n]o witness nor any document denotes any Zia path, route, or trail in any of the sub-areas" and that evidence shows Zia Pueblo members only using the Valles Caldera's western half.  Jemez Pueblo Supplemental Response at 7-8.

578.    Next, Jemez Pueblo argues that it has shown specific and extensive use of Redondo Meadows.  <u>See</u> Jemez Pueblo Supplemental Response at 9.  It argues that the United States has not added additional arguments rebutting Jemez Pueblo's claim, and it instead disputes Redondo Meadows' geographic boundaries.  <u>See</u> Jemez Pueblo Supplemental Response at 9.  It argues further that the Court should not give "statements made at a federal tribal consultation about a shared spiritual connection" the same weight as Jemez Pueblo's continued traditional uses.  <u>See</u> Jemez Pueblo Supplemental Response at 9.

579.    Jemez Pueblo then argues that it has demonstrated exclusive use of the Valle San Antonio.  <u>See</u> Jemez Pueblo Supplemental Response at 9.  It states that a "single, random and

isolated question about the PNM pipeline, not discussed by any witness, cannot defeat the overwhelming and extensive evidence confirming only Jemez use in the western two-thirds of the Valle San Antonio." Jemez Pueblo Supplemental Response at 9. It argues that the quality and character of the evidence of Zia Pueblo's use pales in comparison to its own use evidence and that Zia Pueblo has largely not used Valles Caldera or the claimed sub-areas in traditional ways. See Jemez Pueblo Supplemental Response at 9-10.

580. Jemez Pueblo next argues that other Pueblos and Tribes have not used the claimed sub-areas. See Jemez Pueblo Supplemental response at 11. It argues that the Court's conclusion that Santa Clara Pueblo used the Valles Caldera's northeast corner does not allow the United States to argue that it used the western two-thirds of Valle San Antonio; further, it argues that Santa Clara Pueblo's boundaries lie on the Valles Caldera's eastern edge. See Jemez Pueblo Supplemental response at 11-12 (citing Dec. 3 Tr. 5114:1-19; id. at 5146:6-9; id. at 5152:25-5153:4; id. at 5165:16-25; id. at 5169:4-7; Santa Clara Pueblo Letter to Andy Dunigan re: Claims to Baca Location No. 1 (dated Sept. 26, 1997), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX 005; History of the Boundary Between the Baca Location No. 1 Grant and Santa Clara Pueblo at 96-99 (dated June 3, 1998), admitted October 29, 2018, at trial as Jemez Pueblo's Ex. PX 172; Letter from Walter Dasheno, Governor of Santa Clara Pueblo, to Andy Dunigan at 1; Tribal Council, Pueblo of Santa Clara, Resolution No. 97-18). Jemez Pueblo also argues that the Navajo Nation has not used its claimed sub-areas and that the United States does not have contradictory evidence. See Jemez Pueblo Supplemental Response at 12. It argues that an ethnographic study of the Valles Caldera suggests that the Navajo's land did not extend to the Valles Caldera, and evidence from a September, 1863, incident where Jemez Pueblo sheltered Navajo Nation warriors

that various Tribes and the United States Army pursued does not suggest that Jemez Pueblo submitted to other Tribes.  See Jemez Pueblo Supplemental Response at 12 (citing VCNP Land Use History at 37; Craig Martin, Valle Grande: A History of the Baca Location No. 1 at 19 (2003), admitted November 15, 2018, at trial as United States' Ex. DX-JO ("Valle Grande")).  Finally, Jemez Pueblo argues that "maps admitted into evidence confirm Jemez' title to the four areas." Jemez Pueblo Supplemental Response at 13.

581.   Jemez Pueblo then turns to the United States' proposed conclusions of law; it argues first that it meets the standard for the Court to rule on its rule 59(e) Motion, because it would be "clear error and manifest injustice" if the Court did not make specific factual findings about the four discrete sub-areas.  Jemez Pueblo Supplemental Response at 14.  It noted that all parties agree that the Court can award less than the original claim area and that "no case supports the Government's assertions that an area a tribe claims aboriginal title must be a certain size or be in a particular location."  Jemez Pueblo Supplemental Response at 15-16.  It also stated that Wichita Indian Tribe v. United States is highly relevant, because its holding is premised on nearly identical evidence of use as in this case.  See Jemez Pueblo Supplemental Response at 16-17 (citing Wichita Indian Tribe v. United States, 696 F.2d at 1384-86).

582.   Last, Jemez Pueblo argued that the United States has always been on notice that it "sought title to discrete Sub-areas."  Jemez Pueblo Supplemental Response at 17.  It stated that its original Complaint "discussed in detail many of these sub-areas."  Jemez Pueblo Supplemental Response at 18 (citing Complaint ¶¶ 30-33, 38-42, 45-50, 57-58, 79, at 6-9, 12).  It stated that, while the United States focuses on one discovery request where it asked Jemez Pueblo to identify its claim area, it "ignores other discovery requests where Jemez extensively identified multiple

areas."  Jemez Pueblo Supplemental Response at 18 (citing Plaintiff Pueblo of Jemez's Second

Supplemental Answers and Objections to Defendant United States of America's Interrogatories,

dated July 3, 2019, filed April 20, 2020 (Doc. 455-1)).  It also asserts that the United States had

notice from depositions that it took of Jemez Pueblo witnesses.  See Jemez Pueblo Supplemental

Response at 18.  It contends that the United States' assertion that it would have more extensively

developed and presented evidence of other Tribes' use of other areas, including by cross-

examining Dr. Ferguson, "is unpersuasive," because the United States had several opportunities to

cross Dr. Ferguson, and it did not produce additional evidence.  Jemez Pueblo Supplemental

Response at 18.  Jemez Pueblo concluded by arguing that courts do "not deny a complaint in its

entirety when a party is unsuccessful in proving some of its damages or when damages are less

than initially pled.  Rather, the final order should conform to the evidence, which is aligned with

Jemez's requests."  Jemez Pueblo Supplemental Response at 19.

<h2 style="text-align:center">LAW REGARDING ABORIGINAL TITLE</h2>

583.    Aboriginal title, or original Indian title, refers to American Indian land occupancy

rights premised on exclusive use and occupancy of a particular territory at the time of first

European contact, and to an entitlement arising subsequent to such contact under the governing

European sovereign's laws, which are derived largely from international law concepts that

prevailed before the American Revolution.  See Pueblo of Jemez v. United States, 790 F.3d at

1151-56 (discussing Indian law and aboriginal title history); Felix Cohen, Original Indian Title,

32 Minn. L. Rev. 28, 43-44 (1947)("Our concepts of Indian title derive only in part from common

law feudal concepts. In the main, they are to be traced to Spanish origins, and particularly to

doctrines developed by Francisco de Vitoria, the real founder of modern international law.").  A

Tribe establishes aboriginal title by "immemorial occupancy . . . to the exclusion of other Indians," i.e., by continually and exclusively fishing, hunting, gathering, and otherwise occupying lands. Nw. Bands of Shoshone Indians v. United States, 324 U.S. 335, 338-39 (1945). Aboriginal title exists at the United States' pleasure, and the United States may effectuate aboriginal title extinguishment "by treaty, by the sword, by purchase, by the exercise of complete domination adverse to the right of occupancy, or otherwise." United States v. Santa Fe Pac. R.R. Co., 314 U.S. 339, 347 (1941)("Santa Fe"). Although Congress has the exclusive power to extinguish aboriginal title, intent to do so must be "plain and unambiguous," and will not be "lightly implied." Santa Fe, 314 U.S. at 346, 354. Notwithstanding this requirement, several federal courts have held that Congressional acts in anticipation of settlement and public use, and actual settlement, by non-Indians are factors that may affect extinguishment. See, e.g., United States v. Gemmill, 535 F.2d 1135, 1147 (9th Cir. 1976); United States v. Pueblo of San Ildefonso, 513 F.2d at 1391; Gila River Pima-Maricopa Indian Cmty. v. United States, 494 F.2d 1386, 1386 (Fed. Cir. 1974).

1.    **Establishment of Aboriginal Title.**

584.    Among the ways that American Indian Tribes may acquire real property interests is through possession and exercise of sovereignty,[51] and, within the bundle of recognized property rights,[52] aboriginal title refers to land claimed by sovereignty, rather than by letters patent or other

---

[51]The Supreme Court has delineated six ways in which Tribes may acquire interest in real property: (i) possession and exercise of sovereignty; (ii) action of a prior government; (iii) by treaty; (iv) by act of Congress; (v) by executive action; or (vi) by purchase. See Montana v. United States, 450 U.S. 544, 559 (1981).

[52]The common law of real property recognizes particular estates in land that comprise the permissible forms in which real property is held. See Joseph William Singer, Property §§ 7.1-7.7, at 299-344 (5th ed. 2016). These estates describe particular bundles of rights and obligations, some of which owners can vary and some of which owners cannot vary. See Singer, Property

formal conveyance.[53]  Aboriginal title preexists the formation of the United States.  See Santa Fe, 314 U.S. at 347 ("Nor is it true, as respondent urges, that a tribal claim to any particular lands must be based upon a treaty, statute, or other formal government action."); Cramer v. United States, 261 U.S. 219, 229 (1923)("The fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive.").  See also Native Vill. of Eyak v. Blank, F.3d at 622 (9th Cir. 2012)("Aboriginal rights don't depend on a treaty or an act of Congress for their existence."); Sac & Fox Tribe of Indians of Okla. v. United States, 383 F.2d at 998-99 (stating that aboriginal title is not "frozen" as of the date of discovery or the date of establishment of the United States).  Aboriginal title is established through exclusive occupation of historic Indian lands.  See Santa Fe, 314 U.S. at 345 ("If . . . the lands in question . . . were included in[] the ancestral home of the Walapais in the sense that they constituted definable territory occupied exclusively by the Walapais (as distinguished from lands wandered over by many tribes), then the Walapais had 'Indian title.'" (quoting Buttz v. N. Pac. R.R. Co., 119 U.S. 55, 66 (1886))).  See also Native Vill. of Eyak v. Blank, 688 F.3d at 622 ("[T]he Villages have the burden of proving

---

§ 7.1-7.7, at 299-344.  In the American legal landscape, the real property interests that American Indian Tribes hold "represent a unique form of property right, one that is shaped by the federal trust over tribal land and statutory restrains against alienation."  Cohen's Handbook § 5.04[3][a], at 995 (discussing the federal government's interest in tribal land as a trustee's fee title and the tribal interest as beneficial ownership under trust).  Approximately "56.2 million acres of land are now held in trust by the United States for Indian Tribes and individuals."  Cohen's Handbook § 15.01, at 995.  That amount is about two percent of the landmass of the continental United States.  See An Introduction to Indian Nations in the United States, Nat'l Cong. Of Am. Indians, 13 (Nov. 11, 2003), http://www.ncai.org/about-tribes/Indians_101.pdf.

[53]Letters patent is defined as a "document granting some right or privilege, issued under governmental seal but open to public inspection."  Black's Law Dictionary, "Letters Patent," at 1046 (10th ed. 2014).

'actual, exclusive, and continuous use and occupancy 'for a long time' of the claimed area."
(quoting Sac & Fox Tribe of Indians of Okla. v. United States, 383 F.2d at 998)).   Moreover,
"occupancy necessary to establish aboriginal possession is a question of fact." Santa Fe, 314 U.S.
at 345.

585.    The Supreme Court consistently has held that Tribes have a "legal as well as just
claim to retain possession" of the land that they have historically occupied within the United States.
Johnson v. M'Intosh, 21 U.S. 543, 574 (1823).   Moreover, this right exists independent of the
United States' recognition.[54]   See Holden v. Joy, 84 U.S. 211, 244 (1872)("[T]he Indians as tribes
or nations, have been considered as distinct, independent communities, retaining their original,
natural rights as the undisputed possessors of the soil, from time immemorial.").   Early Supreme
Court decisions built the framework for understanding the relationship of the United States to
Tribes and Tribal property.   For example, in Johnson v. M'Intosh, the Marshall Court[55] adopted a
rule of international law known as the "discovery doctrine" and explained how that doctrine
functions alongside United States law.   See 21 U.S. at 572-74.   Under the discovery doctrine,
European nations claimed the right to acquire land rights from American Indians, exclusive both
of other European nations and of their own subjects.   See 21 U.S. at 573 ("[D]iscovery gave title
to the government by whose subjects, or by whose authority, it was made, against all other

---

[54]Both international law and common-law countries' law recognize aboriginal title.   See,
e.g., UN Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295 U.N. Doc.
A/RES/61/295 (Sept. 2007); Mabo v. Queensland II (1992) 175 C.L.R. 1 (Austl.)(holding that
"native title" exists and that Australia's common law recognizes native title).

[55]The "Marshall Court" refers to the Supreme Court of the United States from 1801 to
1835, when John Marshall served as the fourth Chief Justice of the United States.   See Bernard
Schwartz, A History of the Supreme Court at 43-44 (1993).

European governments, which title might be consummated by possession."). The Supreme Court in Johnson v. M'Intosh held that Tribal conveyances to private parties in 1773 and 1775 did not convey fee simple title to the lands, because English law forbade alienation of aboriginal title without the Crown's consent. See 21 U.S. at 594. Thus, the United States' later conveyances of the fee in those lands superseded the Tribe's prior conveyances. See 21 U.S. at 603-04. The Supreme Court described the Tribal interest in the land as a "title of occupancy," "rights of occupancy," and "right of possession," 21 U.S. at 583, 587, 588, and characterized the United States' interest as successor to the discoverer as the "fee," "absolute title," and the "absolute ultimate title," 21 U.S. at 588.

586.    The discovery doctrine prevents aboriginal title alienation without the European sovereign's consent or the United States' consent, or that of the original thirteen states,[56] as successor-in-interest. See Oneida Indian Nation v. Cty. of Oneida, 414 U.S. at 670; Seneca Nation of Indians v. Christy, 162 U.S. 283, 828 (1896). Alongside the restraint on alienation was the exclusive power to purchase Indian land, traditionally called the "right of preemption."[57] Johnson

---

[56]An earlier Supreme Court decision established that the thirteen original states had succeeded England's fee interest in aboriginal title. See Fletcher v. Peck, 10 U.S. 87, 142-43 (1810); Seneca Nation v. New York, 382 F.3d 245, 265 (2d Cir. 2004)(holding that title to Seneca lands that England acquired in 1764 passed to New York after the American Revolution). This doctrine changed with the adoption of the Constitution of the United States, whereby the United States gained exclusive power over Indian affairs. See Worcester v. Georgia, 31 U.S. at 558; Oneida Indian Nation v. New York, 194 F. Supp. 2d 104, 146 (N.D.N.Y. 2002)(Kahn, J.)("Any rights [in Indian land] possessed by the State prior to ratification of the Constitution were ceded by the State to the federal government by the State's ratification of the Constitution."). Congress formally exercised its exclusive power over Tribal lands in the 1790 Nonintercourse Act by forbidding any transfer of title to lands that Indians or Tribes held to any person or state, "whether having the right of pre-emption to such lands or not," unless made by treaty held under federal authority. Act of July 22, 1970, § 4, 1 Stat. 137.

[57]Right of Preemption is defined as a "potential buyer's contractual right to have the first

---

v. M'Intosh, 21 U.S. at 565 n.5.  The discovery doctrine also provided a mechanism to validate the United States' previous acquisitions of Tribal land "by purchase or conquest." Johnson v. M'Intosh, 21 U.S. at 587.

587.    Three additional Marshall Court opinions address aboriginal title and further elaborate on the nature of Tribal rights to property: Cherokee Nation v. Georgia, 30 U.S. 1 (1831); Worcester v. Georgia, 31 U.S. 515 (1832); and Mitchel v. United States, 34 U.S. 711 (1835).  In Worchester v. Georgia, the Supreme Court discussed extensively the doctrine of discovery and the nature of aboriginal title, and it noted that, while the sovereign interest permitted the European sovereign to issue land grants still subject to aboriginal title, the issuance of a grant was insufficient by itself to extinguish such title.  See 31 U.S. at 546.  Until the European sovereign purchased the land from a given Tribe, the grant "asserted a title against Europeans only and was considered as blank paper so far as the rights of natives were concerned."  31 U.S. at 546.  In Mitchel v. United States, the Supreme Court upheld the validity of title acquired from an Indian Tribe in present-day Florida, because Spain had ratified the Tribal sale and thereby extinguished aboriginal title to the property.  See 34 U.S. at 751-53.  The Supreme Court affirmed the notion that aboriginal title was "as sacred as the fee simple of the whites" and analogized the sovereign's right as an "ultimate reversion in fee" subject to the Tribe's "perpetual right of occupancy." 34 U.S. at 746, 756.

588.    Although refusing to accord American Indians full sovereignty and title over their lands, the Marshall Court cases nevertheless afford ample respect to aboriginal title.  See, e.g., Johnson v. M'Intosh, 21 U.S. at 574 (stating that aboriginal title makes a Tribe's members "the

---

opportunity to buy, at a specified price, if the seller chooses to sell within the contracted period." Black's Law Dictionary, "Right of Preemption" at 1521 (10th ed. 2014).

rightful occupants of the soil, with a legal as well as just claim to retain possession of it").  The Supreme Court respected the Tribal right to retain possession, provided Tribes remained at peace with the United States.  See Johnson v. M'Intosh, 21 U.S. at 591 ("[T]he Indian inhabitants are to be considered merely as occupants, to be protected, indeed, while in peace, in the possession of their lands.").  These cases further recognize Tribal sovereignty over Tribal lands by asserting that Tribal members and others who acquire land from Tribes are subject to Tribal law.  See Johnson v. M'Intosh, 21 U.S. at 593 ("The person who purchases lands from the Indians, within their territory, incorporates himself with them, so far as respects the property purchased; holds their title under their protection, and subject to their laws.").  In contrast, only the United States could extinguish aboriginal title, with purchase being the preferred acquisition method.  See Johnson v. M'Intosh, 21 U.S. at 586.  While Congress and the President did not always follow these principles, the Supreme Court consistently reiterated and applied them to protect aboriginal title.  See, e.g., Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 235 (collecting cases); Holden v. Joy, 84 U.S. at 244 (stating that aboriginal title is "absolute, subject only to the [federal] pre-emption right of purchase"); Chouteau v. Molony, 57 U.S. 203, 203 (1853)(interpreting Spanish fee grant as confirming easement granted previously to Tribe).

589.    A Tribe asserting aboriginal title may bring a federal common-law action to enforce ownership rights.  See, e.g., Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 235-36 (collecting cases).  Moreover, the Supreme Court has stated that occupancy necessary to establish aboriginal possession is a question of fact, determined as any other question of fact.  See Santa Fe, 314 U.S. at 359-60 ("As we have said, occupancy necessary to establish aboriginal possession is a question of fact.").  The Court of Claims has concluded that factual support for an aboriginal title claim may

include: evidence that no other Tribes claimed or used the areas involved, a neighboring Tribe's recognition of ownership, earlier official European sovereign recognition of the Tribe's exclusive title, and expert testimony of historians in the field of American history.  See Otoe & Missouria Tribe v. United States, 131 F. Supp. 265, 289-91 (Ct. Cl. 1955).

### 2.   Scope and Limits of Aboriginal Title.

590.   The requirement that aboriginal title be based on possession or occupancy, as opposed to official documentation, raises important questions about the nature and extent of possession required to support aboriginal title.  Since the earliest Spanish conquests, opponents of American Indian property rights have argued that hunting, gathering, and other uses which involve only occasional human presence are not sufficient to constitute possession.  See, e.g., Johnson v. M'Intosh, 21 U.S. at 567 ("On the part of the defendants, it was insisted, that the uniform understanding and practice of European nations, and the settled law, as laid down by the tribunals of civilized states, denied the right of the Indians to be considered as independent communities, having a permanent property in the soil.").  Opponents of such rights argued that courts should declare Indian lands vacant and available to the first Europeans to put them to commercial use. See Johnson v. M'Intosh, 21 U.S. at 588-89.  Alternatively, they argued that hunting rights should be nonexclusive, similar to fishing rights in public lands.  See Johnson v. M'Intosh, 21 U.S. at 567-71 (citing as justification the scholarship of notable European authors Locke, Grotius, Montesquieu, and de Vattel).[58]  The Marshall Court, however, rejected these arguments in Johnson v. M'Intosh and again in Mitchel v. United States, both of which recognize aboriginal

---

[58]These scholars all share a preference for land use patterned after the European labor theory of property, i.e., that interests in real property originate from the exertion of labor upon natural resources.  See S. James Anaya, Indigenous Peoples in International Law 11-16 (1996).

title based on traditional Tribal use alone.  See Johnson v. M'Intosh, 21 U.S. at 569-70; Mitchel v. United States, 34 U.S. at 746 (1835)("[T]heir hunting grounds were as much in their actual possession as the cleared fields of the whites.").

591.   In treaties with the United States, the limit of aboriginal title correspond with the limit of a Tribe's exclusive possession that other Tribes respected, i.e. with a Tribe's national boundaries; therefore, proof of exclusive and continuous occupation of the land determines the boundary of land claimed under aboriginal title.[59]  See, e.g., United States v. Alcea Band of Tillamooks, 329 U.S. 40, 40 (1946); Santa Fe, 314 U.S. at 345; Pueblo of Jemez v. United States, 790 F.3d at 1165.  See also Yankton Sioux Tribe of Indians v. South Dakota, 796 F.2d 241, 243 (8th Cir. 1986)("In order to establish aboriginal title, an Indian tribe must show that it actually, exclusively,  and continuously used the property for an extended period  of time.").  Thus, to establish the extent of a land claim under aboriginal title, a Tribe must show that it "'used and occupied the land to the *exclusion of other Indian Groups*.'"  Pueblo of Jemez v. United States, 790 F.3d at 1165-66 (emphasis in original)(quoting Pueblo of San Ildefonso, 513 F.2d at 1394).  See Native Village of Eyak, 688 F.3d at 624 ("Exclusivity is established when a tribe or a group shows that it used and occupied the land to the *exclusion* of other Indian groups." (emphasis in original)).  This requirement means that the Tribe must have behaved as an owner of the land by exercising dominion and control.  See Santa Fe, 314 U.S. at 345.  See also Native Vill. of Eyak v. Blank, 688 F.3d at 623 ("The tribe or group must exercise full dominion and control over the area,

---

[59]Moreover, a Tribe may prove exclusive and continuous occupation by reference to adjacent land that the Tribe ceded.  See, e.g., United States v. Elliot, 131 F.2d 720, 724 (10th Cir. 1942).

such that it 'possesses the right to expel intruders,' . . . as well as the power to do so." (quoting

Osage Nation of Indians v. United States, 19 Ind. Cl. Comm. 447, 489 (1968))).  The Court of

Claims has explained that

> [i]mplicit in the concept of ownership of property is the right to exclude others.
> Generally speaking, a true owner of land exercises full dominion and control over
> it; a true owner possesses the right to expel intruders . . . .  True ownership of land
> by a tribe is called in question where the historical record of the region indicates
> that it was inhabited, controlled or wandered over by many tribes or groups.
> Ordinarily, where two or more tribes inhabit an area no tribe will satisfy the
> requirement of showing such "exclusive" use . . . .

United States v. Pueblo of San Ildefonso, 513 F.2d at 1394 (quoted by the United States Court of

Federal Claims[60] in Wichita Indian Tribe v. United States, 696 F.2d 1378, 1385 (Fed. Cir. 1983)).

592.    The Court of Federal Claims has noted that "the general rule of exclusive use and

occupancy is subject to three exceptions: (1) the joint-and-amicable use exception; (2) the

dominated use exception; and (3) the permissive use exception."[61] Ala.-Coushatta Tribe of Texas

---

[60]"[I]n the Federal Courts Improvement Act of 1982, Congress established the United
States Claims Court to replace the old Court of Claims, pursuant to its Article I powers. . . . Claims
Court judges, unlike the life-tenured Article III judges who sit in district courts, serve for limited
terms of 15 years."  Bowen v. Massachusetts, 487 U.S. 879, 908 n.46 (1988)(citing 28 U.S.C.
§§ 171-172).  In 1992, the United States Claims Court's name was changed to the United States
Court of Federal Claims.  See U.S. Court of Federal Claims: The People's Court, The Federal
Lawyer, Oct. 2007, at 29.  Court of Federal Claims appeals "are taken to the United States Court
of Appeals for the Federal Circuit and a judgement there is conclusive unless reviewed by the
Supreme Court on writ of certiorari.  Decisions of the Court of Claims are binding precedent on
both its appellate and trial court successors."  U.S. Court of Federal Claims: The People's Court at
29.

[61]The Court of Appeals, Court of Claims, Claims Court, and Court of Federal Claims cases
that discuss the joint-and-amicable use exception, the dominated use exception, and the permissive
use exception to the exclusive-use-and-occupancy rule are not binding precedent; however, the
Court concludes that these cases have persuasive value with respect to joint aboriginal title claims
and, thus, will assist the Court in its disposition of the case.  Moreover, the Court notes that the
Tenth Circuit in this case cites favorably to numerous out-of-circuit and lower court cases, several
of which discuss exceptions to the exclusive-use-and-occupancy rule, including Native Vill. of
Eyak v. Blank, 688 F.3d 619, 622 (9th Cir. 2012); Wichita Indian Tribe v. United States, 696

v. United States, 2000 WL 1013532, at *12.  The joint-and-amicable use exception provides that "two or more tribes or groups might inhabit an area in 'joint and amicable' possession without erasing the 'exclusive' nature of their use and occupancy," and without interrupting establishment of aboriginal title.  Strong v. United States, 518 F.2d at 561 (quoting United States v. Pueblo of San Ildefonso, 513 F.2d at 1394).  "To qualify for treatment under 'joint and amicable' occupancy, the relationship of the Indian groups must be extremely close."   Strong v. United States, 518 F.2d at 561.  The Court of Claims described such a relationship in Sac & Fox Tribe v. United States:

> Originally the Sac and Fox Nation consisted of two separate and identifiable tribes of Indians belonging to the Algonquin stock.  Around 1735, due to their mutual hostility and conflict with the French, they formed a close and intimate alliance, politically and socially, so that from thence forward they have been dealt with and referred to as a single nation both in their relationship with other Indian tribes and in treaty negotiations and other matters with the United States.

315 F.2d at 995.  Although the joint possessors must show their relationship is a "close and intimate alliance, politically and socially," Strong v. United States, 518 F.2d at 562, it is not necessary for the Tribes to show that they are completely merged, see United States v. Pueblo of San Ildefonso, 513 F.2d at 1395 ("There are no holdings of this court which say that two Indian tribes or groups, each a separate 'entity' and each with its own separate lands, can never assert joint ownership to other lands which are commonly used and occupied.").   For example, the evidence in United States v. Pueblo of San Ildefonso shows that two Indian groups objectively believed that they shared common ownership of the land "in joint tenancy under a 1770 land grant from the Spanish Crown," and the court held that the Tribes used and occupied the land in joint-and-amicable possession. United States v. Pueblo of San Ildefonso, 513 F.2d at 1395-96.  The joint-and-amicable use

_____

F.2d 1378, 1385 (Fed. Cir. 1983); United States v. Pueblo of San Ildefonso, 513 F.2d 1383; and Sac & Fox Tribe of Indians of Okla. v. United States, 383 F.2d 991, 998 (Ct. Cl. 1967).

exception does not apply, however, when "each tribe had separate lands, [and] there was no community of interest in the lands," because

> [t]he [Tribes] did not consider themselves, and were not treated, as a single or closely integrated entity, but rather as separate political groups which were friends or allies (for the most part). Their use of the same lands may have been in common, like much of Indian use of the midwestern and western regions -- but the Commission could properly decide that it was not proved to be truly joint, and therefore that each separate tribe's claim to Indian title would have to be tested on its own distinct basis.

Strong v. United States, 518 F.2d at 562. Thus, mere cooperation among two or more Tribes is insufficient to prove joint-and-amicable possession. See Strong v. United States, 518 F.2d at 562.

593. The dominant-use exception to the exclusive use rule recognizes that, where another Tribe commonly uses the land with the claimant Tribe, proof of the claimant Tribe's dominance over the other Tribe preserves its exclusive use of the land. See United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383-86. The claimant Tribe's dominance illustrates its ability to exclude other Tribes from the area, even if it never chooses to exercise that ability. See United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383. In United States v. Seminole Indians of Florida, for example, the Court of Claims explained that the Seminole Indians obtained aboriginal title to the Florida peninsula, notwithstanding the presence of other Indian Tribes, because there was

> little question that, in their occupation of the land, the Seminoles held a virtual "monopoly." While expert witnesses concede the contemporaneous existence of other Indians in Florida . . . these scattered groupings were few and far between, and the record offers no evidence to suggest that Seminole dominion was ever challenged by these vestiges of aboriginal cultures. Instead, the pattern that prevailed was one of cultural assimilation -- the Seminoles simply absorbing these "foreign" elements into their own ranks.

United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383. Thus, the dominant-use exception prevails in situations where one Tribe culturally assimilates another Tribe or otherwise exercises

complete dominion over "scattered groupings" of other Indians that appear "few and far between." United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383.

594.    The permissive-use exception to the exclusive use rule acknowledges that other Indian Tribes could have "rang[ed] over large portions" of the claimant Tribe's land without defeating the exclusive nature of the claimant Tribe's use, as long as the other Tribes' presence was with the claimant Tribe's permission. Wichita Indian Tribe v. United States, 696 F.2d at 1385. The United States Court of Federal Claims in Wichita Indian Tribe v. United States explained that, in light of the other Tribes' friendly relations and trading activities, it required more specific evidence than that of shared hunting grounds to "justify a finding of a lack of exclusive use of all the Texas lands." 696 F.2d at 1385. Similarly, in Spokane Tribe of Indians v. United States, the Court of Claims admonished the ICC to "adequately consider whether [the] use by other Indians was by permission and at the sufferance of the [claimant Tribe], or as a matter of right; if the former, the alien visits would not diminish the appellant's Indian title." Spokane Tribe of Indians v. United States, 163 Ct. Cl. at 68-69. In Strong v. United States, the Court of Claims affirmed the ICC's finding that the claimant Tribe's presence was "overwhelmingly predominant and lasted a long time. Those incidents of use and occupancy by other Indians [the Court of Claims views] as permissive or as so sporadic as not to be inconsistent with [the claimant Tribe's] use and occupancy." Strong v. United States, 518 F.2d at 565. To satisfy the permissive use exception, permission need not be explicit, but may be inferred from the record as a whole. See Strong v. United States, 518 F.2d at 572. The Court of Claims in Strong v. United States found that a Tribe other than the claimant Tribe had two settlements in the claim area and inferred permissive use, stating that

> [t]here is evidence that the Wyandot had given permission to other Indian tribes
> to use their lands in Ohio, and we think the record, taken as a whole, supports the
> inference that the Ottawa were in the Sandusky area with the consent of the
> Wyandot.  Permissive use by the Ottawa did not diminish the title of the
> Wyandot, and by the same token, such use gave the Ottawa no interest in the
> land.

Strong v. United States, 518 F.2d at 572.

595.    The Court of Federal Claims has noted that "a claimant tribe's non-exclusive use

of one segment of the claim area is not automatically imputed to the whole claim area."   Ala.-

Coushatta Tribe of Tex. v. United States, 2000 WL 1013532, at *14.  See Wichita Indian Tribe v.

United States, 696 F.2d at 1385 (finding that the "sphere of Osage influence capable of

disrupting the Wichitas' exclusivity of use . . . did not extend to the southern border of Oklahoma").

Thus, a court may find that a claimant Tribe had exclusive use of certain portions of the claim area,

but failed to prove exclusive use of other portions.  See e.g., Sac & Fox Tribe of Indians of Okla.

v. United States, 315 F.2d at 901-06; Strong v. United States, 518 F.2d at 565-69.

596.    When disputes require the Supreme Court to determine the extent of Tribal lands,

the Supreme Court applies the canons of construction applicable to treaties with Indian nations

and to statutes regulating Indian affairs.[62]   See, e.g., Choctaw Nation of Indians v. United States,

---

[62]The Supreme Court has developed canons of construction to assist lower courts in
interpreting Indian treaties; for example, in Choctaw Nation of Indians v. United States, 318 U.S.
423 (1943), the Supreme Court states:

> Of course, treaties are construed more liberally than private agreements, and to
> ascertain their meaning we may look beyond the written words to the history of
> the treaty, the negotiations, and the practical construction adopted by the parties.
> Especially is this true in interpreting treaties and agreements with the Indians;
> they are to be construed, so far as possible, in the sense in which the Indians
> understood them, and in a spirit which generously recognizes the full obligation
> of this nation to protect the interests of a dependent people.

Choctaw Nation of Indians v. United States, 318 U.S. at 431-32 (internal quotation marks and

318 U.S. 423, 431-32 (1943). The Supreme Court and the federal Courts of Appeals have also resolved Tribal boundary disputes by applying general rules for resolution of ambiguities of deeds and patents. See, e.g., Meigs v. M'Clung's Lessee, 13 U.S. 11, 17-18 (1815)(holding that unilateral action of United States' agents cannot give meaning to bilateral treaty); City of New Town v. United States, 454 F.2d 121, 125 (8th Cir. 1972)(holding that administrative action may not alter an Indian reservation's boundaries).  Although the Secretary of the Interior has no inherent authority to resolve Tribal boundary disputes, courts have given significant weight to administrative recognition of Tribal boundaries.  See, e.g., DeCoteau v. Dist. Cty. Court, 420 U.S. 425, 442-44 (1975)(citing DOI opinion as support for determination of reservation borders).  Cf. Op. Sol. Interior, M-36539 (Nov. 19, 1958)("In determining the boundaries of an Indian reservation[,] the recognition by the Interior Department of a boundary as such for many years will be deemed controlling."); Op. Sol. Interior, 57 Interior Dec. 219 (1940)(granting authority to enter

---

citations omitted).  See Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 247 ("The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.  Thus, it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." (internal quotations and citations omitted)).  The Supreme Court affirmed these canons in Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 119 (1999), wherein the Supreme Court held that, when construing Indian treaties, a court should

> look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties.   In this case, an examination of the historical record provides insight into how the parties to the Treaty understood the terms of the agreement.  This insight is especially helpful to the extent that it sheds light on how the [Tribal] signatories to the Treaty understood the agreement because we interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them.

526 U.S. at 196 (internal quotation marks and citations omitted).

into agreement fixing boundaries of allotted and ceded Tribal lands).  Errors in United States' land

surveys, however, are a recurring source of Tribal land claims.[63]   See, e.g., Or. Dep't of Fish &

Wildlife v. Klamath Tribe, 473 U.S. 753, 756-57 (1985); Creek Nation v. United States, 302 U.S.

620 (1938); Pueblo of Sandia v. Babbitt, 231 F.3d 878 (D.C. Cir. 2000); Seminole Nation v. United

States, 102 Ct. Cl. 565, 618-21 (1944); Pueblo of Taos v. Andrus, 475 F. Supp. 359 (D.D.C.

1979)(Gasch, J.).

### 3.        Extinguishment of Aboriginal Title.

597.    The basic rule governing alienation of American Indian land is that only the United

States can extinguish aboriginal title.[64]  See 25 U.S.C. § 177.  See also 25 C.F.R. § 152.22(b);

Santa Fe, 314 at 347.  The United States holds most Tribal property in trust.[65]   See Cohen's

---

[63]At least one Tribe has benefitted from a surveying error.  See Yankton Sioux Tribe v.
Gaffey, 14 F. Supp. 2d 1135, 1146 (D.S.D. 1998)(Piersol, J.)(discussing treaty that set aside
400,000 acres of reservation land, but "when the reservation was surveyed, it actually contained
430,495 acres").

[64]Consequently, a seller or buyer of Tribal land must show authority in federal law to
allow a transfer of the interest from the Tribe, while at common law restraints on alienation of fee
interests are upheld only in limited circumstances.  See Restatement (Second) of Property § 4.1
cmt. a. (Am. Law. Inst. 1977)(discussing the common-law presumption of alienability).  The
restraint evolved from the national and international law of the European nations that colonized
the Americas.  See Johnson v. M'Intosh, 21 U.S. at 592-94.  As detailed above, the discovering
European sovereign, or its successor by war or purchase, asserted the exclusive right to acquire
Indian land.  See Johnson v. M'Intosh, 21 U.S. at 592-94.  The transfer of the United States' fee
interest to a private purchaser became a fee simple interest whenever Congress extinguished the
aboriginal title, regardless of the status that title might have had under Tribal law.  Had this not
been the case, courts would have lacked jurisdiction to settle conclusively the property interests
that the Tribe conferred.  See Chouteau v. Molony, 57 U.S. at 217-18 (discussing dispute over
whether purchase from Tribe was fee or lesser interest); Johnson v. M'Intosh, 21 U.S. at 592-94
(stating that Tribes had allegedly treated purported sale to plaintiffs as revoked).

[65]Over a period of many decades, the formal terminology for aboriginal title changed from
the Marshall Court era's right of occupancy/fee title characterization to the concept of the United
States holding Tribal land in trust.  See Cohen's Handbook § 15.09, at 1053. Trust terminology
is now explicit in statutes and court decisions, and "more accurately reflects the nature of tribal

---

Handbook at 997-99.  The United States, or the state government in the case of the original

thirteen states, holds the "fee" interest -- the right of preemption -- while the Tribe holds the "title

of occupancy" or beneficial title.  Cohen's Handbook § 15.03, at 997-99.  The Supreme Court has

held that, although the sovereign can alienate the right of preemption without Tribal consent,[66]

only Congress, or a presidential act ratified by Congress, of tribal ownership can extinguish

---

ownership interests in tribal land, which is limited by the power of the United States to forbid or condition alienation."  Cohen's Handbook § 15.09, at 1053.

[66]The view that the United States could not extinguish aboriginal title without the affected Tribe's voluntary consent permeates the Marshall Court cases, likely because it accords with the spirit of the property law right of preemption, which consists of the right to purchase a property interest in preference to all others when the current holder chooses to sell; for example, in Johnson v. M'Intosh, the Supreme Court noted that the United States has the exclusive power to "acquire" aboriginal tribal title.  Johnson v. M'Intosh, 21 U.S. at 603.  In Cherokee Nation v. Georgia, the Supreme Court clarified the meaning of "acquire" by noting that "the Indians are acknowledged to have an unquestionable, and heretofore unquestioned, right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government."  30 U.S. at 17.  Furthermore, in Worcester v. Georgia, the Supreme Court stressed that purchase was the preferred method of acquisition of Tribal land, with conquest a legitimate method of acquisition only in the case of Indian Tribes' unjustified war of aggression.  See Worcester v. Georgia, 31 U.S. at 546 ("The power of war is given only for defense, not for conquest."); id. at 580 ("The soil, thus taken, was taken by the laws of conquest, and always as an indemnity for the expenses of the war, commenced by the Indians.").

Although before 1887, the United States formally acted only with Tribal consent, coercion and corruption often corrupted that consent.   See Cohen's Handbook § 1.03, at 23-24.  After enactment of the General Allotment Act of 1887, consent became yet more attenuated and was at times ignored.  See Cohen's Handbook § 1.04, at 72-75.  During those periods, Tribes were rarely able to seek judicial protection of their ownership interests.  See Cohen's Handbook § 1.04, at 72-75.  Notwithstanding the de facto policy of non- protection of aboriginal title, the Supreme Court continued to affirm the "voluntary cession" requirement until the 1903 case of Lone Wolf v. Hitchcock, 187 U.S. 553 (1903), wherein the Supreme Court held that Congress had the power to take Tribal property without the Tribe's consent and in violation of treaty promises.  See 187 U.S. at 565.  The Supreme Court further stated that Congress' decision to take Tribal property is a political question not subject to judicial review.  See Lone Wolf v. Hitchcock, 187 U.S. at 565 ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government.").

aboriginal title, no matter which sovereign holds the right of preemption.  Buttz v. Northern Pac.
R.R., 119 U.S. at 65.  Thus, the exclusive right to extinguish aboriginal title rests with the United
States.  See Oneida Indian Nation v. Cty. of Oneida, 414 U.S. at 667 ("Once the United States
was organized and the Constitution adopted, these tribal rights to Indian lands became the
exclusive province of the federal law.  Indian title, recognized to be only a right of occupancy, was
extinguishable only by the United States."); Santa Fe, 314 U.S. at 347; Buttz v. Northern Pac.
R.R., 119 U.S. at 68; Johnson v. M'Intosh, 21 U.S. at 586.

        598.    Although the principle that the United States has the exclusive power to extinguish
aboriginal title has remained unchanged, the Supreme Court unequivocally has rejected the view
that the process by which the United States extinguishes title is nonjusticiable:

> [I]t seems that the Court's conclusive presumption of congressional good faith
> [in Lone Wolf v. Hitchcock] was based in large measure on the idea that relations
> between this Nation and the Indian tribes are a political matter, not amenable to
> judicial review. That view, of course, has long since been discredited in takings
> cases.

United States v. Sioux Nation, 448 U.S. 371, 413 (1980)(citing Lone Wolf v. Hitchcock, 187 U.S.
553, 565 (1903)).[67]  Nevertheless, the Supreme Court continues to state that Congress is authorized
to extinguish aboriginal title when it chooses to do so, notwithstanding treaty promises to the
contrary.[68]   See, e.g., Idaho v. United States, 533 U.S. 262, 277 (2001); United States v. Sioux

---

[67]International law also rejects the nonjusticibility of aboriginal title extinguishment; for
example, The United Nations Declaration on the Rights of Indigenous Peoples provides significant
protection for indigenous peoples' right to the lands and resources they have traditionally owned
and prevents the taking of such lands without due process and compensation.  See, e.g., The United
Nations Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295, U.N. Doc.
A/RES/61/295 (Sept. 13, 2007), adopted by the General Assembly on September 13, 2007.

[68]Historically, when Tribes sought compensation for their land, they confronted numerous
barriers, including the United States' sovereign immunity, the passage of time, and the difficulty
of gaining access to the courts.  See Cohen's Handbook § 5.06[2], at 437-38.  Aboriginal title has

Nation, 448 U.S. at 415 n.29.

599.    Moreover, because aboriginal title is based on proof of continuous possession, a number of cases have held Tribal abandonment can result in the loss of aboriginal title, but only if such abandonment is voluntary.[69]   See Santa Fe, 314 U.S. at 349; Williams v. City of Chicago, 242 U.S. 434, 438 (1917); Buttz v. Northern Pac. R.R., 119 U.S. at 55.   Rather than serving as the basis for title extinguishment, voluntary abandonment most frequently figures in disputes over which of two Tribes owns disputed territory.   See Six Nations v. United States, 173 Ct. Cl. 899, 899 (1965).   Notably, as discussed above, the Court of Claims repeatedly has held that claims of aboriginal title may survive evidence of joint ownership by two or more Tribes.   See, e.g., United States v. Pueblo of San Ildefonso, 513 F.2d at 1395; Strong v. United States, 518 F.2d at 561; United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383-86.

600.    Although Congress has the power to extinguish aboriginal title, intent to do so must be "plain and unambiguous," and will not be "lightly implied."   Santa Fe, 314 U.S. at 346, 354. The Supreme Court consistently holds that Congress' intent to extinguish aboriginal title must be

---

had practical judicial protection only since the 1920s, after federal policy shifted away from the effort to eliminate Tribal land ownership.   See Cohen's Handbook § 1.05, at 79-80. According to current Congressional policy, Congress may alienate Indian land by an act of eminent domain, by an arranged purchase of the property, or by other agreement, such as payment of a judgment rendered in a claim for damages.   See United States v. Dann, 470 U.S. at 45-50; Cohen's Handbook § 5.06[3], at 430-40 (discussing ICCA's statutorily imposed compensation scheme).

[69]Forcible removal is not voluntary abandonment.   See Santa Fe, 314 U.S. at 355-56 ("No forfeiture can be predicated on an unauthorized attempt to effect a forcible settlement on the reservation unless we are to be insensitive to the high standards for fair dealing in light of which laws dealing with Indian rights have long been read.").   In two nineteenth-century cases involving Spanish land grants, the Supreme Court notes that the voluntary-abandonment requirement derives from the discovery doctrine.   See United States v. Fernandez, 35 U.S. 303, 304 (1832)(relying on Johnson v. M'Intosh, 21 U.S. at 543; United States v. Arredondo, 31 U.S. 691, 747-48 (1832)("[I]f [abandonment was] voluntary, the dominion of the crown over it was unimpaired in its plenitude; if by force the Indians had the right whenever they had the power or inclination to return.")).

express on the face of the legislative act or treaty authorizing extinguishment, or be clear from the surrounding circumstances.  See, e.g., Mattz v. Arnett, 412 U.S. 481, 505, (1973); Santa Fe, 314 U.S. at 353-54; Jones v. Meehan, 175 U.S. 1, 1 (1899).  Indeed, most federal land grants explicitly provide that the  grantee cannot take possession until aboriginal  title is extinguished.  See,  e.g., Oneida Indian Nation of N.Y. v. New York, 691 F.2d at 1075 ("Until Indian title is extinguished by sovereign act, any holder of the fee title or right of preemption, either through discovery or a grant from or succession to the discovering sovereign, remains subject . . . to the Indian right of occupancy, and the Indians may not be ejected."); Buttz v. Northern Pac. R.R., 119 U.S. at 68 (railroad grant provided for extinguishment of aboriginal title by government "as rapidly as might be consistent with public policy and the welfare of the Indians").  In ambiguous cases regarding the interpretation of statutes and treaties that arguably extinguished aboriginal title, the federal courts have applied the Indian law canon that Tribal property rights are preserved unless Congress's intent to the contrary is clear and unambiguous.  See, e.g., Cty. of Oneida v. Oneida Indian Nation, 470 U.S. at 246-47 (interpreting federally approved treaties ceding additional land to New York as not sufficiently clear to extinguish title to land in question); Cramer v. United States, 261 U.S. at 227 (interpreting exception in grant to railroad for lands "otherwise disposed of" to include lands occupied by Indians, in light of federal policy "from the beginning to respect the Indian right of occupancy"); Pueblo of Jemez v. United States, 790 F.3d at 1164 (rejecting United States' argument that aboriginal title is extinguished if a federal land grant does not contain "language that the grant was subject to pre-existing interests" and affirming that "federal land grants pass fee title to the grantees subject to aboriginal title").   See also Cohen's Handbook § 2.02[1], at 113 ("The basic Indian law canons of construction require that treaties, agreements, statutes, and executive orders be liberally construed in favor of the Indians and that all ambiguities

are to be resolved in their favor.").

601.    Notwithstanding the requirement that only Congress can extinguish aboriginal title, the Supreme Court has held that payment of a judgment rendered in a claim for damages is sufficient to effect extinguishment.  See United States v. Dann, 470 U.S. at 45-50.[70]  Moreover,

---

[70]In United States v. Dann, the government brought a trespass action against two Western Shoshone Indians, Mary and Carrie Dann, for violating the Taylor Grazing Act by grazing their livestock on public land without a permit.  See United States v. Dann, 470 U.S. 39, 43 (1985).  The United States based its title to the land on an ICC decision, see W. Shoshone Identifiable Group v. United States, 40 Indian Cl. Comm'n 318, 318 (1977), in which the ICC entered judgment in the amount of $26 million for the United States' taking of Western Shoshone Indians' aboriginal title to land located in California, Colorado, Idaho, Nevada, Utah, and Wyoming, see 40 Indian Cl. Comm'n at 318.  Although no single act of taking occurred, the ICC found that the United States had treated the property as public land.  See Shoshone Tribe v. United States, 11 Indian Cl. Comm'n, 387, 416 (1962)(stating that gradual encroachment by whites, settlers, and others resulted in taking of Indian lands by United States for its own use).  In related litigation in Temoak Band of W. Shoshone Indians v. United States, 29 Indian Cl. Comm'n 5 (1972), a Shoshone attorney stipulated that the United States took all the Tribe's Nevada land on July 1, 1872, to simplify the case so that the ICC could assess damages.  See Temoak Band of W. Shoshone Indians v. United States, 29 Indian Cl. Comm'n 5, 6 (1972).  Those individuals involved in the claims case, including the Tribe's attorney, apparently believed that the claim involved only land which non-Indians held at the stipulation date.  See United States v. Dann, 572 F.2d 222, 224 (9th Cir. 1978)(stating that most Western Shoshone Indians still live within land described in the Treaty of Ruby Valley, which defined the boundaries of their land). The Danns, however, were not members of the Temoak Band of Western Shoshones or the entity known as the Western Shoshone Identifiable Group, a group created solely to bring a claim case, and had supported unsuccessful efforts to intervene in the case to exclude claims for present possessory rights.  See Western Shoshone Legal Defense & Educ. Ass'n v. United States, 531 F.2d at 497. One of the original claimants, the Temoak Band, attempted to stay the proceeding in 1977 and thereafter discharged its attorney to stop the claim from proceeding.  See Temoak Band of W. Shoshone Indians v. United States, 593 F.2d 994, 997 (Ct. Cl. 1979).  Nevertheless, the United States argued that the ICC case barred the Dann sisters' claim to aboriginal title.  See United States v. Dann, 572 F.2d at 225 (noting United States' argument that the ICC decision estopped Danns from asserting that Indians retained "beneficial ownership" of Western Shoshone's Nevada lands).

The Ninth Circuit vindicated the sisters' claim by applying general claim preclusion principles.  See United States v. Dann, 572 F.2d at 225-26.  The Ninth Circuit held that claim preclusion did not attach, because the decision was not final until Congress paid the compensation owed to the Tribe.  See United States v. Dann, 572 F.2d at 225-26.  The Danns, therefore, were not precluded from litigating the title issue, because the title issue was never raised or litigated before the ICC.  See 572 F.2d at 225-26.  Instead, the issue litigated was the extent of the Western Shoshone's holdings before "the arrival of the white man."  572 F.2d at 225-26.  The Ninth Circuit

---

concluded that "the extinguishment question was not necessarily in issue, it was not actually litigated, and it has not been decided." F.2d at 226-27.  The only issue decided, according to the Ninth Circuit, was the extent to which the Western Shoshone asserted title before non-Indian contact.  See 572 F.2d at 226.  The ICC did not decide that Congress had extinguished their title, and the stipulation established only a date of taking for purposes of valuation.  See 572 F.2d at 226.

The Supreme Court reversed the Ninth Circuit by issuing a decision based exclusively on statutory interpretation of the ICCA.  See United States v. Dann, 470 U.S. at 44-45.  Because the ICCA provides that payment of the claims will fully discharge all of the United States' obligations, the Supreme Court viewed its task as merely to determine whether crediting the judgment award to a Tribal account in the United States Treasury qualified as payment.  See 470 U.S. at 44.  The Supreme Court applied trust law principles to determine whether payment had been made: payment to a trustee is payment to the beneficiary, so when the United States as defendant handed the money to itself as trustee, payment occurred.  See 470 U.S. at 47-50.  Although on remand the Danns won the right to retain the land containing their homestead, they lost their grazing land.  See United States v. Dann, 873 F.2d 1189, 1200 (9th Cir. 1989)(holding that the Dann sisters' individual land title was restricted to land that they or their descendants occupied before 1934, and restricting animal number and kind that could graze), cert. denied, 493 U.S. 890 (1989).

Scholars have criticized the Supreme Court's decision in United States v. Dann for sidestepping a discussion of the more difficult issues regarding why a decision entered on behalf of a group that was formed just for the purpose of bringing ICC litigation should bind the Dann sisters, whose Band had continuously occupied the land.  See Kristine L. Foot, United States v. Dann: What It Portends for Ownership of Millions of Acres in the Western United States, 5 Pub. Land L. Rev. 183, 183 (1984); Nell Jessup Newton, Indian Claims in the Courts of the Conqueror, 41 Am. U. L. Rev. 753, 854 (1992).  Then-Professor -- now Dean -- Nell Jessup Newton of Notre Dame Law School, for example, commented that the Supreme Court's opinion is "most notable for what it did not say," specifically that the Supreme Court did not take up the Dann sisters' argument that to permit the United States to use the ICC's judgment against them would result in permitting judicial extinguishment of aboriginal title, i.e., that the judgment would effect a taking of Indian land when only Congress has the authority to confiscate such land.  See Newton at 829-30 (citing Brief for Respondent at 25-29, United States v. Dann, 470 U.S. 39 (1985)(No. 83-1476)). Dean Newton further notes that

> most of the Court's opinion focused on Congress' intent to settle all the ancient claims in enacting the Indian Claims Commission Act.   Whether the method chosen might violate fundamental principles of fairness was simply not of interest to the Court.  Of greatest concern to the Court was to dispatch these claims cases once and for all.

Newton at 854 (citing Robert Woodward & Scott Armstrong, The Brethren 57-58, 359 (1979)(stating that Burger Court denigrated Indian claims cases by calling them "teepee" and "peewee" cases)).

several courts have held that Congressional acts in anticipation of settlement and public use, and actual settlement, by non-Indians are factors that may affect aboriginal title extinguishment.  See, e.g., United States v. Gemmill, 535 F.2d at 1147; United States v Pueblo of San Ildefonso, 513 F.2d at 1391; Gila River Pima-Maricopa Indian Cmty. v. United States, 494 F.2d at 1386; Plamondon ex rel. Cowlitz Tribe of Indians v. United States, 467 F.2d 935, 937 (Ct. Cl. 1972).

602.    In Plamondon ex rel. Cowlitz Tribe of Indians v. United States, the Court of Claims, when tasked with deciding only whether the lands in question were taken in 1855 or 1863, explained first that the limited settlement by non-Indians on the Cowlitz land up to 1855 was not sufficient to extinguish the Tribe's aboriginal title; settlement was minimal and did not disrupt the Cowlitz Tribe's way of life, and, in fact, land patents were not issued to claimants on Cowlitz Tribal lands until several years after 1855.  See 467 F.2d at 937-38.  By 1863, the Court of Claims found, however, that non-Indians had substantially settled the Cowlitz Tribal land, that the non-Indians greatly outnumbered the Indians, that the Indians intermingled with the non-Indians and no longer maintained an independent existence and that the Indians were thus deprived of the exclusive use and occupancy of their aboriginal lands.  See 467 F.2d at 936-37.  This finding, when combined with the establishment of a reservation for the Cowlitz, and evidence of Congressional intent to foreclose treaty negotiations and subject the Cowlitz land to public sale, led the Court of Claims to affirm the ICC's finding of an 1863 taking date.  See 467 F.2d at 937.

603.    Additional Court of Claims support for aboriginal title extinguishment absent express Congressional intent is seen in Gila River Pima-Maricopa Indian Community v. United States, wherein American Indian claimants -- who had conceded before the ICC that their aboriginal title was extinguished -- argued that, until the enactment of the Taylor Grazing Act of 1934, the settlers' individual entries effected the only extinguishment of aboriginal title to the

- 138 -

claimed lands, tract by tract, onto the land in the ICC award area.  See 494 F.2d at 1392.  In

considering the date at which extinguishment occurred, the Court of Claims stated that the ICC

was

> faced with a difficult task. Unlike some other cases, there was here no formal
> cession by the Indians, no express indication by Congress (or its delegate) of a
> purpose to extinguish at a specified time, and no single act (or contemporaneous
> series of acts) of the Federal Government which indisputably erased native
> ownership at one swoop.  The Indian appellants say that, in these circumstances,
> the presumption of the Santa Fe opinion requires the tribunal to hold that there was
> no general taking at all until some unequivocal action by Congress (such as, they
> concede but only arguendo, the Taylor Grazing Act of 1934).  We think, however,
> that this is a case in which the history of the award area is such that the Commission
> could permissibly stop short of an uncontroverted and unmistakable sign from
> Congress.

494 F.2d at 1392.  The Court of Claims found that the ICC had the discretion to choose, as the

taking date, an Executive Order issued in 1883, which doubled the size of the existing reservation,

because the Executive Order indicated that the United States believed that all the rightful Tribal

land was now within the reservations and that the 1883 extension was an effort to keep for the

Indians the lands that they were then occupying and using.   See 494 F.2d at 1392 ("At that moment,

it could be said, the Government called a final halt because in its eyes the Pima-Maricopa group

did not own the territory outside of the reservation, and any Indian claim to it was and should be

rejected.").   Thus, the Court of Claims affirmed the ICC's conclusion that the extent of non-Indian

settlement, coupled with an Executive Order that Congress "impliedly ratified," marked the

extinguishment of aboriginal title to all of the Tribe's outlying lands.  494 F.2d at 1394 ("In the

context of this history, it is proper to imply a Congressional delegation of some of its plenary

power over Pima-Maricopa affairs to the executive branch.").

      604.     The claim for failure to protect aboriginal title in United States v. Pueblo of San

Ildefonso arose after the United States created a reservation for thirteen Pueblos on their historic

lands, included other Tribal lands in a national forest reserve, and, over many years, granted the Pueblos' remaining lands to non-Indian settlers under the public land laws.  See 513 F.2d at 1383. The Court of Claims concluded that the reservation's creation by itself was not sufficient to extinguish Tribal title to lands not included in the reservation borders.  See 513 F.2d at 1388. Extinguishment occurred only when federal land laws granted non-Indians the right to settle particular lands.  See 513 F.2d at 1391.  The United States argued that substantial "non-Indian interference with [the Indians'] exclusive use and occupancy of aboriginal land title areas" extinguished Tribal title.  513 F.2d at 1386-87. The Court of Claims rejected the argument that non-Indian encroachment could result in the loss of aboriginal title when the affected Tribe did not voluntarily abandon the land, see 513 F.2d at 1390, and affirmed that private individuals' actions cannot affect aboriginal title, see 513 F.2d at 1387 ("[T]ermination of Indian title is exclusively the province of the United States.").  The Court of Claims held that there must be "clear and convincing evidence of an intent to extinguish" aboriginal title and that "the fact that some entries [by non-Indians] were allowed in the plaintiffs' aboriginal areas is evidence of official negligence, or lack of knowledge of the plaintiffs' areas, rather than an intent on the part of the United States to abolish their whole titles." 513 F.2d at 1390.  Nevertheless, the Court of Claims affirmed the ICC extinguishment award based on the dates when the aboriginal areas were included in what later became the Santa Fe National Forest and when individual non-Indian settlers entered Tribal lands under the public land laws, concluding that

> there are no fine spun or precise formulas for determining the end of aboriginal ownership. Unquestionably, the impact of authorized white settlement upon the Indian way of life in aboriginal areas may serve as an important indicator of when aboriginal title was lost.  But such authorized settlement is only one of various factors to be considered in determining when specific lands were "taken."

United States v Pueblo of San Ildefonso, 513 F.2d at 1390.  See generally Tlingit & Haida Indians

v. United States, 177 F. Supp. 452 (Ct. Cl. 1959)(holding that the establishment of forest reserves constituted a taking of land which the claimant Indians historically used and occupied); Pueblo of Nambe v. United States, 16 Ind. Cl. Comm. 393 (1965)(same); Pueblo of Taos, 15 Ind. Cl. Comm. 666 (1965)(same).

605.    In United States v. Gemmill -- the only United States Court of Appeals case to consider factors other than express Congressional intent as evidence of aboriginal title extinguishment -- members of the Pit River Indian Tribe were arrested for trespass and theft of United States government property after they removed Christmas trees from the Shasta Trinity National Forest.  See 535 F.2d at 1149.  Other Tribal members were arrested for trespass when they sought to stop logging in the Lassen National Forrest, which the members considered sacred Tribal lands.  See 535 F.2d at 1147.  The members contended that their Tribe possessed unextinguished aboriginal title to the land in question; however, the Ninth Circuit concluded that four events taken together demonstrated Congressional intent sufficient to extinguish their Tribe's aboriginal title.  See 535 F.2d at 1149.  The first event was passage of the California Land Claims Act of 1851, Act of March 3, 1851, ch. 41, 9 Stat. 631 ("California Land Act"), which required all persons claiming lands by virtue of Spanish or Mexican title grants to present their claims to a special commission or lose their rights.  See 535 F.2d at 1148.  Although Tribal claims were based on aboriginal possession and occupancy, rather than a grant from Spain or Mexico, the Supreme Court interpreted the statute as requiring the Indians in the area to present their claims to the federal government.  See 535 F.2d at 1148 ("In Barker v. Harvey . . . and United States v. Title Ins. & Trust Co., the Supreme Court upheld fee titles based on· patents against challenges by Mission Indians who had not presented their claims to the 1851 Commission.").  Thus, a federal statute

- 141 -

interpreted by the Supreme Court constituted sufficient Congressional intent to extinguish aboriginal title when the Tribes in question failed to comply with the statutory claim procedures. See 535 F.2d at 1148.

606.    Second, the United States engaged in prolonged military confrontation with the Pit River Indians in the 1850s and 1860s, which culminated in a decisive military defeat in 1867.   See 535 F.2d at 1148.   The United States then removed the Pit River Indians from their lands by force. See 535 F.2d at 1149.   Third, in another express act, the federal government included the lands in question in the Shasta Trinity and Lassen National Forests.   See 535 F.2d at 1149 (citing the Court of Claims' holding in United States v. Pueblo of San Ildefonso that the designation of land as a forest reserve is itself effective to extinguish aboriginal title).   Fourth, the Tribe brought a damages claim against the United States before the ICC for taking its lands, and the ICC awarded the Tribe compensation.   See 535 F.2d at 1149 (citing Pit River Indians v. United States, 7 Ind. Cl. Comm. 815).   In concluding that the Tribe previously had acknowledged the extinction of its aboriginal title, the Ninth Circuit opined:

> The exact date on which Indian title has been extinguished is often difficult to determine.   (See United States v. Pueblo of San Ildefonso, supra, at 1391). The four events we have recounted amply illustrate that problem. Any one of these actions, examined in isolation, may not provide an unequivocal answer to the question of extinguishment. However, the activity of the federal government, beginning with the ambiguous Act of 1851 and culminating in the payment of the compromise settlement, has included expulsion by force, inconsistent use, and voluntary payment of compensation agreement. (See Santa Fe, supra, 314 U.S. at 347 . . .).   This century-long course of conduct amply demonstrates that the Pit River Indian title has been extinguished.

United States v. Gemmill, 535 F.2d at 1149.[71]

---

[71]The United States District Court for the District of Alaska in United States v. Atlantic Richfield Co. cites the United States v. Gemmill decision as an application of the "complete dominion" theory, i.e., that the United States may extinguish aboriginal title "by exercise of

## LAW REGARDING MOTION TO ALTER OR AMEND UNDER RULE 59(e)

607.   Motions to reconsider in civil cases fall into three categories:

(i) a motion to reconsider filed within twenty-eight[72] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion.

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. at 462 (citing Price v. Philpot, 420 F.3d 1158, 1167

& n.9 (10th Cir. 2005)).  See Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d

1292, 1296 n.3 (10th Cir. 2002).

608.   Whether a motion for reconsideration should be considered a motion under rule 59

or rule 60 is not only a question of timing, but also "depends upon the reasons expressed by the

movant."  Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d

---

complete dominion adverse to the right of occupancy," as the Supreme Court stated in Santa Fe. 435 F. Supp. 1009, 1019 (D. Alaska 1977)(Fitzgerald, J.)(quoting Santa Fe, 314 U.S. at 347; United States v. Gemmill, 535 F.2d at 1149)("The Ninth Circuit recently applied the 'complete dominion' theory in United States v. Gemmill . . . to conclude that a tribe's aboriginal title had been extinguished de jure.").  The Court does not agree that the Ninth Circuit in United States v. Gemmill applies the complete dominion theory, and the Court is unaware of any other federal court opinion to make this assertion.

[72]Former rule 59 provided for a ten-day period after entry of judgment to file motions to reconsider.  In 2009, the rule was amended, extending the filing period to twenty-eight days:

Experience has proved that in many cases it is not possible to prepare a satisfactory post-judgment motion in 10 days, even under the former rule that excluded intermediate Saturdays, Sundays, and legal holidays.  These time periods are particularly sensitive because Appellate Rule 4 integrates the time to appeal with a timely motion under these rules.  Rather than introduce the prospect of uncertainty in appeal time by amending Rule 6(b) to permit additional time, the former 10-day periods are expanded to 28 days.

Fed. R. Civ. P. 59 advisory committee's notes.

1194, 1200 (10th Cir. 2011).  Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d 751, 753 (10th Cir. 1989)).  In other words, if the reconsideration motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."  Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).  A motion to alter or amend under rule 59(e), however, is an "inappropriate vehicle[] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."  Servants of Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

609.    The Tenth Circuit reviews a district court's ruling on a motion to alter or amend "under an abuse of discretion standard."  Phelps v. Hamilton, 122 F.3d at 1324.  Under that standard "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  122 F.3d at 1324.  "The purpose [of a rule 59(e)] motion is to correct manifest errors of law or to present newly discovered evidence."  Monge v. RG Petro-Machinery (Group) Co. Ltd., 701 F.3d 598, 611 (10th Cir. 2012)(internal quotation marks omitted)(quoting Webber v. Mefford, 43 F.3d 1340, 1345 (10th Cir. 1994)).  "Where the motion requests a substantive change in the district court's judgment or otherwise questions its substantive

correctness, the motion is a Rule 59 motion, regardless of its label." Yost v. Stout, 607 F.3d 1239, 1243 (10th Cir. 2010).

610.    The Tenth Circuit has determined that the "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d at 1225. In short, a district court can use whatever standard it wants to review an earlier interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

611.    The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy that the parties spent on it -- in

briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[73] than when the prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

612.    Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence that the parties may produce, and use those factors to assess the degree of reasonable reliance which the opposing party has placed in the Court's prior ruling.  See 18B Charles Alan Wright, et

---

[73]The Court typically makes findings of fact and conclusions of law in ruling on these motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59."  Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its twenty-eight-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

al., Federal Practice & Procedure § 4478.1 (2d ed. 2018)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling than they faced in fighting the motion for protective order the first time.

613.   Third, the Court should consider the factors from Servants of the Paraclete v. Does. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

614.   These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived its right to appeal the alleged error by not raising the appropriate argument.  Even in circumstances where the Court concludes that it is insulated from

reversal on appeal, there are principled reasons for applying a de novo standard.  After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

615.    What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again.  Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard which it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

616.    In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion.  The Court analyzes motions to reconsider by starting where it ended in the prior ruling -- not by starting anew.  Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

## ANALYSIS

617.    The Court concludes that rule 59 bars Jemez Pueblo from asserting title to Redondo Meadows, Redondo Peak and surrounding locations, and Valle San Antonio.  Even if the Court reviewed Jemez Pueblo's claims to these areas, it would conclude that Jemez Pueblo has not established aboriginal title to the areas.  Finally, the Court concludes that Jemez Pueblo has not established aboriginal title to the Banco Bonito.  Accordingly, the Court denies the Motion.

## I.    RULE 59 BARS JEMEZ PUEBLO FROM NOW ASSERTING TITLE TO REDONDO MEADOWS, REDONDO PEAK, AND VALLE SAN ANTONIO.

618.    A Court may alter or amend its judgment under rule 59(e) for: (i) an intervening change in the controlling law; (ii) new evidence previously unavailable; or (iii) to correct clear error or prevent manifest injustice.   See Anderson Living Tr. v. WPX Energy Prod., LLC, 308 F.R.D. at 427.    "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."   Servants of Paraclete v. Does, 204 F.3d 1015, 1012 (10th Cir. 2000).   District courts are "vested with considerable discretion" to alter or amend their judgments.   Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1332 (10th Cir. 1996).[74]

619.    At the outset, the Court notes some confusion surrounding rule 59(e)'s standard for rearguing positions that a litigant already raised.   The Tenth Circuit, in Servants of Paraclete v. Does, stated that motions for reconsideration under rule 59(e) are "inappropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."   Servants

---

[74]The United States proposes as a Conclusion of Law:

Jemez's motion for reconsideration fails because Jemez does not identify clear error.   To the contrary, Jemez's motion regurgitates the same evidence it presented unsuccessfully at trial and attempts to rebut the Court's findings with clearly erroneous assertions.   Jemez's efforts to reargue questions already presented to and considered by this Court, without identifying any clear error made by this Court, are a misuse of Rule 59(e).

U.S. Proposed Findings ¶ 4(b), at 14 (citations omitted).   The United States' proposed Conclusion of Law is conclusory, and it does not address whether the Court's Memorandum Opinion and Order caused "manifest injustice."   Anderson Living Tr. v. WPX Energy Prod., LLC, 308 F.R.D. at 427.   Aboriginal title to large portions of New Mexico land is a weighty civil concern.   The Court cannot determine well whether amending its Findings of Fact and Conclusions of Law will prevent manifest injustice without closely examining Jemez Pueblo's contentions.

of Paraclete v. Does, 204 F.3d at 1012.  Despite this dictum, the Court previously said in Nelson

v. City of Albuquerque that

> Servants of Paraclete v. Does, does not force the Court to deny a motion to amend
> or alter, simply because it raises identical issues; rather, it affords the Court the
> option to deny that motion for reasons of judicial efficiency.  A court need not
> review a motion to alter or amend with the same rigor if the motion raises issues
> already considered, because it would waste time by forcing a judge to rewrite an
> opinion already rendered.  If, on the other hand, a party raises an identical issue on
> a motion to alter, and, upon the district judge's reflection, perhaps after passions
> have cooled, he or she concludes that he or she erred previously, Servants of
> Paraclete v. Does does not chain that district judge to an erroneous legal conclusion.
> There is no sound reason for a district judge to be unable to change a ruling he or
> she has made if he or she has become concerned that he or she is wrong.

Nelson v. City of Albuquerque, 283 F. Supp. 3d at 1099, rev'd and remanded sub nom. Nelson v.

City of Albuquerque, 921 F.3d 925 (10th Cir. 2019).  The Tenth Circuit reversed the Court in

Nelson v. City of Albuquerque after it granted a second rule 59(e) motion that a defendant filed,

in which the defendant reargued issues it raised in a previous rule 59(e) motion.  See Nelson v.

City of Albuquerque, 921 F.3d at 931.  The Tenth Circuit concluded that the second rule 59(e)

motion "merely reurged arguments already made in a previous Rule 59(e) motion," and that

granting the second motion was therefore error.  Nelson v. City of Albuquerque, 921 F.3d at 931.

620.   An active Tenth Circuit judge requested rehearing of the Tenth Circuit panel

decision in Nelson v. City of Albuquerque.  See Nelson v. City of Albuquerque, 925 F.3d 1187

(10th Cir. 2019).  The majority of Tenth Circuit judges voted against rehearing.  See 925 F.3d at

1188.  Judge Hartz wrote a dissent from the denial of en banc reconsideration, in which the

Honorable Timothy Tymkovich, Chief United States Circuit Judge for the Tenth Circuit, joined.

See 925 F.3d at 1188.  Judge Hartz noted the tension between the apparent limits which the Tenth

Circuit and Supreme Court have placed on a litigant's ability to reargue issues in rule 59(e)

motions, see 925 F.3d at 1191 (citing Exxon Shipping Co. v. Baker, 554 U.S. at 485 (2008)(stating

that rule 59(e) "'may not be used to relitigate old matters'" (quoting 11 C. Wright & A. Miller,
Federal Practice and Procedure § 2810.1, 127-28 (2d ed. 1995) and Servants of Paraclete v. Does,
204 F.3d at 1012))), and its recent statement that "a motion under Rule 59(e) allows a party to
reargue previously articulated positions to correct clear legal error," Hayes Family Tr. v. State
Farm Fire & Cas. Co., 845 F.3d 997, 1005 (10th Cir. 2017).  Judge Hartz suggests that, if the Tenth
Circuit believes that parties cannot reargue issues they raised or could have raised, rule 59(e)
motions could succeed only when a party discovers new evidence or there was an intervening
change in the law.  See 925 F.3d at 1191.  Judge Hartz noted that Nelson v. City of Albuquerque
implies that the "'need to correct clear error or prevent manifest injustice'" is no longer a ground
for relief, but he argues that the district courts should retain full discretion to review their rulings
regardless the reason for reconsideration.  925 F.3d at 1191 (quoting Servants of Paraclete v. Does,
204 F.3d at 1012).

621.  Nelson v. City of Albuquerque's author, Judge Bacharach, responded to Judge
Hartz' criticisms in a concurrence from the denial of en banc reconsideration.  See 925 F.3d at
1196.  In the concurrence, Judge Bacharach rejected Judge Hartz' "parade of horribles," 925 F.3d
at 1196, and argued that "[c]ertainly there would be nothing wrong with a motion to correct clear
error or prevent manifest injustice," 925 F.3d at 1198.  Judge Bacharach emphasized that rehashing
earlier arguments was improper only when the same arguments were presented in a previous,
unsuccessful post-trial motion.  925 F.3d at 1198.  He asserted that Nelson v. City of Albuquerque
merely represented a straightforward application of Servants of Paraclete v. Does and that its
holding that parties cannot "repeat the same arguments in a Rule 59(e) motion on the heels of a

prior post-judgment motion" does not "scuttle the use of Rule 59(e) or upend our jurisprudence on post-judgment motions."  925 F.3d at 1198.

622.    The Supreme Court's subsequent ruling in <u>Banister v. Davis</u> contains dicta supporting a district court's unrestricted discretion to reconsider its rulings.  In <u>Banister v. Davis</u>, the Supreme Court concluded that filing a motion under rule 59(e) did not constitute a "second or successive habeas corpus application" that 28 U.S.C. § 2244(b) ordinarily prohibits courts from hearing.  <u>Banister v. Davis</u>, 140 S. Ct. at 1702.  It noted that rule 59 derives from a district court's common law power to alter or amend judgments.  <u>See</u> 140 S. Ct. at 1706 (citing <u>Browder v. Director, Dept. of Corr. of Ill.</u>, 434 U.S. 257, 270 (1978); <u>Zimmern v. United States</u>, 298 U.S. 167, 169-70 (1936)("The judge had plenary power while the term was in existence to modify his judgment [or] revoke it altogether.")).  The Supreme Court asserted that this common law power's 1946 codification in rule 59(e) "did nothing to narrow the set of judgments amenable to alteration." 140 S. Ct. at 1706.  It also noted that, although habeas courts routinely dismiss rule 60(b) motions for raising repetitive claims, only one habeas court has dismissed a rule 59(e) motion for repetitive arguments rather than reaching a decision on the merits.  <u>See</u> 140 S. Ct. at 1707.  This willingness to engage with 59(e) petitions in habeas cases, the Supreme Court asserted, accords with an "economic and effective appellate process," as it "gives the court a brief chance to fix mistakes before its (single) judgment on a (single) habeas application becomes final and thereby triggers the time for appeal."  140 S. Ct. at 1708.

623.    Jemez Pueblo has filed only one motion under rule 59(e), and so the Court may exercise its discretion to reconsider the issues presented in the Motion.[75]  The Supreme Court's

_____

[75]Judge Bacharach's subsequent clarification of his opinion in <u>Nelson v. City of</u>

decision in Banister v. Davis, which endorses a district court's ability to revisit issues previously argued, also suggests that the Court may properly review the Motion's arguments that Jemez Pueblo previously raised.  But although the Court has the authority to reconsider Jemez Pueblo's previously raised arguments to correct clear error and prevent manifest injustice -- and it will do so for Jemez Pueblo's claim to the Banco Bonito -- the Court concludes that Jemez Pueblo's claims of aboriginal title to Redondo Meadows, Redondo Peak, and the Valle San Antonio are not suitable for review under rule 59(e).

624.    Rule 59(e) was adopted to make clear that a district court has the power "to rectify its own mistakes in the period immediately following the entry of judgment."  White v. N.H. Dep't of Emp't Sec., 455 U.S. 445, 450 (1982).  Courts "generally" invoke "Rule 59(e) to support reconsideration of matters properly encompassed in a decision on the merits."  White v. N.H. Dep't of Emp't Sec., 455 U.S. at 451.  See Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).  Further, "'reconsideration' means just that: Courts will not entertain arguments that could have been but were not raised before the just-issued decision."  Banister v. Davis, 140 S. Ct. at 1708.  The Court believes that Jemez Pueblo's claims to the sub-areas other than Banco Bonito are "arguments that could have been but were not raised."  Banister v. Davis, 140 S. Ct. at 1708.  Jemez Pueblo did not specifically argue that it was entitled to each discrete cultural polygon in the Valles Caldera and instead premised its aboriginal title claims to the Valles Caldera as a whole.  See Complaint ¶¶ 95-96, at 14; Plaintiff's Second Supplemental Answers and Objections to Defendant

---

Albuquerque still leaves the Court skeptical that Nelson v. City of Albuquerque's holding is limited only to situations where a litigant presents multiple rule 59(e) motions.  Although it agrees with the reasoning in Judge Hartz's dissent from the denial of en banc reconsideration, it will take the Tenth Circuit at its word in this instance and reconsider the issues listed in the Motion.

United States' Interrogatories at 32-34 (dated July 3, 2018), admitted at trial as United States' Ex. DX-SD)("Interrogatory Response")(responding to an interrogatory requesting a description of "the area(s) within Baca Location No. 1 for which Plaintiff asserts aboriginal title" by referring to documents describing all of the Valles Caldera National Preserve); Transcript of Proceedings at 74:7-13 (West)(taken May 7, 2019), filed August 8, 2019 (Doc. 395)("Closing Argument Tr.").

625.    The four cases that provide Jemez Pueblo a legal basis to seek less than the full amount of its original claim area do not allow it to seek title, after trial, to areas not within the general issue that the Complaint and subsequent litigation presented. See Strong v. United States, 518 F.2d at 565-69; Wichita Indian Tribe v. United States, 696 F.2d at 1385; Ala.-Coushatta Tribe of Tex. v. United States, 2000 WL 1013532, at *14; Sac & Fox Tribe of Indians of Okla. v. United States, 315 F.2d at 901-06.[76]  In these cases, the land that the Tribe sought was not a new issue beyond the pleadings that would require either trial by consent or the pleadings' amendment. See Fed. R. Civ. P. 15(b).  In Alabama-Coushatta Tribe of Texas v. United States, the Tribe voluntarily reduced its claim area from nine million acres to roughly six million four-hundred thousand acres. See 2000 WL 1013532, at *1; Ala.-Coushatta Tribe of Tex. v. United States, 28 Fed. Cl. 95, 97 n.4 (1993).  The Tribe made this strategic decision on remand from a successful appeal of the trial

---

[76]The Court of Appeals, Court of Claims, Court of Federal Claims cases that discuss many of the aboriginal title issues present in this case are not binding precedent; however, the Court concludes that these cases have persuasive value with respect to joint aboriginal title claims and, thus, will assist the Court in its disposition of the case.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1091 n.135.  The Court notes that the Tenth Circuit in this case cites favorably to numerous out-of-circuit and lower court cases, including Native Vill. of Eyak v. Blank; Wichita Indian Tribe v. United States; United States v. Pueblo of San Ildefonso; Sac & Fox Tribe of Indians of Okla. v. United States.  In many instances, the Court has specifically explained its decision to rely on these non-binding cases.

judge's factual findings.  See Ala.-Coushatta Tribe of Tex. v. United States, 28 Fed. Cl. at 98-99

(describing the case's procedural history).  There is no indication that the evidence adduced at trial

was inadequate to fully settling revised claim.  See generally 2000 WL 1013532, at *10-42.

626.    In Wichita Indian Tribe v. United States, the Federal Circuit remanded a case to the

United States Court of Federal Claims for a determination what areas the Wichita Tribe had

abandoned.  See 696 F.2d at 1386.  The trial court previously had determined that, because the

Wichita Tribe abandoned a portion of its claim area, it was not entitled to any part of the claim

area.  See 696 F.2d at 1382.  Because this legal ruling is an incorrect statement of the law and

contradicted some trial court findings, the Federal Circuit remanded the case to expand the record.

See 696 F.2d at 1378-79.  The issue on remand was therefore a narrower question already

subsumed within the original litigation: which areas the Wichita Tribe fully abandoned.  See 696

F.2d at 1386.

627.    Sac & Fox Tribe of Indians of Oklahoma v. United States and Strong v. United

States stand only for the proposition that a Court may award less than the entire claim area to a

Tribe seeking aboriginal title.  Sac & Fox Tribe of Indians of Oklahoma v. United States concerns

a challenge to an ICC determination that the challenging Tribe had proved aboriginal title to only

a part of its original claim area.  See 315 F.2d at 897.  Strong v. United States likewise concerned

an appeal from an ICC proceeding that awarded title to only a portion of a claim area.  See 518

F.2d at 565-66.  The Court already has concluded that Jemez Pueblo has not proved aboriginal title

to its entire claim area, see, e.g., Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1222-23,

and these cases do not support an argument that the Court may now review the record again to

determine aboriginal title for sub-areas not specifically litigated during the trial.

628.    Jemez Pueblo pled and litigated a single claim for the entire Preserve; it did not litigate ninety different claims for ninety discrete areas.  See Complaint ¶¶ 95-96, at 14; Plaintiff's Second Supplemental Answers and Objections to Defendant United States' Interrogatories at 32-34 (dated July 3, 2018), admitted at trial as United States' Ex. DX-SD)("Interrogatory Response")(responding to an interrogatory requesting a description of "the area(s) within Baca Location No. 1 for which Plaintiff asserts aboriginal title" by referring to documents describing all of the Valles Caldera National Preserve).  The United States tried only one of the sub-areas at issue here by consent -- Banco Bonito -- because Jemez Pueblo's summary judgment motion put the United States on notice of that discrete claim.  See Plaintiff Pueblo of Jemez's Motion for Partial Summary Judgment Confirming its Indian (Aboriginal) Title to the Banco Bonito and Redondo Mountain, filed August 17, 2018 (Doc. 238); Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150, 1162 (10th Cir. 1999)("Implied consent cannot be based upon the introduction of evidence that is relevant to an issue already in the case when there is no indication that the party presenting the evidence intended to raise a new issue."); Fed. R. Civ. P. 15(b).

629.    Jemez Pueblo disputes the United States' contention that it did not put the United States on notice of its claims to discrete sub-areas within the preserve.  See Jemez Pueblo Supplemental Response at 16-18.  It presents three arguments.  See Jemez Pueblo Supplemental Response at 16-17.  First, it argues that its Complaint "discussed in detail many of these sub-areas." Jemez Pueblo Supplemental Response at 17.  Second, Jemez Pueblo argues that, although it answered an interrogatory asking it to identify the area to which it seeks aboriginal title by referring to the Valles Caldera National Preserve's entirety, it "extensively identified multiple areas" when answering "other discovery requests."  Jemez Pueblo Supplemental Response at 17.  Finally,

Jemez Pueblo argues that the United States "ignores each deposition it took of Jemez witnesses, where it asked each witness to mark on a map of the Valles Caldera areas of Jemez use."  Jemez Pueblo Supplemental Response at 17.

630.    Jemez Pueblo's Complaint indeed refers to the sub-areas for which it now seeks title.  See Complaint ¶¶ 30-33, 40-42, 45, 47-50, 57-58, 79, at 6-9, 12.  The inclusion of these sub-areas within the Complaint does not, however, put the United States on notice that Jemez Pueblo sought title to these sub-areas separate and apart from its pleaded claim to aboriginal title for the Preserve's entirety.  See Complaint ¶¶ 88-96, at 13-14.  Some of the references are too general to notify the United States, see, e.g., Complaint ¶ 79, at 12 (noting, in the Complaint's only reference to Valle San Antonio, that the Valle San Antonio is within Baca Location No. 1), and the Complaint is framed, overall, as a challenge to the "lands of the Valles Caldera National Preserve," Complaint ¶¶ 94-96, at 14.

631.    Jemez Pueblo's interrogatory answers are also insufficient to notify the United States to the Jemez Pueblo's claim to specific sub-areas.  Jemez Pueblo specifically directs the Court to its July 3, 2018, response to Interrogatory No. 5.  See Jemez Pueblo Supplemental Response at 17.  This response provides the various "areas that are associated with ancestral Jemez" that are "within the western Jemez homeland," Complaint ¶ 26, at 6-7; see Interrogatory Response at 16, as well as the "area(s) within Baca Location No. 1 where" certain cultural land uses occur, Interrogatory Response at 29.  Although they reference the geographic areas that Jemez Pueblo now seeks, because they respond to a limited question within the dispute that the Complaint frames, Jemez Pueblo's answers do not put the United States on notice that it would later seek title

to these smaller areas.  Jemez Pueblo's response only bolsters its pleaded claim to the Valles Caldera's entirety.

632.    Last, the depositions that the United States took of Jemez Pueblo witnesses also did not put the United States on notice that Jemez Pueblo would later seek title to these specific sub-areas.  Jemez Pueblo does not cite any deposition in which a witness specifically discussed any of these sub-areas.  See Jemez Pueblo Supplemental Response at 17.  Parties frame cases, not witnesses, and the United States was not under an obligation to disprove aboriginal title to each specifically mentioned geographic location in the Valles Caldera as part of its effort to defeat Jemez Pueblo's claim to the Valles Caldera National Preserve's entirety -- especially when Jemez Pueblo gave no indication that it sought title to specific sub-areas.  See Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 457 (10th Cir. 1982)(noting that the trial court may deny amendment in its discretion "[w]hen the evidence claimed to show that an issue was tried by consent is relevant to an issue already in the case, and there is no indication that the party presenting the evidence intended thereby to raise a new issue").  Accordingly, the Court agrees with the United States that, for the sub-areas other than Banco Bonito, Jemez Pueblo did not provide the United States adequate notice to permit Jemez Pueblo to amend its pleadings under rule 15.  See Minter v. Prime Equipment Co., 451 F.3d at 1206 ("Courts will properly deny a motion to amend when it appears that the plaintiff is using Rule 15 to make the complaint 'a moving target,' [or] to 'salvage a lost case by untimely suggestion of new theories of recovery." (quoting Viernow v. Euripides Dev. Corp., 157 F.3d 785, 800 (10th Cir. 1998), and Hayes v. Whitman, 264 F.3d 1017, 1027 (10th Cir. 2001)).

633.    Rule 15 does not permit a plaintiff to unfairly reframe its case after the fact.  <u>See</u> <u>United States v. Hougham</u>, 364 U.S. 310, 316 (1960)("Rule 15 . . . was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result."); <u>Green Country Food Mkt., Inc. v. Bottling Grp., LLC</u>, 371 F.3d 1275, 1281 (10th Cir. 2004); 6 Wright, Miller & Kane, <u>Federal Practice and Procedure</u> § 1487 (2d ed. 1990)("Perhaps the most important factor listed by the Court and the most frequent reason for denying leave to amend is that the opposing party will be prejudiced if the movant is permitted to alter his pleading.").  "Courts typically find prejudice only when the amendment unfairly affects the defendants 'in terms of preparing their defense to the amendment.'"  <u>Minter v. Prime Equipment Co.</u>, 451 F.3d at 1208)(quoting <u>Patton v. Guyer</u>, 443 F.2d 79, 86 (10th Cir. 1971)).

634.    The United States would be prejudiced if, after the Court determined that Jemez Pueblo did not prove aboriginal title to the Valles Caldera National Preserve, Jemez Pueblo amended its pleadings to assert aboriginal title specifically to Valle San Antonio, Redondo Peak, and Redondo Meadows based on the same evidence.  The United States structured its opposition based on the case's pleadings and Jemez Pueblo's Interrogatory Response, which suggest that Jemez Pueblo seeks aboriginal title to the entire Valles Caldera National Preserve.  <u>See</u> <u>generally</u> United States' Proposed Findings of Fact, filed April 15, 2019 (Doc. 385)(not mentioning Valle San Antonio); <u>id.</u> ¶ 22, at 9 (incidentally mentioning Redondo Meadows); <u>id.</u> ¶¶ 301-464, at 78-126 (proposing findings concerning other Tribes' Valles Caldera use); U.S. Proposed Findings ¶ 9, at 18 (arguing that, had Jemez Pueblo put the United States on notice of its new claims, it "would have sought discovery on each of the ninety polygons, exhaustively cross-examined Jemez's witness Dr. Ferguson on each polygon, and more-thoroughly developed and presented evidence of

other Tribes' use of those areas"); Plaintiff Pueblo of Jemez's Proposed Conclusions of Law ¶ 37,

at 22, filed April 15, 2019 (Doc. 387)("Even by demonstrating only intermittent or seasonal use

of certain areas within the Claim Area, the Pueblo of Jemez has demonstrated 'actual and

continuous use' of the entire Claim Area."); id. ¶ 72, at 45; Interrogatory Response at 29.

635.    Rule 15 therefore bars Jemez Pueblo after trial from now asserting title to Redondo

Meadows, Valle San Antonio, and Redondo Peak.  See Rodriguez v. Doral Mortg. Corp., 57 F.3d

1168, 1171 (1st Cir. 1995)("A fundamental purpose of pleadings under the Federal Rules of Civil

Procedure is to afford the opposing party fair notice of the claims asserted against him and the

grounds on which those claims rest."); Monod v. Futura, Inc., 415 F.2d 1170, 1174 (10th Cir.

1969)("The purpose of Rule 15(b) is to bring the pleadings in line with issues actually tried and

does not permit amendment to include collateral issues which may find incidental support in the

record." (citing Gallon v. Lloyd-Thomas Co., 264 F.2d 821, 825 n.3 (8th Cir. 1959)).

## II.    JEMEZ PUEBLO MAY NOT SEEK ABORIGINAL TITLE TO SMALL GEOGRAPHIC SUB-AREAS WITHIN THE VALLES CALDERA WHERE IT HAS NOT PROVEN ABORIGINAL TITLE TO THE SURROUNDING LAND.

636.    In the Motion, Jemez Pueblo asserts aboriginal title to ███████████████

███████████████████████████████████████████.  See Motion at 9-13.  It

bases its argument on the fact that there is no evidence other Tribes used these features.  See

Motion at 9, 11.  Although no case deals with aboriginal title to such minute areas, the Court

believes that to establish aboriginal title to a discrete geographic feature, such as ███████████

██████, a Tribe must prove that it had the ability, if it wished, to exclude local, adverse Tribes from

the surrounding land or from the feature itself if there is evidence of other Tribes in the vicinity.

See Pueblo of Jemez v. United States, 790 F.3d at 1165-66 ("But the 'exclusive' part of the test

meant only that in order to establish aboriginal title, a tribe "must show that it used and occupied

- 161 -

the land to the *exclusion of other Indian groups*." (emphasis in original));[77] <u>Native Vill. of Eyak v. Blank</u>, 688 F.3d 619, 623 (9th Cir. 2012)(per curiam)(en banc)("Exclusivity is established when a tribe or a group shows that it used and occupied the land to the *exclusion* of other Indian groups" (emphasis in original)); <u>id.</u> at 613 (Fletcher, J., joined by Pregerson, Thomas, and Hawkins, JJ., dissenting)(arguing that a Tribe does not need to show that it had the power to exclude other Tribes when there is no evidence of any other use or occupancy); <u>Strong v. United States</u>, 518 F.2d 556, 561 (Ct. Cl. 1975)("Certainly, one of the primary characteristics of ownership is the desire and ability to exclude others from the area over which ownership is claimed."); <u>United States v. Pueblo of San Ildefonso</u>, 513 F.2d 1383, 1394 (Ct. Cl. 1975)("[A] true owner possesses the right to expel intruders.  In order for an Indian Tribe to establish ownership of land by so-called Indian title, it must show that it used and occupied the land to the exclusion of other Indian groups."); <u>Ala.-Coushatta Tribe of Tex. v. United States</u>, 2000 WL 1013532, at *12 (explaining that this general rule is subject to three exceptions: (i) joint and amicable use; (ii) dominated use; and (iii) permissive use).

637.   The Tenth Circuit's requirement that Pueblo of Jemez demonstrate that it used its claimed areas "to the *exclusion of other Indian groups*," 790 F.3d at 1166 (emphasis in original), leaves an ambiguity unresolved -- whether Jemez Pueblo must show that it could have or did exclude other Indian groups, or whether Jemez Pueblo only need show that it was the only Indian group to use the land.  The cases the Tenth Circuit cites in support suggests that the Tenth Circuit

---

[77]In <u>Pueblo of Jemez v. United States</u>, the Tenth Circuit held that the term "exclusive" required Jemez Pueblo to show that it "'used and occupied the land to the *exclusion of other Indian groups.*'"  790 F.3d at 1165-66 (quoting <u>United States v. Pueblo of San Ildefonso</u>, 513 F.2d at 1394 (emphasis in <u>Pueblo of Jemez v. United States</u>)).

is inclined to believe that a Tribe must show its ability to exclude other Indian groups even if there is little evidence that such Indian groups used the area.  It cites the majority opinion in Native Village of Eyak v. Blank, for example, and not its dissent, which argues if there is no evidence of other Tribes' use or occupancy, a Tribe does not need to prove that "it had the power to exclude other groups."  688 F.3d at 631.  It also cites Caddo Tribe of Oklahoma v. United States, 35 Ind. Cl. Comm. 321, 358-60 (1975), for its statement that a Tribe established exclusivity where it "exercised control over [the claim area] and over other Indians who may have ventured therein." Pueblo of Jemez v. United States, 790 F.3d at 1166.  In light of these citations, the Tenth Circuit hints that claimant Tribes must demonstrate that they had the ability to exclude adverse Tribes from the claimed area.  Cf. Nw. Bands of Shoshone Indians v. United States, 324 U.S. at 338-39 ("[A] certain nation, tribe or band of Indians may have claimed the right [of occupancy] because of immemorial occupancy to roam certain territory to the exclusion of any other Indians and in contradistinction to the custom of the early nomads to wander at will in the search of food.").  Accordingly, even if Jemez Pueblo's claims for its Redondo Peak locations were appropriate for reconsideration, Jemez Pueblo could not establish title to these areas without showing it had aboriginal title to the surrounding land.  The trial established that many Tribes used Redondo Peak and the Valles Caldera's western half, see FOF ¶¶ 583-84, 587-90, 593-99, 601, 606, 608-10, 612-13, 615, 620, 647, at 5-6, 8-13, 15-21, 23-25, 27-28, 39-40, and Jemez Pueblo has not established that other Tribes' Valles Caldera use was, and is, joint and amicable, dominated, or permissive. See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1222-23.  Its arguments that it was the exclusive user of ███████████████████████████████ are, even if

true, not enough to establish aboriginal title to them.[78]

638.    If it were writing on a clean slate, the Court believes that Tribes and Pueblos should not have to demonstrate that they had the power to exclude other completely hypothetical Indian groups that wandered onto their land.  This requirement would have allowed the United States to seize the land of any isolated Tribe if the Tribe was relatively weak, thereby reserving aboriginal title only to relatively powerful tribes.  Requiring proof of the power to exclude is at odds with foundational aboriginal title cases, which unreservedly protect lands Indian groups exclusively occupy.  See Cherokee Nation v. Georgia, 30 U.S. at 32 (stating that "the Indians are acknowledged to have an unquestionable, and heretofore unquestioned, right to the land they occupy, until that right shall be extinguished by a voluntary cession to our government"); Johnson v. M'Intosh, 21 U.S. at 574 (stating that aboriginal title makes a Tribe's members "the rightful occupants of the soil, with a legal as well as just claim to retain possession of it").

639.    Jemez Pueblo cites United States v. Platt as support for its contention that it may assert aboriginal title to geographic features as narrow as a trail.  See Feb. 18 Tr. at 85:1-19 (Luebben).  United States v. Platt does not support this legal principle.  The case generally concerns the Zuni Tribe's access to its historic pilgrimage route; a landowner sought to prevent Zuni Tribe members from crossing his land on their quadrennial pilgrimage to northeast Arizona, and the United States sought to establish a prescriptive easement for a fifty-foot wide, twenty-mile-long

---

[78]Because of its conclusion regarding the difficulty of establishing aboriginal title to very small sub-areas, the Court does not adopt Jemez Pueblo's proposed Conclusion of Law that "Jemez can establish aboriginal title to ███████████████████████████████████████
███████████████████████████████████████████████████████████

Jemez Pueblo Proposed Finding ¶ 10, at 26.

path across landowner's land.  See United States v. Platt, 730 F. Supp. at 319-21.  The United States based its claim on Zuni Tribe's right to a prescriptive easement, and on Zuni Tribe's rights to property protection and free exercise of religion under the Treaty of Guadalupe Hidalgo.  United States v. Platt, 730 F. Supp. at 319; Treaty of Guadalupe Hidalgo, U.S.-Mex., Feb. 2, 1848, art. VIII, 9 Stat. 922, 928-30.  Proving aboriginal title requires establishing different elements than does proving prescriptive easements.  See United States v. Platt, F. Supp. at 319-21.  Jemez Pueblo does not seek an easement in this case, and, therefore, United States v. Platt does not support Jemez Pueblo's attempt to assert aboriginal title to such a narrow piece of property.

### III.   JEMEZ PUEBLO'S USE OF THE VALLE SAN ANTONIO WAS NOT EXCLUSIVE.

640.   Jemez Pueblo requests that the Court analyze whether it has established aboriginal title to the Valle San Antonio.  See Motion at 22.  For the reasons discussed above, reconsidering is not appropriate under rule 59(e) and rule 15.  Nevertheless, even when the Court reconsidered this claim to the Valle San Antonio, based on the evidence presented at trial the Court will also not conclude that Jemez Pueblo has aboriginal title to the Valle San Antonio, because its Valle San Antonio use was not "'exclusive.'"  Pueblo of Jemez v. United States, 790 F.3d at 1165 (quoting Native Vill. of Eyak v. Blank, 688 F.3d at 622).

641.   After trial, the Court made a few specific findings regarding the Valle San Antonio, all of which concerned the ███████████████████████████████████████████ ████████.  First, it found:

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████    ███████    ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

Memorandum Opinion and Order FOF ¶ 485, at 222.  The Court noted in a footnote that "[t]he ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████." Memorandum Opinion and Order FOF ¶ 485 n.159, at 222.  Next, the Court found that "San Antonio Creek follows the Valle San Antonio along the Valles Caldera's northern section and traverses through many areas significant to Jemez Pueblo, ████████████████████████████████████████████." Memorandum Opinion and Order FOF ¶ 486, at 223.  Third, the Court found that the Jemez Pueblo ████████████ ███████████████████████████████████████████████████████████████████ ████████████.  See Memorandum Opinion and Order FOF ¶ 487, at 223.  Finally, the Court found that "[t]he remains of a historic ████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████ are also in the area." Memorandum Opinion and Order FOF ¶ 488, at 223.  In addition to noting this evidence, Jemez Pueblo disputes FOF ¶ 91, at 50, which states that "Tewa, Keres, and Towa speakers all used the Valles Caldera's northern portion between 1200 and 1750 C.E.; Jemez Pueblo was not the Valles Caldera's northern portion's dominant Tribal user." Pueblo of Jemez v. United States, 430 F. Supp. 3d at 979.  Jemez Pueblo argues that this Finding of Fact is based on a map in the Gauthier Report that identifies an eighteenth-century Keres site in the Valle San Antonio based on one sherd, even though Gauthier testified that he could not distinguish Pueblo pottery after the 1680 Pueblo Revolt.  See Motion at 23-24.

643.   A single sherd dated after the 1680 Pueblo Revolt is insufficient evidence on which to conclude that Jemez Pueblo was not the exclusive occupier of Valle San Antonio.  After

reviewing the evidence from trial, however, the Court is satisfied that Jemez Pueblo was not the Valle San Antonio's exclusive user and that Jicarilla Apache, Navajo Nation, and Santa Clara Pueblo also used the Valle San Antonio.  See FOF ¶ 612, at 23-24 ("In using the entire Valles Caldera 'often' for hunting . . . Jicarilla Pueblo members traversed the Valle San Antonio and Redondo Peak;[] Jicarilla Apache members approaching their ████████████████ from the north also would traverse the Valle San Antonio."); id. ¶ 613, at 24 ("The Navajo Nation used and traversed Valle San Antonio in using the Preserve lands to hunt, gather, and worship."); id. ¶ 609, at 20 (noting that ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ ).  Accordingly, Jemez Pueblo is not entitled to aboriginal title to the Valle San Antonio, even if it properly could make this argument under rule 15 and rule 59(e).

## IV.   JEMEZ PUEBLO'S USE OF REDONDO MEADOWS HAS NOT BEEN EXCLUSIVE.

644.   Jemez Pueblo requests that the Court analyze whether it has established aboriginal title to the Redondo Meadows.  See Motion at 22.  As with Jemez Pueblo's claim to the Valle San Antonio, reviewing Jemez Pueblo's claim to Redondo Meadows after trial is not appropriate under rule 15 and rule 59(e).  Even when the Court reviews the claim to the sub-area, the Court does not award Jemez Pueblo aboriginal title to the Redondo Meadows, because its Redondo Meadow use has not been "'exclusive.'"  Pueblo of Jemez v. United States, 790 F.3d at 1165 (quoting Native Vill. of Eyak v. Blank, 688 F.3d at 622).

645.   Jemez Pueblo asserts that the trial confirms "that no other pueblo or tribe accessed Redondo Meadows in the Valles Caldera from the west," and it argues that "the only findings that

address non-Jemez use of Redondo Meadows" are the same findings it contends are unreliable evidence that other Indian groups used the Banco Bonito.  Motion at 21.  Jemez Pueblo argues that no witness testified that any other Indian group used Redondo Meadows.  See Motion at 22.  It asserts that "there is no evidence of Redondo Meadows use except by Jemez Pueblo."  Motion at 22.

646.   The trial did not produce evidence that Jicarilla Apache, Navajo Nation, and Santa Clara Pueblo used Redondo Meadows.  See FOFs ¶¶ 610, 612, 613, at 20-21, 23, 24 (rejecting the United States' arguments that these Indian groups used Redondo Meadows).  Still, contrary to Jemez Pueblo's arguments, it is not Redondo Meadow's exclusive user.  Zia Pueblo has traversed the Redondo Meadows polygon to which Jemez Pueblo seeks title as part of its cultural use, because ███████████████████████████████████████.  See FOF ¶ 599, at 11-13 ("Zia Pueblo members ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████).  Accordingly, even when the Court considers Jemez Pueblo's aboriginal title claim to Redondo Meadows, the Court would not find that Jemez Pueblo has aboriginal title to the sub-area, because Zia Pueblo has used Redondo Meadows, and because the trial establishes that Zia Pueblo's Valles Caldera use has not been dominated, joint-and-amicable, or permissive.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1222-29.

- 168 -

## V.   JEMEZ PUEBLO HAS NOT ESTABLISHED ABORIGINAL TITLE TO THE GEOTHERMAL PROJECT AREA AND THE VALLES CALDERA'S PIPELINE ROUTE.

647.   Even though portions of its proposed Redondo Meadows polygon overlap with the geothermal site area,[79] Jemez Pueblo disclaims aboriginal title to areas within the geothermal area. See Reply at 11 ("Jemez is not claiming aboriginal title to the geothermal site area."); Pueblo of Jemez v. United States, 430 F. Supp. 3d at 961 ("Jemez Pueblo does not seek to quiet title to the Pipeline System or to NMGC's ingress and egress right across the Valles Caldera National Preserve."); Draft Letter From Governor Madalena to Other Tribes at 1 (dated Feb. 28, 2012), admitted November 9, 2018, at trial as United States' Ex. DX-UV ("Although our Indian title remains unextinguished we assumed the 12-year statute of limitation of the Federal Quiet Title Act was a barrier to our recovery of these lands.").  The statute of limitations for the Quiet Title Act, 28 U.S.C. § 2409a, is triggered when the United States asserts an adverse interest that clouds alleged aboriginal title, even if that interest is invalid.  See Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 738 (8th Cir. 2001)(citing Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 769 (4th Cir. 1991)).  The trigger for starting this limitations period is "an 'exceedingly light one.'"  Kane Cty., Utah v. United States, 772 F.3d 1205, 1215 (10th Cir. 2014)(quoting George v. United States, 672 F.3d 942, 944 (10th Cir. 2012)).  It begins to run when a claimant "*objectively* should have known about the government's claim[.]"  George v. United States, 672 F.3d at 944 (emphasis in original).  The acquisition of easements, such as easements for a natural gas pipeline, clouds aboriginal title and triggers the Quiet Title Act's statute of

---

[79]The United States proposes that the overlap is "substantial."  U.S. Proposed Findings ¶ 10, at 18.  Jemez Pueblo argues that the geothermal area "does not substantially overlap with Redondo Meadows."  Jemez Pueblo Supplemental Reply at 8.  The Court addresses the overlap above, in its Findings of Facts.  See FOF ¶ 648, at 40.

limitations.  See Rio Grande Silvery Minnow v. Bureau of Reclamation, 599 F.3d 1165, 1182 (10th Cir. 2010)(stating that, under New Mexico law, easements are real property interests that may cloud title).  The statute of limitations in 28 U.S.C. § 2409a is twelve years.  See 28 U.S.C. § 2409a(g).

648.    The United States' action in United States v. 49.77 Acres of Land, more or less, in Sandoval County, New Mexico, No. CIV 99-0774 JP\DJS (D.N.M. Oct. 18, 1999)(Parker, J.), condemned a perpetual and assignable easement title to Tract No. 2013-E within the Valles Caldera, which became effective July 12, 1999.  See Final Judgment at 1, No. CIV 99-0774 JP\DJS, filed October 18, 1999 (Doc. 19); Order Granting Defendant-in-Intervention New Mexico Gas Company's Unopposed Motion for Order Approving Stipulations of All Parties Regarding Easement Owned by New Mexico Gas Company at 2, filed December 19, 2016 (Doc. 104); Pueblo of Jemez v. United States, 430 F. Supp. 3d at 960-61.  NM Gas Co. currently owns the easement.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 961.  Because the United States condemned the easement in 1999, and Jemez Pueblo filed this case in 2012, the Quiet Title Act's statute of limitations accrued and expired prior to Pueblo of Jemez filing this case.[80]

## VI.    JEMEZ PUEBLO HAS NOT ESTABLISHED ABORIGINAL TITLE TO BANCO BONITO.

649.    Jemez Pueblo asserts an aboriginal title claim to Banco Bonito, an area in the southwest corner of the Valles Caldera that it historically farmed and occupied.  See Motion at 1-9.  As the Court has previously concluded, see Pueblo of Jemez v. United States, 430 F. Supp. 3d

---

[80]Jemez Pueblo does not contest this proposed Conclusion of Law.  See Jemez Pueblo Supplemental Response at 13 n.9.  The Court already concluded that Jemez Pueblo does not seek to quiet title to the pipeline system or to NM Gas Co.'s ingress and egress rights in the Valles Caldera.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 961.

at 1188, it is possible to award less than the entire tract that a Tribe originally claims, see Ala.-
Coushatta Tribe of Tex. v. United States, 2000 WL 1013532, at *14; Wichita Indian Tribe v.
United States, 696 F.2d at 1385; Sac & Fox Tribe of Indians of Okla. v. United States, 315 F.2d at
901-06; Strong v. United States, 518 F.2d at 565-69.  Further, Jemez Pueblo's non-exclusive use
of a segment of the claim area is not automatically imputed to the entire claim area.[81, 82]  Strong v.
United States, 518 F.2d at 565-69; Wichita Indian Tribe v. United States, 696 F.2d at 1385; Ala.-
Coushatta Tribe of Tex. v. United States, 2000 WL 1013532, at *14; Sac & Fox Tribe of Indians
of Okla. v. United States, 315 F.3d at 901-06; Pueblo of Jemez v. United States, 430 F. Supp. 3d
at 1181.  Jemez Pueblo filed for summary judgment on its claim to Banco Bonito and Redondo

---

[81]In disputing this Conclusion of Law, which Jemez Pueblo proposes, the United States
does not challenge the legal principle that Jemez Pueblo sets forth.  Instead, it argues that Jemez
Pueblo cannot establish exclusivity, because "the entire Preserve lands were used by many Tribes
and was not exclusive to Jemez."  U.S. Supplemental Response at 20.  Although Jemez Pueblo
does not support this legal principle with citations from either the Supreme Court or the Tenth
Circuit, see Jemez Pueblo Proposed Finding at 20, the Court believes that it reflects reasonable,
settled law.  There is no reason to think that the Supreme Court or Tenth Circuit would disagree
with the Federal Circuit, the Court of Claims, and the Court of Federal Claims, and conclude that,
once a Tribe proposes a claim area it can either establish title to the entire area or establish title to
no part of the claim area.  Nothing in aboriginal title doctrine suggests this result, and the Court
already reached this Conclusion of Law.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d
at 1181.

[82]The United States proposes as a Conclusion of Law that "[u]se of the entire Preserve,
including the western portion of the Preserve, for hunting, gathering, pilgrimages, and other
cultural and religious purposes by Zia, Santa Clara, Jicarilla, and Navajo, among other Tribes,
defeats any claim of Jemez exclusivity over any portion of the Preserve."  U.S. Proposed Findings
¶ 3, at 14.  Any Tribe's documented use of the Valles Caldera's entirety would defeat aboriginal
title if it did not fall under an exception.  See United States v. Santa Fe Pac. R.R. Co., 314 U.S. at
345; Ala.-Coushatta Tribe of Tex. v. United States, 2000 WL 1013532, at *12.  The question on
reconsideration is whether any Tribe has used the Banco Bonito or the other sub-areas, and the
United States must therefore demonstrate use in Banco Bonito and in the other sub-areas, or
demonstrate that Jemez Pueblo has failed in some other way to establish aboriginal title to these
sub-areas.

Mountain before trial.  <u>See</u> Plaintiff Pueblo of Jemez's Motion for Partial Summary Judgment Confirming Its Indian (Aboriginal) Title to the Banco Bonito and Redondo Mountain at 1, filed August 17, 2018 (Doc. 238)("Partial MSJ").  The Court denied the Partial MSJ, concluding that genuine issues of material fact existed as to Jemez Pueblo's aboriginal title claims to these areas. <u>See</u> Order at 1-2, filed March 12, 2019 (Doc. 375).  After the trial, the Court concluded that Jemez Pueblo's Valles Caldera use was not exclusive.  <u>See</u> <u>Pueblo of Jemez v. United States</u>, 430 F. Supp. 3d at 1219.  So although the Court did not award Jemez Pueblo title to the entire Valles Caldera, because Jemez Pueblo has previously raised the issue of its title to Banco Bonito, the Court may, on reconsideration, award this discrete part of the Valles Caldera.  <u>See</u> <u>Banister v. Davis</u>, 140 S. Ct. at 1708 ("And 'reconsideration' means just that: Courts will not entertain arguments that could have been but were not raised before the just-issued decision.").

### A.   JEMEZ PUEBLO'S HISTORICAL DOMINANCE OF THE BANCO BONITO IS LARGELY IRRELEVANT TO THE ABORIGINAL TITLE ANALYSIS.

650.   Jemez Pueblo also argues in the Motion that it has established aboriginal title to Banco Bonito and the other sub-areas, because it exclusively and dominantly used each sub-area for some period of time, even if that period of time was over five-hundred years ago:

> Here, relevant periods exist from Jemez settlement in the Jemez Mountains in the 13th Century to the Spanish Entrada of 1542, and during the Spanish colonial and Mexican periods.  The Court need not find that Jemez exclusively used any of the sub-areas at issue in this motion during the entirety of any of these time frames. <u>Wichita Indian Tribe v. United States</u>, 696 F.2d 1378, 1381 (Fed. Cir. 1983)("such use and occupancy undoubtedly continued 'for a long time' in numerous instances").  On reconsideration, the Court need only find that there was a relevant period in which Jemez use dominated in the four sub-areas identified in this motion.

Motion at 5 (citing <u>Wichita Indian Tribe v. United States</u>, 696 F.2d at 1385).  It further argues that evidence that other Tribes used these sub-areas after Jemez Pueblo established aboriginal title is

only relevant as evidence that that Tribe conquered Jemez Pueblo or as evidence that Jemez Pueblo abandoned the land.  See Motion at 7 (citing Pueblo of Jemez v. United States, 790 F.3d at 1166).

651.    Jemez Pueblo's position finds some support from Lipan Apache Tribe v. United States, 180 Ct. Cl. 487 (1967).  In Lipan Apache Tribe v. United States, the Court of Claims stated that "Indian title based on aboriginal possession does not depend upon sovereign recognition or affirmative acceptance for its survival.  Once established in fact, it endures until extinguished or abandoned."  180 Ct. Cl. at 492 (citing United States v. Santa Fe Pac. R.R. Co., 314 U.S. at 345, 347).  Although Lipan Apache Tribe v. United States suggests, superficially at least, that established aboriginal title can only end via extinguishment or abandonment, the Court of Claims was likely writing imprecisely.  The case concerned two Tribes' efforts to seek compensation for Texas' forceful removal from their lands and did not raise questions about other Tribes' infringement on aboriginal title.  See 180 Ct. Cl. at 490.  Moreover, the passages that the Court of Claims cites from United States v. Santa Fe Pacific Railroad Company concern only the United States' power to alter aboriginal title and not the prerequisites for establishing it and keeping it against other Tribes.  The Court of Claims was therefore only describing a Tribe's aboriginal title claim requirements vis-à-vis the United States.

652.    A Tribe's use and occupancy can change year to year, and the right of occupancy changes with it.  See Sac & Fox Tribe of Indians of Okla. v. United States, 383 F.2d at 998-99 (noting that there was considerable change in Indian title to American lands between 1776 and 1824).  The inquiry often centers on the date that the United States acquired title to the land.  Notably, in this case, the Tenth Circuit remanded Judge Brack's case to determine "[w]hether Jemez Pueblo can establish that it exercised its right of aboriginal occupancy to these lands in 1860

and thereafter . . . ."  Pueblo of Jemez v. United States, 790 F.3d at 1165.  "To do so," the Tenth

Circuit stated, Jemez Pueblo "must 'show actual, exclusive, and continuous use and occupancy

"for a long time" of the claimed area.'"   Pueblo of Jemez v. United States, 790 F.3d at 1165

(quoting Native Vill. of Eyak v. Blank, 688 F.3d at 622).   The Tenth Circuit stated, to show

continuous use, Jemez Pueblo must show "that the Jemez people have continued for hundreds[83] of

years to use the Valles Caldera for traditional purposes."  Pueblo of Jemez v. United States, 790

F.3d at 1166 (emphasis added).  The Tenth Circuit thus framed the analysis around Jemez Pueblo's

Valles Caldera use and occupancy from 1860 onwards.  Jemez Pueblo's aboriginal title to Banco

Bonito and the other sub-areas before 1860 is unimportant if Jemez Pueblo did not have aboriginal

title to the land between 1860 and 2000.

653.    If Jemez Pueblo only had to show that it possessed aboriginal title at one point and

then never abandoned the land or had it extinguished, the Court would conclude that Jemez Pueblo

has established aboriginal title to Banco Bonito.  Jemez Pueblo had aboriginal title to Banco Bonito

during the time it heavily farmed the area between the early fifteenth century and 1650.  Jemez

Pueblo occupied over one hundred fieldhouses on the Banco Bonito across a four-hundred-year

period, with most of its occupation occurring from 1500 to 1650.  See Pueblo of Jemez v. United

States, 430 F. Supp. 3d at 973.   The pottery evidence suggests minimal Keres and Tewa

---

[83]The Tenth Circuit requires Jemez Pueblo to show continuous use for "hundreds of years,"
to demonstrate its "continuous" and "actual" use for a "long time."   Pueblo of Jemez v. United
States, 790 F.3d at 1166.  Although other courts have awarded aboriginal title to claimants showing
use for less than two hundred years, the Tenth Circuit has set the bar high for Tribes and Pueblos
within its jurisdiction.

occupational use of the Banco Bonito, see FOF ¶¶ 632-37, at 33-36,[84] and this period coincided

with the peak of Jemez Pueblo's population, see Pueblo of Jemez v. United States, 430 F. Supp.

3d at 985, 995, 997 (finding that Jemez Pueblo's population reached a peak in 1541 but descended

to below 1,000 by 1700, where it remained until the twentieth century).  After 1650 -- roughly the

date it ceased farming the Banco Bonito -- another Tribe did not conquer Jemez Pueblo,  the United

States did not extinguish title to any land on the Banco Bonito, and Jemez Pueblo also did not

completely abandon its Banco Bonito use.  Although after Jemez Pueblo abandoned farming on

the Banco Bonito, its aboriginal use and occupancy of Banco Bonito became solely its passage

through Banco Bonito on its way to Redondo Peak and other parts of the Valles Caldera, this falls

within the Tenth Circuit's broad definition of "aboriginal use and occupancy."  Pueblo of Jemez

v. United States, 790 F.3d at 1165 (defining "aboriginal use and occupancy" as the "use and

occupancy in accordance with the way of life, habits, customs and usages of the Indians who are

its users and occupiers.").

        654.    Further, Jemez Pueblo is correct that evidence of other Tribes' sub-area use since

1650 does not prove that its aboriginal title was extinguished or that it abandoned its aboriginal

title.  "The basic rule governing alienation of American Indian land is that only the United States

can extinguish aboriginal title," Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1189 (citing

---

[84]Jemez Pueblo also asks the Court to reconsider its statement in Conclusion of Law ¶ 442 that archeologists have found "substantial quantities" of Tewa pottery within the Banco Bonito. Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1221.  See Motion at 12.  After carefully re-reviewing the archeological record, the Court agrees that non-Jemez pottery on the Banco Bonito should not be characterized as present in substantial quantities.  Archeologists have found only three non-Jemez Pueblo sherds on the Banco Bonito.  See FOF ¶ 637, at 35.  In contrast, archeologists have recovered hundreds of Jemez Pueblo sherds from the area.  See FOF ¶ 636, at 34.  Non-Jemez Pueblo pottery therefore has been found in relatively minimal quantities on the Banco Bonito.

25 U.S.C. § 177; 25 C.F.R. § 152.22(b); <u>United States v. Santa Fe Pac. R.R. Co.</u>, 314 U.S. at 347), and so any other Tribe's actions are irrelevant.  Likewise, abandonment must be voluntary before it ends aboriginal title, <u>see</u> <u>Pueblo of Jemez v. United States</u>, 430 F. Supp. 3d at 1191, and other Tribes' actions have no apparent role to play in this abandonment analysis.  As discussed above, however, the Court concludes that Jemez Pueblo's interpretation of aboriginal title's requirements is not the best interpretation.  It analyzes Jemez Pueblo's aboriginal title claim to determine whether it has shown "actual exclusive, and continuous use and occupancy 'for a long time' of the claimed area," "in 1860 and thereafter."  <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1165 (quoting <u>Native Vill. of Eyak v. Blank</u>, 688 F.3d at 622).

655.    Other Tribes' actions are highly relevant to the exclusivity analysis and Jemez Pueblo does not show why other Tribes' Banco Bonito use, particularly Zia Pueblo, means Jemez Pueblo maintained exclusive ownership over Banco Bonito.  <u>See</u> Motion at 7.  Exclusive use is a requirement of aboriginal title, <u>see</u> <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1165, and after 1650, with a much reduced presence on Banco Bonito and a smaller population, there is no evidence that Jemez Pueblo was able to walk through Banco Bonito "to the exclusion of other Indian groups," and there is some evidence that it could not.  <u>Pueblo of Jemez v. United States</u>, 790 F.3d at 1166.  <u>See</u>, <u>e.g.</u>, <u>Pueblo of Jemez v. United States</u>, 430 F. Supp. 3d at 998 (finding that Jemez Pueblo's reduced population made it vulnerable to Navajo and Apache raids in the eighteenth and nineteenth centuries).  Ultimately, evidence that a Tribe or Tribes were the first people to use certain land is irrelevant to whether it or they established aboriginal title to that

land.[85]  Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 279 (1955)(suggesting that aboriginal title depends on the past exercise of sovereignty); Turtle Mountain Band of Chippewa Indians v. United States, 490 F.2d 935, 941-42 (Ct. Cl. 1974); United States v. Seminole Indians of Fla., 180 Ct. Cl. 375 (stating that fifty years is not enough to establish aboriginal title).

### B.      JEMEZ PUEBLO HAS NOT DEMONSTRATED THAT IT USED THE BANCO BONITO TO THE EXCLUSION OF OTHER INDIAN GROUPS.

656.    Jemez Pueblo must show "actual exclusive, and continuous use and occupancy 'for a long time'" of the Banco Bonito "in 1860 and thereafter." Pueblo of Jemez v. United States, 790 F.3d at 1165 (quoting Native Vill. of Eyak v. Blank, 688 F.3d at 622).  To demonstrate evidence of specific use to overcome the evidence of Jemez Pueblo's exclusive Banco Bonito use, the United States may present evidence of another Indian Tribe's actual physical presence, but statements of individual Indians expressing a religious or spiritual interest are not enough to defeat a claim for aboriginal title.[86]  See Zuni Tribe of N.M. v. United States, 12 Ct. Cl. at 609 n.4; Wichita Indian

---

[85]The United States proposes that, if "evidence that a modern-day Tribe or Tribes were the first people to use the Preserve lands is probative of that Tribe's exclusive title, th[e]n Zia or Santa Clara have better claims to the Preserve than Jemez because they moved to the Caldera before Jemez." U.S. Proposed Findings ¶ 2, at 13. Under aboriginal title doctrine, whether a Tribe was the first occupant of certain land is ultimately irrelevant to whether the Tribe established aboriginal title to that land.  To establish aboriginal right, a Tribe "must show 'actual, exclusive, and continuous use and occupancy 'for a long time' of the claimed area.'" Pueblo of Jemez v. United States, 790 F.3d at 1165 (quoting Native Vill. of Eyak v. Blank, 688 F.3d at 622).  See Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 279 (1955)(suggesting that aboriginal title depends on the past exercise of sovereignty).  For this reason, the Court will not adopt the United States' proposed Conclusion of Law.

[86]Jemez Pueblo proposes that the United States "must" present evidence of another Tribe's physical presence.  Jemez Pueblo Proposed Finding ¶ 6, at 23.  The United States agrees that such evidence would defeat its claim to aboriginal title.  See U.S. Supplemental Response ¶ 6, at 24. The Court has modified Jemez Pueblo's proposed Conclusion of Law to reflect caselaw showing that an adverse Tribe's physical presence is not the only reason that a Tribe fails to prove aboriginal title and that a Tribe may fail to prove aboriginal title even without strong evidence of other Tribe's physical presences if it does not "exercise full dominion and control over the area, such that it

Tribe v. United States, 696 F.2d at 1385; Ala.-Coushatta Tribe of Tex. v. United States, 2000 WL

1013532, at *17.   The other Tribe's physical presence must be more than fleeting; evidence that

non-Jemez Pueblo members drove through Banco Bonito on State Route 4 to Jemez Springs on

one occasion, for example, are not determinative in the aboriginal title analysis.   See Ala.-

Coushatta Tribe of Tex. v. United States, 2000 WL 1013532, at *27 ("[T]he law requires more

than fleeting transgressions over the area.   There must at least be evidence of continuous

wanderings by adverse tribes.").   Banco Bonito is the closest part of the Valles Caldera to Jemez

Pueblo, but Tribes are not entitled to aboriginal title to the geographic areas closest to their villages

without proving aboriginal title -- that they continuously used these lands to the exclusion of other

Indian groups for a long time.[87]   See Pueblo of Jemez v. United States, 790 F.3d at 1165-66; Native

---

'possesses the right to expel intruders.'"   Native Vill. of Eyak v. Blank, 688 F.3d at 623 (quoting United States v. Pueblo of San Ildefonso, 513 F.2d at 1394).

[87]Jemez Pueblo proposes as a Conclusion of Law:

> At a minimum, the area between and near ███████████████
> ███, Jemez's fieldhouses in Banco Bonito, and the large ancestral villages
> immediately south of Banco Bonito were exclusive to Jemez Pueblo.  Another tribal
> member that was allowed to travel through Jemez villages and fieldhouses did so
> permissively or would be expelled.

Jemez Pueblo Proposed Finding ¶ 9, at 26.  No case suggests that Tribes have an automatic grant of aboriginal title to the land immediately surrounding its villages without having to prove aboriginal title's usual elements.  See Native Vill. of Eyak v. Blank, 688 F.3d at 625 (noting that, although the claimants hunted and fished in the claimed areas closest to their village, they were not in a position to control or dominate access to this or any other part of the claimed area).  The Court also will not adopt such a legal principle.
    Jemez Pueblo cites Wichita Indian Tribe v. United States, 696 F.2d 1378 (Fed. Cir. 1983), as support, and in particular its conclusion that, "[a]t some near enough line [to the Wichita villages], the Comanche and Kiowa presence would not have impinged on the Wichitas' exclusive use of the land," and its apparent agreement that the Wichita's "closely knit" villages, houses, and fields meant that the Tribe had exclusive control over the areas between the villages.  696 F.2d at 1384-85.  This case must be read in light of the Federal Circuit's conclusion that the Wichita Tribe already had established aboriginal title to some land, meaning that it had already proven lengthy

Vill. of Eyak v. Blank, 688 F.3d at 625.

657.    The "exclusive" use prong of the Tenth Circuit's test for aboriginal title is the deciding factor to Jemez Pueblo's Banco Bonito claims.  Pueblo of Jemez v. United States, 790 F.3d at 1165.  Where there is no evidence of use or occupancy by other Indian groups within or nearby the claimed area, the claimant Tribe need show only its own use and occupancy.  Native Vill. of Eyak v. Blank, 688 F.3d at 627-28.  Jemez Pueblo proposes instead that "[t]here is no evidence of any other tribe occupying Banco Bonito, using or occupying the western two-thirds Valle San Antonio, ██████████████████████████████████████████████ ███████████████████████████████ and, therefore, "Jemez has used and occupied these areas exclusively."  Jemez Pueblo Proposed Findings ¶ 8, at 25.  Jemez Pueblo primarily relies on the dissent in Native Village of Eyak v. Blank to support this assertion.  See Jemez Pueblo Proposed Findings ¶ 8, at 25.  The dissent argues that the en banc Ninth Circuit wrongly held that, where there is no evidence of other Tribes using a claimed area, the claiming Tribe still must show that it had the power to exclude.  See Native Vill. of Eyak v. Blank, 688 F.3d at 631.

658.    While the Court agrees that demonstrating a Tribe's power to exclude is necessary

---

use of the land to the exclusion of other Indian groups.  See 696 F.2d at 1385.  Where a Tribe has already established aboriginal title to some portion, inferring aboriginal title to areas between population centers is far more reasonable, because the court must determine aboriginal title's precise boundaries.  See Snake or Piute Indians v. United States, 112 F. Supp. 543, 552 (Ct. Cl. 1953).  That situation is not the case here, where the Court has determined that Jemez Pueblo has not proven aboriginal title to the Valles Caldera National Preserve as a whole.  Further, in addition to not providing adequate legal support, Jemez Pueblo does not direct the Court to factual evidence suggesting that Jemez Pueblo has ever expelled Zia Pueblo or any other Pueblo group from the area between its village and the Valles Caldera's southwest corner.  See Jemez Pueblo Proposed Finding ¶ 9, at 26.  The Court will not, therefore, adopt Jemez Pueblo's proposed conclusion of law.

only when there is other documented use in the claimed area, this principle does not apply here. The Court denied Jemez Pueblo's initial request to quiet title to the Valles Caldera's entirety, because, "for many centuries, non-Jemez Pueblo American Indians, including the ancestors of numerous modern Pueblos and federally recognized Tribes, wandered throughout and actually used the Valles Caldera," Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1222, and because this non-Jemez Pueblo use was neither joint and amicable, dominated, or permissive, see, e.g., Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1222-23.  The area that Jemez Pueblo initially claimed is the Valles Caldera.  See Interrogatory Response.  For centuries, over a dozen Tribes used or held sacred parts of the Valles Caldera.  Non-Jemez Pueblo use of the Valles Caldera's western side and Redondo Peak is well-documented.  See FOF ¶¶ 583-84, 587-90, 593-99, 601, 606, 608-10, 612-13, 615, 620, 647, at 5-6, 8-13, 15-21, 23-25, 27-28, 39-40.  Because the Valles Caldera, these sub-areas, and the land surrounding them were  "wandered over by many Tribes," United States v. Santa Fe Pac. R. Co., 314 U.S. at 345, the "[t]rue ownership of land by [Jemez Pueblo] is called in question," United States v. Pueblo of San Ildefonso, 513 F.2d at 1394, and Jemez Pueblo must, at the very least, make a greater showing of exclusivity than that no other Tribe has documented use of certain, small portions of the Valles Caldera, see United States v. Santa Fe Pac. R. Co., 314 U.S. at 345 (stating that occupancy necessary to establish aboriginal title cannot be shown for "lands wandered over by many tribes").  There is extensive evidence that other Tribes used the Valles Caldera, so Jemez Pueblo must show that it used these areas "to the exclusion of other Indian groups." Pueblo of Jemez v. United States, 790 F.3d at 1166.  See Caddo Tribe of Okla. v. United States, 35 Ind. Cl. Comm. 321, 358-60 (1975)(stating that exclusivity is established where a Tribe "exercised control [over the claimed area] and over other Indians who

may have ventured therein").

659.    Jemez Pueblo has have not proven aboriginal title to the Banco Bonito, because, although it can show actual and continuous use for a long period of time, see FOF ¶¶ 628-31, at 31-33 (finding that Jemez Pueblo had fieldhouses on Banco Bonito and were the only Tribal people to occupy the Banco Bonito); Pueblo of Jemez v. United States, 430 F. Supp. 3d at 973 (finding that Jemez Pueblo occupied Banco Bonito fieldhouses over a 400-year period, but primarily between 1500 and 1650 C.E.), Jemez Pueblo has not shown that it used the Banco Bonito "to the *exclusion of other Indian groups.*"  Pueblo of Jemez v. United States, 790 F.3d at 1166 (quoting United States v. Pueblo of San Ildefonso, 513 F.2 at 1394 (emphasis in original)).  Other Tribes and Pueblos have used extensively the Valles Caldera's western portion around the Banco Bonito. See FOF ¶¶ 583-84, 587-90, 593-99, 601, 606, 608-10, 612-13, 615, 620, 647, at 5-6, 8-13, 15-21, 23-25, 27-28, 39-40.  Jemez Pueblo ceased farming the Banco Bonito and using the fieldhouses there around 1650, see FOF ¶ 630, at 32, and, over the next 200 years, as it lost population and became more vulnerable, Jemez Pueblo lost its aboriginal title to this land.  Its population dwindled to fewer than 200 members in the eighteenth century, all of whom lived more than fifteen miles away from the Banco Bonito in Walatowa.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1227.  At the same time, other Tribes were growing in power.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 999 ("Navajo, Apache, and Ute Tribes grew in power in the seventeenth century after adopting an equestrian lifestyle, which allowed for an 'escalation in raiding and violence that . . . transformed the Valles Caldera into a dangerous place.'" (quoting Oct. 30 Tr. at 585:18-586:25 (Marinelli, Liebmann)).

660.    Jemez Pueblo argues that no other Tribe has established permanent settlements in

Banco Bonito and this fact means that hostile Tribes' pressure did not extinguish its aboriginal title to Banco Bonito.  In support, it cites Wichita Indian Tribe v. United States:

> In Osage Nation of Indians v. United States, 19 Ind. Cl. Comm. 447 (1968), the Indian Claims Commission recognized that if an Indian tribe has proven that it has held aboriginal title to certain lands, the government cannot then assert that a second tribe has extinguished such title simply by demonstrating that the second tribe exerted military pressure on the first tribe.  Rather, the encroaching tribe must succeed in establishing permanent settlements: "[t]he Commission has already held that raids and similar encroachments do not extinguish title where the raiders do not succeed in establishing permanent settlements."

Wichita Indian Tribe v. United States, 696 F.2d at 1382 (quoting Osage Nation of Indians v. United States, 19 Ind. Cl. Comm. at 485).  The Federal Circuit does not bind the Court, and, even if it did, the Court does not interpret the Federal Circuit as saying that evidence of hostile Tribes in the area is irrelevant to the aboriginal title analysis unless the hostile Tribes establish permanent settlements.  Permanent settlements extinguish aboriginal title per se, see Wichita Indian Tribe v. United States, 696 F.2d at 1382, but evidence of hostile Tribes exerting pressure in the area is some evidence, even if not dispositive evidence, that Jemez Pueblo was not able to use the Banco Bonito or other parts of the Valles Caldera "to the exclusion of other Indian groups," Pueblo of Jemez v. United States, 790 F.3d at 1166.

661.    Jemez Pueblo also argues that tribal members' casual or occasional crossings of the Banco Bonito or other sub-areas to reach shrines or sacred sites outside of the Banco does not justify finding a lack of exclusivity and dominance as to Banco Bonito.[88]  See Jemez Pueblo

---

[88]Other Tribes' and Pueblos' incursions onto the Banco Bonito are still secondary to whether Jemez Pueblo established aboriginal title to the area.  The problem Jemez Pueblo encounters for Banco Bonito and other sub-areas is that, even if Jemez Pueblo can show that it was the only Indian group to use a particular geographic area in the Valles Caldera, it has not established that it ever "possesse[d] the right to expel intruders."  United States v. Pueblo of San Ildefonso, 513 F.2d 1383, 1394 (Ct. Cl. 1975).

Proposed Findings ¶ 4, at 22 (citing <u>Ala.-Coushatta Tribe of Tex. v. United States</u>, 2000 WL 1013532, at *27 ("[A]lthough it is not necessary for the government to show that the Choctaw permanently settled throughout the [modified claim area] to prove mutual use and occupancy of the area, the law requires more than fleeting transgressions over the area. There must at least be evidence of continuous wanderings by adverse tribes." (citing <u>Wichita Indian Tribe v. United States</u>, 696 F.2d at 1285))).

662.    The Court is not bound to follow the United States Court of Federal Claims, and the history of this particular aspect of aboriginal title doctrine suggests that the Court of Federal Claims applied a slight expansion of the Supreme Court's position. <u>Alabama-Coushatta Tribe of Texas v. United States</u> cites <u>Wichita Indian Tribe v. United States</u> as support for its holding that the United States must show continuous wanderings by adverse Tribes to defeat exclusivity. <u>See</u> <u>Ala.-Coushatta Tribe of Tex. v. United States,</u> 2000 WL 1013532, at *27. But <u>Wichita Indian Tribe v. United States</u> suggests that "continuous wanderings" is sufficient, but not necessary, to defeat a Tribe's claim to exclusivity. The Federal Circuit in that case stated that "[c]learly, the

---

Further, as discussed above, Jemez Pueblo has not had the ability to exclude other Tribes and Pueblos from the Valles Caldera, or from any sub-area within it. <u>See</u>, <u>e.g.</u>, Nov. 29 Tr. at 4554:23-4562:8 (Marinelli, Anschuetz)(describing how Keres and Tewa room counts and likely populations in settlements near the Valles Caldera exceeded Jemez Pueblo's population); <u>Pueblo of Jemez v. United States</u>, 430 F. Supp. 3d at 995 (finding that, by the end of the seventeenth century, Jemez Pueblo's population was under 1,000); <u>id.</u> at 997 (finding that Jemez Pueblo's population reached a low in the mid-1700s of between 100 and 200 members); <u>id.</u> at 998-99 (finding that Jemez Pueblo was incapable of defending itself from Apache, Comanche, Navajo, and Ute attacks throughout the eighteenth century); <u>id.</u> at 999 (finding that, since 1300 C.E., Jemez Pueblo lacked the military power and population to prevent other Tribes or Pueblos from accessing the Valles Caldera). Jemez Pueblo has not challenged or attempted to qualify these findings in its Motion. Having fallen short of this proof at trial for the entire Valles Caldera, Jemez Pueblo does not show that the Court's conclusion for Banco Bonito and the other sub-areas should be any different.

northern two-thirds of Oklahoma where the Osage also hunted cannot have been used exclusively by the Wichitas.  Lands continuously wandered over by adverse tribes cannot be claimed by any one of those tribes." Wichita Indian Tribe v. United States, 696 F.2d at 1385. The Federal Circuit cites the Supreme Court's opinion in United States v. Santa Fe Pacific Railroad Co., 314 U.S. at 345, as support for this legal principle.  See Wichita Indian Tribe v. United States, 696 F.2d at 1385.  On the page it cites, the Supreme Court noted that

> If it were established as a fact that the lands in question were, or were included in, the ancestral home of the Walapais in the sense that they constituted definable territory occupied exclusively by the Walapais (as distinguished from lands wandered over by many tribes), then the Walapais had 'Indian title' . . .

United States v. Santa Fe Pac. R.R. Co., 314 U.S. at 345.

663.    There is considerable distance between the Supreme Court's language and the Court of Federal Claims' holding that "the law requires more than fleeting transgressions over the area.  There must at least be evidence of continuous wanderings by adverse tribes." Ala.-Coushatta Tribe of Tex. v. United States, 2000 WL 1013532, at *27.  The Supreme Court does not require "continuous" wanderings to defeat an aboriginal title claim, and the Court likewise will not set the bar this high.  2000 WL 1013532, at *27.  United States v. Santa Fe Pac. R.R. Co., 314 U.S. at 345.  See Pueblo of Jemez v. United States, 790 F.3d at 1165 (noting that "'continuous use'" is an element a Tribe must establish to prove aboriginal title).  At the same time, the Supreme Court very likely did not intend that any non-exclusive use, no matter how minor, could defeat aboriginal title.  The phrase "lands wandered over by many tribes" suggests some duration to the adverse use. United States v. Santa Fe Pac. R.R. Co., 314 U.S. at 345; Ala.-Coushatta Tribe of Tex. v. United States, 2000 WL 1013532, at *27.  The non-Jemez Pueblo use that the United States established for the Banco Bonito suggests more than "fleeting transgressions" but less than "continuous

wanderings," and it is, therefore, evidence against concluding that Jemez Pueblo has proven aboriginal title.  2000 WL 1013532, at *27.

664.   Jemez Pueblo also argues that

> Thin speculation as to the possibility of other Pueblo members using areas near the sub-areas that Jemez claims title neither justifies a finding of lack of exclusivity, nor lack of dominance as to those sub-areas, given the strong, cumulative, and uncontradicted testimony of the Pueblo of Jemez's fact and expert witnesses establishing the Pueblo of Jemez's actual and continuous use of the sub-areas for a long time.

Jemez Pueblo Proposed Findings ¶ 3, at 21.[89]  In primary support, Jemez Pueblo cites a footnote from Spokane Tribe of Indians v. United States, 163 Ct. Cl. 58 (1963).  In this case, the Spokane Tribe had proven aboriginal title to a large area, and the United States Court of Claims was reviewing only the ICC's determinations of this area's boundaries.  See 163 Ct. Cl. at 61-62.  The Court of Claims concluded that "scattered observations that other Indians were at one or another time found at one or another spot [near the claim area's boundary] cannot be given any substantial weight.  These casual observations do not indicate whether the alien Indians were there as visitors,

---

[89]Jemez Pueblo proposes, relatedly, that "Jemez' dominance of the sub-areas is shown by minimal evidence of other tribal use."  Jemez Pueblo Proposed Finding ¶ 7, at 24.  In support, Jemez Pueblo cites Zuni Tribe of New Mexico v. United States, 12 Ct. Cl. at 617-20 nn.13-15.  In this case, the Court of Claims concludes that a lack of evidence that any other Tribe used a particular area substantiated Zuni Pueblo's claim that it exclusively used that area.  See Zuni Tribe of N.M. v. United States, 12 Ct. Cl. at 620.  Zuni Tribe of New Mexico v. United States does not support the proposition that that a small amount of evidence supporting other Tribes' use in an area suggests that a Tribe with substantial evidence exerted "dominance" over the area.  Jemez Pueblo Proposed Finding ¶ 7, at 24.  Accordingly, the Court will not adopt Jemez Pueblo's proposed conclusion of law.  See Native Vill. of Eyak v. Blank, 688 F.3d at 624 (concluding that, where another Tribe's use was relegated to the claimed area's periphery, the claiming Tribe's use was not exclusive).  Cf. Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1220 ("Moreover, Jemez Pueblo cannot satisfy exclusive use merely through being 'predominant in [a] region' that other Tribes or Pueblo's used." (quoting Strong v. United States, 518 F.2d at 565)).

on a temporary basis, etc." 163 Ct. Cl. at 64 n.5. The Court of Claims does not describe these "scattered observations." 163 Ct. Cl. at 64 n.5. In the same paragraph, however, it says that inferring a reason for why the Spokane Tribe does not have a name for Mt. Spokane -- as one might expect for a mountain on the Tribe's boundary -- is "thin speculation," 163 Ct. Cl. at 64, and not enough to deny aboriginal title to the Tribe.

665.    Spokane Tribe of Indians v. United States does not convince the Court that it should grant Jemez Pueblo aboriginal title to Banco Bonito based on a lack of evidence of other Tribes' use. First, a countervailing canon in aboriginal title doctrine requires courts, depending on the case's facts, to make inferential leaps when weighing scanty evidence of aboriginal title. Under this theory, "[b]ecause of the 'difficulty of obtaining the essential proof necessary to establish Indian title,' courts take a 'liberal approach' in weighing the limited historical evidence regarding exclusive use and occupancy." Native Vill. of Eyak v. Blank, 688 F.3d at 628 (quoting Nooksack Tribe of Indians v. United States, 3 Ind. Cl. Comm. 492, 499 (1955)). See Muckleshoot Tribe v. United States, 3 Ind. Cl. Comm. at 677 (stating that, because "it is extremely difficult to establish facts after the lapse of time involved in matters of Indian litigation," courts must "take a common sense approach" when evaluating exclusivity); Snake or Piute Indians v. United States, 112 F. Supp. 543, 552 (Ct. Cl. 1953)(stating that exclusivity "can only be inferred," because it is difficult to prove "as of a date too remote to admit of testimony of living witnesses"). In addition to the usual difficulty of providing evidence on historical uses, Zia Pueblo in particular was reluctant to share information on its current Valles Caldera uses. See Zia Interview at 2 (explaining Zia Pueblo's reasoning behind its reluctance to cooperate with the United States). Despite this reluctance, work from the 1970s and 1980s place Zia Pueblo throughout the Valles Caldera's

western half.  See FOF ¶¶ 587, 589-90, 593-99, 601, 606, 647, at 7, 8-12, 15-18, 38.  Zia Pueblo also crossed the Banco Bonito to access the Valles Caldera and its nearby culturally significant locations.  Other trial evidence shows other Tribes and Pueblos also extensively used the western Valles Caldera.  See FOF ¶¶ 583-84, 587-90, 593-99, 601, 606, 608-10, 612-13, 615, 620, 647, at 5-6, 8-13, 15-21, 23-25, 27-28, 39-40.  A member of a non-Jemez Pueblo Indian group also peeled a tree on Banco Bonito.  See FOF ¶ 611, at 22-23.  This is concrete evidence -- not "thin speculation" -- and when viewed liberally suggests that Jemez Pueblo was not the exclusive Banco Bonito user.  Spokane Tribe of Indians v. United States, 163 Ct. Cl. at 64.

666.   Finally, Jemez Pueblo's Motion does not challenge any facts underpinning the Court's earlier conclusion that other Tribes' Valles Caldera use has not been permissive, see Pueblo of Jemez v. United States, F. Supp. 3d at 1228-29, its conclusion that Jemez Pueblo did not dominate surrounding Tribes, see Pueblo of Jemez v. United States, F. Supp. 3d at 1225-26, or its conclusion that Jemez Pueblo has not used the Valles Caldera jointly and amicably with other Indian groups, see Pueblo of Jemez v. United States, F. Supp. 3d at 1224.  Although these conclusions applied to the Valles Caldera as a whole, see Pueblo of Jemez v. United States, F. Supp. 3d at 1222-23, Jemez Pueblo has not presented evidence from the trial suggesting that these conclusions are inapplicable to Banco Bonito specifically.  Jemez Pueblo has demonstrated that it was the primary Indian group using the Banco Bonito over several centuries, but the record also establishes that the Banco Bonito was "wandered over by many tribes," United States v. Pueblo of San Ildefonso, 518 F.2d at 1394, and that Jemez Pueblo did not have the right or the power to expel any of these Indian groups, see Native Vill. of Eyak v. Blank, 688 F.3d at 623.  Accordingly, Jemez Pueblo has not established aboriginal title to Banco Bonito.

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

667.    After reconsidering the trial evidence and the parties' arguments, the Court deletes one Finding of Fact -- ¶ 168, at 85 -- and amends three Conclusions of Law-- ¶¶ 442, 458, 463, at 513-14, 523-24, 526-27 -- from its previous Memorandum Opinion and Order.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1000, 1059, 1060.  The Court's amended Conclusions of Law, stated below, reflect that: (i) archeologists have not discovered Tewa pottery "in substantial quantities" on the Banco Bonito; (ii) Navajo Nation peoples did not twice drive Jemez Pueblo from the Valles Caldera; and (iii) Jemez Pueblo did not submit to Santa Clara Pueblo, San Ildefonso Pueblo and the Ute Tribe during an 1863 incident involving the latter Tribe's pursuit of Navajo Nation raiders.  For Conclusion of Law ¶¶ 442, 463, at 513-14, 526-27, the Court has amended its previous Conclusion of Law by deleting incorrect material.  For Conclusion of Law ¶ 458, at 523-24, the Court has replaced incorrect material with material from Finding of Fact ¶ 162, at 83, from its previous Memorandum Opinion and Order.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 998.  Although the Court has amended three Conclusions of Law, none of its amendments is substantial.  These  amendments do not change the Court's larger conclusions about Jemez Pueblo's aboriginal title claims.

### 1.    Amended Findings of Fact.

The Court deletes FOF ¶ 168, at 85, which found that "Navajo peoples at least twice drove Jemez Pueblo members from the Valles Caldera."  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1000.[90]

---

[90]As mentioned above, the Court previously found this fact.  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1000.  In finding this fact, the Court cited Nov. 6 Tr. at 1958:24-1961:19 (Ferguson, Marinelli).  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1000.  Upon re-

2.     **Amended Conclusions of Law**.

442.     The trial establishes that ancestral Keres and Tewa peoples would bring pottery with them on at least some trips to the Valles Caldera, and broken pottery fragments found throughout those lands prove that ancestral Keres and Tewa members actually and continuously used the Valles Caldera from at least 1250 C.E. through at least 1750 C.E.  See supra FOFs ¶¶ 75, 76, 77, 79-81, 83-84, 85, 87, 88, at 43-49.  Sites that archeologists affiliate with ancestral Tewa and Keres populations -- including the Valles Caldera's most robust ceramics evidence, which archeologists excavated at ███████ -- are the most common sites in the Valles Caldera's southeast and south central areas, i.e., the areas closest to ancestral Keres and Tewa villages.  See supra FOFs ¶ 89, at 49.  The ceramics record also demonstrates that ancestral Tewa and Keres peoples used the Valles Caldera's northern portions.  See supra FOFs ¶ 91, at 50.  The pre-Pueblo Revolt Tewa and Keres ceramics found at █████████ are especially probative of Tewa and Keres' Valles Caldera use, because Tewa and Jemez peoples did not trade pottery, or any goods, before the Pueblo Revolt, and trade between ancestral Jemez and other Tribes was so infrequent before the Pueblo Revolt that it accounted for less than three percent of pottery found at Jemez

---

reviewing the record, however, the record does not support the United States' proposed fact and the Court's initial finding.  Ferguson testified to one incident that C. Toya described in which Navajo Nation members attacked a group of Jemez Pueblo men and stole their cattle.  See Nov. 6 Tr. at 1956:14-1957:17.  The trial testimony does not describe a second incident, nor is it clear that the attack occurred in the Valles Caldera.  See Nov. 6 Tr. at 1960:12-18 (Ferguson)(suggesting that the attack occurred outside the Valles Caldera, but the chase occurred within the Valles Caldera).  Ferguson was testifying to two instances where Jemez Pueblo members drove Navajo Nation members from the Valles Caldera, not two instances where Navajo Nation members drove Jemez Pueblo from the Valels Caldera.  See also Nov. 6 Tr. at 1957:18-21 (Ferguson, Marinelli)(noting that Ferguson concluded that there were two instances in which Jemez Pueblo drove Navajo Nation members from the Valles Caldera).

Pueblo sites.  See supra FOFs ¶¶ 89, 90, at 49-50. Accordingly, although many groups, including ancestral Jemez Pueblo, used ████████, the Court concludes that the site is predominantly Tewa.  Jemez Pueblo pottery dominates the Banco Bonito, but the record also contains evidence that multiple Zia Pueblo ████████ traverse the Banco Bonito while pilgrimaging to numerous locations throughout the Valles Caldera, including ████████████.  See supra FOFs ¶¶ 69, 73, 86, at 38-40, 48.  The Court concludes that, because the predominant ceramics evidence found throughout the Valles Caldera has an ancestral Tewa and Keres affiliation, Tribes other than Jemez Pueblo actually and continuously have used those lands for a long time.

458.   The record contains two instances wherein Jemez Pueblo members attacked and defeated Navajo Nation members during the 1800s; however, these events do not establish Jemez Pueblo's dominance over the Navajo Nation, because the record also contains evidence that Navajo Nation members worshipped ████████, which Jemez Pueblo would not have permitted given that mountain's sacredness to Jemez Pueblo, and because the record reflects that Jemez Pueblo's low population during the eighteenth and nineteenth centuries made it vulnerable to Navajo and Apache raids on Jemez Pueblo's animals and food.  See supra FOFs ¶¶ 44, 162, 168, 174, 176, 535 n.170, at 16-17, 83, 85, 87, 238.  Therefore, even if the Court considers the Navajo Nation's presence in and use of the Valles Caldera as "scattered" and "few and far between" -- which the Court does not -- Jemez Pueblo has not shown that it had "complete dominion" over the Navajo Nation.  United States v. Seminole Indians of Fla., 180 Ct. Cl. at 383

463.   The record also does not support an inference that other Pueblos' Valles Caldera use was subject to Jemez Pueblo's permission, because such use was deliberate, longstanding and

substantial, that is, not sporadic or to facilitate trade. See Wichita Indian Tribe v. United States, 696 F.2d at 1385; Strong v. United States, 518 F.2d at 565.  As stated above, numerous Pueblos and Tribes have used the Valles Caldera to hunt, to gather plants, to collect obsidian, and to conduct other traditional practices in the centuries before trade occurred, i.e., during a period when Jemez Pueblo's relationship with these groups was either nonexistent or belligerent.  See supra FOFs ¶¶ 56, 58, 60, 72, 73, 74, 81 n.41, 89, 90, 110, 111, 112, at 28-33, 39-41, 46, 49-50, 58-59.  Moreover, Jemez Pueblo's relations with its neighbors were not universally warm in the centuries following the Pueblo Revolt, and the record evidences numerous, hostile engagements between 1680 and 1863.  See supra FOFs ¶¶ 162-66, 182-84, at 83-85, 89-90.  Hence, Santa Clara, San Ildefonso, Jicarilla, Navajo, and Ute members each used the Valles Caldera while adverse to Jemez Pueblo during periods spanning from 1300 C.E. through at least 1863, and use after the seventeenth century occurred when many Pueblos and Tribes outnumbered and were militarily superior to Jemez Pueblo.  See supra FOFs ¶¶ 156-66, at 81-85.  These adverse Tribes, at a minimum, therefore, did not use the Valles Caldera subject to Jemez Pueblo's permission, which, standing alone, defeats Jemez Pueblo's ability to benefit from the permissive-use exception to the exclusive use requirement.

**IT IS ORDERED** that the requests in Pueblo of Jemez' Opposed Motion and Memorandum in Support of its Motion to Reconsider and Alter Final Decision, filed with the Court September 28, 2019 (Doc. 405), filed publicly October 7, 2019 (Doc. 409), are granted in part and denied in part.  The Court has altered slightly its original opinion in Pueblo of Jemez v. United States to reflect that archeologists have not discovered Tewa pottery in substantial quantities on the Banco Bonito, Navajo Nation peoples did not twice drive Jemez Pueblo from the Valles

Caldera, and Jemez Pueblo did not submit to Santa Clara Pueblo, San Ildefonso Pueblo and the

Ute Tribe during an 1863 incident.  All other requests are denied.

UNITED STATES DISTRICT JUDGE

*Counsel*:

Frederick R. Petti
Petti and Briones, PLLC
Scottsdale, Arizona

--and--

Thomas E. Luebben, Jr.
Law Offices of Thomas E. Luebben
Sandia Park, New Mexico

--and--

Randolph H. Barnhouse
Kelli J Keegan
Justin J. Solimon
Christina S. West
Karl E. Johnson
Veronique Richardson
Dianna Kicking Woman
Tierra Marks
Michelle T Miano
Barnhouse Keegan Solimon & West LLP
Los Ranchos de Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Jeffrey Wood
  Acting Assistant Attorney General
Peter K. Dykema
Matthew Marinelli
Jacqueline M. Leonard
Amarveer Brar
Kenneth Rooney
Kristofor R. Swanson
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
Washington, D.C.

*Attorneys for Defendant United States of America*

Kirk R. Allen
Elizabeth Reitzel
Miller Stratvert P.A.
Albuquerque, New Mexico

*Attorneys for the Intervenor Defendant*